# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ORLEANS HOMEBUILDERS, INC., et al., | ) | Bankr. Case No. 10-10684 (PJW) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DEBTORS' MOTION FOR ORDER AUTHORIZING THEM (A) TO CONTRACT AND CLOSE ON SALES OF HOMES; (B) TO HONOR DEPOSITS AND OTHER CONTRACTUAL OBLIGATIONS; (C) TO SELL HOMES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (D) TO ESTABLISH PROCEDURES FOR THE RESOLUTION OF LIEN AND OTHER CLAIMS; AND (E) TO USE PROCEEDS OF HOME SALES IN ACCORDANCE WITH LIEN PROCEDURES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),[1] by and through their undersigned attorneys, hereby file this motion (the "Motion"),

---

[1] The other Debtors in these cases are: Brookshire Estates, L.P.; Community Management Services Group, Inc.; Greenwood Financial Inc.; Masterpiece Homes, LLC; OHB Homes, Inc.; OHI Financing, Inc.; OHI PA GP, LLC; OPCNC, LLC; Orleans Arizona Realty, LLC; Orleans Arizona, Inc.; Orleans at Bordentown, LLC; Orleans at Cooks Bridge, LLC; Orleans at Covington Manor, LLC; Orleans at Crofton Chase, LLC; Orleans at East Greenwich, LLC; Orleans at Elk Township, LLC; Orleans at Evesham, LLC; Orleans at Falls, LP; Orleans at Hamilton, LLC; Orleans at Harrison, LLC; Orleans at Hidden Creek, LLC; Orleans at Jennings Mill, LLC; Orleans at Lambertville, LLC; Orleans at Limerick, LP; Orleans at Lower Salford, LP; Orleans at Lyons Gate, LLC; Orleans at Mansfield LLC; Orleans at Maple Glen LLC; Orleans at Meadow Glen, LLC; Orleans at Millstone River Preserve, LLC; Orleans at Millstone, LLC; Orleans at Moorestown, LLC; Orleans at Tabernacle, LLC; Orleans at Thornbury, L.P.; Orleans at Upper Freehold, LLC; Orleans at Upper Saucon, L.P.; Orleans at Upper Uwchlan, LP; Orleans at Wallkill, LLC; Orleans at West Bradford, LP; Orleans at West Vincent, LP; Orleans at Westampton Woods, LLC; Orleans at Windsor Square, LP; Orleans at Woolwich, LLC; Orleans at Wrightstown, LP; Orleans Construction Corp.; Orleans Corporation; Orleans Corporation of New Jersey; Orleans DK, LLC; Orleans RHIL, LP; Parker & Lancaster Corporation; Parker & Orleans Homebuilders, Inc.; Parker Lancaster, Tidewater, L.L.C.; Realen Homes, L.P.; RHGP LLC; Sharp Road Farms Inc.; Stock Grange, LP; and Wheatley Meadows Associates, LLC. Tax identification and individual

(continued)

pursuant to Bankruptcy Code §§ 105(a), 363(b), (c), and (f), 506(b), 541, 546(b), 1107, and 1108 for an order authorizing the Debtors (a) to contract and close on sales of homes; (b) to honor deposits and other contractual obligations; (c) to sell homes free and clear of all liens, claims, encumbrances, and other interests; (d) to establish procedures for the resolution of lien and other claims; and (e) to use proceeds of home sales in accordance with the lien procedures (as described below). In support of the relief requested in this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## INTRODUCTION

2.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee has been appointed in these cases.

3.      Contemporaneously with the filing of this pleading, the Debtors have sought an order of this Court pursuant to Bankruptcy Rule 1015 directing that their Chapter 11 cases be jointly administered. The Debtors have also filed additional motions with the Court

---

case numbers are set forth in the Declaration of Benjamin D. Goldman in Support of Debtors' First-Day Pleadings.

(some of which are seeking emergency relief) in the proposed lead case of Orleans Homebuilders, Inc. ("OHB").

The Debtors and their Business[2]

4.    The Debtors build, develop, market, and sell single-family homes, townhouses, and condominiums to various segments of the homebuyer market. The Debtors also regularly purchase land and finished lots for development, improve land to be ready for home construction, obtain land entitlements, and invest in joint venture projects with other homebuilders.

5.    The Debtors pride themselves on building high-quality and affordable homes, using a combination of production-style construction techniques and a design center customization marketing approach. Indeed, they have won various awards, including JD Powers and Associates awards for home quality and designs in various divisions, and top rankings for being one of the fastest growing homebuilders from Builder magazine, one of the largest homebuilders from Big Builder magazine, and best homebuilder companies to work for from Professional Builder magazine, as well as various other product design and community of the year awards in various divisions from similar publications and homebuilding trade groups.

6.    The Debtors have developments or projects in the following regions:  (a) the Northern Region (including southeastern Pennsylvania, central and southern New Jersey, and Orange County, New York); (b) the Southern Region (including Charlotte, Raleigh, and

---

[2]    The description set forth herein is solely a summary of the Debtors, their corporate and capital structure, their operations, and the events leading to these Chapter 11 cases. For more information, please review the Debtors' public filings with the Securities and Exchange Commission, accessible at http://www.sec.gov and at http://www.orleanshomes.com.

Greensboro, North Carolina, including adjacent counties in South Carolina, and Richmond and Tidewater, Virginia); (c) the Midwestern Region (including Chicago, Illinois); and (d) the Florida Region (including Orlando, Florida). The Debtors' operations in Pennsylvania and New Jersey date back more than 90 years, and they have operated in Florida on and off since 1970. The Debtors have been in business in Virginia, North Carolina, and South Carolina since approximately 2000. Over the years, the Debtors have acquired other homebuilders, including Masterpiece Homes (Florida), Parker Lancaster Corporation (North Carolina and Virginia), and Realen Homes (Illinois and Pennsylvania).

7. Most of the Debtors' projects are "master-planned" residential communities where the Debtors purchase plots of land, obtain the necessary approvals, build several model homes and "spec" (constructed but unsold) homes, and then build additional "backlog" homes upon entering into sales contracts with homebuyers. The Debtors typically act as a general contractor and employ subcontractors to construct homes and install site improvements. The Debtors' agreements with subcontractors typically provide for a fixed price for work performed and materials supplied. The Debtors do not manufacture any of the materials or other items used in the development of their communities.

8. The Debtors have various non-debtor direct and indirect subsidiaries (the "Non-Debtor Subsidiaries")[3] that, among other things, offer supplemental services to

---

[3] These entities have not filed Chapter 11 petitions: Alambry Funding, Inc.; A. P. Orleans & Co.; A. P. Orleans, Incorporated (PA); A. P. Orleans, Incorporated (NJ); A. P. Orleans Real Estate Co., Inc.; Greenwood Orleans, Inc.; Lucy Financial, Inc.; Masterpiece Homes & Properties, Inc.; Meadows at Hyde Park, LLC; Moorefield Title Agency, L.C.; OAH Manager LLC; OHI NJ, LLC; OHI PA, LLC; OHI South Service Corp.; Orleans Abstract Member, LLC; Orleans Affordable Housing LP; Orleans Air LLC; Orleans Arizona Construction, LLC; Orleans at Aston, L.P.; Orleans at Dolington, L.P.; Orleans at

(continued)

homebuyers, including real estate brokerage, title and closing, and mortgage broker services. The Debtors provide administrative support for certain of the Non-Debtor Subsidiaries, including, for example, payroll and accounting services.

9.    For the six months ending December 31, 2009, the Debtors delivered 356 homes to homebuyers, generating approximately $132.7 million in revenue. For the same period, the Debtors recorded net new orders for 369 homes in the amount of approximately $134.5 million. As of December 31, 2009, the Debtors had approximately 589 homes in inventory, consisting of approximately 345 backlog units, 184 spec homes, and 60 owned model homes.

10.    The Debtors have approximately 305 employees, including 22 Alambry mortgage services employees. The majority of these employees are full-time employees, and none is a member of any union.

Capital Structure

*Background*

11.    OHB, a Delaware corporation, is a public company listed on the American Stock Exchange under the symbol "OHB."

12.    The Debtors' Chairman, President, Chief Executive Officer, and majority shareholder is Jeffrey P. Orleans, the grandson of the Debtors' founder, Alfred P. Orleans.

---

Florence, LLC; Orleans at Horsham, LP; Orleans at Illinois, LLC; Orleans at Lower Makefield, LP; Orleans at Monroe, LLC; Orleans at South Brunswick, LLC; Orleans Homebuilders Trust; Orleans Management, LLC; Orleans RHPA, LLC; Orleans-Wheatley Meadows, LLC; P & L Realty, Inc.; Quaker Sewer, Inc.; and Radnor Carpentry Corporation.

*Senior Secured Credit Agreement*

13.    On or about September 30, 2008, Greenwood Financial, Inc., and the rest of the Debtors, with OHB as guarantor, entered into a second amended and restated revolving credit loan agreement (as amended and modified on or about January 28, 2009, February 11, 2009, August 3, 2009, August 13, 2009, September 30, 2009, October 30, 2009, December 18, 2009, and January 25, 2010 (the "Senior Secured Credit Agreement")), with various banks as lenders (collectively, the "Senior Lenders") and with Wachovia Bank, National Association, as administrative agent ("Wachovia," or the "Agent"). The obligations under the Senior Secured Credit Agreement were guaranteed by OHB and the maturity date of the Senior Secured Credit Agreement, originally December 20, 2009, was extended through February 12, 2010, under certain terms and conditions. As of that date, the loan matured, and on February 17, 2010, the Agent sent the Debtors a Default and Reservation of Rights Letter.

14.    The Senior Secured Credit Agreement provided the Debtors with a revolving facility of up to $350 million[4] as of the Petition Date, subject to a defined borrowing base availability.[5] The Senior Secured Credit Agreement also originally provided for a swingline facility of $10 million and a letter of credit sublimit of $30 million.[6] The Debtors used the funds available under the Senior Secured Credit Agreement to support their operations.

---

[4]    This amount reflects various agreements to reduce the size of the facility from its original $650 million.

[5]    The definition of borrowing base was amended to remain until February 12, 2010, at the level reflected on the borrowing base certificate provided to the Agent on December 15, 2009 (as of November 30, 2009).

[6]    Pursuant to agreements with the Senior Lenders, swing line borrowings have been suspended, and no new letters of credit may be issued.

15. The Debtors' obligations under the Senior Secured Credit Agreement are secured by senior, first-priority liens on, among other things, all real estate, income tax refunds, inter-company debt, certain cash deposits, certain equity interests, certain pineland development credits, and life insurance policies under the Debtors' survivor benefit program.

Circumstances Leading to this Filing

16. The homebuilding industry has experienced a significant and sustained downturn characterized by decreased demand for new homes, an oversupply of both new and resale home inventories (including homes under foreclosure), a decline in average selling prices, and aggressive competition among homebuilders. The declining real estate market has negatively impacted homebuilders nationwide.

17. The decreased demand for new homes has been exacerbated by the credit crisis, which has made traditional mortgages more difficult to obtain, and their terms and pricing more onerous, resulting in a challenging lending environment for most prospective home buyers.

18. As a result of these and other external factors, the Debtors' consolidated revenue dropped from $987 million, for the fiscal year ended June 30, 2006, to $335 million, for the fiscal year ended June 30, 2009. While the Debtors reacted appropriately to the changing market conditions, including reducing net debt by approximately $185 million (31%); reducing spec home units by 53%; reducing total lots by 59%, including exiting certain markets in Florida and Arizona and reducing land exposure in Illinois; and reducing staff headcount by 67%, enabling the Debtors to be cash flow positive or neutral in 10 of the last 12 quarters, the Debtors violated certain covenants contained in the Senior Secured Credit Agreement (which has now matured).

19. The recent turmoil in the credit markets has also had an adverse impact on

the Debtors' continued access to needed financing. Despite their significant efforts, the Debtors were unable to obtain a heavily-negotiated maturity extension and structural modification to the Senior Secured Credit Agreement.

20.     Market conditions have not improved, and the Debtors do not have sufficient liquidity to continue operating normally outside of bankruptcy. Accordingly, the Debtors have concluded in their sound business judgment that commencing these Chapter 11 cases was necessary to provide them with the breathing space necessary to formulate a reorganization strategy that would allow them to continue as a going concern, for the benefit of all parties-in-interest.

## FACTUAL BACKGROUND

21.     The Debtors generally enter into a standard form of home sale contract, modified on a case-by-case basis, in part, to comply with jurisdictional requirements (collectively, the "Pre-Petition Contracts"). Each of the Pre-Petition Contracts typically contains terms, including, but not limited to, the payment of a deposit, the purchase price, design options for a home, procedures for paying closing costs, and inspection rights. As of the Petition Date, the Debtors were parties to approximately 389 home sale contracts that have not yet closed.

Home Sale Deposits

22.     Whereas the terms of the Pre-Petition Contracts vary, a deposit on the purchase price of a home, ranging from 2% to 10% of the purchase price, is typically required (each, a "Deposit," and collectively, "Deposits"). If the Debtors are unable to close on the sale of a particular home, they may be contractually obligated or required under applicable law to return any Deposit related thereto.

23.     In certain states or circumstances, Deposits must be held in escrow or trust

pending construction of the home. Historically, in those states where no special procedures are required under applicable law with respect to Deposits, the Debtors deposited, but did not segregate, such funds in their operating accounts.

24.     In order to ease concerns of potential buyers and to encourage customers to enter into new contracts in a difficult and competitive market, the Debtors have taken steps to ensure that all Deposits are currently in escrow and will continue to be placed in escrow on a going-forward basis. The Debtors estimate that they currently hold approximately $8.1 million in Deposits related to the Pre-Petition Contracts.

Operational Liens

25.     As part of their operations, the Debtors rely upon, routinely contract with, and are obligated to a number of third parties (each, an "Operational Lien Claimant" and collectively, the "Operational Lien Claimants"), that may be able to assert liens against or otherwise encumber the Debtors' property to secure payment for certain goods and services delivered or provided to the Debtors, or for other claims (the "Operational Lien Claims").[7] Many of the Operational Lien Claimants may have a right or interest, whether or not such right or interest has been exercised, under applicable law to assert and/or to perfect construction, materialman's, mechanics', or other statutory or common law liens (the "Operational Liens").[8]

---

[7]     Nothing set forth in this Motion is intended or should be construed as an admission as to the validity of any claim, lien, or interest against the Debtors or their property, a waiver of the Debtors' rights to dispute any claim, lien, or interest or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code § 365, and the Debtors reserve all related rights.

[8]     The Operational Liens addressed by this Motion include any liens or other interests that have been or may be asserted by taxing authorities pursuant to any federal, state, or local

(continued)

26.     The Operational Liens may attach in a number of different ways, and the time period within which the Operational Lien Claimants must assert or perfect liens varies depending on the applicable jurisdiction.  Furthermore, in certain states, the Operational Liens may attach simply by virtue of the Operational Lien Claimant's commencing work, whereas other states have more stringent notice and perfection requirements.  For example, in New York, a mechanic's lien may be filed any time after work commences or within eight months after work concludes.  N.Y. Lien Law § 10.  In New Jersey, by contrast, a mechanic's lien must be filed within 90 days after work concludes, subject to certain notice and arbitration requirements.  N.J. Stat. Ann. § 2A:44A-20.  Also, there is no requirement in North Carolina to give notice that a contractor intends to file a mechanic's lien, whereas in Illinois, a contractor intending to file a mechanic's lien must serve a notice of intent within 90 days after stopping work, see 770 ILCS § 60/24.

27.     In any event, pursuant to Bankruptcy Code § 362(b)(3), the act of perfecting the Operational Liens may not be subject the automatic stay to the extent such liens are unavoidable pursuant to Bankruptcy Code § 546(b).  The Operational Lien Claimants therefore may be entitled to assert and perfect the Operational Liens against the Debtors' property during these cases with respect to any pre-petition claims or post-petition claims that could serve as a basis for asserting or perfecting an Operational Lien.  In addition, the automatic stay would not prohibit an Operational Lien Claimant from asserting a lien against a property already conveyed to a buyer.

---

statute or regulation.

Lender Liens

28.     As described above, the Debtors' properties are subject to liens arising from the Senior Secured Credit Agreement (the "Lender Liens"). Specifically, the Debtors' indebtedness to the Senior Lenders is secured by a first priority lien on the Debtors' existing properties, including certain unsold homes (each, a "Mortgaged Property" and collectively, the "Mortgaged Properties").

29.     Pursuant to the Senior Secured Credit Agreement, the Debtors are authorized to sell homes to their customers in the ordinary course of business. Specifically, section 2.11.2 of the Senior Secured Credit Agreement provides that a Mortgaged Property "shall be released by the Senior Lenders from the liens of the applicable Mortgage" after receipt by the Senior Lenders of net sale proceeds.

30.     Certain title insurance agents and underwriters (the "Title Insurers") generally insure against financial loss from defects in title to real property sold by the Debtors. Among other things, the Title Insurers would normally indemnify home buyers for any unknown Operational Liens on the homes sold by the Debtors.

31.     Although it may not be customary for a the Title Insurers to remove mechanic's lien exceptions in all states in which the Debtors sell homes, it is highly unlikely that a homebuyer would purchase a home without removal of the mechanic's lien exception. Furthermore, the Title Insurers will not provide such insurance without confidence that the Operational Liens (and the Lender Liens) will attach to sale proceeds, not the homes they insure. Selling homes free and clear of the Operational Liens and the Lender Liens would provide much needed comfort to the Title Insurers and to the Debtors' customers.

**RELIEF REQUESTED**

32.     Pursuant to Bankruptcy Code §§ 105(a), 363(b), (c), and (f), 506(b), 541, and 546(b), the Debtors request entry of an order authorizing the Debtors (a) to contract and close on sales of homes; (b) to honor deposits and other contractual obligations as permitted by the budget approved by the DIP Lenders (as defined in the debtor-in-possession financing motion); (c) to sell homes free and clear of all liens, claims, encumbrances, and other interests; (d) to establish procedures for the resolution of lien and other claims; and (e) to use proceeds of home sales in accordance with the lien procedures (as described below).

The Proposed Operational Lien Procedures

33.     To protect the rights of the Operational Lien Claimants with valid and enforceable liens, the Debtors propose to establish the following procedures for the resolution and/or satisfaction of such liens, whether or not asserted or perfected (the "Operational Lien Procedures"):

(a)     The Debtors would be authorized to sell homes, which sales would be free and clear of <u>all</u> liens, claims, encumbrances, and other interests, including, without limitation, any and all of the Operational Liens and the Lender Liens;

(b)     None of the Operational Lien Claimants would have any claim against the Title Insurers, the Senior Lenders, the property sold, any owner of the property, or any subsequent purchaser with respect to the Operational Liens or any other claim that was or could be asserted, whether or not asserted or perfected;

(c)     Each Operational Lien Claimant seeking to assert a valid and enforceable Operational Lien would be required to send a written demand (a "Demand") to (i) the Debtors, Orleans Homebuilders Inc., 3333 Street Road, Suite 101, Bensalem, Pennsylvania 19020 (Attn: Lawrence J. Dugan); (ii) counsel to the Debtors, (a) Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005 (Attn: Joel H. Levitin, Esq., Michael R. Carney, Esq., and Maya Peleg, Esq.), and (b) Morris, Nichols, Arsht & Tunnel LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney, Esq. and Curtis Miller, Esq.); (iii) the Agent, (a) Wells Fargo Securities LLC, One

-12-

Wachovia Center, 301 South College Street, Charlotte, NC 28288-0737 (Attn: Nathan Rantala and Darrell Perry), (b) Capstone Advisory Group, LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, NJ 07663 (Attn: David Galfus), and (c) Capstone Advisory Group, LLC, 311 South Wacker Drive, Suite 2350, Chicago, IL, 60606 (Attn: Don Harer); (iv) counsel to the Agent, Reed Smith, LLP, 2500 One Liberty Place, 1650 Market Street, Philadelphia, PA, 19103 (Attn: Claudia Springer, Esq. and Scott Esterbrook, Esq.); and (v) counsel to any official committees appointed in these cases. Such Demand must (i) set forth the location of the property, (ii) state the amount of the asserted claim, (iii) describe, with particularity, the reasons the Operational Lien Claimant believes it has a valid and enforceable Operational Lien against the individual property sold, and (iv) attach documentation (e.g., invoices or purchase orders) or other information sufficient to demonstrate that a valid and enforceable Operational Lien Claim exists or could otherwise be asserted and perfected;

(d)     If, based on reasonable inquiry and evaluation, the Debtors determine that an Operational Lien is (i) valid and enforceable and (ii) senior to the Lender Liens, the Debtors would be authorized to pay the Operational Lien Claim as reflected in the applicable Demand from the applicable sale proceeds without further notice or order of the Court, provided that, the Debtors would provide reasonable notice to the Agent and counsel to the Agent of the intent to make such payment and if the Agent disagrees with the Debtors' determination, then subparagraph (f) below would apply;

(e)     If, based on reasonable inquiry and evaluation, the Debtors determine that an Operational Lien is (i) valid and enforceable and is (ii) not senior to the Lender Liens, the Operational Lien would transfer to and would attach to the proceeds of the sale of such property with the same priority as such Operational Lien is entitled to under applicable law or court order;

(f)     If the Debtors, the Agent, or the Operational Lien Claimant dispute the validity, extent, or priority of the claim asserted in a Demand, the parties would negotiate in good faith to resolve the dispute. If the dispute is not resolved within 30 days after receipt of such Demand (the "Resolution Period"), any party would be permitted to file a motion (a "Demand Resolution Motion") in this Court seeking a determination as to the validity, extent, and priority of the Operational Lien. A Demand Resolution Motion would be heard at the Court's next regularly scheduled omnibus hearing date or at such other time ordered by the Court;

(g)     Upon a determination by this Court that an Operational Lien is valid and enforceable, it would attach to the proceeds of the sale of the subject property, provided that, if the Court determines that such Operational Lien is senior to the Lender Liens, the Debtors would be authorized to pay the Operational Lien Claimant from the applicable sale proceeds within five

-13-

business days of the date that the order resolving the Demand Resolution Motion becomes a final order no longer subject to appeal, <u>provided further</u>, that if this Court determines that the Operational Lien is valid and enforceable but is <u>not</u> senior to the Lender Liens, the Operational Lien would transfer to and would attach to the proceeds of the sale of such property with the same priority as such Operational Lien would be entitled to under applicable law or court order.

34.    The Debtors also request authority to use proceeds from the sales of homes for general corporate purposes in the ordinary course of business without being required to escrow such proceeds; <u>provided</u>, <u>however</u>, that any use of home sale proceeds would be subject to the provisions of any applicable debtor-in-possession financing or cash collateral orders.

35.    The Debtors also request that filing of a copy of an order granting the relief sought herein in each county where the Debtors are selling residential units subject to this Order may be relied upon by all Title Insurers in order to issue title insurance policies on properties located within each such county.

## BASIS FOR RELIEF

36.    The Debtors' ability to satisfy their contractual obligations to homebuyers and to continue to sell homes during these cases is essential to the continuation of the Debtors' business and is vital to the preservation of enterprise value.[9]  Indeed, selling homes <u>is</u> the Debtors' principal business.  It is crucial to the Debtors' survival as a going concern that they have the ability to enter into home sale contracts and to close on the sale of homes, to honor Deposits, and to honor the terms of the Pre-Petition Contracts.  Specifically, to continue to close on sales of homes, the Debtors must be able to transfer title to homebuyers free and clear of all

---

[9]    The Debtors believe that they are authorized to continue to sell homes post-petition in the ordinary course of business.

liens, claims, encumbrances, and other interests, without the necessity of seeking and obtaining court orders for each individual sale.

The Debtors Should Be Permitted to Sell Homes Free and Clear

37.     Pursuant to Bankruptcy Code § 363(f), a debtor may sell property free and clear of liens, claims, encumbrances, and other interests if any one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     the [lienholder or claimholder] consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     [the lienholder or claimholder] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Because Section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale of homes.[10]  See Folger Adam Sec. Inc. v. De Matties/McGregor JV, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how Section 363(f) authorizes the sale of a debtor's assets free and clear if all liens, claims, and interests if

---

[10]     Moreover, if a holder of a lien, claim, encumbrance, or other interest receives the requisite notice of this Motion and does not object within the prescribed time period, such holder will be deemed to have consented to the proposed sale of homes, and the homes may then be sold free and clear of such holder's liens, claims, encumbrances, and other interests pursuant to the terms proposed herein.  See, e.g., Veltman v. Whetzel, 93 F.3d 517 (8th Cir. 1996) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of Bankruptcy Code § 363); In re Enron Corp., 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. Feb. 5, 2004) (same); Hargrave v. Pemberton (In re Tabore, Inc.), 175 B.R. 855 (Bankr. D. N.J. 1994) (same).

"any one of [the] five prescribed claims is met"); In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (property may be sold "free and clear" if at least one of the subsections of Section 363(f) is met); In re DVI, Inc., 306 B.R. 496, 503 (Bankr. D. Del. 2004) (same).

38.     Each lien, claim, encumbrance, or other interest in the Debtors' homes satisfies at least one of the five conditions set forth in Bankruptcy Code § 363(f).  First, the Debtors will likely satisfy Section 363(f)(2) with respect to the Lender Liens.  The Debtors anticipate that the Senior Lenders will consent to the sale of homes free and clear of all liens, as set forth in the Senior Credit Agreement, because such sales provide the most effective, efficient, and timely approach to ensuring the continuation of the Debtors' business as a going concern to preserve enterprise value.

39.     Second, because Operational Lien Claimants may be required to accept money damages in exchange for their interests, Section 363(f)(5) is satisfied.  See In re Trans World Airlines, 322 F.3d 283, 290-91 (3d Cir. 2003) (property sold free and clear of interests when claims were subject to monetary valuation and satisfaction).  This is especially true with respect to the Operational Liens, which exist solely to secure a monetary debt owed and are usually dischargeable upon payment of such debt.  See Statsky v. U.S., 993 F. Supp. 1027, 1029 (S.D. Tex. 1998) (statutory lien is charge on property for payment of a monetary debt).

40.     Indeed, the homes will be sold for amounts the Debtors, in the exercise of their business judgment, believe approximate at least their fair market value, and the holders of any liens thereon therefore could be compelled to accept money in satisfaction of their liens.  See In re WPRV-TV, Inc., 143 B.R. 315, 321 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part on other grounds, 983 F.2d 336 (1st Cir. 1993) (where

"properties . . . sold for the best price obtainable under the circumstances, and the liens will attach to the sale proceeds, the proposed sale [satisfies section 363(f)(5)] and may be approved").

41.     Further, in some cases, Section 363(f)(4) may apply to the extent the Debtors dispute the validity and/or enforceability of an alleged Operational Lien. Accordingly, the Debtors submit that at least one (if not more) of the subsections of Bankruptcy Code § 363(f) will be satisfied here such that the Court should approve the sale of the homes free and clear of liens, claims, encumbrances, and other interests as requested herein.

42.     Absent the relief sought herein, potential homebuyers may not proceed with home closings unless the Debtors provide assurance that the Operational Liens and the Lender Liens will not cloud title to the homes. Moreover, to the extent an Operational Lien is senior to the Lender Liens, such Operational Lien Claimants' pre-petition claims are likely less than the value of the homes and real property securing those claims. In that instance, the Operational Lien Claimants holding lien rights are likely over-secured creditors. In general, under Bankruptcy Code § 506(b), over-secured creditors are entitled to receive payment in full of their pre-petition claims under any confirmed plan. Consequently, approval of the Operational Lien Procedures, which provide a mechanism for the Debtors to resolve issues related to Operational Liens, to the extent they are senior in priority to the Lender Liens, would provide such Operational Lien Claimants with what they would be entitled to under a plan.

*To the Extent Required, the Operational Lien Claims Are Adequately Protected*

43.     The proposed Operational Lien Procedures contemplate paying any Operational Lien Claimants whose Operational Liens are senior to the Lender Liens pursuant to a fair, orderly, and transparent process. The Debtors therefore believe that they will not be using any cash collateral, as that term is defined in Bankruptcy Code § 363(a), in a manner that would

prejudice the Operational Lien Claimants. Out of an abundance of caution, the Debtors submit that to the extent any Operational Lien Claimant is entitled to adequate protection pursuant to Section 363(c), the Operational Lien Claimants are adequately protected by a replacement lien in the proceeds of the applicable home sale to the extent they have (or can assert and perfect) any valid and enforceable Operational Liens.

44.     Bankruptcy Code § 363(e) provides that this Court may authorize the use of cash collateral if holders of secured claims against such cash collateral are accorded adequate protection. The Bankruptcy Code does not define "adequate protection," but Bankruptcy Code § 361 provides that adequate protection may take the form of "an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."

45.     The critical purpose of adequate protection is to guard against diminution of a secured creditor's interest in collateral during the period when such collateral is being used by the debtor. In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization"). Because the proposed Operational Lien Procedures provide for replacement liens in home sale proceeds and pay all Operational Lien Claimants to the extent their Operational Liens are senior to the Lender Liens, no Operational Lien Claimant will be harmed during the period while Demands to determine the status of purported Operational Liens are resolved.

The Debtors Should Be Permitted to Continue Selling Homes and Honoring Deposits

46.     Bankruptcy Code § 105(a) empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

The purpose of Bankruptcy Code § 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (15th rev. ed. 1997); see also In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 843 (S.D.N.Y. 1991). Further, under the "necessity of payment rule" or the "doctrine of necessity,"[11] courts often allow the immediate payment of pre-petition claims. See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824 (Bankr. D. Del. 1999); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994). Indeed, courts in this District and elsewhere have invoked the equitable power of Section 105(a) and the doctrine of necessity to authorize the post-petition payment of pre-petition claims where payment is necessary to preserve the going concern value of a debtor's business. See, e.g., In re Smurfit-Stone Container Corp., Case No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009) (authorizing payment of pre-petition claims of shippers, warehousemen, and other lien claimants); In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008) (authorizing payment of certain pre-petition obligations to employees); In re WCI Cmtys., Inc., Case No. 08-11643 (KJC) (Bankr. D. Del. Aug. 5, 2008) (authorizing debtors to satisfy certain pre-petition obligations in connection with the sale of property free and clear of liens, claims, encumbrances and other interests).

47.     The Debtors submit that the need to honor pre-petition Deposits is of paramount importance to the Debtors' ongoing operations. Specifically, continuation of the Debtors' home-selling activities is critical to efforts to preserve the value of their estates, and is consistent with Bankruptcy Code §§ 363(c) and 1108, which authorize the continued operation

---

[11]     This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport, C&S W. R. Co., 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor to pay pre-petition claims in certain situations.

of a debtor's business in the ordinary course in Chapter 11. Indeed, under Section 363(b), the Debtors may use property of the estate outside of the ordinary course of business if it is within their sound business judgment, see In re Ionosphere Clubs, 98 B.R. 175, 175 (S.D.N.Y. 1989), and some courts have employed Section 363(b) to allow a debtor to pay a pre-petition claim as a transaction outside the ordinary course. See, e.g., In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002).

48. Although Bankruptcy Code § 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor. See In re Martin, 91 F.3d 389, 394-395 (3d Cir. 1996) (requiring "legitimate business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 799 (Bankr. D. Del. 2007) (applying sound business justification standard in authorizing modification of employee bonus compensation plan); In re Network Access Solutions, Corp., 330 B.R. 67, 74 (Bankr. D. Del. 2005); In re Montgomery Ward Holdings Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1991).

49. In these Chapter 11 cases, it is clear that sufficient business justification exists for the requested relief. Specifically, the Debtors' business is the construction and sale of homes, and they must retain the ability and authority to continue to make and sell homes in order to ensure adequate cash flow during these Chapter 11 cases. Failure to honor pre-petition Deposits and resolve the Operational Lien Claims upon closing would jeopardize the Debtors' ability to sell homes, as well as customer loyalty and trust. In short, the Debtors would not be

able to operate their business, thereby causing significant (if not fatal) harm to their enterprise value and survival as a going concern.

<u>The Debtors Should Be Allowed to Use the Proceeds of Home Sales</u>

50.　　The ability to use cash generated from home sales is critical to the Debtors' survival, and the Debtors will be unable to continue in business if they cannot use home sale proceeds to fund their general operations. The Debtors therefore propose that the Lender Liens would attach to the net proceeds home sales with the same force, effect, and priority as such liens currently have pursuant to the Senior Secured Credit Agreement. The Debtors would use such proceeds from home sales only in accordance with the terms of any orders approving post-petition financing and/or the use of cash collateral.

## SATISFACTION OF BANKRUPTCY RULE 6003

51.　　The Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003. As discussed above, it is imperative that the Debtors be permitted, immediately, to satisfy pre-petition obligations to customers and to sell homes free and clear of all liens, claims, encumbrances, and other interests, including, without limitation, any and all of the Operational Liens and the Lender Liens, in order to prevent immediate and irreparable harm to the Debtors. The Debtors must be able to carry on their business operations in order to survive. If the relief herein is not granted, the Debtors would effectively be prevented from continuing their principal business of selling homes, thereby causing irreparable harm to their estates and enterprise value.[12]

---

[12]　　See <u>In re New World Pasta Company</u>, 2004 WL 5651052, at *5 (Bankr. M.D. Pa. July 9, 2004) (where "the continued operation of the Debtors' businesses would not be possible . . . serious, immediate and irreparable harm to the Debtors and their estates would

(continued)

## REQUEST FOR WAIVER OF STAY

52.    For the reasons set forth above, any delay in implementing the relief sought herein would disrupt the Debtors' normal business operations and therefore would be detrimental to the Debtors, their creditors, and their estates. Accordingly and to successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of any order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

53.    Notice of this Motion has been served upon the Office of the United States Trustee for the District of Delaware, the 50 largest unsecured non-insider creditors of the Debtors on a consolidated basis, the Agent and counsel to the Agent, and the transfer agent for the stock of OHB. As this Motion is seeking first-day relief, notice hereof and of any order entered hereon will be served in accordance with Local Bankruptcy Rule 9013-1(m). Due to the urgency of the circumstances, the Debtors submit that no other or further notice of this Motion is required.

## NO PRIOR APPLICATION

54.    No previous request for the relief sought in this Motion has been made to this or to any other Court.

---

occur."); Northwest Airlines Corp. v. Assoc. of Flight Attendants-CWA (In re Northwest Airlines Corp.), 349 B.R. 338, (S.D.N.Y. 2006) (loss of an ongoing business can constitute irreparable harm).

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter of order, substantially in the form filed herewith, granting the relief requested herein and such other and further relief that may be just and proper under the circumstances.

Dated: Wilmington, Delaware
      March 1, 2010

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4586)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

CAHILL GORDON & REINDEL LLP

Joel H. Levitin
Michael R. Carney
Maya Peleg
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Proposed Attorneys for the*
*Debtors and Debtors-in-Possession*