# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ORLEANS HOMEBUILDERS, INC., et al., | ) | Bankr. Case No. 10-10684 (PJW) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |

## DECLARATION OF BENJAMIN D. GOLDMAN
## IN SUPPORT OF DEBTORS' FIRST-DAY PLEADINGS

Benjamin D. Goldman declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.     My name is Benjamin D. Goldman, and I am over 21 years of age.  I am of sound mind and, if called to testify, I will attest to the facts described herein.

2.     I am the Vice Chairman of the Board of Directors of Orleans Homebuilders, Inc ("OHB").  I have served as the Vice Chairman since my election in April 1998, and I have been a director since May 1992.  From May 1992 until April 1998 I was also the President and Chief Operating Office of OHB.  As such, I am familiar with the day-to-day operations, business, and financial affairs of each of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").[1]

---

[1]     The other Debtors in these cases are:  Brookshire Estates, L.P.; Community Management Services Group, Inc.; Greenwood Financial Inc.; Masterpiece Homes, LLC; OHB Homes, Inc.; OHI Financing, Inc.; OHI PA GP, LLC; OPCNC, LLC; Orleans Arizona Realty, LLC; Orleans Arizona, Inc.; Orleans at Bordentown, LLC; Orleans at Cooks Bridge, LLC; Orleans at Covington Manor, LLC; Orleans at Crofton Chase, LLC; Orleans at East Greenwich, LLC; Orleans at Elk Township, LLC; Orleans at Evesham, LLC; Orleans at Falls, LP; Orleans at Hamilton, LLC; Orleans at Harrison, LLC; Orleans at Hidden Creek, LLC; Orleans at Jennings Mill, LLC; Orleans at Lambertville, LLC; Orleans at Limerick, LP; Orleans at Lower Salford, LP; Orleans at Lyons Gate, LLC; Orleans at Mansfield LLC; Orleans at Maple Glen LLC; Orleans at Meadow Glen, LLC; Orleans at Millstone River Preserve, LLC; Orleans at Millstone, LLC; Orleans at Moorestown, LLC; Orleans at Tabernacle, LLC; Orleans at Thornbury, L.P.; Orleans at

3.	On the date hereof (the "Petition Date"), each of the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No trustee, examiner, or official committee has been appointed in these cases.

4.	I submit this declaration (the "Declaration") in support of the Debtors' petitions for relief under Chapter 11 of the Bankruptcy Code and certain First-Day Pleadings (as defined below).  All facts set forth in this Declaration are based upon my personal knowledge, information supplied or verified to me by other members of the Debtors' senior management and the Debtors' third-party advisors and professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.

5.	I have reviewed the Chapter 11 bankruptcy petitions filed by the Debtors, as well as the attachments thereto, and, to the extent necessary and required, I declare under penalty of perjury that the information set forth therein is true and correct to the best of my knowledge, information, and belief.

---

Upper Freehold, LLC; Orleans at Upper Saucon, L.P.; Orleans at Upper Uwchlan, LP; Orleans at Wallkill, LLC; Orleans at West Bradford, LP; Orleans at West Vincent, LP; Orleans at Westampton Woods, LLC; Orleans at Windsor Square, LP; Orleans at Woolwich, LLC; Orleans at Wrightstown, LP; Orleans Construction Corp.; Orleans Corporation; Orleans Corporation of New Jersey; Orleans DK, LLC; Orleans RHIL, LP; Parker & Lancaster Corporation; Parker & Orleans Homebuilders, Inc.; Parker Lancaster, Tidewater, L.L.C.; Realen Homes, L.P.; RHGP LLC; Sharp Road Farms Inc.; Stock Grange, LP;  and Wheatley Meadows Associates, LLC.  Tax identification and individual case numbers are set forth in the chart as attached hereto as Exhibit A.

<u>The Debtors and their Business</u>[2]

6.      The Debtors build, develop, market, and sell single-family homes, townhouses, and condominiums to various segments of the homebuyer market. The Debtors also regularly purchase land and finished lots for development, improve land to be ready for home construction, obtain land entitlements, and invest in joint venture projects with other homebuilders.

7.      The Debtors pride themselves on building high-quality and affordable homes, using a combination of production-style construction techniques and a design center customization marketing approach. Indeed, they have won various awards, including JD Power and Associates awards for home quality and designs in various divisions, and top rankings for being one of the fastest growing homebuilders from <u>Builder</u> magazine, one of the largest homebuilders from <u>Big Builder</u> magazine, and best homebuilder companies to work for from <u>Professional Builder</u> magazine, as well as various other product design and community of the year awards in various divisions from similar publications and homebuilding trade groups.

8.      The Debtors have developments or projects in the following regions: (a) the Northern Region (including southeastern Pennsylvania, central and southern New Jersey, and Orange County, New York); (b) the Southern Region (including Charlotte, Raleigh, and Greensboro, North Carolina, including adjacent counties in South Carolina, and Richmond and Tidewater, Virginia); (c) the Midwestern Region (including Chicago, Illinois); and (d) the Florida Region (including Orlando, Florida). The Debtors' operations in Pennsylvania and New Jersey date back more than 90 years, and they have operated in Florida on and off since 1970.

---

[2]      The description set forth herein is solely a summary of the Debtors, their corporate and capital structure, their operations, and the events leading to these Chapter 11 cases. For more information, please review the Debtors' public filings with the Securities and Exchange Commission, accessible at http://www.sec.gov and at http://www.orleanshomes.com.

The Debtors have been in business in Virginia, North Carolina, and South Carolina since approximately 2000. Over the years, the Debtors have acquired other homebuilders, including Masterpiece Homes (Florida), Parker Lancaster Corporation (North Carolina and Virginia), and Realen Homes (Illinois and Pennsylvania).

9. Most of the Debtors' projects are "master-planned" residential communities where the Debtors purchase plots of land, obtain the necessary approvals, build several model homes and "spec" (constructed but unsold) homes, and then build additional "backlog" homes upon entering into sales contracts with homebuyers. The Debtors typically act as a general contractor and employ subcontractors to construct homes and install site improvements. The Debtors' agreements with subcontractors typically provide for a fixed price for work performed and materials supplied. The Debtors do not manufacture any of the materials or other items used in the development of their communities.

10. The Debtors have various non-debtor direct and indirect subsidiaries (the "Non-Debtor Subsidiaries")[3] that, among other things, offer supplemental services to homebuyers, including real estate brokerage, title and closing, and mortgage broker services.

---

[3] These entities have not filed Chapter 11 petitions: Alambry Funding, Inc.; A. P. Orleans & Co.; A. P. Orleans, Incorporated (PA); A. P. Orleans, Incorporated (NJ); A. P. Orleans Real Estate Co., Inc.; Greenwood Orleans, Inc.; Lucy Financial, Inc.; Masterpiece Homes & Properties, Inc.; Meadows at Hyde Park, LLC; Moorefield Title Agency, L.C.; OAH Manager LLC; OHI NJ, LLC; OHI PA, LLC; OHI South Service Corp.; Orleans Abstract Member, LLC; Orleans Affordable Housing LP; Orleans Air LLC; Orleans Arizona Construction, LLC; Orleans at Aston, L.P.; Orleans at Dolington, L.P.; Orleans at Florence, LLC; Orleans at Horsham, LP; Orleans at Illinois, LLC; Orleans at Lower Makefield, LP; Orleans at Monroe, LLC; Orleans at South Brunswick, LLC; Orleans Homebuilders Trust; Orleans Management, LLC; Orleans RHPA, LLC; Orleans-Wheatley Meadows, LLC; P & L Realty, Inc.; Quaker Sewer, Inc.; and Radnor Carpentry Corporation.

The Debtors provide administrative support for certain of the Non-Debtor Subsidiaries, including, for example, payroll and accounting services.

11.     For the six months ending December 31, 2009, the Debtors delivered 356 homes to homebuyers, generating approximately $132.7 million in revenue. For the same period, the Debtors recorded net new orders for 369 homes in the amount of approximately $134.5 million. As of December 31, 2009, the Debtors had approximately 589 homes in inventory, consisting of approximately 345 backlog units, 184 spec homes, and 60 owned model homes.

12.     The Debtors have approximately 305 employees, including 22 Alambry mortgage services employees. The majority of these employees are full-time employees, and none is a member of any union.

Capital Structure

*Background*

13.     OHB, a Delaware corporation, is a public company listed on the American Stock Exchange under the symbol "OHB."

14.     The Debtors' Chairman, President, Chief Executive Officer, and majority shareholder is Jeffrey P. Orleans, the grandson of the Debtors' founder, Alfred P. Orleans.

*Senior Secured Credit Agreement*

15.     On or about September 30, 2008, Greenwood Financial, Inc., and the rest of the Debtors, with OHB as guarantor, entered into a second amended and restated revolving credit loan agreement (as amended and modified on or about January 28, 2009, February 11, 2009, August 3, 2009, August 13, 2009, September 30, 2009, October 30, 2009, December 18, 2009, and January 25, 2010 (the "Senior Secured Credit Agreement")), with various banks as lenders (collectively, the "Senior Lenders") and with Wachovia Bank, National Association, as

administrative agent ("Wachovia," or the "Agent"). The obligations under the Senior Secured Credit Agreement were guaranteed by OHB and the maturity date of the Senior Secured Credit Agreement, originally December 20, 2009, was extended through February 12, 2010, under certain terms and conditions. As of that date, the loan matured, and on February 17, 2010, the Agent sent the Debtors a Default and Reservation of Rights Letter.

16.     The Senior Secured Credit Agreement provided the Debtors with a revolving facility of up to $350 million[4] as of the Petition Date, subject to a defined borrowing base availability.[5] The Senior Secured Credit Agreement also originally provided for a swingline facility of $10 million and a letter of credit sublimit of $30 million.[6] The Debtors used the funds available under the Senior Secured Credit Agreement to support their operations.

17.     The Debtors' obligations under the Senior Secured Credit Agreement are secured by senior, first-priority liens on, among other things, all real estate, income tax refunds, inter-company debt, certain cash deposits, certain equity interests, certain pineland development credits, and life insurance policies under the Debtors' survivor benefit program.

<u>Circumstances Leading to this Filing</u>

18.     The homebuilding industry has experienced a significant and sustained downturn characterized by decreased demand for new homes, an oversupply of both new and resale home inventories (including homes under foreclosure), a decline in average selling prices,

---

[4]     This amount reflects various agreements to reduce the size of the facility from its original $650 million.

[5]     The definition of borrowing base was amended to remain until February 12, 2010, at the level reflected on the borrowing base certificate provided to the Agent on December 15, 2009 (as of November 30, 2009).

[6]     Pursuant to agreements with the Senior Lenders, swing line borrowings have been suspended, and no new letters of credit may be issued.

and aggressive competition among homebuilders. The declining real estate market has negatively impacted homebuilders nationwide.

19. The decreased demand for new homes has been exacerbated by the credit crisis, which has made traditional mortgages more difficult to obtain, and their terms and pricing more onerous, resulting in a challenging lending environment for most prospective home buyers.

20. As a result of these and other external factors, the Debtors' consolidated revenue dropped from $987 million, for the fiscal year ended June 30, 2006, to $335 million, for the fiscal year ended June 30, 2009. While the Debtors reacted appropriately to the changing market conditions, including reducing net debt by approximately $185 million (31%); reducing spec home units by 53%; reducing total lots by 59%, including exiting certain markets in Florida and Arizona and reducing land exposure in Illinois; and reducing staff headcount by 67%, enabling the Debtors to be cash flow positive or neutral in 10 of the last 12 quarters, the Debtors violated certain covenants contained in the Senior Secured Credit Agreement (which has now matured).

21. The recent turmoil in the credit markets has also had an adverse impact on the Debtors' continued access to needed financing. Despite their significant efforts, the Debtors were unable to obtain a heavily-negotiated maturity extension and structural modification to the Senior Secured Credit Agreement.

22. Market conditions have not improved, and the Debtors do not have sufficient liquidity to continue operating normally outside of bankruptcy. Accordingly, the Debtors have concluded in their sound business judgment that commencing these Chapter 11 cases was necessary to provide them with the breathing space necessary to formulate a

reorganization strategy that would allow them to continue as a going concern, for the benefit of all parties-in-interest.

<u>Filing of First-Day Pleadings</u>

23.     I understand that the Debtors have filed the following motions and applications (collectively, the "First-Day Pleadings"), among other pleadings, some of which seek fairly routine administrative or emergency relief, and certain of which the Debtors do not expect to be heard until a longer notice period has elapsed:[7]

*Routine and/or Administrative Relief Requested*:

        a.    Debtors' Motion for Joint Administration;

        b.    Debtors' Motion for Order (i) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, and (ii) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases; and

        c.    Debtors' Application to Retain and to Employ the Garden City Group, Inc. as Claims, Notice, and Balloting Agent.

*Emergency Relief Requested*:

        a.    Debtors' Motion for Orders Authorizing and Approving the (i) Maintenance and Continued Use of Existing Cash Management System, Including Existing Bank Accounts, (ii) Continued Use of Business Forms, and (iii) Temporary Waiver of Investment and Deposit Requirements;

        b.    Debtors' Motion for Entry of Orders Authorizing Them to Pay Pre-Petition Obligations to Certain Critical Vendors;

        c.    Debtors' Motion for Order Authorizing Payment of Pre-Petition Taxes;

        d.    Debtor's Motion Pursuant to Bankruptcy Code Sections 105(a); 363(b), and 507(a) for Authority to Pay Pre-Petition Employee Compensation, Benefits, Reimbursable Business Expenses, and Other Obligations and Related Administrative Costs;

---

[7]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First-Day Pleadings.

e.    Debtors' Motion for Order Authorizing, But Not Directing, the Debtors to Honor and to Maintain (a) The Mortgage Plus Program and (b) The Home Warranty Programs;

f.    Debtors' Motion for Interim and Final Orders Authorizing the Maintenance and Renewal of Surety Bonds, the Payment of Surety Bond Premiums, and Preventing the Sureties from Giving Any Notice of Termination or Otherwise Modifying or Canceling Any Surety Bonds;

g.    Debtors' Motion for Orders Authorizing Payment of Their Obligations to Homeowner Associations, Condominium Associations, and Other Community Organizations;

h.    Debtors' Motion for Order Authorizing Them (a) To Contract and Close on Sales of Homes, (b) To Honor Deposits and Other Contractual Obligations, (c) To Sell Homes Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (d) To Establish Procedures for the Resolution of Lien and Other Claims, and (e) To Use Proceeds of Home Sales in Accordance with Lien Procedures; and

i.    Debtors' Motion for an Order Pursuant to Bankruptcy Code §§ 105, 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001, and 9014 (i) Authorizing the Debtors (a) to Obtain Post-Petition Financing and (b) to Use Cash Collateral and (ii) Granting (a) Adequate Protection to Pre-Petition Secured Parties and (b) Related Relief.

*Motions and Applications to be Heard at a Later Date*:

a.    Debtors' Application for Authority to Employ and to Retain Cahill Gordon & Reindel LLP Nunc Pro Tunc to the Petition Date;

b.    Debtors' Application to Employ and to Retain FTI Consulting, Inc., Nunc Pro Tunc to the Petition Date;

c.    Debtors' Application to Employ and to Retain BMO Capital Markets Corp. as M & A Advisor, Nunc Pro Tunc to the Petition Date;

d.    Debtors' Application to Employ and to Retain Lieutenant Island Partners LLC as Consultant and Financial Advisor Nunc Pro Tunc to the Petition Date;

e.    Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals;

f.   Debtors' Motion for Order Authorizing Them to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of Business;

g.   Debtors' Motion for Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Payment, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment; and

h.   Debtors' Motion for Entry of Order Establishing Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to Bankruptcy Code § 503(b)(9).

**Routine and/or Administrative Relief Requested:**

Motion for Joint Administration

24.   I have been advised that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of the Debtors.

25.   I believe that joint administration of the Debtors' Chapter 11 cases will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to file duplicate motions, enter duplicate orders, and forward duplicate notices to creditors and other parties-in-interest, which would result in unnecessary cost and expense and potential delay and inefficiency. I also believe that designating Orleans Homebuilders, Inc., as the main bankruptcy case is appropriate because it is recognizable to the vast majority of creditors and other parties-in-interest, it is the direct or indirect corporate parent of the Debtors, its securities are publicly traded, and it is a public filer with the Securities and Exchange Commission.

<u>Motion for Order (i) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, and (ii) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases</u>

26.     I submit that requiring each of the Debtors to file a separate list of top twenty creditors in each of their respective cases would consume an excessive amount of the Debtors' scarce time and resources.  Moreover, as the Debtors will request the Office of the United States Trustee for the District of Delaware to appoint a single official committee of unsecured creditors, I submit that filing a consolidated list of the Debtors' 50 most significant unsecured creditors in these Chapter 11 cases in lieu of a list of the 20 largest for each Debtor is appropriate and necessary for the efficient and orderly administration of the Debtors' estates.

27.     Further, I understand that the Debtors have filed an application to retain and to employ a notice, claim, and balloting agent (the "Notice Agent") for their Chapter 11 case the Notice Agent will, to, among other things, (i) assist with compiling a creditor database from the Debtors' records and (ii) complete the mailing of notices to the parties in such database. Publication of the Case Commencement Notice by the Notice Agent is the most practical method by which to notify those creditors and other parties-in-interest who do not receive the Case Commencement Notice by mail thereby ensuring an efficient use of estate resources.  I believe that the proposed combination of notice by mail and publication will ensure that creditors in various locations receive prompt notice of the commencement of these Chapter 11 cases.

Debtors' Application to Retain and to
Employ the Garden City Group, Inc. as
Claims, Notice, and Balloting Agent

28.     It is my understanding that the Debtors have thousands of creditors and
other potential parties-in-interest.  Upon information and belief, the Office of the Clerk of the
United States Bankruptcy Court for District of Delaware (the "Office of the Clerk") is not
equipped to (a) distribute notices, (b) process all of the proofs of claim filed, and (c) assist in the
balloting process.  I believe that engaging an independent third party to act as an agent of the
Court and the Clerk's Office is the most effective, efficient, and cost conscious manner by which
to distribute notices, process proofs of claim, assist in the balloting process, and perform other
related administrative tasks for these cases.

29.     The Debtors seek to alleviate the demands placed on the Office of the
Clerk by proposing the retention by the Debtors of the Garden City Group, Inc. ("GCG").  I
believe that GCG is well qualified to serve in the capacity as claims, notice, and balloting agent
and that GCG's retention is in the best interests of the Debtors' estate.  I, along with other
representatives of the Debtors, chose GCG based on both its experience and the competitiveness
of its fees.

30.     Further, I believe that the rates to be charged by GCG for its services in
connection with noticing, claims processing, and the solicitation process are competitive and are
either at or below the rates charged by its competitors.

**Emergency Relief Requested:**

Debtors' Motion for Orders Authorizing and Approving the (i) Maintenance and Continued Use of Existing Cash Management System, Including Existing Bank Accounts, (ii) Continued Use of Business Forms and (iii) Temporary Waiver of Investment and Deposit Requirements

Description of the Debtors' Cash Management System

31.     During the ordinary course of their business, the Debtors historically have used the cash management system (the "Cash Management System") to fund their operations, as well as certain operations of Non-Debtor Subsidiaries.   The Cash Management System is an integrated, centralized mechanism through which the Debtors collect, concentrate, invest in overnight accounts, and disburse those funds borrowed pursuant to the Senior Secured Credit Agreement or generated by the Debtors' operations.   The Cash Management System also enables the Debtors to perform cash forecasting and reporting, to monitor the collection and disbursement of funds, and to maintain control over intercompany obligations and the administration of their Bank Accounts.   Although much of the Cash Management System is automated, the Debtors' employees are required to monitor the system and manage the proper collection and disbursement of funds.

*The Bank Accounts*

32.     The Debtors' cash is held in certain bank accounts (the "Bank Accounts").   One of the Debtors, Greenwood Financial, Inc. ("Greenwood Financial"), maintains an operating account (the "Greenwood Operating Account") with Wachovia.   Greenwood Financial is the main borrower under the Senior Secured Credit Agreement.   Historically, the Debtors' main source of cash used in their operations were borrowings under the Senior Secured Credit

Agreement into the Greenwood Operating Account, which in turn were disbursed to other of the Debtors.  These disbursements are documented as intercompany loans.

33.     In addition to the Greenwood Operating Account, in the ordinary course of their business, the Debtors also maintain regional accounts (the "Regional Accounts") in the various regions of the United States in which the Debtors do business.[8]  The Regional Accounts are used to fund general operating expenses, such as purchasing land and building supplies or paying contractors.

34.     The Regional Accounts also fund payroll accounts (the "Payroll Accounts") in the various regions in which the Debtors do business.[9]  The Payroll Accounts are used to fund payroll and related expenses of the Debtors and one of the Non-Debtor Subsidiaries, Alambry Funding, Inc. ("Alambry").   In the ordinary course of business, Alambry transfers funds from its operating account (which are not property of the Debtors' estates) to the Payroll Account of Debtor OHB Homes, Inc. ("Homes"), to cover its payroll and related expenses. Employees of Alambry are subsequently paid in the ordinary course from the Payroll Account used to pay employees of Homes.

---

[8]     The Regional Account for the Midwestern Region is maintained by Orleans RHIL, LP, with Wachovia.  The Regional Account for the Southern Region is maintained by Parker Lancaster & Orleans, Inc., with Wachovia.  The Regional Account for the Northern Region is maintained by Orleans Corporation with Wachovia.  The Regional Account for the Florida Region is maintained by Florida Masterpiece Homes, LLC, with Wachovia. Community Services Management, Inc. maintains similar accounts with Wachovia and RBC Bank.

[9]     The Payroll Account for the Midwestern Region is maintained by Orleans RHIL, LP, with Wachovia.  The Payroll Account for the Southern Region is maintained by Parker & Orleans Homebuilders, Inc., with Wachovia.  The Payroll Account for the Northern Region is maintained by OHB Homes, Inc., with Firstrust Bank.  The Florida Region does not maintain a separate Payroll Account.

35.     It is my understanding that in order to comply with state and local laws regarding home sales, in addition to traditional business practice in the homebuilding industry, home sale deposits and some portion of the purchase price for homes are held in escrow accounts ("Escrow Accounts") pending the sale closings.  After home sales close, the funds from such Escrow Accounts are transferred into the applicable Regional Accounts.[10]  In general, Escrow Accounts are held by third parties.

36.     In addition to the foregoing, OHB maintains an account with Wachovia (the "OHB Account").  The OHB Account is used to hold funds to pay the Debtors' corporate taxes and other required fees.  Additionally, Orleans Arizona Realty, LLC ("Orleans Arizona Realty"), maintains an account with an affiliate of Wilmington Trust Corporation to fund certain obligations, including rent and management fees.  Orleans Arizona Realty has no ongoing operations, but it owns the rights to certain of the Debtors' trade names and related intellectual property.

37.     In addition, several of the Debtors' offices or other locations maintain petty cash accounts, which are used by employees to pay expenses incurred on behalf of the Debtors.  Funds used as petty cash are held in the offices of various of the Debtors.

*Flow of Funds through the Cash Management System*

38.     <u>Cash Collection</u>:  As noted above, historically, the Debtors' operations were funded primarily by borrowings under the Senior Secured Credit Agreement that were wired into the Greenwood Operating Account.  The Debtors then disbursed these funds as intercompany loans to the Regional Accounts to support the Debtors' operations.

---

[10]     The Debtors recently added to the funding of their Escrow Accounts to include all outstanding customer deposits.

39. In the ordinary course of business, the Debtors also receive cash upon the closings of new home sales. In general, when the sale of a home closes, any deposits made with respect to such purchase, in many instances held in Escrow Accounts pending closing, were transferred into the applicable Regional Account, along with the remaining portion of the purchase price.

40. Prior to the Petition Date, the Debtors routinely transferred 100% of net home sale proceeds periodically to Wachovia to pay down their obligations under the Senior Secured Credit Agreement. It is my understanding that the Debtors' Motion for Order Authorizing Them, inter alia, to Sell Homes Free and Clear of All Liens, Claims, Encumbrances and Other Interests, discussed infra, contemplates that home sale proceeds will continue to be transferred to the Regional Accounts, each held with Wachovia. In addition, it is my understanding that as a result of the bankruptcy filings, Greenwood Financial will not have access to any new borrowings under the Senior Secured Credit Agreement. I submit that this flow of cash may be modified pursuant to the terms and conditions of applicable debtor-in-possession financing and/or cash collateral orders approved by the Court, and the Debtors will manage their cash pursuant to the terms and conditions of any such orders.

41. In addition to cash from home sales, the Debtors also collect cash through miscellaneous other means, such as vendor rebates, cash from merchandise returned by the Debtors, and other activities. In general, the Debtors transfer these funds into the Regional Accounts.

42. Overnight Investments: The Greenwood Operating Account and each of the Regional Accounts are swept nightly into various interest-bearing accounts (the "Evergreen Accounts") maintained by one of Wachovia's investment funds, Evergreen Investment Fund.

The following morning, the funds in the Evergreen Accounts, plus any interest that accrued overnight, are returned to the Greenwood Operating Account and to the Regional Accounts from which funds were swept the night before. In this manner, the funds swept nightly into the Evergreen Account produce income for the Debtors on their cash while preserving the Debtors' access to capital and liquidity during normal business hours.

*Benefits of the Cash Management System*

43. Because the Debtors conduct business operations in various locations throughout the country, I believe that it is critical that the Court approve the continued use of the Cash Management System, as proposed to be modified in the motion. The Cash Management System enables the Debtors to collect, transfer, and disburse funds generated by their operations, and to record accurately such collections, transfers, and disbursements as they are made.

The Debtors Existing Checks and Business Forms

44. It is my understanding that if the Debtors were required to re-create the Cash Management System, it would necessitate closing the Bank Accounts and opening numerous new accounts. I believe that the attendant delays would hamper the Debtors' ability to operate and to make use of cash collateral to the extent otherwise permitted by the Court while pursuing these arrangements. As a practical matter, because of the Debtors' corporate and financial structure, it also would be difficult and expensive to establish and maintain a separate cash management system and open new books and records for each of the Debtors.

Maintenance of the Cash Management System

45. I submit that the Debtors should be permitted to maintain the Cash Management System, because it enables them to generate necessary financial information accurately and on a timely basis and is important to the management of the Debtors' business. I

believe that some sort of cash management system is a necessary component of the Debtors' operations, and establishing a new cash management system would entail significant delay and cost and produce substantial disruptions of the Debtors' business, particularly when the Debtors are already subject to the usual operational dislocations attendant to a Chapter 11 filing.

46.     Moreover, I believe that to avoid delays in payments to administrative creditors, to ensure as smooth as possible of a transition into Chapter 11 with minimal disruption, and to aid in the Debtors' efforts to reorganize, it is important that the Debtors be permitted to continue to maintain the Bank Accounts with the same account numbers following the commencement of these cases, subject to a prohibition against honoring checks issued or dated before the Petition Date absent a specific order of the Court.  I have been advised that, as of the date hereof, the Debtors have already put in place a mechanism to ensure that pre-petition checks will not be honored until and unless this Court issues an order authorizing the Debtors to do so. Specifically, in order to ensure that pre-petition activity remains segregated from post-petition activity, the Debtors froze their Bank Accounts on the Petition Date pending further order of the Court.  The Debtors then instituted a check run, and they are in the process of designating those checks that may be cleared for payment pursuant to orders entered by this Court.

47.     Additionally, I have been advised that the use of the Bank Accounts substantially conforms to the approved deposit and investment practices required by of Section 345 of the Bankruptcy Code, as I understand it.

48.     Lastly, I believe that if Debtors have to close their Bank Accounts and open new accounts for each of the Debtors, it would cause an inefficient, unnecessary, and substantial administrative burden on the Debtors.  The Debtors would have to rework the Cash Management System completely, and the Debtors' already strained accounting staff and

management would focus immediately on opening new accounts and revising cash management procedures instead of their daily responsibilities. Such distractions would ordinarily be disruptive, but I believe they would be even more so as the Debtors transition into Chapter 11.

Continued Use of Business Forms

49. In the ordinary course of business, the Debtors use numerous varieties of checks and other business forms, including, but not limited to, multi-copy checks, purchase orders, invoices, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"). The Business Forms have been used by the Debtors for a number of years prior to the Petition Date, and the Debtors have significant quantities of Business Forms on hand for use as needed. Further, the Debtors have an automated mechanism to re-order Business Forms once supplies dwindle. Additionally, suppliers with whom the Debtors have ongoing relationships are familiar with the Debtors' Business Forms and are accustomed to restocking them upon request.

50. I submit that to minimize expenses, the Debtors also should be authorized to continue to use their Business Forms, without reference to their status as debtors-in-possession.

51. It is my understanding that in an effort to avoid confusion regarding the Debtors' status as debtors-in-possession, the Debtors will immediately cause the phrase "Debtor-in-Possession," as well as the lead case number for these cases, to be stamped or otherwise imprinted on their checks.

52. I believe that because parties doing business with the Debtors will be aware of the Debtors' status as a debtor-in-possession (all known creditors will be sent a notice of commencement of these cases, and such notice will be published in a national newspaper),

discarding the Business Forms and purchasing them anew would serve no useful purpose. I believe that any requirement that the Debtors abruptly discard their Business Forms, including their existing check stock, and moving new business forms into daily use solely on account of these cases would cause unnecessary expense, waste, delay, and confusion. I believe that the Debtors would also be severely burdened by having to replace the Business Forms as they would have to coordinate the implementation of new business forms across their operations throughout the country instead of focusing on more pressing issues attendant to these Chapter 11 cases.

<u>Debtors' Motion for Entry of Orders Authorizing Them to Pay Pre-Petition Obligations to Certain Critical Vendors</u>

53. In the ordinary course of business, the Debtors rely on certain third-parties to supply goods and services, without which the Debtors either could not operate or would operate at significantly reduced efficiency. The Debtors have established relationships with a number of third-party vendors and suppliers in each of their markets and I believe that these relationships ensure continued access to consistent labor and material and otherwise provide substantial savings and benefits. It is my understanding that these vendors provide the diverse products and services that are necessary at all stages of home construction and development. These products and services include, among other things, plumbing, electrical, lumber, appliances, fixtures, floor coverings, and other high quality equipment and materials.

54. It is my understanding that the vendors give the Debtors a level of certainty that materials of a specified quality will be provided, and services of a consistent quality will be rendered, in accordance with the various deadlines of the Debtors' projects. Accordingly, I believe that any disruption in the services of such vendors would likely have a detrimental impact upon the quality of homes built by the Debtors and impede the timely

completion of homes in accordance with customers' specifications. I submit that given the highly competitive markets in which the Debtors operate, such a disadvantage would lead to an immediate erosion in customer confidence and have an adverse affect on the Debtors' reputation, which could be impossible to restore.

55. I have been advised that the Debtors owe certain of these aforementioned vendors (each, a "Critical Vendor" and collectively, the "Critical Vendors") amounts for pre-petition goods and services. I believe that without the continued support of, and the goods and services to be provided by, the Critical Vendors, the Debtors may not be able to continue operating and producing homes without great added cost and likely delay.

56. I have been advised that despite the need for the receipt of essential goods and services, the Debtors historically have sought to bargain with their vendors to achieve the lowest price, the best service and quality, and the most favorable payment terms possible for each necessary product or service. The Debtors have developed valued relationships with many suppliers that have met the Debtors' standards for price, service, quality, and payment terms, and they hope to maintain and improve upon those vendor relationships on a post-petition basis and to continue to negotiate to ensure such standards going forward.

57. I submit that any refusal by the Critical Vendors to work with the Debtors post-petition would likely impair the Debtors' value as a going concern. I believe that the Debtors' construction and home sale operations could be severely disrupted if a Critical Vendor refused to provide goods or services on a timely basis and on acceptable terms. The Debtors' failure to receive any such goods or services could cause the shutdown of development projects until an agreement could be reached with the Critical Vendor in question or an alternate source

could be identified. I have been advised that such a situation would delay the completion of homes built and could precipitate a significant decline in sales.

58. Furthermore, I believe that beyond the impact on future home sales if the construction of homes is delayed or the Debtors fail to deliver homes to their customers' specifications, the Debtors risk delayed closings or home sale contract terminations. Even a temporary disruption of this sort in the Debtors' operations could result in a failure to meet their commitments to customers and may cause severe damage to the Debtors' reputation and customer relationships.

59. Additionally, I believe that a breakdown in supply relationships with one Critical Vendor may erode the confidences of others in the Debtors' ability to continue operations, thus resulting in a follow-on tightening of vendor liquidity and support at a time when the Debtors' relationships with their Critical Vendors already may be stressed by these Chapter 11 filings. On an emergency basis, the Debtors have requested authority to pay up to $7.5 million on the Critical Vendor Claims that they believe may come due or otherwise require payment within 21 days of the Petition Date.

Debtors' Motion for Order Authorizing
Payment of Pre-Petition Taxes

60. Prior to the Petition Date, and in connection with the normal operation of their business, the Debtors collected, withheld, or incurred certain taxes, fees, and charges ("Taxes and Fees"). I have been advised that the Debtors customarily remit Taxes and Fees to various federal, state, and local government, taxing, and licensing authorities (collectively, "Governmental Authorities").

*Income Taxes*

61.     The Debtors generally pay state and federal income taxes ("Income Taxes") on a quarterly basis.  It is my understanding that as a result of net operating losses, the Debtors only incur approximately $2,000, $5,500, and $12,500 per quarter of Income Taxes and related minimum tax obligations in New Jersey, New York, and Pennsylvania, respectively.

62.     I believe that the Debtors' next quarterly payments on account of Income Taxes (covering January 1, 2010, through and including March 31, 2010) are due on or about March 15, 2010.

*Personal and Real Property Taxes*

63.     The Debtors own property in Florida, Illinois, North Carolina, New Jersey, New York, Pennsylvania, South Carolina, and Virginia.  As a result of their direct and indirect property holdings in such states, I have been advised that the Debtors may be subject to state and local real property taxes ("Real Property Taxes") and personal property taxes ("Personal Property Taxes"), and have other related tax obligations to Governmental Authorities.

64.     It is my understanding that Personal Property Taxes are assessed against the Debtors by Governmental Authorities in North Carolina and Virginia and that Personal Property Taxes in these two jurisdictions are normally determined on an annual basis and paid in arrears.  I have been advised that the Debtors historically have paid annual Personal Property Taxes to Governmental Authorities in North Carolina and Virginia of approximately $30,000 and $10,000, respectively.

65.     I believe that approximately 1/6 (2 months) of such estimated amounts accrued prior to the Petition Date and remain unpaid.

66.     Real Property Taxes are normally determined on an annual basis, and depending on the state, such taxes are paid in arrears and remitted annually, semi-annually, or quarterly.  Consequently, there may be a significant lapse in time between the accrual date and the due date of Real Property Taxes and Personal Property Taxes.

67.     I believe that as of the Petition Date, based on historical averages, the Debtors may owe no more than $423,297 in accrued, but unpaid, Real Property Taxes.

*Real Estate Transfer Taxes, Mansion Taxes, and Roll Back Taxes*

68.     The Debtors pay real estate transfer taxes ("Transfer Taxes") in the ordinary course of business.  In general, it is my understanding that the Debtors' obligations to pay such taxes arise because states, counties, and municipalities impose taxes on transfers of real property.  Depending on the particular Governmental Authority, the transfer tax may be paid by the purchaser, the Debtors, or split evenly among the parties.

69.     I believe that there are no Transfer Taxes that accrued prior to the Petition Date that have not yet been paid.

70.     Certain states also impose "mansion" taxes ("Mansion Taxes") when the purchase price exceeds $1,000,000 or another specified amount for a particular home.  Although Mansion Taxes are generally paid by the buyer at closing, the Debtors may, in certain instances, have contractual obligations to pay Mansion Taxes.  It is my understanding that in order to facilitate the sale of a new home, the Debtors, in the ordinary course of their business, often reach agreements with purchasers of new homes to pay Mansion Taxes that would otherwise be payable by the purchaser.

71.     I believe that there are no Mansion Taxes that accrued prior to the Petition Date that have not yet been paid.

72.     Historically, the Debtors have been responsible for "roll back" taxes ("Roll Back Taxes") on certain development properties in New Jersey, North Carolina, and Pennsylvania.  Such Roll Back Taxes are applied when the use of all or a portion of property classified for a particular use is changed from a designation affording the owner a tax reduction and/or abatement to another designation that limits or denies such tax reduction and/or abatement.  For example, I have been advised that when land formerly used for agriculture is converted into a residential development, tax reductions and/or abatements applied to farmland may no longer be available, and the Debtors would then be required to pay Roll Back Taxes on account of the changed land use.

73.     I believe that there are no Roll Back Taxes that accrued prior to the Petition Date that have not yet been paid.

*Sales and Use Taxes*

74.     In the normal operation of their business, the Debtors are liable for and obligated to remit certain sales and use taxes ("Sales and Use Taxes") to Governmental Authorities.  It is my understanding that Sales and Use Taxes are generally attributable to certain purchases of tangible personal property from out-of-state vendors.  Specifically, I have been advised that if the vendor has no business operations within the state, it has no legal obligation to charge or remit Sales and Use Taxes for sales to parties within the state, and such taxes become the obligation of the purchaser.  The Debtors routinely incur Sales and Use Taxes in connection with the purchase of certain tangible personal property or services from vendors that do not have a connection to the state of residency of the purchasing Debtor.  It is my understanding that in these situations, the Debtors must self-assess the amount of Sales and Use

Taxes that would have been owed on account of purchases from out-of-state vendors and remit such amounts to the applicable Governmental Authorities.

75.     I believe that no more than $4,000 of Sales and Use Taxes accrued prior to the Petition Date but remain unpaid.

*Business Privilege Taxes, Franchise Taxes, Gross Receipts Taxes, and Regulatory Fees*

76.     The Debtors are required to pay various taxes, fees, and charges, including but not limited to franchise taxes, regulatory fees such as annual report filing fees, and privilege fees, to various Governmental Authorities in order to conduct their business.

77.     For example, the Debtors pay gross receipt taxes in North Carolina and Virginia of approximately $25,000 and $50,000, respectively.  Such taxes are annual business privilege taxes measured by gross receipts from business activities and are typically paid in April of each year.

78.     I believe that as of the Petition Date, the Debtors may owe $25,000 and $50,000 to Governmental Authorities in North Carolina and Virginia, respectively, on account of accrued, but unpaid, gross receipt taxes for calendar year 2009.  I believe that the Debtors may also owe no more than 1/6 (2 months) of such amounts on account of accrued, but unpaid, gross receipt taxes for calendar year 2010.

79.     The Debtors generally pay business privilege taxes to various Governmental Authorities, which generally do not exceed $1,000 per quarter.  With respect to Bensalem Township, Pennsylvania, however, the Debtors pay approximately $30,000 annually in business privilege taxes.

80.     I believe that as of the Petition Date, the Debtors may owe $30,000 to Governmental Authorities in Bensalem Township, Pennsylvania on account of accrued but

unpaid, business privilege taxes for calendar year 2009.  I believe that the Debtors may also owe approximately 1/6 (2 months) of such amounts on account of accrued, but unpaid, business privilege taxes for calendar year 2010.

81.     Moreover, the Debtors pay franchise taxes ("Franchise Taxes") on a quarterly basis to certain Governmental Authorities relating to the operation of their business.  Some states assess flat Franchise Taxes on all businesses, while other states assess Franchise Taxes based on net operating income, net worth, or a fixed formula of capitalization of income plus net worth.

82.     I believe that the Debtors pay approximately $20,000, $18,000, $2,000, and $24,000 in Franchise Taxes per quarter to the Governmental Authorities in Delaware, North Carolina, New York, and Pennsylvania, respectively.

83.     I believe that the Debtors' next quarterly payments on account of Franchise Taxes (covering January 1, 2010 through and including March 31, 2010) are due on or about March 15, 2010.

84.     I believe that it is necessary for the Debtors to pay the Pre-Petition Taxes when they become due because non-payment of certain Taxes and Fees may cause certain Governmental Authorities to take precipitous action, including but not limited to conducting audits, filing liens, and seeking to lift the automatic stay, or restricting the Debtors' ability to do business in certain jurisdictions, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs and burdens on the Debtors' estates.  I have been advised that prompt payment of Taxes and Fees will avoid these unnecessary and potentially costly governmental actions.

85. Furthermore, I have been advised that in certain instances, Governmental Authorities could subject the Debtors' directors, officers, or other employees to lawsuits or criminal prosecution during the pendency of these cases to the extent that Taxes and Fees remain unpaid. I believe that the threat of suit or prosecution, and any ensuing liability, would distract the Debtors' critical personnel from needed restructuring efforts to the detriment of all parties-in-interest. Finally, I believe that the dedicated and active participation of the Debtors' directors, officers, and employees is integral to the Debtors' operations and essential to the orderly administration of these bankruptcy cases.

<u>Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a); 363(b), and 507(a) for Authority to Pay Pre-Petition Employee Compensation, Benefits, Reimbursable Business Expenses, and Other Obligations and Related Administrative Costs</u>

<u>The Debtors' Obligations to their Workforce</u>

*Employee Compensation and Payroll Tax Obligations*

86. As of the Petition Date, the Debtors employed approximately 300 employees nationwide (each, an "Employee" and collectively, "Employees"),[11] including approximately 264 full-time Employees ("Full-Time Employees") and approximately 36 part-time Employees ("Part-Time Employees"). It is my understanding that Full-Time Employees are those that are

---

[11] In addition to the Debtors' Employees, one of the Non-Debtor Subsidiaries, Alambry Funding, Inc. ("Alambry"), employs approximately 22 individuals. In the ordinary course of business, Alambry transfers funds from its operating account (which is not property of the Debtors' estates) to the payroll account of Debtor OHB Homes, Inc. ("Homes"), to cover its payroll and related expenses. Employees of Alambry are subsequently paid from the Homes payroll account. Because Alambry essentially funds its own payroll, albeit by using administrative support from Homes, there is no effect on the Debtors as a result of this arrangement, and it should continue to be permitted.

scheduled to work 35 or more hours per week, and Part-Time Employees are those that are scheduled to work fewer than 35 hours per week. The Debtors pay Employees' wages ("Wages") in a variety of ways, which include those Employees paid (i) on an hourly rate basis, (ii) on a per-diem basis, (iii) exclusively through commissions, (iv) a combination of salary and bonus, and (v) salary plus commission. Although the Debtors divide Full-Time Employees into two categories, salaried ("Full-Time Salaried Employees") and hourly ("Full-Time Hourly Employees"), for benefits purposes, certain Full-Time Employees in both of these categories are paid an hourly rate. All Part-Time Employees are paid either on an hourly basis or per diem.

87. Full-Timed Salaried Employees in the Southern and Florida divisions are paid bi-weekly, on a lag basis, with pay day on Friday. Employees in these divisions are paid amounts earned through and including the Sunday prior to pay day. Full-Time Salaried Employees in the Debtors' other divisions are paid bi-weekly, on a current basis, with pay day on Friday. Employees in these other divisions are paid amounts earned through and including the Sunday following pay day. Ordinarily, this bi-weekly payroll, net of withholdings, aggregates approximately $528,000 for Full-Time Employees and approximately $10,000 for Part-Time Employees. All Full-Time Hourly Employees, as well as Part-Time Employees paid by the hour, are paid bi-weekly, on a lag basis, with pay day on Friday. Such Employees are paid amounts earned through and including the Sunday prior to pay day.

88. I understand that to facilitate payment, the Debtors engage a payroll service, Ceridian Corporation ("Ceridian") to process payroll for the Debtors. Ceridian processed an estimated $28.834 million in payroll in 2009. The Debtors pay Ceridian

approximately $68,000 per year in administrative fees ("Payroll Service Fees"). I have been advised that, as of the Petition Date, no Payroll Service Fees have accrued that have not yet been paid.

89. I believe that the aggregate amount of all accrued but unpaid Wages, net of payroll withholdings, for Employees should not exceed approximately $85,000. In addition, I understand that some checks or transfers may have been issued to certain Employees prior to the Petition Date and have yet to be presented for payment or may not have cleared through the banking system.

90. Additionally, because the Debtors' revenues come primarily from selling homes, many Employees are engaged in sales jobs ("Sales Employees"). As is typical for employees in sales, including those in the homebuilding industry, a portion of Sales Employees' compensation is tied to the sales of homes they generate. Accordingly, in addition to their salary, the Sales Employees are entitled to receive commissions ("Commissions") under various sales compensation programs.

91. Commissions are generally earned upon the closing of the sale of a home and are typically paid up to two months after they are earned. Certain Sales Employees, either because of their agreement with the Debtors or because they have just become commissioned (or potentially for other reasons), receive "forgivable draws." Similarly, certain other Sales Employees receive "advances" against Commissions, which act like temporary salary payments, and are deducted from future Commissions. If a contract for the sale of a home is cancelled, applicable Sales Employees must return advanced amounts to the Debtors. I believe that the

Debtors owe these Sales Employees approximately $77,000[12] for pre-petition Commissions earned.

92.     I understand that the Debtors are required by law to withhold from their Employees' pay all applicable federal, state, and local income taxes, state unemployment taxes, and social security and Medicare taxes (collectively, "Trust Fund Taxes").  In addition, I understand that the Debtors are required to match from their own funds social security and Medicare taxes withheld, and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, "Employer Payroll Taxes" and, together with Trust Fund Taxes, "Payroll Taxes").  The Debtors are also required to remit Payroll Taxes to the applicable taxing authorities, which is customarily done using Ceridian as an intermediary.  I believe that as of the Petition Date, the Debtors have withheld approximately $35,000 in Payroll Taxes that they have not yet remitted to Ceridian.

*Vacation and Other Paid Time Off*

93.     The Debtors provide certain of their eligible Employees with vacation pay and/or other paid time off.  Vacation benefits begin to accrue upon the respective Employee's commencement of employment with the Debtors, but Full-Time Salaried Employees[13] are only eligible to utilize vacation benefits after 30 days of employment, and Full-Time Hourly Employees are only eligible to take paid vacations after 180 days of employment.  In addition, until the fifth anniversary of their employment, Full-Time Salaried Employees are entitled to up to 10 paid vacation days per year.  Following the fifth anniversary of their employment, Full-

---

[12]     Such amount includes Commissions to be paid to terminated Employees that are entitled, pursuant to agreements with the Debtors, to Commissions on sales of homes closing up to 90 days after termination of their employment.

[13]     Employees paid entirely by Commissions are not entitled to vacation days, but are entitled to approved time off in accordance with company policy.

Time Salaried Employees are entitled to up to 15 paid vacation days per year.  Similarly, Full-Time Hourly Employees are entitled to five paid vacation days per year until the fourth anniversary of their employment and 10 paid vacation days per year thereafter.  I understand that any earned, unused, and accrued vacation is paid upon separation from the Debtors only if required by applicable law.  As of the Petition Date, I have been advised that approximately $317,634 of vacation time has accrued ("Vacation Obligations").

94.     The Debtors also recognize certain holidays and provide these holidays as a paid benefit to eligible employees.  Full-Time Salaried Employees are eligible for paid holiday benefits from the start of employment, and Full-Time Hourly Employees are eligible for paid holiday benefits following 180 days of employment.

95.     In addition, Full-Time Employees are eligible for paid sick leave.  Full-Time Employees are eligible for up to six days of paid sick leave per calendar year earned at a rate of one-half day per month.  Full-Time Salaried Employees are eligible to take sick leave following 30 days of employment, and Full-Time Hourly Employees are eligible to take sick leave following 180 days of employment.  Sick days that remain unused at the end of a calendar year may be carried forward.  Any earned, unused, and accrued sick leave is paid upon separation from the Debtors only if required by applicable law.  I believe that as of the Petition Date there are no amounts outstanding for unpaid sick leave.

96.     In addition, Full-Time Employees are eligible for up to five paid bereavement days in the event of a death in their immediate family, and up to three paid bereavement days to attend the funeral services of an aunt, uncle, niece, nephew, cousin, grandparent, grandchild, brother-in-law, or sister-in-law.  These benefits are available for Full-

Time Salaried Employees after 30 days of employment and for Full-Time Hourly Employees after 180 days of employment.

97.     Full-Time Employees are eligible for two weeks of paid military leave and are eligible for up to five days of paid jury duty leave.  I believe that as of the Petition Date there are no amounts outstanding for unpaid military and jury duty leave.

*Employee Incentive Programs*

98.     Certain Employees participate in various programs that provide for car allowances ("Employee Car Allowances"), bonuses (the "Employee Bonus Programs"), and other incentives, as described below.

99.     Employee Car Allowances consist of funds used to provide 87 Employees with vehicles.  Certain of these Employees are executives, and others receive Employee Car Allowances because of travel requirements, or because they are required to have cars or trucks on job sites.  Employee Car Allowances range from $150 to $900 per month.  Ordinarily, Employee Car Allowances total approximately $40,870 per month.  I believe that no more than $40,870 in Employee Car Allowances has accrued, but remains unpaid, as of the Petition Date.

100.    The Employee Bonus Programs consist of various programs pursuant to which the Debtors pay certain Employees bonuses in order to encourage superior performance.  Specifically, in the ordinary course of business, the Debtors pay (i) bonuses to certain Employees who oversee building operations for meeting predetermined production and quality targets ("Construction Bonuses"); (ii) discretionary bonuses to certain Employees ("Discretionary Bonuses"); (iii) bonuses based on achievements of certain performance metrics ("Performance Bonuses"); and (iv) bonuses that the Debtors are obligated to pay on account of certain employment agreements ("Contractual Bonuses").

101.    Payment on account of Construction Bonuses is typically made one to two months following the achievement of applicable targets related to threshold levels of homebuilding and home sales.  Because Construction Bonuses are not considered "earned" until they are paid, terminated Employees or Employees who voluntarily leave their employment with the Debtors are not entitled to receive Construction Bonuses.  Employees who are furloughed are entitled to receive Construction Bonuses, but only for sales of houses that have closed by the time such Employees receive notice of furlough.  On average, the Debtors pay approximately $30,000 per month in Construction Bonuses.  As of the Petition Date, I believe that approximately $30,000 is owed on account of accrued, but unpaid, Construction Bonuses.

102.    The Debtors' Chairman and Chief Executive Officer, in consultation with a committee of the board of directors (the "Compensation Committee"), may recommend that certain Employees receive Discretionary Bonuses.  The Compensation Committee must approve Discretionary Bonuses before they are awarded.  Discretionary Bonuses are awarded for a variety of reasons, but they are generally awarded to Employees in recognition of exemplary dedication and service to the Debtors.  I am of the understanding that as of the Petition Date no more than $1.6 million was recommended for use to pay Discretionary Bonuses.  These Discretionary Bonuses have not yet been approved by the Compensation Committee and have been neither awarded nor paid.

103.    Performance Bonuses are awarded to certain Employees upon the satisfaction of objective criteria or the achievement of certain benchmarks.  For example, Employees may be entitled to Performance Bonuses based on the achievement of set net sales targets and closings of home sales, meeting threshold requirements for revenues and other accounting metrics, and delivering homes to customers within a set period of time, among other

things. Performance Bonuses reward Employees entitled to receive them for success and are an important tool the Debtors use as an incentive to encourage superior performance. I believe that no more than approximately $200,000 in Performance Bonuses earned prior to the Petition Date remain unpaid.

104. Pursuant to their employment agreements with the Debtors, I believe that the (i) Director of Financial Planning and Analysis and Vice President and (ii) General Counsel are entitled to cash bonuses of $20,000 and $35,000 for fiscal year 2009, respectively. In addition, I believe that pursuant to his employment agreement with the Debtors, the Chief Financial Officer earned a signing bonus prior to the Petition Date, and the final installment of $150,000 is payable in February 2010, prior to the Petition Date. I also believe that the Chief Financial Officer's employment agreement entitled him to a minimum bonus of $175,000 due on December 31, 2009. Finally, I believe that according to his agreement with the Debtors, the Vice President and Controller earned a deferred cash bonus prior to the Petition Date, payable in installments of $25,000 each June of 2010, 2011, and 2012.

105. As of the Petition Date, I believe that the Debtors will owe no more than approximately $2 million pursuant to the Employee Bonus Programs that were awarded pre-petition, but remain unpaid.

106. From time to time, the Debtors also provide non-cash incentives ("Non-Cash Incentives") to certain Employees designed to recognize contributions, commitment, and loyalty. In a given year, up to 20 Employees may receive awards such as vacations and gift certificates, among other things. I believe that as of the Petition Date there are no accrued, but unpaid, Non-Cash Incentives.

*Expense Reimbursement Obligations*

107.     The Debtors customarily reimburse their Employees for certain expenses ("Reimbursement Obligations"), subject to established guidelines.   Generally, the Debtors reimburse Employees for a variety of business expenses incurred in the ordinary course of performing their duties on behalf of the Debtors.   For example, certain of the Employees are reimbursed for fuel or other transportation expenses, and others may incur expenses on home construction or other job sites or with respect to other matters.   I am of the understanding that as of the Petition Date these Employees may not have submitted expense reimbursement requests, or such requests may have been made, but not yet processed.   I believe that based on historical averages, as of the Petition Date, the amount of accrued, but unpaid, Reimbursement Obligations should not exceed approximately $25,000.   In addition, I believe that some checks or transfers may have been issued to certain Employees on account of Reimbursement Obligations prior to the Petition Date and have yet to be presented for payment or may not have cleared through the banking system.

Employee Benefits

*401(k) Plan, Survival Benefit Plan, and Deferred Compensation Plan*

108.     I understand that the Debtors maintain a tax-qualified defined contribution plan (the "401(k) Plan") pursuant to the requirements of the Internal Revenue Code of 1986, as amended, through which Employees can accumulate retirement savings.   I have been advised that each Employee may contribute up to a certain percentage of his or her pre-tax earnings to the 401(k) Plan subject to the ceiling set by the Internal Revenue Code and related guidance. Under the 401(k) Plan, the Debtors withhold, at each participating Employee's request, pre-tax pay for contribution to the 401(k) Plan, up to certain limits, and these contributions are fully vested immediately.   Specifically, after 30 days of employment, Full-Time Employees are

eligible to participate in the 401(k) Plan, and Part-Time Employees are eligible to participate in the 401(k) Plan after working at least 1,000 hours within a period of 12 consecutive months.

109.     In addition to allowing Employees to make pre-tax contributions to the 401(k) Plan, the Debtors provide matching contributions in accordance with the terms of the 401(k) Plan.  The Debtors match contributions under the 401(k) Plan at a rate of 50%-60% of a participant's salary and/or commission.  The matching contributions are capped at $3,000 and vest immediately.  I believe that as of the Petition Date, no more than $18,500 in matching contributions have accrued, but have not been remitted.

110.     The 401(k) Plan is administered by Prudential Retirement Services (the "Administrator"), and all fees for services related to the administration of the 401(k) Plan are paid out of the 401(k) Plan.  In addition, the Debtors remit contributions to the 401(k) Plan directly to the Administrator (the "401(k) Obligations").  I have been advised that contributions include wage deferrals collected from Employees through automatic withholding authorized by particular Employees, approximately $5,241 deducted each payroll period from certain Employees' checks to repay such Employees' borrowing from their individual retirement accounts, and the Debtors' own matching contributions.  I am of the understanding that, as of the Petition Date, no more than $62,500 in Employee wage deferrals were due, but not yet remitted, to the Administrator.  I have been further advised that pursuant to Department of Labor regulations at 29 C.F.R. § 2510.3-102, such Employee wage deferrals must be remitted to the Administrator as of the earliest date on which such contributions can reasonably be segregated from the Debtors' general assets.

111.     The Debtors historically provided a Supplemental Executive Retirement Plan (the "SERP") that covered 26 Employees (including certain former employees).  As of June

30, 2009, the Debtors terminated the SERP, including its retirement-benefit and disability-benefit portions, but the death-benefit portion remains in place in a new benefit plan known as the Orleans Homebuilders Executive Survivor Benefits Plan (the "Survivor Benefits Plan"). The Survivor Benefits Plan is partially funded through certain company-owned life insurance policies. Under the Survivor Benefits Plan, eligible Employees' survivors would receive annual supplemental benefits based upon the applicable Employee's total recognized compensation for the last three years of employment. I have been advised that as of the Petition Date no premiums have accrued, but remain unpaid, related to the life insurance policies in the Survivor Benefits Plan. I believe that approximately $1,257,083.34 in obligations to eligible survivors pursuant to the Survivor Benefits Plan have accrued, but remain unpaid, as of the Petition Date.[14]

112.    In addition to the 401(k) Plan and the Survivor Benefits Plan, the Debtors also maintain a non-qualified deferred compensation plan (the "Deferred Compensation Plan"). As of the Petition Date, approximately five Employees participated in the Deferred Compensation Plan. I have been advised that pursuant to the Deferred Compensation Plan, participants may elect salary or bonus as provided for in Internal Revenue Regulation 409A. I believe that, as of the Petition Date, approximately $240,000 in obligations pursuant to the Deferred Compensation Plan ("Deferred Compensation Obligations") have accrued, but remain unpaid.

---

[14]    I have been advised that the obligations to eligible survivors pursuant to the Survivor Benefits Plan are owed pursuant to a settlement agreement between the Debtors and the estate of the Debtors' former President and Chief Operating Officer, Michael T. Vesey. Pursuant to that settlement agreement, Kelly Vesey, Mr. Vesey's widow, is entitled to receive a cash payment in the amount of $179,583.33 to be paid in 2010, as well as additional annual  cash payments of $359,166.67 to be paid in each of 2011 through 2013.

113. The Debtors pay The Pangburn Company ("Pangburn"), the third-party administrator for the Deferred Compensation Plan, approximately $1,000 annually for providing recordkeeping functions and issuing of benefit statements, among other administrative duties. I believe that approximately $166 in administrative fees to Pangburn have accrued, but remain unpaid, as of the Petition Date.

*Tuition Savings Plan and Tuition Assistance Plan*

114. The Debtors also maintain a tax-advantaged education savings plan established under Internal Revenue Code § 529 (the "College 529 Plan"). I have been advised that, under the College 529 Plan, all of the Employees are eligible to contribute to a savings plan with certain tax benefits up to certain contribution limits prescribed by statute. Post-tax deductions are deposited into certain accounts (the "College 529 Accounts"), and earnings accumulate on a tax-free basis and can be used by contributing Employees to finance post-secondary education. I understand that only two Employees participate in the College 529 Plan and, as of the Petition Date, an amount of no more than $230 has been withheld, but remains unpaid.

115. In addition to the College 529 Plan, I understand that the Debtors also provide tuition assistance for certain Full-Time Employees with at least one year of service (the "Tuition Assistance Program"). Pursuant to the Tuition Assistance Program, participating Employees are entitled to receive reimbursement for matriculation in classes at post-secondary educational institutions in which such Employee received a grade of "C" or higher. I am of the understanding that, typically, benefits, pursuant to the Tuition Assistance Program, do not exceed approximately $15,000 per year. I believe, as of the Petition Date, the Debtors have no accrued, but unpaid, liability to Employees under the Tuition Assistance Program.

*Health and Welfare Benefit Obligations*

116.     The Debtors sponsor several health and welfare benefit plans or participate in mandatory government programs to provide benefits to the Full-Time Employees, including medical and health, life, AD&D, dental, vision care, short- and long-term disability, and flexible spending account, among others (the "Health Benefit Plans").   The Debtors pay obligations under the Health Benefit Plans (the "Health Benefit Obligations") out of general corporate assets.

117.     One of the Health Benefit Plans, the Debtors' medical plan (the "Medical Plan"), is self-insured through Independence Administrators (an affiliate of Blue Cross Blue Shield Association), with individual stop-loss coverage ranging from $100,000 up to $1,000,000 provided by Sun Life Financial, with the overall cost reduced by contributions of Employees electing coverage.   I understand that the Debtors' premiums for stop-loss coverage vary depending on the number of covered Employees.   I have been advised that, as of the Petition Date, there are no amounts outstanding on account of unpaid premiums to Sun Life Financial.   I have been further advised that the average weekly claims under the Medical Plan, subject to fluctuation depending on Employee claims, is approximately $50,000, and the average monthly administrative fee is approximately $53 per person enrolled.   Obligations related to the Medical Plan (the "Medical Plan Obligations") are paid on a weekly basis, as invoiced, and the administrative fee is paid on a monthly basis.

118.     As the Debtors self-administer the Medical Plan, participating Employees pay premiums withheld from their paychecks and health care providers file claims, which claims are paid by a third-party administrator.   Each year Employee claims related to the Medical Plan usually exceed the amounts paid by the third-party administrator.   The Debtors are obligated to

pay any such shortfall each year. I believe that for fiscal year 2009, that shortfall totaled approximately $1.1 million.[15]

119.     Because of the manner in which expenses are incurred and claims are processed under the Medical Plan, I have been advised that it is difficult for the Debtors either to determine or to estimate the total accrued obligations under the Medical Plan outstanding at any particular time. Specifically, because the obligations under the Medical Plan are largely dependent on Employee claims for benefits and are beyond the Debtors' control, I understand that it is impossible for the Debtors to project future Medical Plan Obligations. It is my understanding that the Debtors will not know the amount of the accrued, but unpaid, pre-petition Medical Plan Obligations until they receive invoices from the applicable insurers. A historical average has been used to estimate these amounts, which I have been advised are approximately $50,000 per month. I, therefore, believe that approximately $50,000 in Medical Plan Obligations has accrued, but remains unpaid, as of the Petition Date.

120.     The Debtors' dental plan (the "Dental Plan") is offered to Full-Time Employees through Metropolitan Life Insurance Company ("MetLife"). The overall cost of the Dental Plan is reduced by certain of the electing Employees' contributions, which vary depending on the coverage option chosen by each covered Employee. The Debtors pay an aggregate monthly premium of $14,100 for the Dental Plan (the "Dental Plan Obligations"), and as of the Petition Date, I believe that the Debtors will owe no unpaid premiums that have accrued but have not yet been paid on account of the Dental Plan Obligations.

121.     The Debtors also provide vision coverage (the "Vision Plan") to Full-Time Employees through Vision Service Plan. The overall cost of the Vision Plan is reduced by the

---

[15]     As of 2010, participating Employees are paying higher premiums under the Medical Plan. Thus, the Debtors anticipate a smaller shortfall for fiscal year 2010.

contributions of Employees who choose vision coverage, which vary depending on the coverage option chosen by each covered Employee. The Debtors pay an aggregate monthly premium of $2,100 for the Vision Plan ("Vision Plan Obligations"), and as of the Petition Date, I believe that no premiums that have accrued but have not yet been paid on account of the Vision Plan Obligations.

122. Through MetLife, the Debtors provide basic life insurance (the "Life Insurance Plan") at no cost to Full-Time Employees. Eligible Employees are provided with basic life insurance, with the actual amount of coverage determined by applying a multiple of "one times base pay" for Full-Time Employees, up to a maximum $100,000, and $40,000 for those employees paid solely by Commissions. The Debtors also provide accidental death and dismemberment insurance coverage (the "AD&D Plan") for their Employees through MetLife. The AD&D Plan provides coverage to eligible Full-Time Employees of $100,000, and $40,000 for those employees paid solely by Commissions. The Debtors pay an aggregate monthly premium of $2,200 for the Life Insurance Plan and the AD&D Plan (the "Life and AD&D Obligations"), and it is my understanding that as of the Petition Date, the Debtors will owe no unpaid premiums that have accrued but have not yet been paid to MetLife on account of the Life and AD&D Obligations.

123. As part of the Health Benefit Plans, the Debtors also offer supplemental long-term disability coverage (the "Long-Term Disability Plan") for Employees electing such coverage. Premiums related to the Long-Term Disability Plan are withheld from electing Employees' paychecks and remitted to MetLife. It is my understanding that as of the Petition Date, the Debtors owe no unpaid premiums that have accrued but have not yet been paid to MetLife on account of the Long-Term Disability Plan. The Debtors also provide short-term

disability coverage through MetLife (the "Short-Term Disability Plan") and as of the Petition Date, I understand that the Debtors will owe no unpaid premiums that have accrued but have not yet been paid to MetLife on account of the Short-Term Disability Plan.

124.     Also through MetLife, the Debtors offer voluntary life insurance coverage (the "Voluntary Life Insurance Plan") for Employees electing such coverage.  Premiums related to the Voluntary Life Insurance Plan are withheld from electing Employees and remitted to MetLife.  I am of the understanding that as of the Petition Date, the Debtors will owe no unpaid premiums that have accrued but have not yet been paid to MetLife on account of the Voluntary Life Insurance Plan.

125.     The Debtors provide their Full-Time Employees with the opportunity to elect coverage under the three "voluntary benefits" plans offered by Allstate Insurance Company, pursuant to which Full-Time Employees may select coverage for cancer, critical illness, and accident (the "Voluntary Benefits Plan").  The overall cost of the Voluntary Benefits Plan is funded entirely by the Employees who choose voluntary benefits.  Obligations related to the Voluntary Benefits Plan consist of required monthly premiums of approximately $1,005 per month paid by the Debtors, which act as a "pass-through."  I am of the understanding that as of the Petition Date, the Debtors owe no unpaid premiums that have accrued but have not yet been paid on account of the Voluntary Benefits Plan.

126.     Through PayFlex Systems USA, Inc. ("PayFlex"), the Debtors offer eligible Employees the opportunity to participate in a flexible spending plan (the "Flex Spending Plan"), which allows them to withhold, on a pre-tax basis, amounts for reimbursement of eligible medical, dental, and vision care expenses and dependent care expenses, up to limits set by the Debtors and the Internal Revenue Service.  The Debtors hold these withheld funds in an account,

which is drawn down by PayFlex two days after receiving claims from participating Employees. Similar to the Medical Plan, I have been advised that the Debtors do not know these amounts until PayFlex actually initiates a drawdown. Based on historical averages and the two-day payment lag, I am of the understanding that obligations under the Flex Spending Plan are approximately $35,000 per month. I have been advised that the administrative costs associated with PayFlex are approximately $690 per month. As of the Petition Date, I believe that there are no pre-petition administrative fees owed to PayFlex that remain unpaid.

127. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "COBRA"), I have been advised that the Debtors offer eligible former Employees the opportunity to continue insurance coverage under the Debtors' then-existing medical, vision, dental, and flex-spending plans. I have been further advised that any eligible former Employee who elects to participate in COBRA is entitled by law to such insurance coverage for up to 18 months. Certain former Employees have been provided with COBRA coverage for longer periods of time, however. Thirty-two of the Debtors' former Employees currently receive COBRA benefits, and 7 former Employees' COBRA elections are pending.

128. I have been advised that although the Debtors ordinarily do not pay any out-of-pocket costs under COBRA, as premiums are customarily paid entirely by former Employees electing COBRA coverage in accordance with the American Recovery and Reinvestment Act of 2009, the Debtors pay 65% of certain former Employees' COBRA premiums, which cost is reimbursed through a tax credit.

*Severance Program*

129. For some time, the Debtors have provided certain Full-Time Employees with severance (the "Severance Program") upon termination (other than for cause) based on such

Employees' length of service with the Debtors. Specifically, under the Severance Program, I understand that certain Full-Time Employees are entitled to receive two weeks of pay at their current base salary in lieu of notice and one week of pay at their current base salary for every year of prior service, capped at 12 weeks. It is my understanding that division presidents and corporate vice presidents are entitled to three months severance pay. Further, I have been advised that approximately six Employees have severance arrangements included in their respective employment agreements.

130. It is my understanding that all former Employees who have received payments pursuant to the Severance Program have signed agreements and/or waived any claims related to notice of termination with the Debtors. Because payments pursuant to the Severance Program are typically paid out in one lump sum, I am of the understanding that there are no amounts outstanding under the Severance Program that accrued but were unpaid as of the Petition Date.

Employee Deduction Obligations

131. As requested or required by law, the Debtors garnish Wages of certain Employees (the "Employee Deduction Obligations"). On average, the Employee Deduction Obligations total approximately $1,352 per pay period. I believe that, as of the Petition Date, there are no accrued, but unpaid, amounts with respect to the Employee Deduction Obligations.

Workers' Compensation Obligations

132. I have been advised that the laws of the various states in which the Debtors operate require them to maintain workers' compensation policies and programs to provide Employees with coverage for claims arising from or related to their employment (the "Workers' Compensation Programs"). I understand that the Debtors maintain the Workers'

Compensation Programs in all of the states in which they operate. I have been advised that payments to injured Employees, pursuant to the Workers' Compensation Programs, are made by insurance companies pursuant to workers' compensation polices for which the Debtors pay premiums (the "Workers Compensation Premiums"). I understand that Chartis, Inc., formerly known as AIG Company, through its insurance company, The Insurance Company of the State of Pennsylvania ("Chartis"), provides workers' compensation coverage for Employees in Florida, Illinois, New York, New Jersey, Pennsylvania, Virginia, and South Carolina. It is my understanding that Chartis also provides workers' compensation coverage for the Debtors' mortgage company Employees. I further understand that Erie Insurance Company ("Erie"), through a subsidiary, provides workers' compensation coverage for the Debtors' homebuilding Employees in Virginia. I have been advised that Erie also provides workers' compensation coverage for the Debtors' homebuilding Employees in North Carolina.

133. I submit that payment of all Employee Obligations, Payroll Service Fees, and Workers' Compensation Premiums in accordance with the Debtors' pre-petition business practices will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption and is therefore in the best interests of the Debtors' estates, their creditors, and all parties-in-interest. Indeed, I believe Employees are dependent upon the Debtors' regular payment of the Employee Obligations and also benefit from the Workers' Compensation Programs. I believe that if the Debtors fail to pay Employees what they are owed in a timely manner and leave Workers' Compensation Premiums unpaid, Employees may suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses, causing serious harm to them and their families, potentially making it difficult or impossible to continue their employment with the Debtors. I believe the same is true if the checks issued or

fund transfers requested in respect of the Employee Obligations, Payroll Fees, or Workers Compensation Premiums are neither honored by the Debtors' banks nor replaced by the Debtors.

134. Further, I believe that a significant deterioration in Employee morale—which would undoubtedly manifest if the relief requested herein is not granted—at this critical time, would have a devastating impact on the Debtors, their customers and vendors, the value of the Debtors' assets and business, and the Debtors' ability to continue operations.

Debtors' Motion for Order Authorizing, But
Not Directing, the Debtors to Honor and to
Maintain (a) The Mortgage Plus Program
and (b) The Home Warranty Programs

The Mortgage Plus Program

135. In the ordinary course of business, the Debtors, through their Mortgage Plus Program, provide incentives to homebuyers who use their Non-Debtor Subsidiary, Alambry Funding, Inc. ("Alambry"), a mortgage broker, to arrange for mortgage financing. Pursuant to the Mortgage Plus Program, the Debtors offer a number of incentives to homebuyers to obtain mortgage financing through Alambry, as opposed to other mortgage brokers. For example, homebuyers taking advantage of the Mortgage Plus Program are entitled to, among other things, one percent of the mortgage amount to be applied toward closing costs, refunds of certain appraisal and credit report fees (if certain conditions are met), and a one-year extension of certain home warranty coverage. Approximately 70% of the Debtors' homebuyers take advantage of the Mortgage Plus Program.

136. As part of the Mortgage Plus Program offered in Virginia, North Carolina, and South Carolina, the Debtors offer involuntary loss of employment income insurance ("Job Loss Insurance"), which is underwritten by Virginia Surety Company, Inc., and provided through Cynosure Financial Trust. I understand that if the homebuyer meets certain eligibility

requirements, Job Loss Insurance provides for up to $2,500 in monthly payments for up to seven months in the event the covered individual loses his or her job. The premiums for Job Loss Insurance are paid after closing. As of the Petition Date, I believe that there are no amounts outstanding on account of Job Loss Insurance premiums.

137.     Because the vast majority of transactions pursuant to the Mortgage Plus Program conclude at closing, and all benefits thereunder are transferred to the homebuyer at closing, I believe that the Debtors have no outstanding, pre-petition obligations pursuant to the Mortgage Plus Program.

The Home Warranty Programs

138.     Prior to the Petition Date and in the ordinary course of business, I have been advised that the Debtors implemented certain customer-related programs to protect their customers' purchases and to encourage new purchases, to enhance customer satisfaction, to sustain goodwill, and to ensure that the Debtors remain competitive in their markets. Most importantly, the Debtors offer and maintain the Home Warranty Programs.

139.     As is typical in the homebuilding industry, the Home Warranty Programs provided by the Debtors to all of their homebuyers are limited warranties, with slight variations, depending on the region and the particular program in effect at the time of purchase. I have been advised that in certain jurisdictions in which the Debtors operate, the Home Warranty Programs are legally mandated.

140.     I understand that in most states in which the Debtors operate, the Debtors' obligations under the Home Warranty Programs are administered by Residential Warranty Company, LLC and insured by Western Pacific Mutual Insurance Co. I understand that in

Florida, the Debtors' obligations are administered by Bonded Builders Warranty Group. I further understand that in Illinois, the Debtors self-administer the Home Warranty Programs.

141. I have been advised that most of the Home Warranty Programs provide that the Debtors will be responsible for certain specified conditions throughout the first year following a purchase. Participants in the Mortgage Plus Program may have year-one coverage extended for an extra year. Through year two, the Home Warranty Programs typically provide that the heating, cooling, ventilating, electrical, and plumbing systems will function as warranted. Finally, through year ten, the Home Warranty Programs generally provide that the homes will be free from major structural defects.

142. I have been advised that the Home Warranty Programs generally work as follows: The Debtors are responsible to repair any defects in years one and two of the warranties. If the Debtors refuse to fix the alleged defect, then the administrator will make the necessary repairs under the applicable warranty. In certain instances, the administrator may seek to assert indemnification or subrogation rights against the Debtors if they fail to make the repairs pursuant to valid warranty claims in years one and two. The administrator acts as warrantor for years 3 through 10 of the warranty, and subject to the Administrator's limited right of subrogation, the Debtors incur no further costs with respect to the warranty after year two, except in Illinois, where the Debtors are the warrantor for the life of the warranty.

143. For homes sold in Pennsylvania, New York, New Jersey, North Carolina, South Carolina, and Virginia, the Debtors pay third-party administrators a one-time fee for their administrative services upon the closing of a home sale. Fees in these states are approximately 0.053% of the total sale price of a home and are generally paid by the purchaser to the Debtors at the closing. The terms related to warranties for homes sold in Florida are similar.

144.    I understand that the majority of warranty claims are minor in nature and are made within 30 days of a home sale, but some warranty claims may allege more serious defects.  As a general policy, and in the interest of maintaining customer loyalty, the Debtors attempt to address and satisfactorily resolve all warranty claims during years one and two.  I have been advised that for fiscal year 2009, the Debtors' annual cost with respect to warranty claims was roughly $1.8 million.  In the aggregate, I believe that the Debtors exposure to pre-petition warranty claims is not more than $2,325,000.

145.    I believe that if the Debtors are unable to continue honoring their obligations related to the Mortgage Plus Program and the Home Warranty Programs, many of the Debtors' customers who relied in good faith on such programs could be left without short-term warranties on the homes they purchased.  Failure to honor their warranty commitments may irreparably harm the Debtors' customer relationships at a time when customer loyalty is most critical.  The Debtors may be unable to encourage new purchases and ensure that they remain competitive in their markets, which could jeopardize the Debtors' prospects to reorganize successfully.

146.    Furthermore, I submit that it is critically important to preserving the Debtors' going-concern value to maintain the loyalty and goodwill of their customers.  Buying a home is a significant investment based upon trust and confidence.  In addition to delivering quality homes and a positive home-buying experience, the Debtors must maintain positive customer relationships and the strong reputation of their brand.  Achieving these goals is likely to be particularly challenging while operating in Chapter 11; I believe that it would be impossible to retain their customer base and reputation unless the Debtors are granted the discretion to honor

their pre-petition obligations under the Mortgage Plus Program and the Home Warranty Programs.

<u>Debtors' Motion for Interim and Final Orders Authorizing the Maintenance and Renewal of Surety Bonds, the Payment of Surety Bond Premiums, and Preventing the Sureties from Giving Any Notice of Termination or Otherwise Modifying or Canceling Any Surety Bonds</u>

147.    It is my understanding that in the ordinary course of business, the Debtors are required to post bonds (the "Surety Bonds") as collateral to secure certain of their performance obligations under various contracts, principally in connection with infrastructure improvements that the Debtors are obligated to complete for various local governmental units as a condition for obtaining permits and other approvals necessary for the development of their projects.

148.    I have been advised that the Surety Bonds are provided by various companies that specialize in such issuances (the "Sureties"). Pursuant to various agreements, the Debtors may be obligated to indemnify the Sureties in the event of claims made against any of the Surety Bonds by governmental units. Typically, the Surety Bonds are released when the required infrastructure improvements are completed.

149.    I believe that the Debtors' aggregate annual premiums for the Surety Bonds are approximately $410,115, and the unpaid balance as of the Petition Date is not more than $31,000.

150.    I submit that maintaining the Surety Bonds, even to the extent it involves paying obligations incurred prior to the Petition Date, is an absolute necessity given the Debtors' contractual, statutory, and regulatory obligations. If the Debtors are unable to pay the Surety

Bond premiums, there is a significant risk that the Surety Bonds will be cancelled and/or called upon. I believe that without the Surety Bonds, the Debtors would be unable to conduct business in certain states and could lose valuable development rights issued by local governmental bodies with respect to ongoing real estate projects. An inability to conduct business or close on homes in certain states would significantly diminish the Debtors' going concern value.

151. Furthermore, I have been advised that preventing the Sureties from giving notice of termination or otherwise modifying or canceling the Surety Bonds without obtaining relief from the automatic stay imposed by Bankruptcy Code § 362 would aid in the administration of the Debtors' respective estates. I have been further advised that the Sureties may be unfamiliar with the protections afforded to debtors under the Bankruptcy Code, and affirming such protections would avoid the burden and expense of litigation relating to the Surety Bonds.

Debtors' Motion for Orders Authorizing Payment of Their Obligations to Homeowner Associations, Condominium Associations, and Other Community Organizations

152. It is my understanding that the Debtors typically incorporate non-profit homeowners or condominium associations or other community organizations (collectively, the "Associations") in conjunction with certain of their residential developments (each, a "Development" and collectively, the "Developments").

153. The Associations are managed pursuant to recorded governing documents (the "Governing Documents") that meet the requirements of applicable local laws. The rights and obligations provided in the Governing Documents apply to all homes or condominiums in their respective Developments. Although the Debtors initially control each of the Associations,

control is ultimately transferred to the homeowners when certain thresholds of houses or condominiums in the Associations are sold.

154.    While the Debtors still own homes in the Associations and have not yet sold all of them, the Debtors are required to pay dues and other obligations to the Associations ("Association Obligations").  I have been advised that Association Obligations are a critical source of funds used to maintain and to preserve common areas, and to enforce conditions, covenants, and regulations governing title to properties in the Developments.

155.    For each of the Associations, the Debtors are obligated (i) to fund any deficit in the Association's operating budget after accounting for Association Obligations paid by homeowners prior to turning over control and (ii) to pay Association Obligations for the unsold units that the Debtors own and hold in inventory even after turning over control.

156.    I have been advised that if the Debtors fail to pay Association Obligations, the Associations may be able to cause liens to attach to particular properties.  If such liens attach, in many instances, the Debtors will be unable to convey clean title to the property.  In addition, if the Debtors do not pay Association Obligations that fund certain of the Associations' operating budgets, the shortfall may be assessed among other property owners in the Associations.  Such circumstances would cause all homes in affected Developments to lose value.  I believe that prospective homeowners would either be unwilling to buy homes in a Development in which they face the prospect of increasing Association Obligations, or they would only purchase homes in such a Development at a deep discount.  I believe that in either case, the Debtors would lose revenue, and their going-concern value would suffer.

157.    I have been advised that Association Obligations are due on a monthly, annual, or quarterly basis, depending on the particular Development.  I believe that, as of the

Petition Date, there are no more than $190,000 of pre-petition Association Obligations that have not been paid.

158.    Selling homes is the Debtors' business, and their ability to do so is crucial to the Debtors' value as a going concern.  As mentioned above, I believe that if the Debtors are not allowed to pay pre-petition Association Obligations, liens may attach to unsold properties, assessments in such affected Developments may increase significantly and services may be reduced, each of which would adversely affect the Debtors' ability to market and sell homes in the affected developments.  In addition, I have been advised that pursuant to the Governing Documents of some of the Associations, to the extent Association Obligations are not paid, other homeowners may be assessed a surcharge to cover the shortfall.

159.    Further, I submit that the failure to honor pre-petition Association Obligations could potentially expose the Debtors to significant liability to the Associations, to the homeowners in the Developments, as well as to governmental authorities pursuant to applicable state and local laws.  Such liability could cause extensive and unnecessary litigation in these cases.  I have been advised that affected parties could possibly file adversary proceedings, move this Court to lift the automatic stay, or take other action.

Debtors' Motion for Order Authorizing Them (a) To Contract and Close on Sales of Homes, (b) To Honor Deposits and Other Contractual Obligations, (c) To Sell Homes Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (d) To Establish Procedures for the Resolution of Lien and Other Claims, and (e) To Use Proceeds of Home Sales in Accordance with Lien Procedures

160.    The Debtors generally enter into a standard form of home sale contract, modified on a case-by-case basis, in part, to comply with jurisdictional requirements

(collectively, the "Pre-Petition Contracts"). Each of the Pre-Petition Contracts typically contains terms, including, but not limited to, the payment of a deposit, the purchase price, design options for a home, procedures for paying closing costs, and inspection rights. I believe that, as of the Petition Date, the Debtors were parties to approximately 389 home sale contracts that have not yet closed.

Home Sale Deposits

161.    Whereas the terms of the Pre-Petition Contracts vary, a deposit on the purchase price of a home, ranging from 2% to 10% of the purchase price, is typically required (each, a "Deposit" and collectively, "Deposits"). I believe that if the Debtors are unable to close on the sale of a particular home, they may be contractually obligated or required under applicable law to return any Deposit related thereto.

162.    In certain states or circumstances, Deposits must be held in escrow or trust pending construction of the home. I understand that historically, in those states where no special procedures are required under applicable law with respect to Deposits, the Debtors deposited, but did not segregate, such funds in their operating accounts.

163.    In order to ease concerns of potential buyers and to encourage customers to enter into new contracts in a difficult and competitive market, I have been advised that the Debtors have taken steps to ensure that all Deposits are currently in escrow and will continue to be placed in escrow on a going-forward basis. I have been further advised that the Debtors currently hold approximately $8.1 million in Deposits related to the Pre-Petition Contracts.

Operational Liens

164.    As part of their operations, the Debtors rely upon, routinely contract with, and are obligated to a number of third parties (each, an "Operational Lien Claimant" and collectively, the "Operational Lien Claimants"), that I have been advised may be able to assert

liens against or otherwise encumber the Debtors' property to secure payment for certain goods and services delivered or provided to the Debtors, or for other claims (the "Operational Lien Claims"). I have been further advised that many of the Operational Lien Claimants may have a right or interest, whether or not such right or interest has been exercised, under applicable law to assert and/or to perfect construction, materialman's, mechanics', or other statutory or common law liens (the "Operational Liens").

165. I have been advised that the Operational Liens may attach in a number of different ways, and the time period within which the Operational Lien Claimants must assert or perfect liens varies depending on the applicable jurisdiction. Furthermore, in certain states the Operational Liens may attach simply by virtue of the Operational Lien Claimant's commencing work, whereas other states have more stringent notice and perfection requirements.

166. I have been advised that pursuant to Bankruptcy Code § 362(b)(3), the act of perfecting the Operational Liens may not be subject the automatic stay to the extent such liens are unavoidable pursuant to Bankruptcy Code § 546(b). It is my understanding that the Operational Lien Claimants therefore may be entitled to assert and perfect the Operational Liens against the Debtors' property during these cases with respect to any pre-petition claims or post-petition claims that could serve as a basis for asserting or perfecting an Operational Lien. In addition, I understand that the automatic stay would not prohibit an Operational Lien Claimant from asserting a lien against a property already conveyed to a buyer.

*Lender Liens*

167. The Debtors' properties are subject to liens arising from the Senior Secured Credit Agreement (the "Lender Liens"). Specifically, the Debtors' indebtedness to the Senior Lenders is secured by a first priority lien on the Debtors' existing properties, including

certain unsold homes.  I have been advised that pursuant to the Senior Secured Credit Agreement, the Debtors are authorized to sell homes to their customers in the ordinary course of business.

168.    It is my understanding that certain title insurance agents and underwriters (the "Title Insurers") generally insure against financial loss from defects in title to real property sold by the Debtors.  Among other things, I understand that the Title Insurers would normally indemnify home buyers for any unknown Operational Liens on the homes sold by the Debtors.

169.    Although it may not be customary for the Title Insurers to remove mechanic's lien exceptions in all states in which the Debtors sell homes.  I believe that it is highly unlikely that a homebuyer would purchase a home without removal of the mechanic's lien exception.  Furthermore, I understand that the Title Insurers will not provide such insurance without confidence that the Operational Liens (and the Lender Liens) will attach to sale proceeds, not the homes they insure.  Selling homes free and clear of the Operational Liens and the Lender Liens would provide much needed comfort to the Title Insurers and to the Debtors' customers.

170.    I submit that the Debtors' ability to satisfy their contractual obligations to homebuyers and to continue to sell homes during these cases is essential to the continuation of the Debtors' business and is vital to the preservation of enterprise value.  Indeed, selling homes is the Debtors' principal business.  I believe that it is crucial to the Debtors' survival as a going concern that they have the ability to enter into home sale contracts and to close on the sale of homes, to honor Deposits, and to honor the terms of the Pre-Petition Contracts.  Specifically, to continue to close on sales of homes, I believe that the Debtors must be able to transfer title to

homebuyers free and clear of all liens, claims, encumbrances, and other interests, without the necessity of seeking and obtaining court orders for each individual sale.

171.    Additionally, I believe that potential homebuyers may not proceed with home closings unless the Debtors provide assurance that the Operational Liens and the Lender Liens will not cloud title to the homes.  Approval of the Operational Lien Procedures, which provide a mechanism for the Debtors to resolve issues related to Operational Liens, to the extent they are senior in priority to the Lender Liens, would provide such Operational Lien Claimants with what they would be entitled to under a plan.

172.    Furthermore, I submit that the need to honor pre-petition Deposits is of paramount importance to the Debtors' ongoing operations.  Specifically, continuation of the Debtors' home-selling activities is critical to efforts to preserve the value of their estates.

173.    I believe that the ability to use cash generated from home sales is critical to the Debtors' survival, and the Debtors will be unable to continue in business if they cannot use home sale proceeds to fund their general operations.

Motion of the Debtors for an Order Pursuant to Bankruptcy Code §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 Authorizing the Debtors to (a) Obtain Post-Petition Financing and (b) Granting Adequate Protection to Their Primary Pre-Petition Secured Lenders

174.    I understand the Debtors' obligations under the Senior Secured Credit Agreement (the "Pre-Petition Debt") are secured by senior, first-priority liens on, among other things, all real estate, income tax refunds, inter-company debt, certain cash deposits, certain equity interests, certain pineland development credits, and life insurance policies under the Debtors' survivor benefit program.

## The Need for Post-Petition Financing

175.    I believe that on account of the recent degradation of the of the real estate market and general business environment, described, _supra_, the Debtors will soon lack sufficient liquidity to support their operations and survive as a going concern.  I believe that that the Debtors require the approval of post-petition financing, as quickly as possible, in order to meet their ongoing working capital and general business needs as they enter Chapter 11.

## The Proposed Post-Petition Financing

176.    Accordingly, the Debtors have sought post-petition financing consisting of (a) a priming, superpriority, non-amortizing revolving credit facility in the amount of up to $40,000,000 (the "DIP Revolving Facility") and (b) an $80,000,000 term loan (the "DIP Term Facility," and, together with the DIP Revolving Facility, the "DIP Facilities").  I also understand that the Debtors seek to use cash collateral and replace $80,000,000 of Pre-Petition Debt with the DIP Term Facility.  I understand that the DIP Facilities are being provided by certain Senior Lenders and other possibly other parties (in such capacity, the "DIP Lenders").

## The Terms of the DIP Facilities are Fair and Reasonable and Should Be Approved

177.    I understand that based on discussions with several potential third-party lenders, the Debtors determined that adequate post-petition financing solely on an unsecured or a junior priority basis to the Pre-Petition Lenders was not possible.  Further, I am not aware of any significant unencumbered assets that could be pledged to a third-party lender, thereby making it impossible to obtain financing.

178.    I believe that at their current levels of cash flow and expenditures, the Debtors will shortly run out of sufficient available cash required to operate their businesses.  I understand they continue to accrue expenses and liabilities, however.  I believe that it is therefore essential that the Debtors obtain post-petition financing to provide the necessary working capital

and operate as a viable going concern for the duration of these cases. I believe that such financing will allow them to continue their ordinary course, day-to-day business operations and satisfy the costs of administering their estates during the Chapter 11 process. I believe that, absent an immediate new source of cash and liquidity, not only would the Debtors' ability to maximize the value of their estates for the benefit of their creditors be jeopardized, but the Debtors may effectively be forced to shut down their operations in the short term and thereby risk losing much of (if not all) their going-concern value.

179. I understand when the Debtors determined that it was necessary to commence these cases to allow them to operate as a going concern and to preserve the value of their business enterprise, they endeavored to identify potential sources of post-petition financing. Based on discussions with several potential third-party lenders, I believe that adequate post-petition financing solely on an unsecured or a junior priority basis to the Senior Lenders was not possible. Further, I believe that without access to post-petition financing and the ability to use cash collateral, the Debtors would be unable to operate their business as a going concern. I believe that such a result would likely cause the Debtors to cease operations and destroy the value of their business enterprise, to the detriment of all parties-in-interest. I believe that through the DIP Facilities, including the ability thereunder to use cash collateral pursuant to terms set forth in the DIP Documents, the Debtors would be able to preserve the value of their assets throughout the duration of these cases. Moreover, I believe that the terms of the DIP Facilities are fair and reasonable given the Debtors' circumstances and reflect the exercise of their sound business judgment, as is consistent with their fiduciary duties.

180. I understand the vast majority of the Debtors' property (i.e., homes and real property to be sold) are secured by the Senior Lenders' first-priority liens. I believe that,

because of the substantial amount of Pre-Petition Debt, obtaining new financing the Debtors require in the form of unsecured debt or by offering prospective lenders claims for administrative expenses is not a viable option—especially from a third party with no existing interest in the Debtors to protect. Moreover, I believe that the Senior Lenders would not have agreed to the Debtors' granting any senior or <u>pari</u> <u>passu</u> liens to a new third-party debtor-in-possession lender. Indeed, I believe that any non-consensual attempt to prime the liens of the Senior Lenders would be costly and distracting, with potentially disastrous consequences for the Debtors and their estates.

181. After approaching the DIP Lenders about their financing needs, after much negotiation, the DIP Lenders presented the Debtors with a term sheet. I believe that, after much searching and negotiation, the terms set forth in the Terms Sheet are fair, reasonable, and present the Debtors with the best way to maintain the value of their business as a going concern. For example, I understand the Senior Lenders consented to the priming of their liens, provided the relief requested herein is granted and the DIP Order is entered; I believe they would not have done so under any other arrangement, and I believe that no other parties would have provided the Debtors with post-petition financing with out the Senior Lenders' consenting to a priming lien. In sum, I believe the Debtors currently cannot obtain adequate alternative financing terms more favorable than those provided the DIP Facilities.

182. Given the Debtors' current circumstances, I believe that the terms of the DIP Facilities are fair and reasonable. First, I understand the Debtors have made a concerted effort in good faith to obtain credit on the most favorable terms available. Despite the Debtors' broad search, I believe that no other lender was willing to provide a stand-alone facility to which the Senior Lenders would consent. I believe that obtaining such financing without consent

would, as mentioned above, likely have resulted in an expensive and distracting priming fight, as well as a similarly contentious battle over the use of cash collateral at the outset of these cases. In view of such a potentially disastrous scenario, I understand that the Debtors negotiated and evaluated various proposals from the DIP Lenders, and, eventually, agreed that the DIP Lenders' proposal best suits the Debtors' current and pressing need for new funding. I believe that the terms of the DIP Facilities were negotiated by the parties at arms' length and in good faith.

183. I understand the DIP Term Loan Facility provides for the roll-up of $80,000,000 of Pre-Petition Debt. I believe that the roll-up of the Pre-Petition Debt is appropriate and advantageous to the Debtors in this case. First, I believe that no alternative structure for the DIP Facilities was acceptable to the DIP Lenders that did not include the repayment of such amounts under the Pre-Petition Facility. I believe that this is significant because the Debtors were unable to obtain the financing they required on more favorable terms. I believe that the roll-up of the Pre-Petition Debt as set forth in the Term Sheet and DIP Order.

184. Further, I believe that the use of home sale proceeds (which I understand constitutes the vast majority of the Debtors' cash collateral) is necessary for the Debtors to have sufficient liquidity to survive during these cases and to preserve the value of their business enterprise. I believe that the Debtor's proposed use of cash collateral therefore prejudices no party-in-interest because, absent the use of home sale proceeds and other cash collateral, the Debtors' operations would shut down almost immediately: I believe that an increase in the Debtors' enterprise value will result on account of their use of cash collateral, especially when compared to the near certain alternative of a liquidation.

185. In addition, I believe that the proposed Adequate Protection granted to the Senior Lenders is fair and reasonable. Further, I understand that the Senior Lenders have agreed

that the adequate protection, as set forth in the Term Sheet, is sufficient for them to consent to the Debtors' use of cash collateral while the DIP Facilities remain.

186.    I believe that, after appropriate investigation and analysis, the Debtors' management and advisors have concluded that the DIP Facilities provide the best alternative available under the circumstances of these Chapter 11 cases.  I believe that the Debtors have exercised sound business judgment in determining that a post-petition credit facility along the lines of the DIP Facilities is appropriate.  I believe that the DIP Facilities should be approved.

**Motions and Applications to be Heard at a Later Date:**

<u>Debtors' Application for Authority to Employ and to Retain Cahill Gordon & Reindel LLP Nunc Pro Tunc to the Petition Date</u>

187.    To facilitate the successful reorganization of their business, and for bankruptcy advice and counsel during these cases, I believe the Debtors require the services of attorneys with knowledge and experience in numerous areas of law, including, without limitation, bankruptcy, restructuring, finance, tax, environmental, employee benefits, litigation, real estate, and general corporate and securities law matters.  The Debtors have selected Cahill Gordon & Reindel LLP ("Cahill") as their bankruptcy and restructuring counsel in these cases because of its considerable experience in such and other critical matters, and its knowledge of the Debtors and their operations.

188.    To the best of my knowledge, information, and belief, and except as disclosed in the Levitin Affidavit, the partners, associates, and other professionals of Cahill have no relationship to the Debtors or to any other parties-in-interest in these cases known to Cahill and anticipated to be adverse to the Debtors on any significant matters.

Debtors' Application to Employ and to
Retain FTI Consulting, Inc., Nunc Pro Tunc
to the Petition Date

189.     FTI was initially engaged by the Debtors pursuant to an engagement letter, dated August 20, 2009, to assist them in connection with a potential restructuring of their operations and recapitalization of their funded debt.  The terms of FTI's engagement were modified by an engagement letter, dated February 26, 2010.

190.     The Debtors propose to continue FTI's engagement during the course of these cases because the Debtors are familiar with the professional standing and reputation of FTI. I understand that FTI has a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex Chapter 11 cases on behalf of debtors and creditors throughout the United States.  I submit that FTI is well qualified to advise the Debtors during these cases.

191.     I believe that FTI's resources, capabilities, and experience, including their knowledge of the Debtors' business and operations, will better enable the Debtors to manage and improve operations during these cases.  An experienced financial restructuring advisor such as FTI fulfills a critical service that complements management, as well as the services provided by the Debtors' other professionals.

192.     I have been advised by FTI that it will endeavor to coordinate with the other retained professionals in these cases to eliminate unnecessary duplication or overlap of work.

193. Prior to the commencement of these Chapter 11 cases, the Debtors retained BMO Capital Markets Corp. ("BMOCM") to assist them in connection with a potential sale of the Debtors' operations, the potential sale of equity securities, or the creation of a joint venture, pursuant to the terms of an engagement letter, dated December 4, 2008.

194. The engagement of BMOCM was subsequently amended by letter agreement, dated August 25, 2009, to provide for a potential restructuring of the Debtors' operations and recapitalization of their funded debt and other obligations and to aid in negotiations with the Senior Lenders. The engagement of BMOCM was then further amended by letter agreement, dated February 26, 2010, to provide for assistance in connection with a potential sale of the Debtors' operations, including in connection with these Chapter 11 cases.

195. I am familiar with the professional standing and reputation of BMOCM. I understand that BMOCM has extensive experience in providing advisory services and enjoys an excellent reputation in the investment banking community for services it has rendered at a national level in matters of this character. I believe that BMOCM has an excellent reputation in the investment banking community for its knowledge of and expertise within the Debtors' industry.

196. In addition to BMOCM's understanding of the Debtors' financial history, financial outlook, business operations, and the industry in which the Debtors operate, BMOCM and its professionals have extensive experience in sales of distressed assets. BMOCM's employees have advised debtors, purchasers, and equity constituencies in many distressed asset sales.

197.     In providing pre-petition services to the Debtors in connection with these matters, BMOCM's professionals worked closely with the Debtors' management and other professionals and became well-acquainted with the Debtors' operations, debt structure, creditors, businesses, operations and related matters.  As such, I believe BMOCM has developed extensive knowledge regarding the Debtors that will be valuable to the Debtors in their efforts to reorganize and assist BMOCM in providing effective and efficient services in the these cases.

198.     With its experienced professionals, BMOCM fulfills a critical role that complements the services provided by Lieutenant Island, discussed infra, and the Debtors' other restructuring professionals.  Given the size and complexity of these cases, and the specific and respective expertise of BMOCM and Lieutenant Island, I believe that having two advisors is warranted and will be beneficial to the estates and all other parties-in-interest.

199.     I also believe that the services of BMOCM are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  Further, BMOCM is well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner due in part to BMOCM's global resources and capabilities, together with its pre-petition experience advising the Debtors.

200.     I believe that the compensation structure, in the Engagement Letters, constitutes fair and reasonable terms and conditions for the retention by the Debtors of BMOCM as its financial advisor.  I have been advised that BMOCM and Lieutenant Island will endeavor to coordinate amongst themselves and with the other retained professionals in these cases to eliminate unnecessary duplication or overlap of work as they completed during their pre-petition engagement.

201. Prior to the commencement of these Chapter 11 cases, the Debtors retained Lieutenant Island to assist them in connection with a potential transaction or series of transactions involving a sale of the Debtors' operations, the potential sale of equity securities, or the creation of a joint venture, pursuant to the terms of an engagement letter, dated December 5, 2008.

202. Since 2008, the Managing Partner of Lieutenant Island has developed a great deal of institutional knowledge regarding the Debtors' operations, finances, and systems. I am familiar with the professional standing and reputation of Lieutenant Island. In addition, I am of the understanding that Lieutenant Island's Managing Partner has a wealth of experience in providing corporate advisory services and enjoys an excellent reputation for services he has rendered to other homebuilders.

203. The experience of, and services to be provided by, Lieutenant Island's Managing Partner compliment the services being provided by BMOCM and the Debtors' other restructuring professionals. Given the size and complexity of these cases, and the specific and respective expertise of Lieutenant Island and BMOCM, I believe that retention of two advisors, which services will complement each other, is warranted and will be beneficial to the estates and all other parties-in-interest.

204. I believe that the services of Lieutenant Island are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully. Further, I believe that Lieutenant Island is well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

205.     I believe that the compensation structure constitutes fair and reasonable terms and conditions for the retention by the Debtors of Lieutenant Island as its financial advisor).  Furthermore, I have been advised that Lieutenant Island and BMOCM will endeavor to coordinate amongst themselves and with the other retained professionals in these cases to eliminate unnecessary duplication or overlap of work as they did during their pre-petition engagement.

<u>Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals</u>

206.     I believe that the Compensation Procedures set forth in the motion would reduce the administrative burden imposed on the Court by these cases, enable key parties-in-interest to more closely monitor professional fees and costs, and diminish undue financial burden on the Professionals.  Moreover, I believe that providing notice as set forth in the Compensation Procedures would permit the parties most active in these cases to review and object to the fees and expenses of the Professionals, saving unnecessary duplication and mailing expenses.

207.    It is my understanding that the Debtors seek to continue to employ a number of ordinary course professionals (the "Ordinary Course Professionals") that render a wide range of services impacting the Debtors' day-to-day operations, but are otherwise tangential to the Debtors' Chapter 11 cases.  Specifically, for the most part, the Ordinary Course Professionals provided limited and specialized, but necessary, services to the Debtors prior to the Petition Date.

208.    I believe that it is essential that the employment of the Ordinary Course Professionals be continued on an ongoing basis to avoid disrupting the Debtors' business and submit that the most efficient way to do so is set forth in the motion.

209.    Furthermore, I believe that the procedures outlined in the motion for authorization to employ ordinary course professionals would save the Debtors substantial expenses associated with applying separately for the retention of each of the Ordinary Course Professionals.  The number of professionals the Debtors must continue to employ renders it costly and inefficient for the Debtors to draft, submit, and obtain court approval of individual retention applications for each of the Ordinary Course Professionals.

210.    In addition, I believe that the Ordinary Course Professionals provide essential services to the Debtors in their respective areas of expertise.  I have been advised that if the Debtors cannot employ and pay necessary Ordinary Course Professionals without engaging in a cumbersome and formal application process, the Ordinary Course Professionals may be unwilling to continue to assist the Debtors or to commence working for the Debtors.  Finally, I submit that in light of the Ordinary Course Professionals' expertise and familiarity with the

particular matters for which they were responsible prior to the Petition Date, the Debtors would incur additional and unnecessary expenses should they be required to retain professionals to replace any of the Ordinary Course Professionals.

<u>Debtors' Motion for Entry of Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured or Payment, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment</u>

211.    In connection with the operation of their business and in the ordinary course thereof, the Debtors obtain electricity, water, telephone, trash collection, and other similar services (collectively, the "Utility Services") from various utility companies.  On average, the Debtors spend approximately $322,429 per month on Utility Services, and I believe that the Debtors have a consistently prompt payment history.

212.    Preventing disruption to the Utility Services is essential to the continued operation of the Debtors' business and, consequently, to the success of these Chapter 11 cases. Should the Utility Companies refuse or discontinue service, even for a brief period of time, the Debtors' business operations would be severely disrupted; such disruption would jeopardize the Debtors' reorganization efforts.  I therefore submit that it is critical that Utility Services continue uninterrupted during the pendency of these cases.

213.    I believe that the Debtors' cash on hand, as well as any permitted borrowing, will be sufficient to pay post-petition obligations related to the Utility Services.  I have been advised that the Debtors' payment history combined with their ability to pay for future Utility Services in the ordinary course of business constitute sufficient adequate assurance of future payment.

214.     If a utility disruption were to occur, the impact on the Debtors' business operations and revenue could be severe.  At best, the Debtors' business would suffer a substantial loss of revenue and profit; at worst, the Debtors' reorganization may be jeopardized, to the detriment of creditors and other parties-in-interest.

215.     Furthermore, I have been advised that without the Adequate Assurance Procedures, as described in the motion, the Debtors could be forced to address numerous requests by the Utility Companies in a disorganized manner at a critical period in these cases, during which the Debtors' efforts could be more productively focused on a successful emergence from Chapter 11.

<u>Debtors' Motion for Entry of Order Establishing Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to Bankruptcy Code § 503(b)(9)</u>

216.     Prior to the Petition Date, and in the ordinary course of their business, the Debtors purchased on credit a variety of raw materials, parts, supplies, and other goods for use in their operations.  I believe that as of the Petition Date, the Debtors were in possession of certain Goods that had been delivered to them by various vendors or other parties, but for which they had not yet made payment.

217.     I have been advised that because § 503(b)(9) is a relatively recent addition to the Bankruptcy Code, there may be some uncertainty among vendors over the procedures and methods they must undertake to properly assert administrative expense claims thereunder.  This may result in numerous inquiries and demands on the Debtors' employees and professionals, as well as in the initiation of piecemeal litigation, which would divert the attention of the Debtors and their professionals from the more pressing task of administering these cases.

218.    In the ordinary course of their business, the Debtors purchase a substantial amount of Goods from a variety of vendors, and accordingly, numerous 503(b)(9) Claims may be filed.

219.    Moreover, I submit that the proposed procedure regarding the resolution and satisfaction of claims asserted under Section 503(b)(9) will facilitate the Debtors' ability to negotiate with vendors, expediting the resolution of 503(b)(9) claims and assisting with the economic administration of these cases.  I further submit that the Debtors' ability to address the 503(b)(9) claims in this uniform manner will assist in the timely resolution of such claims and promote the orderly and efficient administration of these cases.

Dated: March 1, 2010

/s/ Benjamin D. Goldman
Benjamin D. Goldman