## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ORLEANS HOMEBUILDERS, INC., et al.,[1] | Case No. 10-10684 (PJW) |
|  | Jointly Administered |
| Debtors. | **Re: Docket No. 1822** |

## FIRST AMENDED DISCLOSURE STATEMENT TO ACCOMPANY
## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each of the Debtors' tax identification numbers, are: Orleans Homebuilders, Inc. (4323), Brookshire Estates, L.P. (8725), Community Management Services Group, Inc. (6620), Greenwood Financial Inc. (7510), Masterpiece Homes, LLC (1971), OHB Homes, Inc. (0973), OHI Financing, Inc. (6591), OHI PA GP, LLC (2675), OPCNC, LLC (8853), Orleans Arizona Realty, LLC (9174), Orleans Arizona, Inc. (2640), Orleans at Bordentown, LLC (4968), Orleans at Cooks Bridge, LLC (4185), Orleans at Covington Manor, LLC (9891), Orleans at Crofton Chase, LLC (8809), Orleans at East Greenwich, LLC (9814), Orleans at Elk Township, LLC (6891), Orleans at Evesham, LLC (7244), Orleans at Falls, LP (2735), Orleans at Hamilton, LLC (9679), Orleans at Harrison, LLC (4155), Orleans at Hidden Creek, LLC (3301), Orleans at Jennings Mill, LLC (4693), Orleans at Lambertville, LLC (0615), Orleans at Limerick, LP (7791), Orleans at Lower Salford, LP (9523), Orleans at Lyons Gate, LLC (2857), Orleans at Mansfield LLC (1498), Orleans at Maple Glen LLC (7797), Orleans at Meadow Glen, LLC (4966), Orleans at Millstone River Preserve, LLC (8810), Orleans at Millstone, LLC (8063), Orleans at Moorestown, LLC (9250), Orleans at Tabernacle, LLC (9927), Orleans at Thornbury, L.P. (4291), Orleans at Upper Freehold, LLC (3225), Orleans at Upper Saucon, L.P. (3715), Orleans at Upper Uwchlan, LP (8394), Orleans at Wallkill, LLC (2875), Orleans at West Bradford, LP (4161), Orleans at West Vincent, LP (9557), Orleans at Westampton Woods, LLC (8095), Orleans at Windsor Square, LP (9481), Orleans at Woolwich, LLC (9215), Orleans at Wrightstown, LP (9701), Orleans Construction Corp. (0893), Orleans Corporation (8770), Orleans Corporation Of New Jersey (5325), Orleans DK, LLC (5308), Orleans RHIL, LP (1938), Parker & Lancaster Corporation (1707), Parker & Orleans Homebuilders, Inc. (5269), Parker Lancaster, Tidewater, L.L.C. (7432), Realen Homes, L.P. (8293), RHGP LLC (8197), Sharp Road Farms Inc. (1871), Stock Grange, LP (4027), and Wheatley Meadows Associates (5459).

Submitted by:

ELLIOTT GREENLEAF
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Mark A. Kearney (DE Bar No. 2601)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399

- and -

CAHILL GORDON & REINDEL LLP
Joel H. Levitin
Stephen J. Gordon
Richard A. Stieglitz Jr.
Maya Peleg
Eighty Pine Street
New York, New York, 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Attorneys for the Debtors and Debtors-in-Possession*

Dated: September 27, 2010

## PRELIMINARY STATEMENT

THIS FIRST AMENDED DISCLOSURE STATEMENT WAS FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON SEPTEMBER 27, 2010. [AFTER A HEARING ON THE ADEQUACY OF THE DISCLOSURE CONTAINED HEREIN, THE BANKRUPTCY COURT HAS DETERMINED THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION, AS DEFINED IN BANKRUPTCY CODE § 1125.] A HEARING ON CONFIRMATION OF THE PROPOSED FIRST AMENDED JOINT PLAN OF REORGANIZATION DESCRIBED HEREIN HAS BEEN SCHEDULED FOR _____ __, 2010, AT __:__ __.M. (PREVAILING EASTERN TIME).

AS DISCUSSED IN GREATER DETAIL HEREIN, THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PROPOSED PLAN MUST BE FILED AND SERVED ON OR BEFORE _____ __, 2010, AT __:__ P.M. (PREVAILING EASTERN TIME) (THE "CONFIRMATION OBJECTION DEADLINE") IN THE MANNER DESCRIBED HEREIN.

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT IT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

Page

I.    PREAMBLE ................................................................................................................. 1

II.   INTRODUCTION ........................................................................................................ 4

III.  VOTING INSTRUCTIONS ......................................................................................... 6

     A.    Voting Procedures......................................................................................... 6
     B.    The Tabulation Procedures ........................................................................... 7
     C.    The Solicitation Procedures .......................................................................... 9
     D.    Ballots. ........................................................................................................ 10
     E.    Withdrawal or Revocation of Ballots. ........................................................ 10
     F.    Waivers of Defects, Irregularities, Etc....................................................... 10

IV.  OVERVIEW OF THE PLAN .................................................................................... 11

V.   GENERAL INFORMATION ..................................................................................... 18

     A.    The Debtors' Business History. ................................................................... 18
     B.    Corporate & Capital Structure of the Debtors. ........................................... 19
     C.    Description of Business. .............................................................................. 27

VI.  EVENTS LEADING TO THE FILING OF THESE CASES ..................................... 45

VII. THE CASES ............................................................................................................... 46

     A.    The Debtors' First-Day Motions................................................................. 46
     B.    Procedural Orders. ...................................................................................... 48
     C.    Other Substantive First-Day Orders........................................................... 48
     D.    Professional Retention Applications and Orders. ....................................... 56
     E.    Formation of Creditors Committee.............................................................. 58
     F.    Schedules and Statements. .......................................................................... 59
     G.    Bar Date Motions........................................................................................ 59
     H.    RayKen Stipulation. .................................................................................... 59
     I.    Mustafa Settlement. .................................................................................... 59
     J.    Upper Stipulation. ....................................................................................... 60
     K.    G&I One Greenwood Motion. ................................................................... 60
     L.    Worrall Stipulation. .................................................................................... 60
     M.   Agreed Orders Regarding Certain North Carolina Lien Enforcement
         Actions. ....................................................................................................... 61
     N.    Motions to Enforce the Automatic Stay...................................................... 61
     O.    The Withdrawn Proposed Sale Motion and the NVR Complaint. .............. 62
     P.    Eric's Nursery Complaint. .......................................................................... 62
     Q.    Mammoth Grading Lift Stay Motion. ......................................................... 63
     R.    Extension Motions. ..................................................................................... 63
     S.    Certain Other Motions and Notices Filed by the Debtors............................ 64

VIII.   THE PLAN OF REORGANIZATION.................................................................65

        A.      General -- Classification of Claims.................................................65
        B.      Summary of Distributions Under the Plan.....................................66
        C.      Implementation of the Plan........................................................84
        D.      Other Provisions of the Plan......................................................104
        E.      Retention of Jurisdiction..........................................................117
        F.      Releases...................................................................................119
        G.      Risk Factors.............................................................................124

IX.     CONFIRMATION OF THE PLAN...................................................................138

        A.      Solicitation of Votes.................................................................140
        B.      Confirmation Hearing...............................................................140
        C.      Classification...........................................................................141
        D.      Impairment..............................................................................141
        E.      Acceptance of the Plan.............................................................141
        F.      Confirmation Without Acceptance By All Impaired Classes..........142
        G.      Feasibility Test........................................................................144
        H.      Best Interests Test....................................................................145
        I.      Valuation of the Reorganized Debtors........................................148
        J.      Amendments to or Modifications of the Plan...............................150
        K.      Conditions to Confirmation of the Plan......................................151
        L.      Conditions to Effectiveness......................................................151
        M.      Waiver of Conditions...............................................................153
        N.      Effects of Plan Confirmation....................................................153

X.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        PLAN.......................................................................................................155

        A.      Continuation of the Cases.........................................................156
        B.      Alternative Plans of Reorganization...........................................156
        C.      Liquidation Under Chapter 11 or Chapter 7................................157

XI.     MANAGEMENT..........................................................................................157

XII.    DESCRIPTION OF THE EXIT CREDIT FACILITY, THE NEW OHB
        COMMON STOCK, NEW NOTES, AND THE NEW NOTES GUARANTEE.........158

        A.      The Exit Credit Facility............................................................158
        B.      The New OHB Common Stock....................................................158
        C.      New Notes and the New Notes Guarantees...................................159

XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS.............................159

|  | A. | Tax Consequences to Creditors. | 161 |
|  | B. | Tax Consequences to the Debtors. | 164 |
| XIV. | | RESALE OF SECURITIES RECEIVED UNDER THE PLAN | 166 |
|  | A. | Issuance of New Securities. | 166 |
|  | B. | Subsequent Transfers Under Federal Securities Laws. | 167 |
| XV. | | AVAILABLE INFORMATION | 168 |
| XVI. | | RECOMMENDATION | 169 |

CG&R DRAFT: 9/27/10 6:42 PM                    #1100434 v3 (11YKY03_.DOC)

## EXHIBITS

A.  Debtors' First Amended Joint Plan of Reorganization, dated September 27, 2010

B.  Projected Financial Information for the Reorganized Debtors

C.  Hypothetical Liquidation Analysis

D.  List of the Known Executory Contracts and/or Unexpired Leases Anticipated to be Assumed under the Plan and the Proposed Cure Amounts Therefor

E.  List of the Known Executory Contracts and/or Unexpired Leases Anticipated to be Rejected under the Plan

F.  List of Operational Liens that Constitute Class 2C Claims

G.  List of Operational Liens that Constitute Class 3 or Class 3A Claims (as Applicable)

H.  Corporate Structure Table

I.  Schedule of Unencumbered Assets

J.  Schedule of Developments Not Revesting in the Reorganized Debtors

CG&R DRAFT: 9/27/10 6:42 PM                                    #1100434 v3 (11YKY03_.DOC)

## I.    PREAMBLE

The Debtors jointly submit this first amended disclosure statement (as it may be further amended, modified, or supplemented from time to time, the "Disclosure Statement") pursuant to Bankruptcy Code § 1125, in connection with (i) the solicitation from certain creditors ("Creditors") of the respective Debtors of votes on the Debtors' proposed First Amended Joint Plan of Reorganization, dated September __, 2010 (as it may be further amended, modified, or supplemented from time to time, the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____ __, 2010, at __:__ __M. (prevailing Eastern Time).  Unless otherwise defined, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

**THE PLAN DESCRIBED HEREIN REFLECTS NEGOTIATIONS THAT OCCURRED SUBSEQUENT TO THE FILING OF THE CASES AMONG THE DEBTORS, THE SPONSORS, AND THE CREDITORS COMMITTEE.  THE DEBTORS' RESPECTIVE BOARDS OF DIRECTORS AND MANAGERS (AS APPLICABLE), THE SPONSORS, AND THE CREDITORS COMMITTEE RECOMMEND THAT THOSE CREDITORS ENTITLED TO VOTE WITH RESPECT TO THE PLAN VOTE TO ACCEPT THE PLAN, AS IT REFLECTS A CONSENSUAL RESTRUCTURING AMONG THE PRIMARY CREDITOR CONSTITUENTS IN THESE CASES.**

You should read both the Disclosure Statement and the Plan in their entirety.  All exhibits to this Disclosure Statement are incorporated into, and are made a part of, this Disclosure Statement.  **HOLDERS OF OPERATIONAL LIEN CLAIMS SHOULD, IN PARTICULAR, REVIEW EXHIBIT F AND EXHIBIT G HERETO TO DETERMINE WHETHER THEIR CLAIMS WILL BE TREATED AS SECURED OPERATIONAL LIEN CLAIMS OR AS GENERAL UNSECURED CLAIMS UNDER THE PLAN. OPERATIONAL LIEN CLAIMS THAT ARE NOT LISTED ON EITHER EXHIBIT F OR EXHIBIT G WILL BE TREATED FOR ALL PURPOSES UNDER THE PLAN AND IN THESE CASES AS GENERAL UNSECURED CLAIMS IN CLASS 3 OR 3A (AS APPLICABLE).**  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtors or their businesses for purposes of such solicitation, other than the information contained herein.

[The Bankruptcy Court has approved this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of Creditors to make an informed judgment as to whether to accept or to reject the Plan.]  APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT OR A DETERMINATION THEREOF AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"); NOR HAS THE

SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER AND OF CERTAIN OTHER DOCUMENTS. WHILE THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY THE COMPLETE TEXT OF SUCH DOCUMENTS. REFERENCE IS MADE TO THE PLAN (WHICH INCLUDES THE PLAN SUPPLEMENT) AND THE DOCUMENTS REFERRED TO HEREIN AND THEREIN FOR A COMPLETE STATEMENT OF THE TERMS AND PROVISIONS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCE, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE HEREOF OR SUCH OTHER SPECIFIED TIME.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THOSE HOLDERS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION ABOUT THE PLAN. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

OTHER THAN AS EXPRESSLY SET FORTH HEREIN, PRIOR TO THE CONSUMMATION OF THE PLAN, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF, OR STIPULATION TO, ANY FACT OR LIABILITY, OR A WAIVER OF ANY RIGHTS, BUT RATHER, AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO ANY INTERESTED PARTY. ANY INTERESTED PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

**CIRCULAR 230 NOTICE**: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C)

YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**IMPORTANT:** THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR TO REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

UNLESS SPECIFICALLY NOTED OTHERWISE, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS UNAUDITED AND WILL NOT BE SUBJECT TO AUDIT OR REVIEW BY THE DEBTORS' EXTERNAL AUDITORS ON A STAND-ALONE BASIS AT ANY TIME IN THE FUTURE. RESULTS FOR THE PRIOR PERIODS AS PRESENTED IN THIS DISCLOSURE STATEMENT ARE NOT NECESSARILY INDICATIVE OF THE ACTUAL RESULTS FOR THE PRESENT OR FUTURE IF ALL SUCH MATTERS WERE ALLOCATED TO ALL PERIODS IN THE QUARTER OR YEAR. ACCORDINGLY, EACH PERIOD REPORTED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE VIEWED ON A STAND-ALONE BASIS, BUT RATHER, IT SHOULD BE VIEWED IN THE CONTEXT OF PREVIOUSLY-REPORTED FINANCIAL RESULTS, INCLUDING THE DEBTORS' PRIOR SEC FILINGS. THE INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT IS NOT PRESENTED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA ("GAAP").

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE, TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. THIS DISCLOSURE STATEMENT INCLUDES PROJECTIONS AND OTHER STATEMENTS THAT CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, BY THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. "FORWARD-LOOKING STATEMENTS" IN THE PROJECTIONS AND ELSEWHERE INCLUDE THE INTENT, BELIEF, OR CURRENT EXPECTATIONS OF THE DEBTORS AND MEMBERS OF THEIR MANAGEMENT TEAM AND/OR OTHERS WITH RESPECT TO, AMONG OTHER THINGS, THE TIMING OF, COMPLETION OF, AND SCOPE OF THE CURRENT CONTEMPLATED RESTRUCTURING, THE PLAN, FINANCING, MARKET CONDITIONS, AND THE DEBTORS' FUTURE LIQUIDITY AND OPERATIONS, AS WELL AS THE ASSUMPTIONS ON WHICH SUCH STATEMENTS ARE BASED. WHILE THE DEBTORS BELIEVE THAT THE EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS WITHIN THE BOUNDS OF THEIR KNOWLEDGE OF THEIR BUSINESSES AND OPERATIONS, PARTIES-IN-INTEREST ARE CAUTIONED THAT ANY SUCH "FORWARD-LOOKING STATEMENTS" ARE NOT GUARANTEES OF FUTURE PERFORMANCE AND INVOLVE RISKS AND UNCERTAINTIES, AND THAT ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY SUCH "FORWARD-LOOKING STATEMENTS".

3

## II.    INTRODUCTION

On March 1, 2010 (the "Petition Date"), each of the Debtors filed with the Bankruptcy Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors also filed a motion for an order directing that their separate Chapter 11 cases (collectively, the "Cases") be jointly administered by the Bankruptcy Court, which was granted on March 3, 2010.

Pursuant to the Bankruptcy Code, only holders of Allowed Claims in Classes 2A or 3 (or 3A, 3B, 3C, and 3D, as applicable) (collectively, the "Voting Classes"), each of which is impaired by the Plan, are entitled to vote on the Plan. Creditors or Interest Holders in Classes 1, 2B, 2C, and 6 are deemed to have accepted the Plan because they are not impaired and, therefore, are not entitled to vote on the Plan with respect to the Claims or Interests in these Classes. Holders of Claims or Interests (as applicable) in Classes 4 and 5 will neither receive a distribution nor return of any property under the Plan on account of their Claims or Interests (other than as may be set forth in Plan Section 5.7 with respect to Intercompany Claims); therefore, the Holders of Claims or Interests (as applicable) in those Classes are deemed to have rejected the Plan and, pursuant to Bankruptcy Code § 1126(g), are not entitled to vote to accept or to reject the Plan. For a description of the various Classes of Claims and Interests and their respective treatment under the Plan, see the section below entitled "The Plan of Reorganization".

For the Plan to be confirmed, it must be accepted by at least one Class of Claims that is impaired under the Plan (determined without including any acceptance of the Plan by any insider of the Debtors, as that term is defined in Bankruptcy Code § 101(a)(31)). Under Bankruptcy Code § 1126(c), an impaired Class of Claims has accepted the Plan if Creditors representing at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims that have actually voted in that Class have voted to accept the Plan; provided that the vote of any Creditor whose acceptance or rejection is determined by the Bankruptcy Court not to have been cast, solicited, or procured in good faith will not be counted pursuant to Bankruptcy Code § 1126(e). Any Voting Class that fails to accept the Plan is considered to have rejected the Plan. Also, under Bankruptcy Code § 1126(g), any Class that does not receive or retain any property under the Plan is deemed to have rejected the Plan.

Bankruptcy Code § 1129(b) permits confirmation of the Plan notwithstanding its rejection (or deemed rejection) by one or more impaired Classes if the Bankruptcy Court finds that the Plan (i) has been accepted by at least one impaired Class of Claims (not including the votes of insiders), (ii) meets the other requirements under Bankruptcy Code § 1129(a) for confirmation, (iii) does not "discriminate unfairly", and (iv) is "fair and equitable" with respect to the rejecting Class or Classes. The Debtors believe that at least Class 2A and Class 3D, which are impaired, will vote to accept the Plan in accordance with Bankruptcy Code § 1126, as the

4

Debtors believe that they and the Sponsors,[1] who hold a majority of the Claims in such Classes, have reached an agreement regarding the principal terms of the Plan. Moreover, the Debtors are hopeful that Class 3 will also vote to accept the Plan in accordance with Bankruptcy Code § 1126 because the Creditors Committee supports the Plan, and the Debtors believe that holders of Allowed Claims in this Class will receive a greater recovery under the Plan both (i) if they vote to accept the Plan, as opposed to voting as a Class to reject the Plan, and (ii) compared to what they would receive in a hypothetical liquidation involving the Debtors. NOTWITHSTANDING THE DEEMED REJECTION OF THE PLAN BY IMPAIRED CLASSES 4 AND 5, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT, PURSUANT TO BANKRUPTCY CODE § 1129(b), CONFIRM THE PLAN UPON FINDING THAT ALL OF THE FOREGOING REQUIREMENTS OF BANKRUPTCY CODE § 1129(b) HAVE BEEN MET. For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding the rejection or deemed rejection of the Plan by certain Classes, see the section below entitled "Confirmation of the Plan".

AMENDMENTS TO THE PLAN'S CLASSIFICATION AND TREATMENT OF ONE OR MORE CLASSES THAT DO NOT MATERIALLY AND ADVERSELY CHANGE THE TREATMENT OF ANY OTHER CLASS MAY BE MADE. SUCH AMENDMENTS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING OR AT SOME OTHER TIME WITHOUT ENTITLING THE MEMBERS OF ANY CLASS WHOSE TREATMENT IS NOT MATERIALLY AND ADVERSELY CHANGED TO WITHDRAW ANY VOTES CAST TO ACCEPT THE PLAN.

All votes to accept or to reject the Plan must be cast by using the ballot (each, a "Ballot" and collectively, the "Ballots") enclosed with this Disclosure Statement (or manually executed copies thereof). No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Bankruptcy Court has fixed __:__ __.M. (prevailing Eastern Time) on _____ __, 2010 (the "Voting Record Date"), as the time and date for the determination of the holders of record of Claims that are entitled to receive a copy of this Disclosure Statement and all related materials and to vote to accept or to reject the Plan.

TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED, AND RECEIVED BY __:__ __.M. (PREVAILING EASTERN TIME) ON _____ __, 2010, OR SUCH LATER DATE TO WHICH SOLICITATION IS EXTENDED BY THE DEBTORS OR THE BANKRUPTCY COURT (THE "VOTING DEADLINE"). BALLOTS TO ACCEPT OR TO REJECT THE PLAN MAY BE REVOKED AT ANY TIME PRIOR TO THE VOTING DEADLINE. THEREAFTER, BALLOTS MAY BE REVOKED ONLY WITH THE APPROVAL OF THE DEBTORS OR THE BANKRUPTCY COURT.

---

[1] The Sponsors are Strategic Value Special Situations Master Fund, LP; Strategic Value Master Fund, Ltd.; Anchorage Illiquid Opportunities Offshore Master, L.P.; Bank of America, N.A.; and each other entity that is designated as a Sponsor prior to the Confirmation Date.

Please vote and return your Ballot(s) to the Debtors' claims, noticing, and balloting agent (the "Claims Agent") via United States mail, overnight delivery, or hand delivery:

**If by mail:**
The Garden City Group, Inc.
Attn: Orleans Homebuilders, Inc.
P.O. Box 9405
Dublin, Ohio 43017-9405

**If by hand delivery or overnight courier:**
The Garden City Group, Inc.
Attn: Orleans Homebuilders, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

If delivery is by mail, enough time should be allowed to ensure timely delivery prior to the Voting Deadline. For a more complete description of the voting procedures, <u>see</u> the section below entitled "<u>Voting Instructions</u>".

The Bankruptcy Court has scheduled the Confirmation Hearing for _____ __, 2010, at __:__ _.M. (prevailing Eastern Time), before the Honorable Peter J. Walsh, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed on or before _____ __, 2010, at _:__ _.M. (prevailing Eastern Time), in the manner described below or in any applicable notice of the Confirmation Hearing.

THE DEBTORS, THE SPONSORS, AND THE CREDITORS COMMITTEE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE DEBTORS' BEST INTERESTS AND THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND OTHER PARTIES-IN-INTEREST AND URGE ALL CREDITORS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

If you have any questions about the Plan, this Disclosure Statement, or procedures for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, please call the Claims Agent at (888) 215-9315 or visit http://www.orleanshomesreorg.com.

## III.    VOTING INSTRUCTIONS

### A.  Voting Procedures.

The Debtors are providing copies of this Disclosure Statement and Ballots to all holders of Claims that are entitled to vote on the Plan.

Classes 2A and 3 (or Class 3A, 3B, 3C, and 3D, as applicable) are impaired and, therefore, all holders of Allowed Claims in such Classes as of the Voting Record Date are entitled to vote to accept or to reject the Plan. Classes 4 and 5 are also impaired, but pursuant to Bankruptcy Code § 1126(g), because the Holders of Claims or Interests (as applicable) in such

6

Classes will not receive or retain any property under the Plan on account of such Claims or Interests (subject to the provisions of Plan Section 5.7 in the case of Intercompany Claims), such Classes are deemed to have rejected the Plan and are not entitled to vote thereon.

Solely for purposes of voting to accept or to reject the Plan, and not for the purpose of distribution, each Claim entitled to vote on the Plan will be temporarily allowed in an amount determined as follows: the liquidated, undisputed, and non-contingent amount of such Claim indicated on a Proof of Claim filed prior to the applicable deadline for filing Claims (or otherwise deemed timely filed by the Bankruptcy Court) or, if no Proof of Claim has been filed, the known liquidated, undisputed, and non-contingent amount of such Claim as listed on the Schedules (as applicable, an "Authorized Voting Amount"); provided, however, that notwithstanding the foregoing, any Claim for which the Authorized Voting Amount is equal to $0.00 will not be eligible to vote; and provided further, however, that the Debtors' right to object to any amounts indicated on a particular Ballot is reserved. Except as provided below, unless a Ballot being furnished is timely submitted on or prior to the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their discretion, reject such Ballot as invalid and decline to utilize it in connection with seeking confirmation of the Plan by the Bankruptcy Court.

In accordance with Bankruptcy Rules 3017 and 3018, the Bankruptcy Court has established _:__ _.M. (prevailing Eastern Time) on _____ __, 2010 as the Voting Record Date for determining which Creditors that are entitled to receive Ballots to vote on the Plan (and the Claim amounts in which they are entitled to vote) or to receive notice of their deemed rejection of the Plan or non-voting status; provided, however, that, with respect to transfers of Claims filed pursuant to Bankruptcy Rule 3001, the Holder of a Claim as of the Voting Record Date shall be the transferor of such Claim unless the documentation evidencing such transfer was docketed by the Bankruptcy Court on or before 21 days prior to the Voting Record Date, and no timely objection with respect to such transfer was filed by the transferor.

## B. The Tabulation Procedures

The following procedures (collectively, the "Tabulation Procedures") will be utilized in tabulating votes contained on Ballots:

<blockquote>

a. any Ballot cast by a person or entity that does not hold a Claim in a Voting Class will not be counted;

b. all votes must be cast either to accept or to reject the Plan and may not be split;

c. to the extent that a Creditor has filed a proof of claim that is for an unliquidated amount or is contingent, or the Schedules list such Creditor as having an unliquidated or contingent Claim, and such Creditor has not timely filed a Proof of Claim in a liquidated, non-contingent amount, the applicable Creditor will be deemed to be voting such Claim for an amount equal to $1.00 for all purposes;

</blockquote>

d.      except as the Debtors may otherwise agree or the Bankruptcy Court may otherwise order, a Ballot received by facsimile, e-mail, or any other electronic means will not be counted;

e.      except as the Debtors may otherwise agree or the Bankruptcy Court may otherwise order, only Ballots properly executed and timely received by the Claims Agent will be counted;

f.      in consultation with the Creditors Committee and the Sponsors, the Debtors may waive any defect in any Ballot at any time, whether before or after the Voting Deadline;

g.      in consultation with the Creditors Committee and the Sponsors, the Debtors may disregard or decline to count any and all Ballots not in proper form or to attempt otherwise to cure any and all defective Ballots;

h.      any Ballot that is illegible or contains insufficient information to permit identification of the claimant will not be counted;

i.      except as the Debtors may otherwise agree or the Bankruptcy Court may otherwise order, only Ballots bearing an original signature on the line adjacent to the "Signature:" label in the authorization section therein will be counted;

j.      whenever a claimant casts more than one Ballot voting the same claim(s) prior to the Voting Deadline, only the last properly-executed ballot received by the Claims Agent on or prior to the Voting Deadline will be counted;

k.      if, prior to the Voting Deadline, the Debtors have (i) filed an objection to disallow or expunge any Proof of Claim or (ii) scheduled any Claim on their Schedules as disputed, and as to which no corresponding Proof of Claim in an amount disputed by the Debtors has been timely filed, the applicable claimant's vote will not be counted for any purpose unless and until such claimant obtains a Final Order from the Bankruptcy Court providing otherwise; provided, however, that, in the event a claimant files a motion pursuant to Bankruptcy Code § 502(c) for temporary allowance of its claim in a greater amount for voting purposes prior to the Voting Deadline, the Voting Deadline for such claimant shall be extended to the earlier of the date the Bankruptcy Court considers such motion or the date of the Confirmation Hearing;

l.      if, prior to the Voting Deadline, the Debtors have filed an objection seeking to partially disallow or expunge any Proof of Claim, the applicable claimant's vote will be counted for all purposes with respect to the Plan or the Confirmation Hearing solely to the extent of the undisputed portion of such Claim, unless and until such claimant obtains a Final Order from the Bankruptcy Court providing otherwise; provided, however,

8

that, in the event a claimant files a motion pursuant to Bankruptcy Code § 502(c) for temporary allowance of its claim for voting purposes prior to the Voting Deadline, the Voting Deadline for such claimant shall be extended to the earlier of the date the Bankruptcy Court considers such motion or the date of the Confirmation Hearing; and

m.  if a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, each such person must indicate such capacity when signing its Ballot and, if so requested by the Debtors, must submit evidence satisfactory to the Debtors of its authority to so act.

## C. The Solicitation Procedures

The following procedures (collectively, the "Solicitation Procedures") will govern the Debtors' solicitation of votes on the Plan:

a.  the Claims Agent is authorized to distribute to Holders of Allowed Claims in Classes 2A and 3 (or Class 3A, 3B, 3C, and 3D, as applicable), as of the Voting Record Date, Solicitation Packages within five business days after the approval of this Disclosure Statement;

b.  any Holder of an Allowed Claim in Classes 2A or 3 (or Class 3A, 3B, 3C, and 3D, as applicable) is entitled to vote on the Plan, unless such Claim has otherwise been disallowed for voting purposes by the Bankruptcy Court;

c.  in the event any of the Solicitation Packages are returned as undeliverable, unless a forwarding address provided by the United States Postal Service appears on the mailing envelope of any such returned package, the Debtors are not required to re-mail the undelivered Solicitation Package to those entities whose addresses differ from the addresses on the claims register or the Debtors' records as of the Voting Record Date;

d.  any Holders of Old OHB Common Stock as nominee for or on behalf of another party will be directed to immediately prepare and deliver copies of any notices or other materials received to the beneficial holder of Old OHB Common Stock registered in such nominee's or similar party's name; and

e.  any subcontractor or other similar vendor or service provider that employed sub-subcontractors (or similar parties) to provide goods or services to the Debtors will be directed to immediately prepare and deliver copies of any Solicitation Package received to any applicable sub-subcontractors (or similar parties) that may hold Claims against the Debtors.

**D. Ballots.**

Those Creditors entitled to vote on the Plan will find a Ballot accompanying this Disclosure Statement. Except as may otherwise be set forth herein in the section below entitled "Additional Voting Procedures", such Creditors are directed to fill out the Ballot and return it to the Claims Agent at the following address:

**If by mail:**
The Garden City Group, Inc.
Attn: Orleans Homebuilders, Inc.
P.O. Box 9405
Dublin, Ohio 43017-9405

**If by hand delivery or overnight courier:**
The Garden City Group, Inc.
Attn: Orleans Homebuilders, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

**Ballots must be received on or before _:_ _.M. (prevailing Eastern Time) on the Voting Deadline to be counted in accordance with the Voting Procedures. Ballots received after this time may not be counted. If you have any questions about the Voting Procedures, Tabulation Procedures, or the Solicitation Procedures, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, please call the Claims Agent at (888) 215-9315 or visit http://www.orleanshomesreorg.com.**

**E. Withdrawal or Revocation of Ballots.**

Ballots may be withdrawn or revoked at any time prior to _:_ _.M. (prevailing Eastern Time) on _____ __, 2010. Thereafter, Ballots may be withdrawn or revoked only with the approval of the Debtors or the Bankruptcy Court.

**F. Waivers of Defects, Irregularities, Etc.**

All questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, and withdrawal of Ballots will be determined by the Debtors, and their determination (unless otherwise directed by the Bankruptcy Court) will be final and binding.

The Debtors reserve the right to contest the validity of any revocation or withdrawal of any Ballot. The Debtors also reserve the right to reject any and all Ballots not in proper form. The Debtors further reserve the right, in consultation with the Committee and the Sponsors, to waive any defects, irregularities, or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors and/or the Bankruptcy Court determine.

Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise ordered by the Bankruptcy

10

Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalid.

## IV.    OVERVIEW OF THE PLAN

The following discussion and table briefly summarize the classification and treatment of Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A. In addition, for a more detailed description of the terms and provisions of the Plan, see the section below entitled "The Plan of Reorganization". All references to FY or Fiscal Year in this Disclosure Statement are to the Debtors' fiscal year, which is from July 1 to June 30.

As contemplated under the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Tax Claims are not classified under the Plan. Under the Plan, each holder of an Allowed Administrative Claim other than a holder of an Allowed DIP Facility Claim (which Claims will be treated and satisfied in the manner set forth in Plan Section 3.2) will receive Cash equal to the amount of its Allowed Claim on the later of the Initial Distribution Date and the date that is 60 days after the Allowance Date, except to the extent that such holder has agreed to a less favorable treatment of such Allowed Claim; provided, however, that Allowed Administrative Claims representing obligations incurred in the ordinary course of the Debtors' businesses and assumed by the Debtors under the Plan will be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements related thereto.

On the Effective Date, each holder of an Allowed DIP Revolving Facility Claim will receive Cash in an amount equal to its Allowed DIP Revolving Facility Claim, which payments will collectively be in the amount equal to the aggregate outstanding amount of the Allowed DIP Revolving Facility Claims. Also, on the Effective Date, each Holder of an Allowed DIP Term Loan Claim as of the Distribution Record Date will receive Cash in an amount up to such Holder's Allowed DIP Term Loan Claim, to the extent sufficient Cash proceeds are available from the Exit Credit Facility for distribution to fully satisfy such Allowed DIP Term Loan Claim, and to the extent sufficient Cash proceeds are not available from the Exit Credit Facility for distribution on account of such Allowed DIP Term Loan Claim, New Notes in an aggregate principal amount equal to any portion of such Allowed DIP Term Loan Claim that is not satisfied with Cash proceeds from the Exit Credit Facility.

Each holder of an Allowed Tax Claim will receive, at the election of the applicable Debtor, either (i) Cash equal to the amount of such Allowed Claim on the later of the Initial Distribution Date and the date that is 60 days after the Allowance Date, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim, or (ii) in accordance with Bankruptcy Code § 1129(a)(9)(C), deferred Cash payments of a value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, over a period not exceeding five years after the Petition Date, and in a manner not less favorable than the treatment of the most favored nonpriority unsecured Claim provided for by the Plan, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim.

11

On the Effective Date, all outstanding shares of Old OHB Common Stock and all other Old Stock of OHB will be cancelled and be deemed terminated and of no force and effect, and Reorganized OHB will issue the New OHB Common Stock; provided, however, that at the request of the Sponsors, Reorganized OHB may be converted to a limited liability company, partnership, joint venture, or other entity in connection with Confirmation. In the event of any such conversion, the New OHB Common Stock to be issued in the manner as provided in the Plan will instead be deemed to be the applicable membership or equity interest issued by Reorganized OHB. Reorganized OHB will also file its Amended and Restated Certificate of Incorporation and its Amended and Restated By-Laws with the Bankruptcy Court prior to the Confirmation Hearing. Except as the Debtors and the Reorganized Debtors may otherwise determine, each Debtor that owned or held the Old Stock of a Subsidiary Debtor (to the extent that any of such Subsidiary Debtors has not been sold or otherwise transferred, dissolved, consolidated, or merged under applicable law prior to the Effective Date) will, as a Reorganized Debtor on the Effective Date, own or hold such capital stock and/or equity interest (as applicable) in the corresponding Reorganized Subsidiary Debtor as of the Effective Date.

The following table summarizes the classification and treatment of the various Claims and Interests under the Plan. For certain classes of Claims, estimated percentage recoveries are also set forth. The value of consideration to be provided was determined based upon the Debtors' review of their respective books and records and includes estimates of a number of Claims that are contingent, disputed, and/or unliquidated. For certain classes of Claims, the actual amounts of Allowed Claims could be materially more or less than the estimated amounts shown.

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| N/A | Administrative Claims | **Unimpaired.** | **100%** |
| N/A | DIP Facility Claims | **Unimpaired.** | **100%** |
| N/A | Tax Claims | **Unimpaired.** | **100%** |
| 1 | Priority Claims | **Unimpaired:** if not otherwise paid in full pursuant to an order of the Bankruptcy Court prior to the Confirmation Date, and except to the extent such Holder has agreed to a less favorable treatment of such Allowed Claim, each Holder of an Allowed Class 1 Claim will receive Cash equal to the amount of such Allowed Claim on the latest of (a) the Initial Distribution Date, (b) the date that is 60 days after the Allowance Date of such Claim, and (c) the date when such Allowed Claim becomes due and payable according to its terms and conditions. | **100%** |

| Class | Description | Treatment | Estimated Recovery |
|---|---|---|---|
| 2A | Secured Revolving Credit Facility Claims | **Impaired:** each holder of an Allowed Class 2A Claim as of the Distribution Record Date will receive its Pro Rata share of (a) the shares of New OHB Common Stock, (b) New Notes, and (c) Cash in an amount equal to the Adequate Protection Claim (it being understood that such payment will be made as soon as reasonably practicable after the Effective Date from proceeds received by the Debtors or the Reorganized Debtors, as applicable, from the sale, transfer, or other disposition of what would otherwise be Unencumbered Assets (but for the Adequate Protection Liens); provided, however, that if Class 3 votes to accept the Plan, the Holders of Class 2A Claims will be deemed to have waived the right to receive the Cash payment on account of the Adequate Protection Claim. | **Between approximately 67% and 87% if Class 3 votes to accept the Plan**<br><br>**Between approximately 67% and 93% if Class 3 votes to reject the Plan** |
| 2B | Other Secured Claims Against any of the Debtors | **Unimpaired:** with respect to each outstanding Allowed Class 2B Claim that has not previously been satisfied pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses, at the election of the applicable Debtor or Reorganized Debtor, such Debtor or Reorganized Debtor will either: (a) pay the amount of such Allowed Class 2B Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; (b) return the underlying collateral to the Holder of such Allowed Class 2B Claim; (c) Reinstate such Allowed Class 2B Claim in accordance with the provisions of Bankruptcy Code § 1124(2); or (d) treat such Allowed Class 2B Claim in a manner otherwise agreed to by the Holder thereof. | **100%** |

CG&R DRAFT:  9/27/10 6:42 PM    #1100434 v3 (11YKY03_.DOC)

| Class | Description | Treatment | Estimated Recovery |
|---|---|---|---|
| 2C | Secured Operational Lien Claims Against Any of the Debtors | **Unimpaired:** for each outstanding Allowed Class 2C Claim that has not previously been satisfied pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses: (a) to the extent that the home or other Asset that is the subject of the applicable Secured Operational Lien Claim has been sold by the Debtors at any time prior to the Effective Date, the Reorganized Debtors will pay the amount of such Allowed Class 2C Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; and (b) to the extent that the home or other Asset that is the subject of the applicable Secured Operational Lien Claim has not been sold by the Debtors prior to the Effective Date, at the election of the applicable Reorganized Debtor, such Reorganized Debtor will (i) pay the amount of such Allowed Class 2C Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; (ii) Reinstate such Allowed Class 2C Claim in accordance with the provisions of Bankruptcy Code § 1124(2); (iii) upon the sale of the home or other Asset that is the subject of the applicable Secured Operational Lien Claim, pay in full, in Cash, the amount of such Allowed Class 2C Claim; or (iv) treat such Allowed Class 2C Claim in a manner otherwise agreed to by the Holder thereof. | **100%** |
| 3 | Aggregate Unsecured Claims Against Any of the Debtors | If Class 3 votes as a Class to accept the Plan, then each Holder of an Allowed Aggregate Unsecured Claim as of the Distribution Record Date will receive its Pro Rata Share of (i) the Initial Avoidance Claim Proceeds, (ii) the Excess Avoidance Claim Proceeds, and (iii) the Aggregate Unsecured Creditor Distribution. If Class 3 votes as a Class to reject the Plan in accordance with Bankruptcy Code § 1126(c), then each Holder of an allowed Aggregate Unsecured Claim will be treated in accordance with Plan Sections 5.4, 5.5, or 5.6, as applicable. | **Between 3.37% and 5.24% if Class 3 votes to accept the Plan** <br><br> **N/A if Class 3 votes to reject the Plan** |

CG&R DRAFT: 9/27/10 6:42 PM

#1100434 v3 (11YKY03_.DOC)

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| 3A | General Unsecured Claims Against Any of the Debtors | **Impaired:** If Class 3 votes as a Class to accept the Plan, then each Holder of an Allowed Class 3A Claim will be treated as a Holder of an Allowed Class 3 Claim in accordance with Plan Section 5.3.<br><br>If Class 3 does not vote to accept the Plan, then each holder of an Allowed Class 3A Claim will receive its Pro Rata share of (a) the Initial Avoidance Claims Proceeds, (b) the Excess Avoidance Claims Proceeds, and (c) the Unencumbered Asset Net Sale Proceeds.<br><br>Holders of Allowed Class 3A Claims may elect to have their Claims instead treated as Convenience Class Claims in Class 3C, subject to the limitations provided for therein. | **Between 3.37% and 5.24% if Class 3 votes to accept the Plan; if Class 3 votes to reject the Plan, the Debtors and the Creditors Committee cannot estimate a specific, projected range of recovery to the Holders of Claims in Class 3A, but believe that it is likely to be lower and more uncertain than what would be received if Class 3 votes to accept.** |
| 3B | Junior Subordinated Notes Claims and Trust Preferred Securities Claims Against Any of the Debtors | **Impaired:** on the Effective Date, all outstanding Junior Subordinated Notes and Trust Preferred Securities will be cancelled.<br><br>If Class 3 votes as a Class to accept the Plan, then each Holder of an Allowed Class 3B Claim will be treated as a Holder of an Allowed Class 3 Claim in accordance with Plan Section 5.3.<br><br>If Class 3 does not vote to accept the Plan, on the Effective Date, then each holder of an Allowed Class 3B Claim will receive its Pro Rata share of (a) the Initial Avoidance Claims Proceeds, (b) the Excess Avoidance Claims Proceeds, and (c) the Unencumbered Asset Net Sale Proceeds; provided, however, that, except for the Initial Avoidance Claims Proceeds, in accordance with the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes, such distribution will not be made to the Holders of Junior Subordinated Notes Claims or Trust Preferred Securities Claims, but will instead be made to the Revolving Credit Facility Agent for further distributions to the Holders of the Lenders' Deficiency Claim in Class 3D. | **Between 3.37% and 5.24% if Class 3 votes to accept the Plan; if Class 3 votes to reject the Plan, the Debtors and the Creditors Committee cannot estimate a specific, projected range of recovery to the Holders of Claims in Class 3B, but believe that it is likely to be lower and more uncertain than what would be received if Class 3 votes to accept.** |

15

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| 3C | Convenience Class Claims Against Any of the Debtors | **Impaired:** If Class 3 votes as a Class to accept the Plan, then each Holder of an Allowed Class 3C Claim will be treated as a Holder of an Allowed Class 3 Claim in accordance with Plan Section 5.3. | **Between 3.37% and 5.24% if Class 3 votes to accept the Plan** |
| | | If Class 3 does not vote to accept the Plan, then on the Effective Date, each holder of an Allowed Class 3C Claim will receive Cash in an amount equal to 3% of such Allowed Claim. | **3% if Class 3 does not vote to accept the Plan** |
| 3D | Lenders' Deficiency Claim Against Any of the Debtors | **Impaired:** If Class 3 votes as a Class to accept the Plan, then each holder of an Allowed Class 3D Claim will be deemed to have waived its right to receive any distribution on account of the Lenders' Deficiency Claims and to enforce any subordination or turnover provisions in the Trust Preferred Securities, the Junior Subordinated Notes, and the Junior Subordinated Notes Indentures. | **0% if Class 3 votes to accept the Plan** **Between 3.67% and 20.60% if Class 3 does not vote to accept the Plan** |
| | | If Class 3 does not vote to accept the Plan, then each holder of an Allowed Class 3D Claim will receive its Pro Rata share of (a) the Excess Avoidance Claims Proceeds and (b) the Unencumbered Asset Net Sale Proceeds, and will also receive the distribution of the Excess Avoidance Claims Proceeds and the Unencumbered Asset Net Sale Proceeds that otherwise would be distributed to the Holders of Class 3B Claims but for the subordination provisions of the Junior Subordinated Notes and the Trust Preferred Securities. | |
| 4 | Old OHB Common Stock Interests | **Impaired and Not Entitled to Vote:** all outstanding shares of Old OHB Common Stock and all other Old Stock of OHB will be cancelled and will be deemed terminated and of no force and effect. | **0%** |
| 5 | Intercompany Claims | **Impaired and Not Entitled to Vote:** all Intercompany Claims will be reviewed by the Debtors or the Reorganized Debtors and adjusted, continued, or discharged, as the Debtors or the Reorganized Debtors determine, with the consent of the Sponsors, as appropriate (by, among other things, releasing such claims, contributing them to capital, issuing a dividend, or leaving them unimpaired). | **N/A** |

CG&R DRAFT:  9/27/10 6:42 PM

#1100434 v3 (11YKY03_.DOC)

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| 6 | Old Stock of the Subsidiary Debtors | **Unimpaired:** Except as the Debtors and the Reorganized Debtors may otherwise determine, the Debtors' existing corporate structure of affiliate and/or subsidiary ownership will be maintained, unaffected by the Plan. At the election of the Reorganized Debtors and with the consent of the Sponsors, each respective Old Stock Interest in a Subsidiary Debtor will be (a) unaffected by the Plan, in which case the entity holding an Interest in such Subsidiary Debtor will continue to hold such Interest in the applicable Reorganized Subsidiary Debtor following the Effective Date, (b) cancelled and new equity in the applicable Reorganized Subsidiary Debtor will be issued pursuant to the Plan, or (c) otherwise restructured. | **N/A** |

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES SET FORTH ABOVE FOR CLASSES 2A AND 3 (OR 3A, 3B, 3C, AND 3D, AS APPLICABLE) ARE REASONABLE AND APPROXIMATE THE ASSUMED RECOVERY THEREFOR, THERE IS NO ASSURANCE THAT THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN SUCH CLASSES WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE CLAIM AMOUNTS ASSUMED IN CALCULATING SUCH ESTIMATED RECOVERIES OR THAT THE ACTUAL PERCENTAGE RECOVERIES WILL NOT OTHERWISE BE SIGNIFICANTLY LESS THAN THESE ESTIMATED PERCENTAGE RECOVERIES. The actual recoveries under the Plan by the Creditors in Classes 2A or 3 (or 3A, 3B, 3C, and 3D, as applicable) will depend upon a variety of factors, including, but not limited to, the actual value and/or amount of the New Notes and the New OHB Common Stock, the ultimate amount of any recoveries obtained on the Avoidance Claims, the ultimate amount of Allowed Class 3 Claims (or Allowed Class 3A, Class 3B, Class 3C, or Class 3D Claims, as applicable), based upon the outcome of Claims objections, the amount of any contingent or unliquidated Claims that may ultimately be Allowed Claims, and the Allowed amount of Rejection Claims or other Claims arising under the Plan, and whether or not Class 3 votes as a Class to accept the Plan. If Class 3 votes as a Class to accept the Plan, the actual recoveries in Class 3 will depend on certain other additional factors, including the ultimate amount of the Agreed Committee Professional Fees, the Additional Committee Investigation Fees, Claim Resolution Fees, and any Additional Committee Professional Fees. If Class 3 votes as a Class to reject the Plan, the actual recoveries in Classes 3A, 3B, and 3D will depend on additional factors, including; the amounts of Unencumbered Asset Net Sale Proceeds actually generated over time in the ordinary course of business, whether any party is successful in challenging that a particular Unencumbered Asset is subject to any valid Operational Lien, and the amount of the Adequate Protection Claim (which is, in turn, equal to the Diminution in Value).

Among the reasons the Debtors and the Creditors Committee cannot (as set forth above) estimate a specific, projected range of recoveries to the Holders of Claims in Class 3A or Class 3B, but believe that it is likely to be lower and more uncertain than what would be received if Class 3 votes to accept the Plan, are:

17

- the uncertainty as to (a) which Assets constitute Unencumbered Assets or may instead actually be subject to an Operational Lien or other Lien, (b) how long it would take to sell the Unencumbered Assets in a manner that would attempt to maximize the value thereof, and (c) the ultimate amount of the costs involved in selling the Unencumbered Assets;

- the risks of receiving lower than anticipated amounts from the future sales of the Unencumbered Assets;

- the risks and speculative costs involved in prosecuting and/or recovering upon the Avoidance Claims;

- the uncertainty as to the ultimate degree of the dilution that will result from the actual Allowed amounts of the Lenders' Deficiency Claim and the Adequate Protection Claim (each of which would be deemed waived if Class 3 votes to accept the Plan);

- the uncertainty as to the amount of Allowed Priority, Administrative Claims, and/or Professional Fees that would have to be satisfied first, as a matter of law, from the Unencumbered Net Asset Sale Proceeds or the proceeds from Avoidance Claims, before any distributions could be made to General Unsecured Creditors; and

- the uncertainty as to the ultimate effect of the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes (which provisions would be deemed waived if Class 3 votes to accept the Plan).

For these and related reasons, the Debtors and the Creditors Committee believe that the treatment that would be afforded to the Aggregate Unsecured Creditors if they were to vote as a Class to accept the Plan (i.e., the immediate creation and funding of the $6 million Unsecured Cash Pool; the Unsecured Creditor Agent's having the right to bring Avoidance Claims, subject to the Debtors' right to purchase such claims at a designated price; and the waiver of the Lenders' Deficiency Claim, the Adequate Protection Claim, and the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes) is better than the alternative treatment they would receive were Class 3 to vote to reject the Plan (i.e., the receipt of the net proceeds from the sale of the Unencumbered Assets and the prosecution of Avoidance Claims over time, after the payment of the Adequate Protection Claim and disposition and other related costs, and the dilution caused by the Lenders' Deficiency Claim, the Adequate Protection Claim, and the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes not being waived).

## V.    GENERAL INFORMATION

### A.  The Debtors' Business History.

The Debtors market, develop, and build high-quality, single-family homes, townhomes, and condominiums to serve various types of homebuyers, including move-up, luxury, empty

nester, active adult, first-time move-up, and first-time homebuyers. The Debtors believe this broad range of home designs gives them flexibility to address economic and demographic trends within its markets.

The Debtors have been in operation since 1918 and are currently engaged in residential real estate development in eight states in the following 11 markets: Southeastern Pennsylvania; Central New Jersey; Southern New Jersey; Orange County, New York; Charlotte, Raleigh and Greensboro, North Carolina; Richmond and Tidewater, Virginia; Chicago, Illinois; and Orlando, Florida. The Debtors' Charlotte, North Carolina market also includes operations in adjacent counties in South Carolina. The Debtors have operated in Pennsylvania and New Jersey for over 90 years.

In FY 2001, the Debtors began operations in North Carolina and Virginia through the acquisition of Parker & Lancaster Corporation, a privately-held residential homebuilder. The Debtors entered the Orlando market on July 28, 2003, through their acquisition of Masterpiece Homes, Inc., a privately-held residential homebuilder. On July 28, 2004, the Debtors entered the Chicago market through the acquisition of Realen Homes, L.P. ("Realen Homes"), an established privately-held homebuilder with operations in Chicago and Southeastern Pennsylvania. On December 23, 2004, the Debtors acquired certain real estate assets from Peachtree Residential Properties, LLC, and Peachtree Townhome Communities, LLC, which, at the time were wholly-owned subsidiaries of Peachtree Residential Properties, Inc. In December 2005, the Debtors entered the Phoenix market as a start-up operation via the purchase of an undeveloped parcel of land, and on December 31, 2007, the Debtors disposed of their entire land position and related work-in-process homes there.

## B. Corporate & Capital Structure of the Debtors.

Orleans Homebuilders, Inc. ("OHB"), a Delaware corporation, is the Debtors' main operating company. OHB's outstanding common stock was publicly traded on the NYSE Amex as "OHB", until the suspension of trading in March 2010. The common stock was delisted by NYSE Amex effective June 14, 2010, and on July 29, 2010, OHB filed a Form 15 with the SEC certifying termination of registration with respect to the Old OHB Common Stock and to terminate and/or suspend its obligations to file reports with the SEC.

Attached hereto as Exhibit H is a table summarizing the corporate structure of OHB and each of the other Debtors in these Cases (collectively, the "Subsidiary Debtors"). The Debtors have various non-debtor direct and indirect subsidiaries (the "Non-Debtor Subsidiaries")[2] and

---

[2]    The Non-Debtor Subsidiaries are Alambry Funding, Inc.; A. P. Orleans & Co.; A. P. Orleans, Incorporated (PA); A. P. Orleans, Incorporated (NJ); A. P. Orleans Real Estate Co., Inc.; Greenwood Orleans, Inc.; Lucy Financial, Inc.; Masterpiece Homes & Properties, Inc.; Meadows at Hyde Park, LLC; Moorefield Title Agency, L.C.; OAH Manager LLC; OHI NJ, LLC; OHI PA, LLC; OHI South Service Corp.; Orleans Abstract Member, LLC; Orleans Affordable Housing LP; Orleans Air LLC; Orleans Arizona

other affiliates that, among other things, offer supplemental services to homebuyers, including, title and closing, and mortgage services. The Debtors provide administrative support for certain of the Non-Debtor Subsidiaries, including, for example, payroll and accounting services, and these Non-Debtor Subsidiaries pay their proportionate share of any related fees but do not compensate the Debtors for the services of related employees.

## 1.     The DIP Facility

The Debtors are parties to that certain debtor-in-possession loan agreement, dated as of April 21, 2010, as amended and modified on or about June 7, 2010 (together with all of the documents, instruments, and agreements related thereto or entered into in connection therewith, and as may be further amended, modified, or supplemented from time to time, the "DIP Facility"), by and among the Borrowers (as defined in the DIP Facility), as borrowers; Wells Fargo Bank, National Association, as administrative agent (together with all successors and assigns thereof, the "DIP Facility Agent"); and the Lenders, as the lenders thereunder (together with their participants, successors, and assigns, the "DIP Facility Lenders"). The DIP Facility currently provides the Debtors with a $25 million revolving loan facility (the "DIP Revolver"), including a subfacility of up to $15 million of letters of credit, and $80 million of term loans, which consist of a "roll up" of portions of the indebtedness under the Revolving Credit Facility of certain of the Revolving Credit Facility Lenders.

The Debtors may only borrow under the DIP Facility in accordance with a budget (the "DIP Budget"), which sets forth the anticipated uses of funds drawn under the DIP Facility, subject to permitted variances that, as per the first amendment to the DIP Facility (as described below), generally cannot exceed $3 million. The Debtors update the DIP Budget on an approximately six-week cycle, which, upon approval, resets the permitted variance to zero. The DIP Budgets reflect, among other things, anticipated receipts from the sale of housing units; cost-to-complete of housing units; payments on behalf of the Debtors' related to ongoing payroll and employee benefits; certain payments with respect to pre-petition accounts payable that are being paid in connection with other orders of the Bankruptcy Court; and restructuring, bankruptcy, and financing costs.

The DIP Facility contains various affirmative, negative, and financial covenants. Among the most significant covenants are those that generally limit the Debtors' Cash position to $7.5 million and require the Debtors to comply with certain milestones (subject to 30-day extension by a majority of the lenders under the DIP Revolver (the "DIP Revolver Lenders")) regarding

---

Construction, LLC; Orleans at Aston, L.P.; Orleans at Dolington, L.P.; Orleans at Florence, LLC; Orleans at Horsham, LP; Orleans at Illinois, LLC; Orleans at Lower Makefield, LP; Orleans at Monroe, LLC; Orleans at South Brunswick, LLC; Orleans Homebuilders Trust; Orleans Management, LLC; Orleans RHPA, LLC; Orleans-Wheatley Meadows, LLC; P & L Realty, Inc.; Quaker Sewer, Inc.; and Radnor Carpentry Corporation.

approval by the Bankruptcy Court of a disclosure statement by September 30, 2010, and confirmation of a plan of reorganization by November 5, 2010.

The Debtors are required to pay various fees under the DIP Facility, including an unused fee at the rate of 1.00% per annum on the average daily unused portion of the DIP Revolver. Also, during such time as any Letter of Credit or Tri-Party Agreement remains outstanding, the Debtors are obligated to pay each quarter, in arrears, a fee based on the amount available to be drawn under such Letter of Credit or Tri-Party Agreement during the preceding Fiscal Quarter, calculated on the basis of a 360-day year at the per annum rate equal to the Applicable Spread (as all such terms are defined in the DIP Facility) applicable to the DIP Revolver, which is 8.50% (the "Letter of Credit Fee"). From the Letter of Credit Fee, any issuer of a Letter of Credit or Tri-Party Agreement is also entitled to receive a Letter of Credit and Tri-Party Agreement issuance fee calculated at the rate of 0.125% per annum of the amount of such issuer's exposure thereunder for so long as any portion of such Letter of Credit and Tri-Party Agreement remains undrawn.

All of the Debtors' obligations under the DIP Facility are granted superpriority administrative expense status (the "DIP Superpriority Claim") and are secured by a first-priority security interest in, and Liens upon, substantially all of the Assets (other than Avoidance Claims), subject to valid and unavoidable Liens that were in existence on March 1, 2010, or that could be asserted after such date, but that relate back to such or an earlier date under applicable law and that under applicable law are senior to, and have not been subordinated to, the Liens of the Revolving Credit Facility Lenders. The foregoing superpriority claim and Liens are also subject to a carve-out (the "Carve-Out") for all fees required to be paid to the Clerk of the Bankruptcy Court and the statutory fees of the United States Trustee, plus an aggregate amount, not to exceed $2.5 million, for the payment of fees and expenses to the Debtors' and the Creditors Committee's Professionals. In addition, the DIP Facility sets forth the agreement of certain of the Revolving Credit Facility Lenders and the DIP Facility Lenders that the unsecured portion of any claim relating to the indebtedness under either the Revolving Credit Facility or the DIP Facility will be subordinate with respect to the first $4 million derived solely from the proceeds of any Avoidance Claims to or for the benefit of General Unsecured Creditors in these Cases.

Five business days after the DIP Facility Agent notifies the Debtors of an event of default under the DIP Facility, the automatic stay imposed by Bankruptcy Code § 362(a) would be automatically lifted, and the DIP Facility Lenders can take any and all actions in furtherance of their rights and remedies as if these Cases were not pending; provided, however, that the Debtors would be permitted to pay all post-petition expenses (other than expenses subject to the Carve-Out) that they incurred prior to the giving of such notice so long as such expenses (at the time of incurrence) were permitted under the DIP Budget.

In connection with the DIP Facility, on April 21, 2010, the Debtors also entered into a security agreement (the "DIP Security Agreement") with the DIP Facility Agent. Pursuant to the DIP Security Agreement, the Debtors secured their indebtedness under the DIP Facility by granting the DIP Facility Agent first-priority Liens upon all of their real, personal, and mixed property, with certain relatively small exceptions set forth in the DIP Security Agreement. The

DIP Security Agreement also includes various representations, warranties, covenants, indemnification, and other provisions.

As a result of certain of the Revolving Credit Facility Lenders' and the DIP Facility Lenders' assignment of their respective rights and obligations under the DIP Facility to Strategic Value Special Situations Master Fund, LP; Strategic Value Master Fund, Ltd.; Anchorage Illiquid Opportunities Offshore Master, L.P.; and Bank of America, N.A. (collectively, and together with each other entity that is designated as a "Sponsor" prior to the Confirmation Date, the "Sponsors"), now hold in excess of two-thirds of the amounts outstanding under the DIP Facility and in excess of two-thirds of the amounts outstanding under the Revolving Credit Facility. Pursuant to an amendment, dated June 7, 2010, the DIP Facility was amended to, among other things, (i) increase the DIP Revolver sublimit from $20 million to $25 million; (ii) increase the amount of permitted variance from the DIP Budget from $2 million to $3 million; (iii) extend various deadlines in these Cases; (iv) allow the construction of certain new homes, subject to specified requirements; and (v) remove the collateral value ratio covenant.

As noted above, the Sponsors, in their capacity as the Majority Lenders, now collectively hold in excess of two-thirds of the amounts outstanding under each of the DIP Facility and the Revolving Credit Facility. The Sponsors, therefore, have the ability to consent to most amendments and modifications to the DIP Facility without the consent of any other of the DIP Facility Lenders. Certain other decisions, however, do require the unanimous consent of all of the DIP Facility Lenders, including postponing the maturity date of the DIP Facility or the date when the payment of any principal, interest, or fee is due; reducing the principal amount, interest rate, or any loan fee thereunder; or releasing any guarantor or collateral except as otherwise expressly permitted under the DIP Facility. Furthermore, as a natural consequence of the Sponsors' holdings of more than two-thirds of the debt outstanding under each of the DIP Facility and the Revolving Credit Facility, together with the first-priority, perfected Liens on substantially all of the Debtors' assets granted to the DIP Facility Lenders, the Sponsors have substantial influence in these Cases. The Sponsors are under no obligation to exercise that influence for the benefit of any other stakeholder, and their interests may be substantially different from the interests of the Debtors' other creditors and the Debtors' Interest holders.

For further information regarding the DIP Facility (including the Bankruptcy Court orders approving same), see the section below entitled "The Cases -- Other First Day Motions -- Debtor-in-Possession Financing".

## 2. The Revolving Credit Facility.

On September 30, 2008, (a) all of the Debtors (other than OHB; Community Management Services, Group, Inc.; OHI Financing, Inc.; and Orleans Arizona, Inc.)[3] as borrowers (collectively, the "Revolving Credit Facility Borrowers"), and (b) OHB, as guarantor

---

[3]    Orleans Arizona, Inc.'s charter was revoked on May 12, 2010.

(the "Revolving Credit Facility Guarantor"), entered into that certain Second Amended and Restated Revolving Credit Loan Agreement for a Senior Secured Revolving Credit and Letter of Credit Facility (as amended and restated from time to time, the "Revolving Credit Facility"), with various banks as lenders thereunder (the "Revolving Credit Facility Lenders").[4] Over several years, the Revolving Credit Facility Borrowers and the Revolving Credit Facility Guarantor entered into various amendments and letter agreements with the Revolving Credit Facility Lenders that, generally, provided limited waivers with respect to certain events of default and anticipated events of default under the Revolving Credit Facility, including payment defaults and breaches and anticipated breaches of certain financial and other covenants, and to provide certain modifications with respect to the determination and calculation of borrowing base availability, the effect of which were to increase availability under the Revolving Credit Facility. The various amendments and waivers also required the payment to the Revolving Credit Facility Lenders of various fees, expenses, and an increase in the applicable interest rate by 25 basis points to LIBOR plus 5.25%.

The Revolving Credit Facility was originally in the amount of $405 million, and then was reduced to $375 million in June of 2009. As of February 12, 2010, the Revolving Credit Facility provided the Debtors with a revolving facility of up to $350 million, subject to a defined borrowing base availability. The Revolving Credit Facility also originally provided for a swingline facility of $10 million and a letter of credit sublimit of $30 million. Pursuant to the subsequent agreements with the Revolving Credit Facility Lenders, swingline borrowings and the issuance of new letters of credit were suspended. The Debtors used the funds available under the Revolving Credit Facility to fund their operations.

The Revolving Credit Facility also provided that past due payments of principal would be subject to a default interest rate equal to the otherwise applicable interest rate plus 4%. In

---

[4] Specifically, a waiver letter agreement with respect to the Revolving Credit Facility was entered into on January 30, 2009, and the Revolving Credit Facility was amended by that certain first amendment, dated February 11, 2009; that certain second amendment, dated August 13, 2009; and that certain third amendment, dated September 30, 2009. In addition, the Revolving Credit Facility Borrowers and the Revolving Credit Facility Guarantor also entered into a first waiver and extension letter agreement, effective as of October 30, 2008; a second waiver and amendment extension letter agreement, dated December 18, 2009; and a third waiver and amendment extension letter agreement, dated January 25, 2010. In connection with the August 13, 2009, second amendment to the Revolving Credit Facility, Orleans at Upper Uwchlan, LP, a revolving Credit Facility Borrower and a subsidiary of OHB, entered into a security agreement granting, among other things, the Revolving Credit Facility Lenders an interest in certain equity interests held by Orleans at Upper Uwchlan, LP. In connection with the January 25, 2010, waiver and amendment extension letter, the Debtors also entered into a security agreement granting, among other things, the agent for the Revolving Credit Facility Lenders a security interest in certain company-owned life insurance policies.

addition to any interest that may be payable with respect to amounts advanced by the Revolving Credit Facility Lenders pursuant to any letter of credit, the Revolving Credit Facility requires the Debtors to pay to any of the Revolving Credit Facility Lenders that issue letters of credit an issuance fee of 0.125% of the amount of the letters of credit. The Revolving Credit Facility also provides for the payment of various fees to the Revolving Credit Facility Lenders. As of the Petition Date, the total amount outstanding under the Revolving Credit Facility, inclusive of interest and fees, was approximately $258 million, excluding $80 million of principal "rolled up" in the DIP Loan Agreement.

As security for all the obligations under the Revolving Credit Facility, the Revolving Credit Facility Lenders were granted a first-priority mortgage Lien on all real estate owned by the Debtors and included in the borrowing base under the Revolving Credit Facility; a security interest in and assignment of all future tax refunds and proceeds thereof received or payable to the Debtors (the "Tax Refunds"); mortgages on all real property owned by the Debtors that was not already subject to a Lien in favor of the Revolving Credit Facility Lenders; a security interest in any intercompany debt; a security interest in certain life insurance policies; and a security interest in any balance or assets in certain deposit or other accounts (collectively, the "Revolving Credit Facility Liens").

Moreover, the DIP Facility Order granted the Revolving Credit Facility Agent, for the benefit of the Revolving Credit Facility Lenders, adequate protection ("Adequate Protection") in an amount equal to the diminution in value of the Revolving Credit Facility Liens. Specifically, the Adequate Protection includes: (i) a security interest in and lien upon all assets and property of the Debtors and their respective Estates, except for Avoidance Claims (the "Adequate Protection Liens"), subject and subordinate only to the Carve-Out and the liens and security interests granted to the DIP Facility Agent for the benefit of the DIP Facility Lenders, which Adequate Protection Liens rank in the same relative priority and right as the Revolving Credit Facility Liens; and (ii) a super-priority administrative expense claim, as provided for in Bankruptcy Code § 507(b), junior to the DIP Superpriority Claim but superior in priority to any Administrative Claims of the Debtors or their respective Estates and subject to payment of the Carve-Out.

The Revolving Credit Facility was supposed to mature on December 20, 2009. The Revolving Credit Facility Lenders entered into a series of limited waivers that conditionally waived a number of defaults, including a failure to repay the outstanding amounts on such date. The last waiver period was effective through February 12, 2010, subject to certain terms and conditions. The Debtors did not repay the Revolving Credit Facility on that date, and on February 17, 2010, the Revolving Credit Facility Agent sent OHB and the Revolving Credit Facility Borrowers a Default and Reservation of Rights Letter. As of the Petition Date, approximately $318 million of cash borrowings were outstanding, excluding certain outstanding letters of credit and other assurances, $9.4 million of which had been drawn either immediately prior to or shortly after the Petition Date. In addition, there was approximately $3.3 million in accrued and unpaid interest and $15.1 million in additional fees that were due upon maturity.

3. **The Trust Preferred Securities.**

   (a)    **The $30 Million Trust Preferred Securities**

On September 20, 2005, Orleans Homebuilders Trust I ("Trust I") issued $30 million of trust preferred securities (the "$30 Million Trust Preferred Securities"), which mature on September 30, 2035, and are callable, in whole or in part, at par plus accrued interest on or after September 30, 2010. For the first 10 years, the $30 Million Trust Preferred Securities have a fixed interest rate of 8.52% per year. Thereafter, the $30 Million Trust Preferred Securities have a floating interest rate equal to three-month LIBOR plus 380 basis points per year, resetting quarterly.

The $30 Million Trust Preferred Securities are treated as debt obligations for financial statement purposes. The principal asset of Trust I is an unsecured junior subordinated note issued to Trust I by OHI Financing, Inc. ("OHI Financing"), and a guarantee of the note on a subordinated basis by OHB. The payment of principal and any premium and interest under the unsecured junior subordinated note is subordinate and subject in right of payment to the prior payment in full of all of the Debtors' senior debt, including their obligations under the Revolving Credit Facility. The subordination provisions provide that, in the event of the Debtors' bankruptcy, all of the Debtors' senior debt, including, without limitation, their obligations under the Revolving Credit Facility, must be paid in full before any payment or distribution can be made to the holder of the junior subordinated note. The subordination provisions also require that, to the extent the holder of a subordinated note receives a distribution before OHB's senior debt (including, without limitation, the Revolving Credit Facility) is paid in full, the distribution will be received in trust for the benefit of, and must be turned over to, such senior debt holder, including without limitation the Revolving Credit Facility Lenders.

OHB used proceeds from the sale of these securities to fund land purchases and residential construction. Under certain circumstances, the trustee of Trust I may distribute notes to the Holders of the $30 Million Trust Preferred Securities.

   (b)    **The $75 Million Trust Preferred Securities**

On November 23, 2005, Orleans Homebuilders Trust II ("Trust II") issued $75 million of trust preferred securities (the "$75M Trust Preferred Securities"). On August 3, 2009, all of the $75M Trust Preferred Securities were exchanged for new unsecured subordinated notes (the "Junior Subordinated Notes") issued by OHI Financing and guaranteed by OHB, pursuant to a private debt exchange (the "Exchange"). The Exchange closed pursuant to an exchange agreement, dated as of August 3, 2009 (the "Exchange Agreement"), between OHI Financing, OHB, and the Holders of the $75M Trust Preferred Securities; a junior subordinated indenture, dated as of August 3, 2009 (the "Indenture"), between OHI Financing, as issuer, and the Bank of New York Mellon, as trustee (the "Indenture Trustee"); and a parent guarantee agreement, dated as of August 3, 2009 (the "Parent Guarantee Agreement" and collectively with the Exchange Agreement and the Indenture, the "Exchange Documents"), between OHB, as parent guarantor, and The Bank of New York Mellon, as guarantee trustee.

25

Pursuant to the Exchange Documents, 100% of the outstanding, unsecured $75M Trust Preferred Securities of Trust II, were exchanged for new subordinated notes issued by OHI Financing and guaranteed on a subordinated basis by OHB. The payment of principal and any premium and interest under such subordinated notes are subordinate and subject in right of payment to the prior payment in full of all of the Debtors' senior debt, including their obligations under the Revolving Credit Facility. The subordination provisions provide that in the event of the Debtors' bankruptcy, all of the Debtors' senior debt, including without limitation their obligations under the Revolving Credit Facility, must be paid in full before any payment or distribution can be made to the Holders of the subordinated notes. The subordination provisions also require that to the extent the holder of a subordinated note receives a distribution before OHB's senior debt (including, without limitation, the Revolving Credit Facility) is paid in full, the distribution will be received in trust for the benefit of, and must be turned over to, such senior debt holder, including without limitation the Revolving Credit Facility Lenders. The Parent Guarantee Agreement provides for the guarantee (the "Parent Guarantee") by OHB of the obligations of OHI Financing under the Indenture, as well as the subordination of the Parent Guarantee to the Revolving Credit Facility in the same manner as the Junior Subordinated Notes are subordinated.

**4. Common Stock of OHB.**

OHB's authorized capital stock consists of 23 million shares of common stock and up to 500,000 shares of "blank check" preferred stock. As of August 1, 2010, OHB had 18,757,641 shares of common stock outstanding, with a $0.10 par value, and no shares of preferred stock outstanding, par value $1.00 per share. As of the Petition Date, OHB had options outstanding that were exercisable for approximately 682,500 shares of Old OHB Common Stock. On July 29, 2010, OHB filed a Form 15 with the SEC certifying termination of registration with respect to the Old OHB Common Stock and to terminate and/or suspend its obligations to file reports with the SEC.

Additional information regarding Old OHB Common Stock and other related matters may be found in periodic public reports and other documents that OHB has filed with the SEC. Such reports and other documents and information filed with the SEC may be examined and are also available for inspection without charge at, or copies may be obtained upon payment of prescribed fees from, the Public Reference Section of the SEC at Judiciary Plaza, 450 Fifth Street, NW, Washington, D.C. 20549, and they are also available for inspection and copying at the regional offices of the SEC located at 233 Broadway, New York, New York 10279, and at 500 West Madison Street, Chicago, Illinois 60661-2511. The SEC maintains a Web Site, http://www.sec.gov, that contains reports and other information regarding OHB, which reports and information may also be available at the "Investor Relations" section of the Debtors' website, http://www.orleanshomes.com/invest/index.cfm.

CG&R DRAFT: 9/27/10 6:42 PM                    #1100434 v3 (11YKY03_.DOC)

## C. Description of the Debtors' Businesses.

**EXCEPT AS SPECIFICALLY NOTED, THE DESCRIPTION OF THE DEBTORS' BUSINESSES SET FORTH BELOW IS PROVIDED AS OF JUNE 30, 2010, AND WITHOUT GIVING EFFECT TO CERTAIN EVENTS OCCURRING THEREAFTER. THE FOLLOWING DISCUSSES HOW THE DEBTORS HAVE OPERATED, AND IN CERTAIN INSTANCES, CONTINUE TO OPERATE THEIR BUSINESSES.**

### 1. Overview.

The Debtors' activities in developing residential communities include the sale of residential properties and, on a limited basis, the sale of land and developed homesites to other builders. The Debtors occasionally participate in joint ventures in certain of these activities. The Debtors conduct business under the Orleans Homebuilders brand name. The Debtors classify a sales contract or potential sale as a new order for backlog purposes at the time a homebuyer executes a contract to purchase a home from the Debtors and any applicable statutory rescission period has expired.

*Northern Region.* The Debtors' Northern Region has operations in the Southeastern Pennsylvania, Central New Jersey, Southern New Jersey, and Orange County, New York, markets. In the Northern Region, the Debtors currently build homes primarily targeted toward move-up, luxury, empty nester, and active adult homebuyers with a regional average home sales price of $460,000 in backlog at June 30, 2010, an increase of 2% compared to backlog at June 30, 2009.

During FY 2010, the Debtors delivered 273 homes in their Northern Region, generating $101,690,000, or 48%, of their residential revenue. During FY 2009 and 2008, respectively, the Debtors delivered 325 and 486 homes in the Northern Region, generating $144,746,000 and $231,034,000, or 44.9% and 41.1%, of their residential revenue.

The backlog in the Northern Region at June 30, 2010, represented 66.3% of the Debtors' total backlog.

*Southern Region.* The Debtors' Southern Region has operations in Richmond and Tidewater, Virginia, and Charlotte, Raleigh, and Greensboro, North Carolina. The Charlotte market also includes operations in adjacent counties in South Carolina. In the Southern Region, the Debtors currently build homes primarily targeted toward the move-up and luxury homebuyer with a regional average home sales price of $371,000 in backlog as of June 30, 2010, a decrease of 12.7% compared to backlog at June 30, 2009.

During FY 2010, the Debtors delivered 238 homes in the Southern Region, generating $90,351,000, or 42.6% of their residential revenue. During FY 2009 and 2008, respectively, the Debtors delivered 340 and 514 homes in the Southern Region, generating $137,604,000 and $243,714,000, or 42.7% and 43.3%, of their residential revenue.

The backlog in the Southern Region at June 30, 2010, represented 24.6% of the Debtors' total backlog.

*Midwestern Region.* In their Midwestern Region, the Debtors have operations in the Chicago area, and they currently build homes primarily targeted toward the move-up homebuyer with a regional average home sales price of $393,000 in backlog as of June 30, 2010, which is the same as FY 2009.

During FY 2010, in the Midwestern Region, the Debtors delivered 47 homes, generating $18,118,000, or 8.5% of their residential revenue. During FY 2009 and 2008, respectively, the Debtors delivered 81 and 142 homes in the Midwestern Region, generating $33,959,000 and $59,005,000, or 10.5% (for both years), of their residential revenue.

The backlog in the Midwestern Region at June 30, 2010, represented 8.8% of the Debtors' total backlog.

*Florida Region.* In the Florida Region, the Debtors have operations in Orlando and they formerly had operations in the Palm Bay and Palm Coast markets that were substantially exited during the first and second quarters of FY 2008. The Debtors have also scaled back their operations in the Orlando market through the disposition of certain communities in the second quarter of FY 2008. In the Florida Region, the Debtors currently build homes primarily targeted toward the first time move-up and entry level homebuyers with a regional average home sales price of $260,000 in backlog as of June 30, 2010, a decrease of 29.6% compared to backlog at June 30, 2009.

During FY 2010, the Debtors delivered 10 homes in the Florida Region, generating $1,911,000, or .9% of their residential revenue. During FY 2009 and 2008, respectively, the Debtors delivered 24 and 120 homes in the Florida Region, generating $5,933,000 and $28,430,000, or 1.9% and 5.1%, of their residential revenue.

The backlog in the Florida Region at June 30, 2010, represented 0.3% of the Debtors' total backlog.

The following tables set forth certain information with respect to the Debtors' residential communities and residential revenues by Region and type of home.

### Residential Communities as of June 30, 2010

| Region | Number of Communities | Home Price Range ($) | Backlog ($) | Percent (%) of Total Backlog | Number of Homes in Backlog |
|---|---|---|---|---|---|
| Northern | 29 | 176 - 1,461 | 66,072 | 66.3 | 135 |
| Southern | 41 | 144 - 1,066 | 22,988 | 24.6 | 62 |
| Midwestern | 6 | 326 - 572 | 8,259 | 8.8 | 21 |
| Florida | 3 | 129 - 308 | 260 | .3 | 1 |
| Total | 79 | 129 - 1,461 | 93,579 | 100 | 219 |

CG&R DRAFT: 9/27/10 6:42 PM #1100434 v3 (11YKY03_.DOC)

## Residential Revenue by Type of Home for the FY Ended June 30

| Type of Home | 2010 Residential Revenue ($) | 2010 Percent (%) of Revenue | 2009 Residential Revenue ($) | 2009 Percent (%) of Revenue | 2008 Residential Revenue ($) | 2008 Percent (%) of Revenue |
|---|---|---|---|---|---|---|
| Single family | 167,235 | 79 | 266,930 | 83 | 484,908 | 86 |
| Townhouses | 37,355 | 18 | 47,161 | 15 | 68,057 | 12 |
| Condominiums | 7,480 | 3 | 8,151 | 2 | 9,128 | 2 |
| Total | 212,070 | 100 | 322,242 | 100 | 562,183 | 100 |

## Residential Revenue by Region for the FY Ended June 30

| Division | 2010 Residential Revenue ($) | 2010 Percent (%) of Revenue | 2009 Residential Revenue ($) | 2009 Percent (%) of Revenue | 2008 Residential Revenue ($) | 2008 Percent (%) of Revenue |
|---|---|---|---|---|---|---|
| Northern | 101,690 | 48 | 144,746 | 45 | 231,034 | 41 |
| Southern | 90,351 | 43 | 137,604 | 43 | 243,714 | 13 |
| Midwestern | 18,118 | 8 | 33,959 | 10 | 59,055 | 11 |
| Florida | 1,911 | 1 | 5,933 | 2 | 28,430 | 5 |
| Total | 212,070 | 100 | 322,242 | 100 | 562,183 | 100 |

The following table sets forth certain details as to residential sales activity from continuing operations before taxes. The information provided is for the Fiscal Years ended June 30, 2009, 2008, and 2007 in the case of revenues earned, new orders, and (loss) income from continuing operations before taxes and as of June 30, 2009, 2008, and 2007 in the case of backlog. All amounts are in thousands (000's) of dollars.

| | As of and for the Year Ended June 30, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| **Northern Region** | | | |
| Residential revenue | $101,690 | $144,746 | $231,034 |
| Homes | 273 | 325 | 486 |
| Average Price | $372 | $445 | $475 |
| New Orders | $84,417 | $114,273 | $196,217 |
| Homes | 232 | 291 | 441 |
| Average Price | $364 | $393 | $445 |

29

| | | | |
|---|---|---|---|
| Backlog | $62,072 | $79,345 | $109,818 |
| Homes | 135 | 176 | 210 |
| Average Price | $460 | $451 | $523 |
| | | | |
| **Southern Region** | | | |
| Residential revenue | $90,351 | $137,604 | $243,714 |
| Homes | 238 | 340 | 514 |
| Average Price | $380 | $405 | $474 |
| New Orders | $61,541 | $85,643 | $216,945 |
| Homes | 178 | 246 | 487 |
| Average Price | $346 | $348 | $445 |
| Backlog | $22,988 | $51,798 | $103,759 |
| Homes | 62 | 122 | 216 |
| Average Price | $371 | $425 | $480 |
| | | | |
| **Midwestern Region** | | | |
| Residential revenue | $18,118 | $33,959 | $59,005 |
| Homes | 47 | 81 | 142 |
| Average Price | $385 | $419 | $416 |
| New Orders | $11,041 | $28,211 | $52,157 |
| Homes | 29 | 72 | 135 |
| Average Price | $381 | $392 | $386 |
| Backlog | $8,259 | $15,336 | $21,084 |
| Homes | 21 | 39 | 48 |
| Average Price | $393 | $393 | $439 |
| | | | |
| **Florida Region** | | | |
| Residential revenue | $1,911 | $5,933 | $28,430 |
| Homes | 10 | 24 | 120 |
| Average Price | $191 | $247 | $237 |
| New Orders | $1,569 | $2,887 | $17,260 |
| Homes | 8 | 15 | 76 |
| Average Price | $196 | $192 | $227 |
| Backlog | $260 | $602 | $3,648 |
| Homes | 1 | 3 | 12 |
| Average Price | $260 | $201 | $304 |
| | | | |
| **Combined Regions** | | | |
| Residential revenue | $212,070 | $322,242 | $562,183 |
| Homes | 568 | 770 | 1,262 |
| Average Price | $373 | $418 | $445 |
| New Orders | $158,568 | $231,014 | $482,579 |

CG&R DRAFT: 9/27/10 6:42 PM

#1100434 v3 (11YKY03_.DOC)

| Homes | 447 | 624 | 1,139 |
| Average Price | $355 | $370 | $424 |
| Backlog | $93,579 | $147,081 | $238,309 |
| Homes | 219 | 340 | 486 |
| Average Price | $427 | $433 | $490 |

## 2. Construction.

The Debtors historically have designed their own homes with the assistance of unaffiliated architectural firms, and they supervised the development and building of their communities. When the Debtors construct homes, they act as a general contractor and employ subcontractors at specified prices for the installation of site improvements and construction. The Debtors' agreements with subcontractors typically provide for a fixed price for work performed or materials supplied. Often, the Debtors' subcontractors will themselves contract with sub-subcontractors (and so on). In many instances, the Debtors have contracts or other agreements with their subcontractors, and they intend to reject such agreements under the Plan pursuant to Bankruptcy Code § 365 and to continue to operate under the same or similar terms and/or to negotiate and enter into similar new agreements with such parties after the Effective Date.

The Debtors do not manufacture any of the materials or other items used in the development of their communities; nor do they maintain substantial inventories of materials. From time to time, the Debtors have experienced significant difficulties with respect to shortages of materials; however, the Debtors mitigate this risk by having long-standing relationships with many of their major suppliers and contractors. None of the Debtors' suppliers or contractors accounted for more than 10% of the Debtors' total purchases in FY 2010.

A majority of the Debtors' single-family detached homes are constructed after the home sale contract has been signed and mortgage approval has been obtained. The Debtors generally begin construction of townhouse and condominium buildings after they have obtained a signed home sale contract for at least 50% of the homes in that building. When the Debtors build condominium buildings, they are typically two-story, wood-frame construction with between four and eight units, similar to their townhome product offerings.

Depending on the market conditions and the specific community, the Debtors may also build homes without first obtaining a signed home sale contract or customer commitment. In the past, most of these speculative homes have been sold while under construction. The Debtors routinely monitor their completed home and speculative inventory to help achieve an adequate return on investment.

## 3. Purchasing and Budgeting.

The Debtors have established relationships with a number of vendors and suppliers in each of their markets and believe these relationships reduce their exposure to any market shortages of labor or materials. The Debtors have negotiated price arrangements that they believe are favorable with regional suppliers to purchase items such as lumber, appliances, plumbing fixtures, floor coverings, and other high-quality equipment and materials. The Debtors have established budgets for all of their home designs and offered options. These budgets are

31

modified and adjusted by local divisional management to reflect the specifications needed to meet market demands and local cost variances. In many instances, the Debtors have contracts or other agreements with their vendors and suppliers, and they intend to reject such agreements under the Plan pursuant to Bankruptcy Code § 365 and to continue to operate under the same or similar terms and/or to negotiate and enter into similar new agreements with such parties after the Effective Date.

### 4. Sales and Marketing.

The Debtors market their homes to various types of homebuyers according to the specific needs of each market. The Debtors advertise using the internet, newspapers, industry publications, direct mail, radio, billboards, and brochures. The Debtors have developed and maintain their website, http://www.orleanshomes.com, to provide prospective homebuyers with information regarding their communities, available home designs, and price ranges, as well as a multimedia gallery offering panoramic video tours and streaming video presentations of some of their homes.

The Debtors typically utilize furnished model homes that are staged by professional decorators and located in their communities to help sell their homes. The Debtors prefer to staff these models with their own sales professionals to assist prospective homebuyers with home selection and financing decisions. The Debtors' sales professionals are typically compensated on a commission basis and are trained extensively in selling techniques, construction, and home-financing programs.

When market conditions warrant, the Debtors utilize designated outside real estate sales brokers who are typically paid on a commission basis. A significant portion of the Debtors' sales are generated in cooperation with outside brokers. Accordingly, the Debtors sponsor a variety of programs and events to increase awareness and to provide incentives to the brokerage community to promote and sell the Debtors' homes.

In addition to a wide range of home designs, the Debtors provide their buyers with the ability to personalize their homes through an extensive home-customization program. In most markets, the Debtors facilitate this process with the use of design centers, which provide a centralized and professionally-merchandised presentation of the various options and features available in their homes. Some of the Debtors' most popular options include kitchen and flooring upgrades and bonus rooms. Homebuyers have the opportunity to work individually with a design consultant to assist them in making their option and upgrade selections. The design consultants are paid a combination of salary and commission. The Debtors believe the use of design centers increases homebuyer satisfaction, streamlines the option-selection process, and ultimately leads to greater profitability.

Sales of the Debtors' homes are made pursuant to a standard home sale contract, which is modified to comply with jurisdictional requirements. A deposit of five percent (5%) of the purchase price is typically required for each contract; however, in certain markets, the required deposits may be as low as two percent (2%). In addition, the home sale contract typically contains a financing contingency. The financing contingency provides homebuyers with the right to cancel in the event they are unable to obtain financing at a prevailing interest rate within

32

a specified time period from the execution of the home sale contract. Typically, the Debtors will not commence construction until mortgage approval has been obtained. The contract may also contain other contingencies, such as the sale of the homebuyer's existing home. The Debtors closely monitor all such contingencies.

### 5. Land Policy.

The Debtors have historically acquired land in order to provide an adequate and well-located supply for their residential building operations. The Debtors' strategy for land acquisition and development is dictated by specific market conditions where they conduct their operations. In general, the Debtors seek to minimize the overall risk associated with acquiring undeveloped land by structuring purchase agreements that allow them to control the process of obtaining environmental and other regulatory approvals, but that also defer the acquisition of the land until the approval process has been substantially completed.

In their Southern and Florida Regions, the Debtors also acquire improved lots from land developers on a lot "takedown" basis. Under a typical agreement with a land developer, a minimal number of lots are purchased initially, and the remaining lot takedowns are subject to the terms of an option agreement. In evaluating possible opportunities to acquire land, the Debtors consider a variety of factors, including projected sales price and profitability, feasibility of development, proximity to developed areas, population-growth patterns, customer preferences, estimated cost of development, and availability and cost of financing.

The Debtors engage in many phases of development activity, including land and site planning, obtaining environmental and other regulatory approvals, and the construction of roads, sewer, water, and drainage facilities, recreation facilities, and other amenities. The Debtors believe that their experience entitling and developing lots in the highly-regulated Pennsylvania and New Jersey markets for over 40 years has given them expertise in all aspects of the site selection, land-planning, entitlement, and land-development processes, which can be leveraged across all markets in which the Debtors operate.

As of June 30, 2010, the Debtors owned building lots that would yield approximately 4,103 homes. As of June 30, 2010, the Debtors also had under option land and improved lots that would yield approximately 172 homes, for a total owned or controlled lot position of approximately 4,275 lots. The Debtors may be in default of certain of the related option agreements and may allow the option on certain of these properties to lapse as the economic return is less than what is required for the Debtor's business plan. Generally, the Debtors structure their land acquisitions so that they have the right to cancel the agreements to purchase undeveloped land and improved lots by forfeiture of their deposits under the agreements. Furthermore, these agreements are generally contingent upon obtaining all governmental approvals and satisfaction of certain requirements by the Debtors and the sellers.

As of June 30, 2010, the Debtors had incurred costs associated with the acquisition and development of these parcels aggregating approximately $5,463,813.59, including approximately $1,113,547.20 of cash deposits. Contingent upon the Debtors' obtaining all required regulatory approvals, they anticipate completing a majority of these acquisitions during the next several years. The Debtors presently believe that the contracts and terms on these parcels will result in a

positive return for the Debtors, despite the current market conditions. During FY 2010, the Debtors wrote off $6,106,000 in land deposits and pre-acquisition costs related to contracts to purchase both improved lots and undeveloped land where the Debtors have either cancelled the option or where the acquisition of the property was not probable due to insufficient economic returns.

The following table sets forth the Debtors' land positions as of June 30, 2010.

| Region | Lots owned | Percent (%) of lots owned | Lots under options or agreements of sale | Percent (%) of lots controlled | Total lots owned or controlled | Percent (%) of total |
|---|---|---|---|---|---|---|
| Northern | 2,217 | 54.0 | 77 | 44.8 | 2,294 | 53.7 |
| Southern | 1,412 | 34.4 | 95 | 55.2 | 1,507 | 35.3 |
| Midwestern | 252 | 6.1 | 0 | 0.0 | 252 | 5.9 |
| Florida | 222 | 5.4 | 0 | 0.0 | 222 | 5.2 |
| Total | 4,103 | 100.0 | 172 | 100.0 | 4,275 | 100.0 |

## 6. Customer Service and Quality Control.

The Debtors' homebuyers are provided with a detailed "New Homebuyer Manual", which outlines the home construction and delivery process. Homebuyers are provided with up to four orientation sessions conducted at the home. These orientation sessions provide the homebuyer with the opportunity to become familiar with the construction and operation of the home, as well as providing the Debtors with valuable feedback. Immediately prior to delivery of the home, the final orientation is conducted, from which a list of items to address is generated.

After delivery of the home, the Debtors process all requests for warranty service through their customer service department. In the event service is required, the Debtors believe that a timely response is critical. The Debtors typically schedule their contractors to minimize the inconvenience to the homebuyer and attempt to complete the necessary repairs within 17 days of receipt of a request for warranty service.

## 7. Warranty Program and Construction Defect Claims.

The Debtors' homebuyers are typically provided with a one- to two-year limited warranty on workmanship and materials and a 10-year limited warranty covering structural items.[5] The extent of the warranties may vary depending on the state in which the community is located. The

---

[5]     In general, most homebuyers that use the Debtors' mortgage broker, Alambry Funding, Inc., as their mortgage broker or for similar services are eligible for a two-year warranty.

CG&R DRAFT: 9/27/10 6:42 PM                                    #1100434 v3 (11YKY03_.DOC)

Debtors' contracts with their subcontractors and suppliers generally require them to indemnify the Debtors for any claims for defective materials or workmanship arising for up to one year from the date of completion of the item, thereby reducing the Debtors' ultimate warranty exposure.

## 8.    Cost-Sharing Arrangements and Joint Ventures.

From time to time, the Debtors have developed and owned communities through joint ventures with other parties. Determinations by the Debtors to enter into these agreements have been based upon a number of factors, including the opportunity to limit their financial exposure involved in the acquisition of larger parcels of land and the ability to pool resources with other homebuilders and developers with respect to completion of the regulatory-approval process for a particular parcel. Additionally, in the Northern Region, the Debtors have partnered with other homebuilders and developers to acquire land and/or to develop or improve common off-site facilities, such as sewer treatment plants. Most of these agreements are established as cost-sharing arrangements, whereby the homebuilders and developers share in the cost of acquiring the parcel or developing or improving the off-site facility. In some communities in the Southern Region, as an alternative to land-acquisition financing, the Debtors have partnered with developers to construct and sell homes on the developers' lots. At the time of settlement, the developers receive a fixed amount for the cost of the lot and a portion of the profits from the sale of the home. The Debtors will continue to evaluate all opportunities related to cost-sharing agreements and joint ventures; however, historically, these arrangements have not been material to the Debtors' operations.

## 9.    Financial Services.

As part of the Debtors' objective to make the home-buying process more convenient and increase the efficiency of their building cycle, the Debtors, through their Non-Debtor Subsidiary, Alambry Funding, Inc. ("Alambry"), offer mortgage-brokerage services to their customers. Alambry assists homebuyers in obtaining financing directly from unaffiliated lenders. The Debtors do not fund or service the mortgage loans.

Alambry derives most of its revenue from buyers of the Debtors' homes, although it also offers its services to existing homeowners refinancing their mortgages, as well as to customers purchasing pre-existing homes or new homes from one of the Debtors' competitors.

During FY 2010, approximately 77% of the Debtors' homebuyers utilized the services of Alambry compared to 74% during FY 2009 and 72% during FY 2008. In general, the Debtors derive less than 1% of their total earned revenues from their mortgage business.

## 10.    Government Regulations.

The Debtors and their subcontractors are subject to continuing compliance requirements of various federal, state, and local statutes, ordinances, rules, and regulations regarding zoning, building, construction, and similar matters. The intensity of development in recent years in areas in which the Debtors are actively developing real estate has resulted in increasingly restrictive regulation and moratoriums by governments due to density, sewer and water, ecological, and similar factors. Further expansion and development may require prior approval of federal, state,

35

and local authorities and may result in delay or curtailment of development activities and costly compliance programs.

Regulation by federal and state authorities relating to the sale and advertising of condominium interests and residential real estate has become more restrictive and extensive. In order to advertise and sell condominiums and residential real estate in many jurisdictions, the Debtors have been required to prepare a registration statement or other disclosure document and, in some cases, to file such materials with a designated regulatory agency.

Despite the Debtors' past ability to obtain necessary permits and authorizations for the communities the Debtors build, more stringent requirements may be imposed on developers and homebuilders in the future. Although the Debtors cannot determine the effect of such requirements, they could result in time-consuming and expensive compliance programs and substantial expenditures for environmental controls, which could have a material adverse effect on the Debtors' results of operations. In addition, the continued effectiveness of permits already granted is subject to many factors beyond the Debtors' control, including changes in policies, rules, and regulations and their interpretation and application.

## 11. Environmental Regulation and Litigation.

Development and sale of real property creates a potential for environmental liability on the part of the developer, owner, or any mortgage lender for its own acts or omissions, as well as those of prior owners of the subject property or adjacent parcels. While the Debtors do not currently have any material environmental liabilities of which they are aware, in the future, if hazardous substances are discovered on, or emanating from, any of their properties, the Debtors, as well as any prior owners or operators, may be held liable for costs and liabilities relating to these hazardous substances.

Environmental studies are generally undertaken in connection with property acquisitions by the Debtors, and they endeavor to obtain Phase I environmental site assessments on all properties they acquire. Further governmental regulation with respect to environmental matters affecting residential development could impose substantial additional expense on the Debtors, which could adversely affect the results of operations or the value of properties owned or under contract of purchase by the Debtors.

## 12. Competition.

The homebuilding industry is highly competitive. The Debtors compete on the basis of their reputation, location, design, price, financing programs, quality of product, and related amenities. The Debtors compete with local, regional, and national homebuilders, some of which have greater sales, financial resources, and geographical diversity than the Debtors. In addition to competition for homebuyers, the Debtors also compete with other homebuilders for desirable properties, raw materials, and reliable, skilled labor. The Debtors also compete with individual resales of existing homes (including foreclosed homes and short sales -- a transaction in which the seller's mortgage lender agrees to accept a payoff of less than the balance due on the loan -- offered at substantially reduced prices), as well as the rental housing market.

### 13. Summary of Selected Financial Data.

The following table sets forth selected financial information for the Debtors. The financial information for the years ended and as of June 30, 2008, and 2007 has been derived from the Debtors' audited financial statements not included in this Disclosure Statement. The financial information for the years ended and as of June 30, 2010 and 2009, has been derived from the Debtors' unaudited financial statements not included in this Disclosure Statement, and the financial information for FY 2010 does not include all adjustments necessary to be in conformity with GAAP, as the Debtors have not yet been able adequately to review the inventory impairment charges and related adjustments, if any, to be recorded for FY 2010. The historical selected financial information may not be indicative of the Debtors' future performance. All dollar amounts (except for per share data) and share amounts are in thousands (000's).

| | Fiscal year ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2010 (a) | 2009 (b) | 2008 (c) | 2007 (d) |
| **Statement of earnings data:** | | | | |
| Total earned revenue: | | | | |
| Residential properties | $ 212,070 | $ 322,242 | $ 562,183 | $ 647,316 |
| Land sales | 372 | 58 | 11,432 | 25,170 |
| Other income | 5,725 | 8,636 | 9,667 | 10,047 |
| Total earned revenues | 218,167 | 330,936 | 583,282 | 682,533 |
| Costs of revenue | | | | |
| Residential properties | 210,008 | 389,450 | 553,600 | 613,954 |
| Land sales | 442 | 26 | 47,682 | 26,022 |
| Other | 8,567 | 6,405 | 7,477 | 6,571 |
| | 219,017 | 395,881 | 608,759 | 646,547 |
| Selling, general and administrative | 64,407 | 49,427 | 96,430 | 114,527 |
| Impairment of goodwill | - | 4,180 | - | 16,334 |
| Interest, net of amount capitalized | 14,433 | 8,039 | 741 | - |
| Total costs and expenses | 297,857 | 457,527 | 705,930 | 777,408 |
| (Loss) income from continuing operations before income taxes | (79,690) | (126,591) | (122,648) | (94,875) |
| Income tax (benefit) provision | (21,784) | 2,903 | (976) | (37,458) |
| (Loss) income from continuing operations | (57,906) | (129,494) | (121,672) | (57,417) |
| Discontinued operations: | | | | |
| Loss from discontinued operations, net of taxes | - | - | (21,741) | (9,433) |
| Net (loss) income available for common shareholders | $ (57,906) | $ (129,494) | $ (143,413) | $ (66,850) |
| Basic (loss) earnings per share: | | | | |
| Continuing operations | $ (3.04) | $ (6.99) | $ (6.60) | $ (3.11) |
| Discontinued operations | $ - | $ - | $ (1.18) | $ (0.51) |
| Basic (loss) earnings per share | $ (3.04) | $ (6.99) | $ (7.78) | $ (3.62) |
| Diluted (loss) earnings per share: | | | | |
| Continuing operations | $ (3.04) | $ (6.99) | $ (6.60) | $ (3.11) |
| Discontinued operations | $ - | $ - | $ (1.18) | $ (0.51) |
| Diluted (loss) earnings per share | $ (3.04) | $ (6.99) | $ (7.78) | $ (3.62) |
| Weighted average common shares outstanding: | | | | |
| Basic | 19,026 | 18,535 | 18,428 | 18,458 |
| Diluted | 19,026 | 18,535 | 18,428 | 18,458 |
| Dividends per share | $ - | $ - | $ 0.08 | $ 0.06 |
| **Supplemental operating data:** | | | | |
| Homes delivered (homes) | 568 | 770 | 1,262 | 1,487 |

37

| | | | | |
|---|---|---|---|---|
| Average price per home delivered | $ 373 | $ 418 | $ 445 | $ 435 |
| New sales contracts, net of cancellations (homes) | 447 | 624 | 1,139 | 1,381 |
| Backlog at end of period (homes) | 219 | 340 | 486 | 609 |
| Backlog at end of period, contract value | $ 93,579 | $ 147,081 | $ 238,309 | $ 317,913 |

| | As of June 30, | | | |
|---|---|---|---|---|
| | **2010** | **2009** | **2008** | **2007** |
| **Balance sheet data:** | | | | |
| Residential properties | $ 100,255 | $ 144,742 | $ 193,257 | $ 228,146 |
| Land and improvements | 240,905 | 264,070 | 359,555 | 511,872 |
| Inventory not owned - VIE | - | 2,878 | 13,050 | 47,214 |
| Inventory not owned - other financial interests | 12,993 | 12,182 | 12,171 | - |
| Land deposits and costs of future developments | 2,641 | 10,112 | 10,380 | 13,102 |
| Total assets | 422,472 | 478,032 | 716,112 | 910,944 |
| Obligations related to inventory not owned - VIE | - | 2,696 | 10,875 | 38,914 |
| Obligations related to inventory not owned - other financial interests | 12,893 | 12,082 | 12,071 | - |
| Mortgage obligations secured by real estate | 319,532 | 333,023 | 396,133 | 469,123 |
| Subordinated notes | 109,224 | 105,000 | 105,000 | 105,000 |
| Other notes payable | - | - | 718 | 787 |
| Shareholders' (deficit) equity | (100,212) | (44,391) | 82,501 | 224,534 |

[a]     Continuing operations include inventory impairment charges of $94,153, impairment of goodwill of $4,180, and write-offs of abandoned projects and other pre-acquisition costs of $1,435. In addition, a net pension credit relating to the Supplemental Executive Retirement Plan of $3,866 was recognized due to the termination of the plan on June 30, 2009.

[b]     Continuing operations include inventory impairment charges of $95,475, write-offs of abandoned projects and other pre-acquisition costs of $8,760, and the statement of operation impact of the establishment of a deferred tax asset valuation allowance in the amount of $53,642. Discontinued operations include inventory impairment charges of $20,706.

[c]     Continuing operations include inventory impairment charges of $62,787 and write-offs of abandoned projects and other pre-acquisition costs of $19,597. Discontinued operations include inventory impairment charges of $13,733 and write-offs of abandoned projects and other pre-acquisition costs of $67.

[d]     Continuing operations includes inventory impairment charges of $1,877 and write-offs of abandoned projects and other pre-acquisition costs of $4,512.

|  | | | |
|---|---|---|---|
|  | 219,017 | 395,881 | 608,759 |
| Selling, general and administrative | 64,407 | 49,427 | 96,430 |
| Impairment of goodwill | - | 4,180 | - |
| Interest: | | | |
| Incurred | 33,342 | 42,151 | 45,977 |
| Less capitalized | (18,909) | (34,112) | (45,236) |
|  | 297,857 | 457,527 | 705,930 |
| Loss from continuing operations before income taxes | (79,690) | (126,591) | (122,648) |
| Income tax provision (benefit) | (21,784) | 2,903 | (976) |
| Loss from continuing operations | (57,906) | (129,494) | (121,672) |
| Discontinued operations: | | | |
| Loss from discontinued operations, net of taxes | - | - | (21,741) |
| Net loss | $ (57,906) | $ (129,494) | $ (143,413) |
| Basic and diluted loss per share: | | | |
| Continuing operations | $ (3.04) | $ (6.99) | $ (6.60) |
| Discontinued operations | $ - | $ - | $ (1.18) |
| Net loss per share | $ (3.04) | $ (6.99) | $ (7.78) |
| Dividends declared per share | $ - | $ - | $ 0.08 |
| Basic and diluted weighted average shares outstanding | 19,026 | 18,535 | 18,428 |

**Orleans Homebuilders, Inc. and Subsidiaries**
**Consolidated Balance Sheets**
**(dollars in thousands, except par value)**

| | | June 30, 2010 | | June 30, 2009 |
|---|---|---|---|---|
| Assets | | | | |
| Cash and cash equivalents | $ | 2,853 | $ | 8,130 |
| Restricted cash - due from title company | | 5,705 | | 4,370 |
| Restricted cash - customer deposits | | 5,027 | | 6,424 |
| Restricted cash - other | | 32,897 | | - |
| Marketable securities | | - | | 6,299 |
| Real estate held for development and sale: | | | | |
|    Residential properties completed or under construction | | 100,255 | | 144,742 |
|    Land held for development or sale and improvements | | 240,905 | | 264,070 |
|    Inventory not owned - variable interest entities | | - | | 2,878 |
|    Inventory not owned - other financial interests | | 12,993 | | 12,182 |
| Property and equipment, at cost, less accumulated depreciation | | 334 | | 642 |
| Goodwill | | - | | - |
| Receivables, deferred charges and other assets | | 18,862 | | 18,183 |
| Land deposits and costs of future development | | 2,641 | | 10,112 |
|    Total Assets | $ | 422,472 | $ | 478,032 |
| | | | | |
| Liabilities and Shareholders' Equity | | | | |
| Liabilities: | | | | |
|    Accounts payable | $ | 45,607 | $ | 33,681 |
|    Accrued expenses | | 30,627 | | 27,904 |
|    Deferred revenue | | 5 | | 135 |
|    Customer deposits | | 4,796 | | 7,902 |
|    Obligations related to inventory not owned - variable interest entities | | - | | 2,696 |
|    Obligations related to inventory not owned - other financial interests | | 12,893 | | 12,082 |
|    Mortgage and other note obligations | | 319,532 | | 333,023 |
|    Subordinated notes | | 109,224 | | 105,000 |
|    Other notes payable | | - | | - |
|    Total Liabilities | | 522,684 | | 522,423 |
| | | | | |
| Commitments and contingencies (See note 12) | | | | |
| | | | | |
| Shareholders' (Deficit) Equity: | | | | |
| Common stock, $0.10 par, 23,000,000 shares authorized, | | | | |
|    19,188,131 and 18,938,131 shares issued at | | | | |
|    June 30, 2009 and June 30, 2008 | | 1,919 | | 1,919 |
| Capital in excess of par value - common stock | | 79,050 | | 76,965 |
| Accumulated other comprehensive loss | | - | | - |
| (Accumulated deficit) retained earnings | | (179,927) | | (122,021) |
| Treasury stock, at cost (98,990 shares | | | | |
|    held at June 30, 2009 and June 30, 2008) | | (1,254) | | (1,254) |
| Total Shareholders' (Deficit) Equity | | (100,212) | | (44,391) |
| | | | | |
| Total Liabilities and Shareholders' (Deficit) Equity | $ | 422,472 | $ | 478,032 |

40

### 14. Other Properties.

The Debtors' leasing arrangements include the leasing of certain office space, model homes, and equipment. These leases have been classified as operating leases. Rent expense was approximately $1,659,000, 2,536,000, and $2,256,000 for the three years ended June 30, 2010, 2009, and 2008, respectively. The Debtors have the following operating lease commitments:

| Fiscal Year | Amount ($000's) |
|---|---|
| 2011 | 539 |
| 2012 | 394 |
| 2013 | 131 |
| 2014 | 106 |
| 2015 | - |
| Thereafter | - |
| Total | 1,170 |

### 15. Legal Proceedings.

From time to time, the Debtors are named as defendants in legal actions arising from their normal business activities. Although the amount of any liability that could arise with respect to currently pending actions cannot be accurately predicted, in the opinion of the Debtors, any such liability will not have a material adverse effect on the financial position or operating results of the Debtors. All of the actions in which one of the Debtors is a defendant have been stayed by operation of law as a result of the commencement of these Cases in accordance with Bankruptcy Code § 362(a), although the Debtors have entered into agreed orders with certain parties that provide for relief from the automatic stay for the limited purpose of allowing such parties to pursue claims against applicable insurance coverage or to commence lien enforcement actions, so long as notices of abatement are filed.

For a discussion of material litigation pending before the Bankruptcy Court, see the sections below entitled "The Cases -- The Withdrawn Proposed Sale Motion and the NVR Complaint" and "The Cases -- The Eric's Nursery Complaint".

### 16. Directors & Officers.

### (a) Directors

OHB's Board of Directors currently has the following nine members:

Benjamin D. Goldman was elected the Vice Chairman of the Board of OHB in April 1998 and has been a director since May 1992. From May 1992 until April 1998, Mr. Goldman served as OHB's President and Chief Operating Officer, and he was a director of Sterling Bank of New Jersey from March 2002 to March 2009.

Jerome S. Goodman has been a director since April 2001. Mr. Goodman was a director of Aetna Inc. from 1988 to May 2001 and was Chairman of Travel One until its sale to American

Express Company on November 15, 1998. He was a trustee of Resource Asset Investment Trust, from 1997 to 1999, and he is a director of The Maine Merchant Bank, LLC.

Robert N. Goodman has been a director since April 1994. Since 1998, Mr. Goodman has served as President of Resmark Equity Partners, LLC (f/k/a Olympic Realty Advisors II, LLC), a finance company providing equity and debt capital for single-family residential homebuilding projects.

Andrew N. Heine has been a director since April 1994. Mr. Heine is a private investor who had previously been a practicing attorney and was a director of Citizens Communications Company from 1975 until 2005.

David Kaplan has been a director since April 1994. Since 1996, Mr. Kaplan has been a principal in Autumn Hill Capital, Inc., a real estate advisory and investment banking firm, and managing partner of Kingsbridge Partners LLC, a real estate investment firm. Prior to that time, he was a principal of Victor Capital Group, L.P., which engaged in real estate advisory services and investment banking.

Lewis Katz has been a director since 1987. From 1972 to 1997, Mr. Katz was a partner in the law firm of Katz, Ettin & Levine, P.A. in Cherry Hill, New Jersey, where he is now Of Counsel. From February 1998 to May 2007, Mr. Katz was a director of Central Parking Corporation.

Jeffrey P. Orleans has been a director since 1983 and has served as OHB's Chairman of the Board and Chief Executive Officer since September 1986. From September 1986 to May 1992, he also served as OHB's President. Mr. Orleans was again appointed President and Chief Operating Officer in October 2009. Mr. Orleans was also a trustee of Pennsylvania Real Estate Investment Trust from 1986 until June 2004.

Robert M. Segal has been a director since August 2002. From February 2007 to March 2009, Mr. Segal served as Senior Counsel for the law firm Wolf Block LLP, which formerly served as OHB's outside general counsel. Mr. Segal had previously been a partner in that law firm. Since April 2009, Mr. Segal has served as Business Advisor of Goodman Properties, Inc., a developer and operator of real estate.

John W. Temple has been a director since April 2002. For more than five years, Mr. Temple has been the President and Chief Executive Officer of Temple Development Company, a real estate development company.

### (b)  Executive Officers.

In addition to Messrs. Orleans and Goldman, whose biographies appear above, the following persons serve as principal executive officers of OHB:

C. Dean Amann II has been an Executive Vice President of OHB since June 2006. From October 2003 to June 2006, Mr. Amann was the Rocky Mountain Area President for Pulte Homes, Inc., and from February 2000 to October 2003, Mr. Amann was the Colorado Division President for Pulte Homes, Inc.

CG&R DRAFT: 9/27/10 6:42 PM                    #1100434 v3 (11YKY03_.DOC)

Mitchell B. Arden was appointed the CRO as of March 4, 2010. At that time, the Debtors also engaged PMCM, LLC ("PMCM"), an affiliate of Phoenix Management Services, Inc., of which Mr. Arden is a Senior Managing Director and Shareholder, to provide restructuring and other services. Mr. Arden's appointment and the retention of PMCM were approved by the Bankruptcy Court.

Thomas R. Vesey has been an Executive Vice President, serving the Debtors' Southern Region, since June 2006. Prior to that, Mr. Vesey had been the Division President for Charlotte, North Carolina, from January 2002 to June 2006 and had been employed from March 2000 to December 2001 to assist in evaluating and identifying opportunities for expansion into additional markets and to assimilate acquisitions into the Debtors' operations.

Mark D. Weaver, CPA, has served as Vice President and Corporate Controller since August 2007 and Principal Accounting Officer since December 2007. Before Mr. Weaver's employment by the Debtors, he was Vice President and Corporate Controller of Agere Systems Inc., at which he had previously served as Director of Accounting Policy and External Reporting.

17. **Agreements with Employees.**

(a) **Employment and Related Agreements.**

OHB is currently party to employment and non-compete agreements with seven current and/or former employees: Dean Amann, II; Thor Amlie; Lawrence J. Dugan; Jeffrey P. Orleans; Keith Trost; Thomas R. Vesey; and Mark Weaver. These agreements are generally for an unspecified duration and either the employee or OHB may terminate the agreements upon specified notice. These employment agreements generally include severance arrangements upon the occurrence of certain events of termination or change in control or pursuant to other triggering events. These agreements may also have certain triggers for the vesting of equity awards. The Debtors anticipate that they will reject all of these employment agreements on or prior to the Effective Date and that associated rejection claims would be approximately $1.9 million. Where appropriate, the Reorganized Debtors will negotiate new employment agreements.

(b) **Michael T. Vesey.**

On March 10, 2009 (effective January 1, 2009), OHB entered into a written Employment Agreement and Non-Competition and Confidentiality Agreement, with Michael T. Vesey, OHB's former President and Chief Operating Officer. Mr. Vesey died on August 28, 2009. OHB and the executrix of Mr. Vesey's estate (the "Vesey Estate") entered into a Termination Agreement and General Release, pursuant to which the Vesey Estate is entitled to receive payments in the gross aggregate amount of $2,186,647.92, of which $929,564.57 has been paid, inclusive of various taxes and withholdings, and $350,000 will be paid to the Vesey Estate by the Debtors or the Reorganized Debtors, as applicable, pursuant to Plan Section 7.8.