IN THE EVENT THAT, FOLLOWING THE REJECTION OF THE PLAN BY AN IMPAIRED CLASS OR CLASSES, AT THE ELECTION OF THE DEBTORS, THE PLAN IS MODIFIED AS DESCRIBED ABOVE (AND IN CONFORMITY WITH ARTICLE X OF THE PLAN), AND THE PLAN AS MODIFIED IS CONFIRMED BY THE BANKRUPTCY COURT, THE REJECTING CLASS OR CLASSES AND ANY CLASS JUNIOR TO SUCH CLASS OR CLASSES COULD BE TREATED LESS FAVORABLY THAN AS CURRENTLY PROVIDED IN THE PLAN, INCLUDING RETAINING NO PROPERTY AND RECEIVING NO DISTRIBUTION UNDER THE PLAN.

THE DEBTORS BELIEVE THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO ANY CLASS AND IS FAIR AND EQUITABLE WITH RESPECT TO EACH IMPAIRED CLASS. THEREFORE, THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN EVEN IF FEWER THAN THE REQUISITE NUMBER OF FAVORABLE VOTES ARE OBTAINED FROM ANY PARTICULAR VOTING CLASS.

### G. Feasibility Test.

The Bankruptcy Code requires that, in order to confirm a plan, the bankruptcy court must find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtor. This requirement is often referred to as the "feasibility test". For a plan to satisfy the feasibility test, a bankruptcy court must find that the reorganized debtors will likely possess the resources and working capital necessary to operate profitably and, based on reasonable assumptions, be able to meet their obligations under the plan.

For purposes of determining whether the Plan meets the feasibility test, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections (the "Financial Projections") for the six-year period ending with FY 2016. The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to make the payments required under the Plan on the Effective Date, repay and service debt obligations (including, without limitation, those under the Exit Credit Facility, the New Notes, and the New Notes Guarantees), and maintain operations. Accordingly, the Debtors believe that the Plan complies with the feasibility test of Bankruptcy Code § 1129(a)(11).

As stated and cautioned in the Financial Projections, however, the Debtors make no representations as to the accuracy of the Financial Projections or as to the Reorganized Debtors' ability to achieve the projected results. Many of the assumptions upon which the Financial Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated and may adversely affect the Debtors' financial results.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC REGARDING FINANCIAL PROJECTIONS.

FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS OR OTHERWISE. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE AND ARE SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS, INCLUDING, WITHOUT LIMITATION, FOR REASONS SET FORTH IN THE RISK FACTORS SECTION OF THIS DISCLOSURE STATEMENT.

The Financial Projections, and the significant assumptions upon which they are based, are included in <u>Exhibit B</u> hereto. Based on the Financial Projections, the Debtors believe that the Plan provides a feasible means of reorganization and operation from which there is a reasonable expectation that, subject to the risks disclosed therein, the Reorganized Debtors will be able to make the payments required to be made pursuant to the Plan and the Plan Documents and the transactions contemplated thereby, and accordingly, they believe that this reorganization will not be followed by another financial reorganization.

## H. Best Interests Test.

Under the Bankruptcy Code, confirmation of a plan requires that each creditor or equity holder in an impaired class either accept the plan or receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such creditor or equity holder would receive or retain if the debtor were liquidated under Chapter 7. This requirement is often referred to as the "best interest of creditors test" or, simply, the "best interests test". To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the hypothetical liquidation of the assets and properties of the debtor (after subtracting the amounts attributable to secured claims and costs and expenses of the cases) must be compared to the present value of the consideration offered to such classes under the plan.

To determine what the holders of claims and interests in each impaired class would receive if a debtor were liquidated, the Bankruptcy Court must determine the amount that would be generated from a liquidation of the assets of the debtor in the context of a hypothetical liquidation under Chapter 7. Such determination must take into account the fact that secured claims, the costs and expenses of liquidation, and any costs and expenses resulting from the original reorganization case would have to be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition unsecured claims and interests.

After consideration of the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors and Interest Holders of the Debtors, including (i)

increased costs and expenses of liquidation under Chapter 7 arising from fees payable to a bankruptcy trustee (up to three percent (3%) of total proceeds) and the attorneys and other professionals such trustee might engage, (ii) additional expenses and claims that would be generated during the liquidation and from the rejection of Executory Contracts in connection with the cessation of the Debtors' operations, some of which could give rise to claims entitled to priority under the Bankruptcy Code, (iii) the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under Chapter 7 and the "fire sale" atmosphere that would prevail, especially at this time in the real estate market, (iv) the adverse effects on the salability of the Debtors' businesses that could result from the possible departure of key employees, (v) the cost attributable to the time value of money resulting from what is likely to be a more protracted proceeding, (vi) the application of the absolute priority rule described above to distributions in a Chapter 7 liquidation, and (vii) the loss of the value of the Debtors as a going concern, the Debtors have determined that confirmation of the Plan will provide each holder of a claim or interest in an impaired class with a recovery that is greater than or equal to what such holder would receive pursuant to a Chapter 7 liquidation of the Debtors.

The Debtors believe that due regard has been given to the various Intercompany Claims and to the relative merits of potential intercompany litigation in formulating the Plan. However, if the Plan is not confirmed, and the Debtors are liquidated under Chapter 7, a separate trustee may be appointed for each of the Debtors, and litigation may ensue among the respective trustees concerning the Intercompany Claims or otherwise, increasing administrative and other costs.

In applying the Best Interests Test, it is possible that Claims and Interests in any Chapter 7 case(s) would not be classified in a manner that such Claims or Interests are classified in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all General Unsecured Claims (including any undersecured portions of any secured claims) that have the same rights upon liquidation may be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Chapter 7 case(s) of the Debtors. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the aggregate Claims held by each Creditor. The Debtors believe that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the absolute priority rule, and under that rule, no junior Creditor may receive any distribution until all senior Creditors are paid in full with interest, and no Interest holder may receive any distribution until all Creditors are paid in full with interest.

The liquidation analysis attached hereto as Exhibit C was prepared by the Debtors and FTI, the Debtors' financial advisors, and is premised on a liquidation in a Chapter 7 case(s). The information contained therein reflects various assumptions and estimates that are subject to revision and adjustment. Neither the Debtors nor any of their officers, affiliates, professionals (including FTI), advisors, or agents make any representation or warranty as to the accuracy or completeness of any information contained in the liquidation analysis.

In the liquidation analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which such assets are subject to liens and security interests. Based on this liquidation analysis, the Debtors estimate that, in a liquidation under Chapter 7, after payment of all liquidation and other costs, as well as the satisfaction of all Allowed DIP Facility Claims, (i) the liquidation

146

value remaining to satisfy the Revolving Credit Facility Claims is estimated to be approximately between $196 million (under the lower estimation) and $233 million (under the higher estimation), which approximates a recovery of between 58% and 69% of each such Claims, and, subject to the availability of any remaining unencumbered assets after the satisfaction of all Claims senior in priority (including the DIP Superpriority Claim and other Administrative Claims, Tax Claims, and Priority Claims), (ii) the liquidation value remaining to satisfy the General Unsecured Claims Against Any of the Debtors (Class 3A), Junior Subordinated Notes Claims and Trust Preferred Securities Claims Against Any of the Debtors (subject to the subordination provisions contained in the underlying documents) (Class 3B), Convenience Class Claims Against any of the Debtors (Class 3C), and the Lenders' Deficiency Claim (Class 3D) would be $0, which would constitute a recovery of 0% of such Claims. The Debtors therefore believe that holders of Allowed Claims in each such Classes will receive at least the same if not more under the Plan (subject to the terms and conditions thereof) than they would under any hypothetical Chapter 7 liquidation. In addition, the Debtors estimate that the liquidation value remaining to satisfy Old OHB Common Stock Interests would be $0, which constitutes a recovery of 0% of such Interests. The Debtors therefore believe that holders of such Interests will receive the same under the Plan as they would under any hypothetical Chapter 7 liquidation.

Specifically, the Debtors estimate that under the Plan, the Holders of Allowed Revolving Credit Facility Claims will receive (1) a recovery (which will be in the form of such Holder's Pro Rata Share of the New OHB Common Stock and the New Notes) equal to between approximately 67% and 87% of their respective Allowed Claims in the event that Class 3 votes to accept the Plan, and (2) a recovery (which will be in the form of the New OHB Common Stock, the New Notes, and Cash in the amount of such Holders' Adequate Protection Claim) equal to between approximately 67% and 93% of their Allowed Claims if Class 3 does not vote to accept the Plan. Also, under the Plan, the Holders of Allowed General Unsecured Claims, Junior Subordinated Notes Claims, or Convenience Class Claims against any of the Debtors will receive (1) in the event that Class 3 votes to accept the Plan, such Holder's Pro Rata Share of (i) the Initial Avoidance Claim Proceeds, (ii) the Excess Avoidance Claim Proceeds, and (iii) the Aggregate Unsecured Creditor Distribution, such that the Debtors estimate that these Holders will receive a recovery equal to between approximately3.37% and 5.24% of their respective Allowed Claims, and (2) if Class 3 does not vote to accept the Plan, (a) the Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the Initial Avoidance Claims Proceeds, the Excess Avoidance Claims Proceeds, and the Unencumbered Asset Net Sale Proceeds, such that the Debtors estimate that these Holders will receive a recovery in excess of 0%, although, as noted above, the Debtors and the Creditors Committee cannot estimate the specific ranges of recovery with any high degree of certainty; (b) the Holders of Junior Subordinated Notes Claims and Trust Preferred Securities Claims against any of the Debtors will receive under the Plan, their Pro Rata share of the Initial Avoidance Claims Proceeds, the Excess Avoidance Claims Proceeds, and the Unencumbered Asset Net Sale Proceeds (although except for the Initial Avoidance Claims Proceeds (which will be distributed to the Junior Subordinated Notes Indenture Trustees for subsequent distribution on a Pro Rata basis to the Holders of Allowed Class 3B Claims), in accordance with the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes, such distribution will not be made to the Holders of Junior Subordinated Notes Claims or Trust Preferred Securities Claims, but will instead be made to the Revolving Credit Facility Agent for further distributions to the Holders of the Lenders' Deficiency Claim in Class 3D), such that the Debtors estimate that these Holders

will receive a recovery in excess of 0%, although, again, the Debtors and the Creditors Committee cannot estimate the specific ranges of recovery with any high degree of certainty; and (c) the Holders of Convenience Class Claims against any of the Debtors will receive a Cash payment equal to 3% of their Allowed Claims. Also, each Holder of an Allowed Class 3D Claim will in the event that Class 3 votes to accept the Plan, be deemed to have waived the Lenders' Deficiency Claim or their rights to enforce the subordination provisions in the Trust Preferred Securities, the Junior Subordinated Notes, and the Junior Subordinated Notes Indentures, such that these Holders will agree not to receive a recovery on account of their Allowed Class 3D Claims; if Class 3 does not vote to accept the Plan, then each Holder of an Allowed Class 3D Claim will receive its Pro Rata share of the Excess Avoidance Claims Proceeds and the Unencumbered Asset Net Sale Proceeds (along with the distribution of the Excess Avoidance Claims Proceeds and the Unencumbered Asset Net Sale Proceeds that otherwise would be distributed to the Holders of Allowed Class 3B Claims pursuant to Plan Section 5.5 but for the subordination provisions of the Junior Subordinated Notes and the Trust Preferred Securities), such that the Debtors estimate that these Holders will receive a recovery equal to between approximately 3.67% and 20.60% of their respective Allowed Claims. In contrast, subject to the availability of any remaining unencumbered assets after the satisfaction of all Claims senior in priority, the Debtors do not believe that the Holders of any such Class 3A, Class 3B, Class 3C, or Class 3D Claims would receive any distribution under any hypothetical Chapter 7 liquidation on account thereof.

The estimated value of the respective recoveries under the terms of the Plan to the Holders of Allowed Revolving Credit Facility Claims and Allowed DIP Term Loan Claims is based upon an assumed reorganization value for the Reorganized Debtors of approximately $245 million, which is based on the midpoint of valuations that range from approximately $228 million to $295 million as of an assumed Effective Date of October 31, 2010. For further discussion of the valuation of the Debtors, see the Section below entitled "Valuation of the Reorganized Debtors".

Based upon (i) the higher recoveries to Holders of Allowed Revolving Credit Facility Claims; Aggregate Unsecured Claims Against Any of the Debtors (including General Unsecured Claims Against Any of the Debtors, Junior Subordinated Notes Claims and Trust Preferred Securities Claims Against Any of the Debtors, and Convenience Claims Against Any of the Debtors in Classes), particularly if the Holders of Class 3 Claims vote, as a Class, to accept the Plan; and the Lenders' Deficiency Claim (subject to any waivers of Claims by the Holders in such Class, as set forth in Plan Section 5.7), under the terms of the Plan versus the projected recoveries to these Classes under the hypothetical Chapter 7 liquidation, and (ii) the fact that all other Allowed Claims and Interests will receive under the Plan no less than what they would receive under the hypothetical Chapter 7 liquidation, the Debtors submit that the proposed Plan satisfies the best interests test of Bankruptcy Code § 1129(a)(7)(A)(ii).

## I. Valuation of the Reorganized Debtors.

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

CG&R DRAFT: 9/27/10 6:42 PM #1100434 v3 (11YKY03_.DOC)

The Debtors have been advised by FTI with respect to the consolidated Enterprise Value (as defined below) of the Reorganized Debtors on a going-concern basis. FTI and the Debtors undertook this valuation analysis for the purpose of determining value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution (the "Distributable Value") to holders of Allowed Claims is comprised of an estimated value of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value").

In estimating the Enterprise Value of the Reorganized Debtors, FTI and the Debtors: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections described in this Disclosure Statement, which data were prepared by the management of the Debtors and provided to FTI and which relate to the Reorganized Debtors' businesses and their prospects; (iii) met with members of senior management to discuss the Debtors' operations and future prospects; (iv) reviewed extensive publicly available financial data for, and considered the market value of, public companies that FTI and the Debtors deemed generally comparable to the operating business of the Debtors; (v) considered certain economic and industry information relevant to the operating business; and (vi) conducted such other studies, analyses, inquiries, and investigations as they deemed appropriate. Although FTI conducted a review and analysis of the Debtors' businesses, operating assets, and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly-available information.

Based in part on information provided by the Debtors, FTI has concluded solely for purposes of the Plan that the Distributable Value of the Reorganized Debtors ranges from approximately $228 million to $295 million, with a valuation of $256 million based on the midpoint of the valuation range as of an assumed Effective Date of October 31, 2010. Based on the amount of the projected Exit Credit Facility balance and the amount of the New Notes, such mid-point estimated Distributable Value implies a value for the New OHB Common Stock as of the Effective Date of $84 million. These values do not give effect to the potentially dilutive impact of any shares issued pursuant to the Long Term Incentive Plan. FTI's estimate of Distributable Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT FTI'S CONCLUSIONS, NEITHER FTI NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THEIR ESTIMATE.

With respect to the Financial Projections prepared by the management of the Debtors and included in this Disclosure Statement, FTI assumed that such Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best judgments as to the future operating and financial performance of the Reorganized Debtors. The Distributable Value range assumes the Reorganized Debtors will achieve their Financial Projections in all material respects, including gross-profit growth and improvements in sales, operating margins, earnings, and cash flow. Any negative developments in the transfer of operations or the restructuring process could result in material, adverse effects on operations and Enterprise Value.

FURTHERMORE, IF THE BUSINESS PERFORMS AT LEVELS BELOW THOSE SET FORTH IN THE FINANCIAL PROJECTIONS, SUCH PERFORMANCE MAY HAVE A MATERIALLY NEGATIVE IMPACT ON ENTERPRISE VALUE.

In addition, FTI did not independently verify management's Financial Projections in connection with preparing estimates of Distributable Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

FTI's analysis addresses the estimated going concern Enterprise Value of the Debtors. It does not address other aspects of the proposed reorganization, the Plan, or any other transactions, and it does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. The Enterprise Value of the Debtors does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. FTI has not been asked to nor did it express any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The Enterprise Value of the Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Such estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business, including, without limitation, as discussed in the Risk Factors section of this Disclosure Statement. As a result, the Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, FTI, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly-issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by Creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of securities.

## J. Amendments to or Modifications of the Plan.

Bankruptcy Code § 1127 allows a debtor to amend a plan at any time prior to its confirmation. If a debtor files a modification of a plan with the Bankruptcy Court, the plan as modified would become the plan. If circumstances so warrant, a debtor may modify its plan after confirmation but prior to substantial consummation of the plan (as defined in Bankruptcy Code § 1101). After notice and hearing, however, the Bankruptcy Court would then have to confirm the plan as modified.

150

The Debtors reserve the right to alter, amend, or modify the Plan prior to or after the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, upon order of the Bankruptcy Court, may amend or modify the Plan in accordance with Bankruptcy Code § 1127, the Confirmation Order, and the Plan. Under the Bankruptcy Rules, any amendments or modifications of the Plan may be approved by the Bankruptcy Court at confirmation without resolicitation of the votes of the members of any class whose treatment is not adversely affected by such amendment or modification.

After confirmation, the Debtors and any other party-in-interest may institute proceedings in the Bankruptcy Court to remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order in such manner as may be necessary to carry out the intents and purposes of the Plan, so long as the Holders of Claims and Interests and the Sponsors are not adversely affected and prior notice of such proceeding is served in accordance with Bankruptcy Rules 2002 and 9014 and Local Bankruptcy Rule 2002-1.

### K. Conditions to Confirmation of the Plan.

Confirmation of the Plan will not occur unless and until the following conditions have been satisfied or waived or modified pursuant to Plan Section 8.3: (i) the Bankruptcy Court will have entered an order approving this Disclosure Statement as containing adequate information pursuant to Bankruptcy Code § 1125, and such order will not have been reversed, stayed, amended, or modified in any manner adverse to the Debtors or their estates, and (ii) the Confirmation Order will be acceptable, in form and substance, to the Debtors and the Sponsors.

### L. Conditions to Effectiveness.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date will not occur, and the Plan will not be binding on any Person, unless and until each of the following conditions has been satisfied or waived or modified pursuant to Plan Section 8.2:

    (a)    the Confirmation Order will have been entered on the docket by the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtors and the Sponsors and will not have been reversed, stayed, amended, or modified in any manner adverse to the Debtors, their Estates, or the Sponsors;

    (b)    the Plan Documents and all other documents provided for under, and reasonably necessary to effectuate the terms of, and actions contemplated under, the Plan, will be in form and substance acceptable to the Debtors and the Sponsors, and will have been executed and delivered by the parties thereto, unless such execution or delivery has been waived in writing by the parties benefited by such documents. The Plan Documents to which the condition in this sub-paragraph (b) refers include, but are not limited to, the following documents:

        (i)    the Amended and Restated Certificates of Incorporation, the Amended and Restated LLC Agreements, the Amended and

Restated Limited Partnership Agreements, the Amended and Restated By-Laws, and all applicable certificates of formation and/or organization;

(ii) the Exit Credit Facility and all instruments, certificates, guarantees, agreements, and documents contemplated by Plan Section 6.14; and

(iii) the New Notes and the New Notes Guarantees, and all instruments, certificates, and documents contemplated by Plan Section 6.16.

(c) all conditions precedent to the consummation of, and the funding obligation under, the Exit Credit Facility will have been satisfied or waived in accordance with the terms thereof;

(d) the Amended and Restated Certificates of Incorporation, the Amended and Restated LLC Agreements, the Amended and Restated Limited Partnership Agreements, and all applicable certificates of formation and/or organization (as applicable) will have been adopted and/or filed with the applicable authority of each Reorganized Debtor's jurisdiction of incorporation or formation in accordance with such jurisdiction's state corporate, limited liability company, or partnership laws (as applicable);

(e) to the extent Class 3 votes to accept the Plan, the Unsecured Creditor Cash Pool has received the $6 million in accordance with Plan Section 6.10;

(f) the new respective Boards of Directors or Managers (as applicable) of the Reorganized Debtors will have been appointed;

(h) all authorizations, consents, and regulatory approvals required (if any) in connection with the effectiveness of the Plan will have been obtained; and

(h) all statutory fees due and payable to the United States Trustee as of the Effective Date will have been paid in full.

If the Effective Date does not occur for any reason within 180 days following the entry of the Confirmation Order, unless such time period is extended by the Debtors with the consent of Sponsors, or if on or before 180 days following the entry of the Confirmation Order, either the Debtors determine, with the agreement of the Sponsors, or the Bankruptcy Court rules, that one or more of the conditions to effectiveness set forth in Plan Section 8.2 will not be satisfied within such period, then the Plan and the Confirmation Order will immediately, upon such applicable date, be deemed null and void and, in such event, nothing contained in the Plan or the Confirmation Order will be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings (whether or not such proceedings involve any of the Debtors). If the Confirmation Order is vacated or revoked, the Plan will be null and void ab initio in all respects, and without limiting the generality of the foregoing, nothing contained in the Plan or herein will: (i) constitute a waiver or release of any Claims by or against, or any

152

Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors; (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors in any respect; or (iv) affect or impair, in any way, any and all Claims against the Debtors, any and all claimed contractual subordination rights and claims between or among the Holders of Claims against the Debtors, and any and all rights and claims between or among holders of Claims relating in any manner to distributions on account of Claims against the Debtors based upon any claimed contractual subordination rights.

### M. Waiver of Conditions.

The Debtors may, but will have no obligation to, waive or modify in writing, at any time, any of the conditions set forth in Article VIII of the Plan, without notice, without leave of or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan; provided that the Sponsors' consent will be required to waive or modify any of the conditions set forth in Plan Section 8.2(b), (c), (d), (e), and (f), and the Creditors Committee's consent will be required to waive or modify the condition set forth in Plan Section 8.2(e). The failure to satisfy, waive, or modify any such condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such conditions to be satisfied or waived or modified.

### N. Effects of Plan Confirmation.

### 1. Vesting of Property.

Except as otherwise provided in the Plan (including Plan Section 7.14 with respect to the developments listed on Exhibit J hereto, as such schedule may be revised and included in the Plan Supplement or otherwise) or the Confirmation Order, and notwithstanding the substantive consolidation of the Debtors solely for the limited purpose of all actions associated with voting, confirmation, and distribution, as provided for in Article XI of the Plan, upon the Effective Date, but retroactive to the Confirmation Date, (a) the Reorganized Debtors will continue to exist as separate corporate entities with all the powers of corporations under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law, and (b) all Assets of the respective Debtors (including, but not limited to, the Debtors' respective equity interests in any Subsidiary Debtor or any Non-Debtor Subsidiary or joint venture (to the extent that any such Non-Debtor Subsidiary or joint venture has not been dissolved under applicable law prior to the Effective Date)), wherever situated, will vest in the applicable Reorganized Debtor, subject to the provisions of the Plan and the Confirmation Order. Thereafter, each Reorganized Debtor may operate its business, incur debt and other obligations in the ordinary course of its business, and may otherwise use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Bankruptcy Court. After the Effective Date, but retroactive to the Confirmation Date, all property retained by the Reorganized Debtors pursuant hereto will be free and clear and divested of all Claims, debts, Liens, security interests, obligations, encumbrances, and interests of Creditors and Interest holders of the Debtors and all other Persons, except as contemplated by or provided in the Plan or the Confirmation Order, except for the obligation to perform according to the Plan and the Confirmation Order, and except for the respective claims, debts, Liens, security interests, encumbrances, and interests of those holders of

any Reinstated Liens or arising in connection with the Exit Credit Facility, the Exit Credit Facility Guarantees, the New Notes, or the New Notes Guarantees.

Without limiting the generality of the foregoing, the Confirmation Order will be effective as a determination that all Liens existing prior to the Effective Date (other than any Reinstated Liens) have been unconditionally released, disallowed, discharged, and terminated as of the Effective Date, regardless of, with respect to Operational Liens, whether or not the applicable Operational Lien Claimholder executes a Lien Waiver or has filed a Proof of Claim, and that such release, disallowance, discharge, and termination will be binding upon and will govern the acts of all entities, including, without limitation, all applicable Operational Lien Claimholders (other than holders of Reinstated Operational Liens) and other parties asserting a Lien, filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets. In addition, each and every federal, state, and local governmental agency or department will be directed to accept any and all documents and instruments (including the Plan, the Confirmation Order, and/or all Lien Waivers) as provided by the Debtors, the Reorganized Debtors, or any related parties to revise appropriately all applicable records and files to reflect that all such Liens have been released, discharged, and terminated in accordance with the Plan, the Confirmation Order, and/or such Lien Waivers. Except for holders of Reinstated Liens, if any person or entity that has filed Liens or other documents or agreements evidencing Liens on, Claims, or other interests in, the Assets will not have delivered to the Debtors prior to the Effective Date, a Lien Waiver in proper form for filing and executed by the appropriate parties, with respect to the Assets or otherwise, then the Debtors and the Reorganized Debtors (as applicable) will be authorized and empowered (but not required) to execute and file any termination statements, instruments of satisfaction, releases of Liens, or other documents on behalf of the applicable person or entity with respect to the Assets and will also be authorized to file, register, or otherwise record or present a copy of the Plan and the Confirmation Order, which, once filed, registered, or otherwise recorded or presented, will constitute conclusive evidence of the release of all Liens of any kind or nature whatsoever in the Assets.

High Fidelity House, Inc., filed a limited objection to the Proposed Sale Motion, dated April 26, 2010 (docket no. 710), and set forth on Exhibit A thereto a list of equipment that does not constitute property of the Debtors (collectively, the "High Fidelity Equipment"). Notwithstanding anything to the contrary herein, in the Plan, or in the Confirmation Order, the High Fidelity Equipment will not be deemed owned by the Reorganized Debtors on and after the Effective Date, as such equipment is not currently owned by the Debtors.

## 2.    Discharge and Injunction.

*Other than with respect to any Reinstated Liens, pursuant to Bankruptcy Code § 1141(b) or otherwise, except as may otherwise be provided in the Plan or in the Confirmation Order, upon the occurrence of the Effective Date, the rights afforded and the payments and distributions to be made under the Plan will be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge, and release of, any and all existing debts, Claims, and*

Interests of any kind, nature, or description whatsoever against the Debtors or any of the Debtors' Assets or other property, and will effect a full and complete release, discharge, and termination of all Liens (including all Operational Liens other than Reinstated Operational Liens), security interests, or other Claims, interests, or encumbrances upon all of the Debtors' Assets and property. No Creditor or Interest holder of the Debtors nor any other Person may receive any distribution from the Debtors, the Estates, the Reorganized Debtors, or the Assets, or seek recourse against, the Debtors, the Estates, the Reorganized Debtors, or any of their Assets, except for those distributions expressly provided for under the Plan. All Persons are precluded from asserting, against any property that is to be distributed under the terms of the Plan, any Claims, Interests, obligations, rights, Causes of Action, liabilities, Liens (including any Operational Liens other than Reinstated Operational Liens), or equity interests based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than to the extent Reinstated or as expressly provided for in the Plan or the Confirmation Order, whether or not (a) a Proof of Claim or Proof of Interest based upon such debt or Interest (as applicable) is filed or deemed filed under Bankruptcy Code § 501; (b) a Claim or Interest based upon such debt or Interest (as applicable) is allowed under Bankruptcy Code § 502; or (c) the holder of a Claim or Interest based upon such debt or Interest (as applicable) has voted to accept the Plan or is deemed to have accepted the Plan under Bankruptcy Code § 1126(f). Except as otherwise provided in Plan Section 9.2 or the Confirmation Order with respect to a Claim that is expressly Reinstated under the terms and conditions of the Plan, all holders of Claims and Interests arising prior to the Effective Date will be permanently barred and enjoined from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors, or the Assets, any of the following actions on account of such Claim or Interest: (a) commencing or continuing in any manner any action or other proceeding on account of such Lien, Claim, or Interest against property to be distributed under the terms of the Plan or the property of any of the Reorganized Debtors, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, Lien (including all Operational Liens), or order against any of the property to be distributed under the terms of the Plan or the property of any of the Reorganized Debtors, other than as permitted under subclause (a) of this sentence; (c) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the terms of the Plan or the property of any of the Reorganized Debtors; (d) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any obligation due the Debtors or the Reorganized Debtors, the Assets or any other property of the Debtors or the Reorganized Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

## X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the theoretical alternatives include, in addition to dismissal of these Cases: continuation of these Cases; preparation and presentation of an alternative plan of reorganization; and liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

CG&R DRAFT: 9/27/10 6:42 PM                                    #1100434 v3 (11YKY03_.DOC)

## A. Continuation of the Cases.

The Debtors have attempted to minimize the potential adverse effects of the filing of these Cases upon the Debtors' relationships with their employees, suppliers, operators, lessors, and customers, by, among other things, seeking orders from the Bankruptcy Court authorizing them to pay pre-petition employee and tax obligations, to honor other pre-petition liabilities, including warranty and critical vendor claims, and to continue home sales in the ordinary course of business; and initially filing a motion to sell substantially all of their assets and then filing a disclosure statement and what is now a consensual proposed plan as soon as possible to the Petition Date. Nonetheless, the filing of these Cases by the Debtors and the publicity attendant thereto might have adversely affected the Debtors' businesses and the businesses of the Non-Debtor Subsidiaries or affiliates. The Debtors believe that relationships with their employees, vendors, and customers have been maintained and should likely not suffer further erosion if the Plan is confirmed and consummated in a timely fashion.

However, adverse effects are likely to be experienced during the pendency of any increasingly protracted bankruptcy cases. If the Debtors remain in Chapter 11 for a prolonged period of time, they could presumably continue to operate their businesses and manage their properties as debtors-in-possession (subject to their having sufficient financing, which would not be a certainty), but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not certain whether the Debtors could survive as a going concern in further protracted Chapter 11 cases. The Debtors could have difficulty sustaining the high costs, and the erosion of vendor, supplier, or customer (current and potential future) confidence, that may be caused if they remain in bankruptcy for an extended period. Ultimately, there could be no assurance that the Debtors would not be forced to liquidate under Chapter 7 or 11.

## B. Alternative Plans of Reorganization.

The Debtors, or after the expiration of the period during which only the Debtors may file a plan of reorganization and solicit acceptances thereof, any other party-in-interest could potentially propose a different plan that may provide certain creditors with less favorable treatment than the Plan. Such an alternative plan might involve either a reorganization and continuation of the Debtors' businesses, an orderly liquidation of the Debtors' Assets, or some combination thereof. It is possible that, prior to the expiration of the current exclusivity period, the Debtors may file a motion to extend the period during which only the Debtors may file a plan and solicit acceptances thereof, which may or may not be granted by the Bankruptcy Court, but in no event could these periods extend beyond 18 and 21 months, respectively, from the Petition Date.

The Debtors believe that a failure to confirm the consensual Plan may lead to expensive and protracted litigation and eventually to the liquidation of the Debtors. In formulating and developing the Plan, the Debtors, the Sponsors, and the Creditors Committee have explored other alternatives and engaged in an extensive negotiation process. The Debtors, the Sponsors, and the Creditors Committee each believe not only that the Plan, as described herein, fairly adjusts the rights of various Classes of Creditors and Interest holders and enables them to realize the best possible recovery under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims and Interests of the various Classes will

156

require, at the very least, an extensive and time-consuming negotiation process, which would not result in a better recovery for any Class of Claims or Interests. It is not atypical for bankruptcy proceedings involving substantial entities with complex corporate and financial structures, such as the Debtors, to continue operating in Chapter 11 for years before a plan of reorganization is consummated and payments are made. During any protracted process, the Debtors would inevitably incur substantial administrative expenses and costs in connection with the operation of their businesses, which would cause a significant financial drain on the Debtors to the detriment of Creditors and Interest holders.

## C. Liquidation Under Chapter 11 or Chapter 7.

In a liquidation under Chapter 11, the Debtors' Assets would be sold in an orderly fashion potentially over a more extended period of time than in a liquidation under Chapter 7, probably resulting in the realization of somewhat greater proceeds. Further, if a trustee were not appointed, as one is not required in Chapter 11, the expenses for professional fees most likely would be lower than in Chapter 7. Although preferable to a Chapter 7 liquidation, the Debtors believe that a liquidation under Chapter 11 would still not realize the full going-concern value of the Debtors' Assets, would be a lengthier proceeding, and would involve greater administrative expenses than these Cases. Consequently, the Debtors believe that a liquidation under Chapter 11 is a less attractive alternative to Creditors than the Plan, because the Plan provides for a greater return to Creditors than what would likely be realized in a Chapter 11 liquidation and would also take longer to consummate (with increased administrative costs).

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under Chapter 7, in which one or more trustees would be appointed or elected to liquidate the Assets of each Debtor for distribution to its Creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that a liquidation under Chapter 7 would result in reduced recovery of funds by the Debtors' Estates. For a discussion of the effect that a Chapter 7 liquidation would have on the recovery by Creditors and Interest holders, see the section above entitled "Confirmation of the Plan -- Best Interests Tests" and Exhibit C.

## XI. MANAGEMENT

Reorganized OHB and any other Debtor that is a corporation may be converted to a limited liability company, partnership, joint venture, or other entity in connection with Confirmation. To the extent Reorganized OHB or any other Reorganized Debtor remains a corporation, as of the Effective Date, it is currently contemplated that Reorganized OHB will initially have a seven-person Board of Directors (although the Debtors reserve, with the Sponsors' consent, the right to revise the number of directors at any time on or before the Confirmation Date and will inform the Bankruptcy Court of any such revision). The initial anticipated members of the respective Boards of Directors or Managers (as applicable) and officers of Reorganized OHB and each of the other Reorganized Debtors that remain corporations, which may have the same members as that of Reorganized OHB, will be appointed in accordance with the respective Amended and Restated Bylaws and will be disclosed to the Bankruptcy Court in compliance with Bankruptcy Code § 1129(a)(5) on or before the Confirmation Date, unless some later date is permitted by the Bankruptcy Court. To the extent Reorganized OHB or any other Reorganized Debtor is converted to a limited liability company,

partnership, joint venture, or another entity in connection with Confirmation, as of the Effective Date, Reorganized OHB and each other Reorganized Debtor that so converts will initially have a Board of Managers or similar governing body appointed in accordance with the governing documents for such entity. Reorganized OHB, or another entity (which may or may not be a Reorganized Debtor) directly or indirectly wholly-owned by Reorganized OHB, will be the initial sole member of each of the Reorganized Debtors that are limited liability companies and the sole general partner of each of the Reorganized Debtors that are limited partnerships. The boards of directors, sole members, and/or general partners of the Reorganized Debtors will have full power and authority to manage the respective businesses and affairs of the Reorganized Debtors on and after the Effective Date.

## XII. DESCRIPTION OF THE EXIT CREDIT FACILITY, THE NEW OHB COMMON STOCK, THE NEW NOTES, AND THE NEW NOTES GUARANTEE

### A. The Exit Credit Facility.

On the Effective Date (or as soon thereafter as is practicable), the Reorganized Debtors, either as direct borrowers or as Exit Credit Facility Guarantors; the Exit Credit Facility Agent, as agent; and the Exit Credit Facility Lender(s), as lender(s) (in each case, as may be set forth in the final Exit Credit Facility), will (as applicable) execute and deliver the Exit Credit Facility, the Exit Credit Facility Guarantees, and any and all security agreements, mortgages or extensions of mortgages, certificates, and other instruments, agreements, assignments, and documents contemplated and/or required by the Exit Credit Facility, including, but not limited to, any and all such documents that serve to evidence and secure the Reorganized Debtors' respective obligations under the Exit Credit Facility and/or the Exit Credit Facility Guarantees (as applicable), and any Liens and security interests in favor of the Exit Credit Facility Lender(s) securing such obligations.

As further set forth in the Plan Supplement and subject to the terms specifically agreed upon by the Debtors, the Reorganized Debtors, the Exit Credit Facility Agent, the Exit Credit Facility Lender(s), and the Sponsors, it is anticipated that the Exit Credit Facility will consist of (i) a new revolving credit facility in the aggregate amount of approximately $50 million (the "New Revolver Financing") and (ii) approximately $110 million in new term loan financing (the "New Term Loan Financing"). The respective components of the Exit Credit Facility will have principal terms and conditions customary for similar financings, and the obligations thereunder will be secured and guaranteed under terms substantially similar to the liens, security interests, and guarantees currently in place with respect to the Revolving Credit Facility. The expected use of the proceeds from the Exit Credit Facility will be to: (i) satisfy the DIP Revolving Facility Claims; (ii) fund various emergence-related disbursements to the extent required; and (iii) provide for working capital needs of the Reorganized Debtors.

### B. The New OHB Common Stock.

On the Effective Date (or as soon thereafter as is practicable), Reorganized OHB will issue in accordance with the terms of the Plan (including Sections 5.2 and 6.17 thereof), the shares of New OHB Common Stock to the Holders of Allowed Claims in Class 2A. As of the Effective Date, such shares of New OHB Common Stock will represent 100% of the outstanding

shares of New OHB Common Stock (subject to dilution with all other holders of shares of New OHB Common Stock upon the issuance of any shares of stock granted pursuant to the Long Term Incentive Plan). In addition, on or after the Effective Date, Reorganized OHB may issue shares of New OHB Common Stock in accordance with the terms of the Long Term Incentive Plan or otherwise in accordance with its Amended and Restated Articles of Incorporation. Upon the issuance of such shares of New OHB Common Stock (including, but not limited to, any shares of stock granted pursuant to the Long Term Incentive Plan), all such shares of New OHB Common Stock will be deemed fully paid and nonassessable.

## C. The New Notes and the New Notes Guarantees.

As will further be set forth in the Plan Supplement, on the Effective Date (or as soon thereafter as is practicable), Reorganized OHB will issue the New Notes, in the aggregate principal amount of approximately $125 million less the amount of the New Term Loan Financing (which amount may be subject to change, depending on the amount of the New Revolver Financing), and the New Notes Guarantors will execute and deliver the New Notes Guarantees concurrently therewith. The New Notes will be secured by Liens and security interests on all or substantially all of the assets of the Reorganized Debtors that are junior in priority only to the Liens and security interests granted to the various Exit Credit Facility Lenders under the Exit Credit Facility and any Reinstated Operational Lien.

## XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following summary is a general discussion of certain anticipated U.S. federal income tax consequences of the Plan. This summary only addresses tax consequences to Classes of Creditors that are voting on the Plan (i.e., Classes 2A and 3 (or 3A, 3B, 3C, and 3D, as applicable)). It does not address Classes of Creditors who are unimpaired or otherwise entitled to payment in full in Cash or Interest Holders (who will be deemed to have rejected the Plan).

Except as specifically noted in the discussion of Class 2A Creditors, this summary only addresses tax consequences to Creditors who are "U.S. persons." For purposes of this discussion, a "U.S. person" is: (i) an individual who is a citizen or resident of the United States; (ii) a corporation (or other entity taxable as a corporation) created or organized in or under the laws of, the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or (iv) a trust if (i) (A) a court within the United States is able to exercise primary supervision over the administration of the trust and (B) one or more U.S. persons have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, was treated as a U.S. person prior to such date, and validly elected to continue to be so treated.

If a Creditor is treated as a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of a partner in a partnership will generally depend on the status of the partner, the activities of the partnership, and certain determinations made at the partner level. If you are a partnership, you and your partners should consult your own tax advisors regarding the U.S. federal income tax consequences of the implementation of the Plan.

This summary does not address all categories of Creditors, some of which (including persons related to the Debtors within the meaning of the Tax Code, life insurance companies, banks, financial institutions, tax-exempt organizations, real estate investment trusts, regulated investment companies, dealers or traders in securities, U.S. expatriates, Creditors subject to the alternative minimum tax, and Creditors who are themselves in bankruptcy) may be subject to special rules not addressed herein. This summary also does not address any U.S. federal tax considerations other than income tax considerations or any state, local, or foreign tax considerations applicable to any Creditor.

This summary assumes that, because there is significant non-overlap in the identity of the various classes of Creditors and Interest Holders (other than with respect to Class 2A Creditors and Class 3D Creditors), the resolution of each class of Claims or Interests will be viewed as a separate transaction for U.S. federal income tax purposes (other than with respect to Class 2A Claims and Class 3D Claims). It is unclear whether the Internal Revenue Service ("IRS") will agree with this conclusion. Holders of multiple classes of Claims or Interests should consult their own tax advisors to determine how the U.S. federal income tax consequences of the Plan would differ to them if the IRS were to aggregate exchanges of multiple Classes.

This summary is based upon relevant provisions of the Tax Code, the applicable Treasury regulations promulgated thereunder, judicial authority, published rulings, and such other authorities considered relevant, all as of the date hereof and all of which are subject to change (possibly with retroactive effect). The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS, nor have the Debtors obtained an opinion of counsel with respect to these matters. There can be no assurance that the IRS will not take positions concerning the consequences of the Plan that are different from those discussed below.

*THE SUMMARY SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A CREDITOR. EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER U.S. FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS.*

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS ADDRESSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A. Tax Consequences to Creditors.

### 1. Class 2A and Class 3D Creditors.

#### (a) Tax Consequences of the Exchange of Claims.

The tax consequences to an exchanging Creditor in Class 2A and Class 3D (a "Class 2A/3D Creditor") will depend in part on whether the Creditor's Claim arose from holding a "security" for U.S. federal income tax purposes. A determination as to whether a debt constitutes a security is based upon numerous facts and circumstances surrounding the origin and nature of the obligation, but most authorities have held that the term to maturity of the debt instrument is one of the most significant factors. Corporate debt obligations with maturities of less than five years generally do not constitute securities, corporate debt instruments with maturities of five years or more, but less than ten years, are likely to be treated as securities, and corporate debt obligations with maturities of ten years or more generally qualify as securities.

The Debtors believe that advances under the Revolving Credit Facility should not be considered securities for U.S. federal income tax purposes. If this is correct, each Class 2A or Class 3D Creditor will be deemed to have disposed of its Claims in a fully taxable exchange. Subject to the discussion below regarding the treatment of accrued and unpaid interest, each Class 2A or Class 3D Creditor will recognize gain or loss with respect to each advance equal to the difference between (i) such Creditor's "amount realized" with respect to such advance (i.e., the sum of the issue price of any New Notes (which should equal their stated principal amount), the fair market value of any New OHB Common Stock (in the case of Class 2A Claims), and the amount of any cash received in exchange therefor) and (ii) the adjusted tax basis of such Creditor in such advance, excluding any tax basis attributable to accrued interest (including any original issue discount). To the extent that any cash is not payable until sometime after the Effective Date of the Plan, a Creditor may be entitled to defer all or any portion of any gain realized and may be required to defer all or a portion of any loss realized. Each Creditor should discuss with its own tax advisor how these deferral rules would apply in such Creditor's particular situation.

The character of any such gain or loss will depend in part on whether such Creditor held its interest in the advances as a "capital asset" (within the meaning of Section 1221 of the Tax Code). Subject to the "market discount" rules discussed below, any gain or loss with respect to a capital asset will be treated as capital gain or loss and will be long term capital gain or loss to the extent the Creditor held its interest in the advances for more than one year. Long term capital gains for non-corporate Creditors are generally eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Any gain or loss with respect to an advance that is not a capital asset generally should be ordinary.

A Creditor that purchased its Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with market discount if its principal amount (or, in the case of a debt instrument issued with original issue discount, the adjusted issue price) exceeds its tax basis in the hands of a Creditor immediately after its acquisition, unless a statutorily defined de minimis exception applies. Gain recognized by a Class 2A or Class 3D Creditor with respect to a debt instrument acquired with market discount that would otherwise have been taxable as capital gain

161

will be recharacterized as ordinary income to the extent of the market discount accrued during the period the debt instrument was held by such Creditor. This rule will not apply to a Creditor who previously had elected to include market discount in income as it accrued for U.S. federal income tax purposes.

A Class 2A Creditor's tax basis in any New Notes received will equal the issue price. A Class 2A Creditor's tax basis in any New OHB Common Stock received will equal the fair market value of such stock when received. The holding period of any New Notes and any New OHB Stock received will begin on the day after the exchange.

Class 2A or Class 3D Creditors should consult their own tax advisors with respect to whether advances under the Revolving Credit Facility should be considered securities for U.S. federal income tax purposes, and the tax consequences of the Plan in such event (including (i) the possibility that the exchange of such Creditor's Claims for New Notes, New OHB Common Stock, and cash (if any) would constitute a "recapitalization" for U.S. federal income tax purposes and (ii) how the Creditor's recognized gain or loss, accrued and unaccrued market discount, tax basis and holding period in any New Notes and New OHB Common Stock would be impacted).

**(b)    Consequences of Owning New Notes and New OHB Common Stock.**

Holders of Class 2A Claims should consult their own tax advisors regarding the U.S. federal income tax consequences of owning and disposing of New Notes and/or New OHB Common Stock (as applicable), including any special tax consequences to a holder that does not hold any New Notes or New OHB Common Stock as a capital asset.

If you are a Holder of a Class 2A Claim and a non-U.S. person, even if you are not otherwise engaged in a U.S. trade or business or subject to U.S. federal income taxation, you may become subject to U.S. federal income tax (and may be required to file a U.S. federal income tax return) upon a disposition of any New OHB Common Stock received by you. Holders of Class 2A Claims should consult their own tax advisors about the impact of the "FIRPTA" rules and their ownership of New OHB Common Stock.

**2.    Class 3 (or Class 3A, Class 3B, and Class 3C, As Applicable) Creditors.**

Each Class 3 (or Class 3A, Class 3B, or Class 3C Creditor, as applicable) will be deemed to have disposed of its Claim in a fully-taxable exchange. Subject to the discussion below regarding the treatment of accrued and unpaid interest, each Class 3 (or Class 3A, Class 3B, or Class 3C, as applicable) Creditor will recognize gain or loss equal to the difference between (a) such Creditor's "amount realized" (i.e., any cash received in connection with the exchange) and (b) the adjusted tax basis of such Creditor in its Aggregate General Unsecured Claim, General Unsecured Claim, Junior Subordinated Notes Claim, Trust Preferred Securities Claim, or Convenience Class Claim, as applicable (each, an "Applicable Claim"), excluding any tax basis attributable to accrued interest (including any original issue discount). To the extent that any cash is not payable until sometime after the Effective Date of the Plan, a Creditor may be entitled to defer all or any portion of any gain realized and may be required to defer all or a portion of

any loss realized. Each Creditor should discuss with its own tax advisor how these deferral rules would apply in such Creditor's particular situation.

The character of any such gain or loss will depend in part on whether such Creditor held its interest in its Applicable Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). Subject to the "market discount" rules discussed below, any gain or loss with respect to a capital asset will be treated as capital gain or loss and will be long-term capital gain or loss to the extent the Creditor held its Applicable Claim for more than one year. Long-term capital gains for non-corporate Creditors are generally eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Any gain or loss with respect to an advance that is not a capital asset generally should be ordinary.

A Creditor that purchased its Applicable Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with market discount if its principal amount (or, in the case of a debt instrument issued with original issue discount, the adjusted issue price) exceeds its tax basis in the hands of a Creditor immediately after its acquisition, unless a statutorily defined de minimis exception applies. Gain recognized by a Class 3 (or Class 3A, Class 3B, or Class 3C, as applicable) Creditor with respect to a debt instrument acquired with market discount that would otherwise have been taxable as capital gain will be recharacterized as ordinary income to the extent of the market discount accrued during the period the debt instrument was held by such Creditor. This rule will not apply to a Creditor that previously had elected to include market discount in income as it accrued for U.S. federal income tax purposes.

As discussed above, under the Plan, Class 3B Creditors may be required to immediately pay over to Class 3D Creditors a portion of any cash they receive in connection with the Plan. Class 3B Creditors should consult their own tax advisors regarding the proper U.S. federal income tax treatment of receiving and immediately disposing of such cash.

It is unclear whether the Junior Subordinated Notes are contingent payment debt instruments ("CPDIs") within the meaning of United States Treasury Regulation Section 1.1275-4. Creditors owning the Junior Subordinated Notes should consult their own tax advisors about how their tax consequences would be affected if the Junior Subordinated Notes are CPDIs.

### 3. Payments to Creditors on Account of Accrued and Unpaid Interest.

In general, to the extent that any payments received pursuant to the Plan are received in satisfaction of accrued and unpaid interest (which, for purposes of this discussion, includes any original issue discount), such amount will not be treated as part of a Creditor's amount realized, but instead will be taxable to a Creditor as ordinary interest income to the extent not previously so taxed. The basis in any consideration received in exchange for a Claim that is attributable to accrued and unpaid interest would equal the fair market value of such consideration when received, and the holding period for such consideration would begin on the day after the exchange.

The Plan provides that all payments made to Creditors will be allocated first to unpaid principal and thereafter to any accrued and unpaid interest. Treasury regulations generally

CG&R DRAFT: 9/27/10 6:42 PM    #1100434 v3 (11YKY03_.DOC)

provide that payments on a debt instrument should be allocated first to accrued and unpaid interest and thereafter to unpaid principal. However, some case law suggests that the ordering rule in the Treasury regulations should not apply in a bankruptcy context. While not free from doubt, the Debtors intend to take the position (and the foregoing discussion assumes) that the rule in the Treasury regulations should not apply and the ordering rule in the Plan should be respected for U.S. federal income tax purposes. If this position is incorrect, any payments allocable to accrued and unpaid interest would be treated as discussed above.

To the extent you have included in income accrued and unpaid interest in respect of the Claims that exceeds any payments allocable to such interest, you may be entitled to claim a deduction for such excess. You should consult your own tax advisor regarding the availability and character of any such deduction.

### 4. Information Reporting and Backup Withholding.

Certain payments made pursuant to the Plan may be subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) unless the recipient is an exempt payee, such as a corporation, or provides the payor with a correct taxpayer identification number and complies with applicable certification requirements. Backup withholding is not an additional tax. Rather, amounts withheld under the backup-withholding rules may be credited against a Creditor's U.S. federal income tax liability, and a Creditor may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

### B. Tax Consequences to the Debtors.

### 1. Cancellation of Indebtedness Income and Attribute Reduction.

The Debtors believe that they will recognize no taxable cancellation of indebtedness income for U.S. federal income tax purposes ("COD Income") as a result of the discharge of their indebtedness at a discount (although there may be some state income taxes imposed on any cancellation of indebtedness income). Under the Tax Code, a discharge of debt in the context of a bankruptcy proceeding will not result in taxable COD income, although such discharge will cause the reduction in certain consolidated tax attributes of OHB, including NOLs, NOL carryforwards, and the tax basis of inventory and other assets. The Debtors will realize substantial amounts of COD Income, the precise amount of which will depend on the fair market value of the New OHB Common Stock, the issue price of the New Notes, and the amount of cash distributed pursuant to the Plan.

OHB estimates that it has approximately $39 million of consolidated NOL carryforwards for U.S. federal income tax purposes as of the end of its 2009 taxable year. A substantial amount of such NOL carryforwards, as well as OHB's current year NOLs and other consolidated tax attributes (including the tax basis in OHB's inventory and other consolidated assets), will be eliminated following implementation of the Plan as a result of taxable COD Income arising from the satisfaction of certain Claims at a discount.

## 2. Net Operating Loss Limitations.

With respect to any NOLs and NOL carryforwards of the Debtors remaining after confirmation of the Plan and any required attribute reduction, Section 382 of the Tax Code contains certain rules limiting the amount of such NOLs and NOL carryforwards a corporate taxpayer can utilize in each taxable year following an "ownership change" (the "Annual Section 382 Limitation"). In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "five-percent stockholders" (within the meaning of Section 382 of the Tax Code) increases by more than 50 percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such five-percent stockholders at any time over the preceding three year period. It is expected that OHB will undergo an ownership change on the Effective Date.

As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," which is a rate published monthly by the Treasury Department that tracks the rate on long-term tax-exempt bonds. Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent taxable years. If a loss corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the corporation's Annual Section 382 Limitation is zero. The Section 382 Annual Limitation will also apply to any net unrealized built-in losses (i.e., losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount), to the extent such losses are recognized during the five year period immediately after the ownership change.

A special bankruptcy rule under Section 382(l)(6) of the Tax Code should apply in calculating the Annual Section 382 Limitation of the Debtors. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments, including any increase in value resulting from any surrender or cancellation of any Claims in the bankruptcy) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the corporation's assets (determined without regard to liabilities) immediately before the ownership change. While this special rule may lessen the impact of Section 382 on the Debtors, there will still be severe limitations on the Debtors' ability to utilize its remaining tax attributes in future years.

## 3. Alternative Minimum Tax Liability.

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income, with certain adjustments. While any NOL carryforwards not limited by the Annual Section 382 Limitation will generally be available to reduce the Debtors' regular U.S. federal income tax liability, such NOL carryforwards generally may offset only 90% of the Debtors' AMT liability, if any.

165

In calculating the AMT liability of the Debtors, among other potential changes, the AMTI must be computed by decreasing the tax basis of the Debtors' assets by 75% of the amount by which such tax basis exceeds the fair market value of the Debtors' assets on the Effective Date. This will reduce the amount of the Debtors' depreciation expense for AMT purposes. In addition, upon disposition by the Reorganized Debtors of an asset, 75% of the gain that would otherwise have been sheltered by the eliminated tax basis of such asset will be included in AMTI and may be taxed under the federal AMT regime.

## XIV. RESALE OF SECURITIES RECEIVED UNDER THE PLAN

### A. Issuance of New Securities.

Bankruptcy Code § 1145(a)(1) exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:

(1)    the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in joint plan with the debtor, or of a successor to the debtor under the plan;

(2)    the recipients of the securities must hold pre-petition or administrative expense claims against the debtor or interests in the debtor; and

(3)    the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or principally in exchange for such claims or interests and partly for cash or property.

The Debtors believe that the offer and sale of the New Notes and the New OHB Common Stock would satisfy the requirements of Bankruptcy Code §1145(a)(1) and would, therefore, be exempt from registration under the Securities Act and state securities laws.

The Debtors believe that the issuance of the New OHB Common Stock pursuant to the Plan (including, pursuant to Plan Sections 5.2, 6.15, 6.16, and 6.20) and the New Notes and the New Notes Guarantees will satisfy the requirements of Bankruptcy Code § 1145(a)(2), which exempts the offer of a security through the issuance of any warrant, option, right to subscribe, or conversion privilege that was issued under a plan of reorganization in accordance with Bankruptcy Code § 1145(a)(1) and the issuance of a security upon the exercise of such a warrant, option, right, or privilege.

The Debtors also anticipate that they or the Reorganized Debtors (as applicable) would intend to seek to qualify for exemptions from registration, pursuant to Section 3(a)(9) or 4(2) of the Securities Act, Regulation D of the Securities Act, Rule 701 promulgated under the Securities Act, or otherwise, the issuance of any shares of the New OHB Common Stock or any equity securities of Reorganized Debtors in the future in connection with the exercise of any stock options under the Long Term Incentive Plan.

## B. Subsequent Transfers Under Federal Securities Laws.

The Debtors believe that all resales and subsequent transactions in the New Notes and the New OHB Common Stock would be exempt from registration under federal and state securities laws, unless the holder thereof is an "underwriter" with respect to such securities. Bankruptcy Code §1145(b) defines four types of "underwriters":

(1)     persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest;

(2)     persons who offer to sell securities offered under a plan for the holders of such securities;

(3)     persons who offer to buy such securities from the holders of such securities, if the offer to buy is: (a) with a view to distributing such securities; and (b) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(4)     persons who are "issuers" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. To the extent that Persons who receive the New Notes or the New OHB Common Stock pursuant to the Plan are deemed to be "underwriters", resales by such persons would not be exempted by Bankruptcy Code § 1145 from registration under the Securities Act or other applicable law. Persons deemed to be underwriters would, however, be permitted to sell the New Notes and the New OHB Common Stock without registration pursuant to the provisions of Rule 144 of the Securities Act, if applicable. These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Other exemptions to the registration requirements of the Securities Act might be applicable in a particular situation. Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or the New OHB Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving the New Notes or the New OHB Common Stock would be an "underwriter" with respect to such securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW NOTES OR THE NEW OHB COMMON STOCK. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW NOTES AND THE NEW OHB COMMON STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE

SECURITIES ACT OR THE SECURITIES EXCHANGE ACT OF 1934, AS WELL AS ANY STATE LAWS.

## XV.  AVAILABLE INFORMATION

Statements made in this Disclosure Statement as to the contents of any contract, agreement, or other document referred to herein are not necessarily complete.  With respect to each such contract, agreement, or other document that has been attached hereto as an exhibit, reference is made to the appropriate exhibit for a more complete description of the matter involved, and each such statement will be deemed qualified in its entirety by such reference.  Any contract, agreement, or other document that has been referred to or described herein but not otherwise attached as an exhibit may be reviewed upon reasonable prior request at the Debtors' principal office, 3333 Street Road, Bensalem, Pennsylvania 19020.

OHB is currently subject to the informational and periodic reporting requirements of the Exchange Act.  Accordingly, it has filed periodic reports and other documents and information required under the Exchange Act with the SEC, although it has not filed its reports on Forms 10-K and 10-Q for any periods ending after March 31, 2009.  Such reports and other documents and information filed by OHB may be examined and are also available for inspection without charge at, or copies obtained upon payment of prescribed fees from, the Public Reference Section of the SEC at Judiciary Plaza, 450 Fifth Street, NW, Washington, D.C.  20549, and are also available for inspection and copying at the regional offices of the SEC located at 233 Broadway, New York, New York 10279, and at 500 West Madison Street, Chicago, Illinois  60661-2511.  The SEC maintains a Web Site (http://www.sec.gov) that contains reports and other information regarding OHB.

[remainder of page intentionally left blank]

## XVI.  RECOMMENDATION

THE DEBTORS, THE SPONSORS, AND THE CREDITORS COMMITTEE BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN ARE PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN.  THE DEBTORS, THE SPONSORS, AND THE CREDITORS COMMITTEE ALSO BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE ALL CREDITORS WITH ALLOWED CLAIMS IN CLASSES 2A AND 3 (OR 3A, 3B, 3C, AND 3D, AS APPLICABLE) WITH A RECOVERY GREATER THAN OR EQUAL TO WHAT THEY WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7, AND THE HOLDER OF ANY OTHER CLAIM OR INTEREST WITH A RECOVERY OF NO LESS THAN WHAT IT WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 (AND IN CERTAIN INSTANCES, MORE THAN WHAT THEY WOULD RECEIVE UNDER SUCH A LIQUIDATION).  ANY OTHER ALTERNATIVE WOULD CAUSE SIGNIFICANT DELAY AND UNCERTAINTY, AS WELL AS SUBSTANTIAL ADDITIONAL ADMINISTRATIVE COSTS.  THUS, THE DEBTORS, THE SPONSORS, AND THE CREDITORS COMMITTEE RECOMMEND THE CONFIRMATION, CONSUMMATION, AND IMPLEMENTATION OF THE PLAN.

Dated:  September 27, 2010

ORLEANS HOMEBUILDERS, INC.,

Debtor and Debtor-in-Possession (for itself and the other Debtors and Debtors-in-Possession)

By:  _____/s/ Mitchell Arden_____

Mitchell Arden
Chief Restructuring Officer

CG&R DRAFT:  9/27/10 6:42 PM  #1100434 v3 (11YKY03_.DOC)

Submitted by:

ELLIOTT GREENLEAF
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Mark A. Kearney (DE Bar No. 2601)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399

- and -

CAHILL GORDON & REINDEL LLP

Joel H. Levitin
Stephen J. Gordon
Richard A. Stieglitz Jr.
Maya Peleg
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

*Attorneys for the Debtors and Debtors-in-Possession*

CG&R DRAFT: 9/27/10 6:42 PM #1100434 v3 (11YKY03_.DOC)

If you have any questions, please call (888) 215-9315 or visit
http://www.orleanshomesreorg.com