(c)    **Garry P. Herdler.**

OHB was party to an employment agreement with Garry P. Herdler, its former Executive Vice President and Chief Financial Officer. Mr. Herdler resigned on April 19, 2010, and his last day of employment was April 23, 2010.

On April 22, 2010, the Debtors filed a motion to reject all agreements with Mr. Herdler, which was approved the Bankruptcy Court on June 2, 2010. The Debtors' estimate that the maximum amount of damages resulting from such rejection is not more than approximately $53,000, although Mr. Herdler has filed claims against the Debtors in the amount of $1,054,848.68.

(d)    **Sponsors' Commitment to Support Short Term Incentive Plan and Payment to the Vesey Estate.**

On June 18, 2010, the Sponsors sent a letter to the Debtors' CRO confirming their commitment to support approval of the Short Term Incentive Plan in connection with Confirmation of the Plan, and that if the Plan is Confirmed and, for any reason, the Short Term Incentive Plan is not approved in connection with Confirmation, and the Sponsors directly or indirectly control the Reorganized Debtors as equity holders, the Sponsors will cause the Reorganized Debtors to pay the amounts contemplated by the Short Term Incentive Plan. This commitment was disclosed on June 25, 2010 by the Debtors both in a Form 8-K filed with the SEC and a notice filed with the Bankruptcy Court. On May 3, 2010, the Sponsors also expressed their support of a $350,000 payment to the Vesey Estate in connection with Confirmation.

18.    **Certain Bonuses.**

(a)    **Discretionary Bonuses.**

The Compensation Committee of OHB typically awards discretionary bonuses in recognition of exemplary dedication and service to certain employees. As of the Petition Date, the Debtors estimate that no more than $1.6 million was recommended to be used to pay discretionary bonuses. No discretionary bonuses have been approved, and the Debtors do not anticipate paying any such bonuses.

(b)    **Performance and Construction Bonuses.**

Performance bonuses are awarded to certain employees upon the satisfaction of objective criteria or the achievement of certain benchmarks. For example, among other things, employees may be entitled to performance bonuses based on the achievement of set net sales targets and closings of home sales, meeting threshold requirements for revenues and other accounting metrics, reducing G&A levels, and delivering homes to customers within a set period of time, among other things.

Payment on account of construction bonuses is typically made one to two months following the achievement of applicable targets related to threshold levels of homebuilding and home sales.

The Debtors believe that they are current with respect to performance and construction bonuses.

**19.    Certain Other Benefit Plans.**

       **(a)    Supplemental Executive Retirement Plan.**

Prior to the Petition Date, OHB maintained a Supplemental Executive Retirement Plan, which was effective September 1, 2005, as amended and supplemented from time to time (the "SERP"). The SERP was initially named the Orleans Homebuilders, Inc. Supplemental Executive Retirement Plan and was renamed the Orleans Homebuilders, Inc. Executive Survivor Benefit Plan on June 30, 2009. If a participant in the SERP should die while employed by the Debtors, his or her beneficiary would be entitled to a survivor benefit equal to 100% of the average of the participant's recognized compensation for the three years prior to the participant's date of death, paid in one lump sum as soon as practical following death, and 50% of such amount paid for each of the following four years. The Debtors estimate that the maximum amount of potential liability under the Supplemental Executive Retirement Plan, including amounts related to employees of Alambry, is approximately $15.8 million. The SERP will be rejected as of the Effective Date.

       **(b)    Deferral Plan.**

The Debtors have established the Orleans Homebuilders, Inc. Executive Compensation Deferral Plan, effective June 1, 2005, as amended and supplemented from time to time (the "Deferral Plan"). Under the Deferral Plan, participants have the ability to defer a portion of their compensation. The Debtors estimate that there was approximately $262,000 so deferred as of August 2010, including amounts related to one employee of Alambry.

       **(c)    Medical Plan.**

The Debtors' medical plan is self-administered, and participating employees pay premiums withheld from their paychecks. Thereafter, healthcare providers file claims, which are paid by the Debtors' third-party administrator, and the Debtors are obligated to pay any shortfall. On June 1, 2009, the Debtors entered into an administrative and network service contract with QCC Insurance Company (d/b/a Independence Administrators) to serve as their medical plan administrator.

**VI.    EVENTS LEADING TO THE FILING OF THESE CASES**

Starting in 2006, the homebuilding industry experienced a significant and sustained downturn characterized by decreased demand for new homes, an oversupply of both new and resale home inventories (including homes under foreclosure), a decline in average selling prices, and aggressive competition among homebuilders. The declining real estate market has negatively impacted homebuilders nationwide. The decrease in demand for new homes has been exacerbated by the credit crisis, which has made traditional mortgages more difficult to obtain, and their terms and pricing more onerous, resulting in a challenging lending environment for most prospective home buyers.

As a result of these and other external factors, the Debtors' consolidated revenue dropped from $987 million for FY 2006 to $322 million for FY 2009 and $212 million for FY 2010. While the Debtors responded to the changing market conditions by, among other things, reducing net debt by $164,665,000 (28%) since December 31, 2006; reducing spec home units by approximately 75% since June 30, 2006; reducing total lots owned and controlled by approximately 66% since June 30, 2006, including exiting certain markets in Florida and Arizona and reducing land exposure in Illinois; and reducing staff headcount by approximately 66% since June 30, 2006, the Debtors violated certain covenants contained in the Revolving Credit Facility, which has now matured and has not been paid off or refinanced. Turmoil in the credit markets throughout Fiscal Years 2009 and 2010 adversely affected the Debtors' continued access to needed financing. Despite their significant efforts, the Debtors were unable to obtain the consent of 100% of the Revolving Credit Facility Lenders necessary to enter into a maturity extension and structural modification of the Revolving Credit Facility.

Market conditions had not improved by March 1, 2010, and, at that time, the Debtors did not have sufficient liquidity to continue normal operations, and the Revolving Credit Facility Lenders had indicated to the Debtors that they would only provide financing after a bankruptcy filing. Accordingly, the Debtors concluded that commencing these Cases was necessary to provide them with the liquidity necessary to formulate a reorganization strategy that would allow them to continue as a going concern or to take other actions to maximize the value of the Company for the benefit of all parties-in-interest.

## VII.  THE CASES

On the Petition Date, the Debtors filed with the Bankruptcy Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have managed their properties and operated their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these Cases. As debtors-in-possession, the Debtors are authorized to operate their businesses, but they may not engage in transactions outside of the ordinary course of business without the approval of the Bankruptcy Court, after notice and the opportunity for a hearing.

### A.  The Debtors' First-Day Motions

To minimize the possible disruption to the Debtors' operations upon the filing of these Cases, on or shortly after the Petition Date, the Debtors filed various motions seeking emergency, substantive, and other procedural or routine relief, including, among others:

(a)     Motion for Joint Administration;

(b)     Motion for Order (i) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, and (ii) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases;

(c)     Motion for Orders Authorizing and Approving the (i) Maintenance and Continued Use of Existing Cash Management System, Including Existing Bank Accounts, (ii) Continued Use of Business Forms, and (iii) Temporary Waiver of Investment and Deposit Requirements;

(d)     Motion for Entry of Orders Authorizing them to Pay Pre-Petition Obligations to Certain Critical Vendors;

(e)     Motion for Order Authorizing Payment of Pre-Petition Taxes;

(f)     Motion Pursuant to Bankruptcy Code §§ 105(a), 363(b), and 507(a) for Authority to Pay Pre-Petition Employee Compensation, Benefits, Reimbursable Business Expenses, and Other Obligations and Related Administrative Costs;

(g)     Motion for Order Authorizing, but not Directing, the Debtors to Honor and to Maintain (a) the Mortgage Plus Program and (b) the Home Warranty Programs;

(h)     Motion for Interim and Final Orders Authorizing the Maintenance and Renewal of Surety Bonds, the Payment of Surety Bond Premiums, and Preventing the Sureties from Giving Any Notice of Termination or Otherwise Modifying or Canceling any Surety Bonds;

(i)     Motion for Orders Authorizing Payment of their Obligations to Homeowner Associations, Condominium Associations, and Other Community Organizations;

(j)     Motion for Order Authorizing them (a) to Contract and Close on Sales of Homes, (b) to Honor Deposits and Other Contractual Obligations, (c) to Sell Homes Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (d) to Establish Procedures for the Resolution of Lien and Other Claims, and (e) to Use Proceeds of Home Sales in Accordance with Lien Procedures;

(k)     Motion for Order, pursuant to Bankruptcy Code §§ 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001, and 9014 (i) Authorizing the Debtors (a) to Obtain Post-Petition Financing and (b) to Use Cash Collateral and (ii) Granting (a) Adequate Protection to Pre-Petition Secured Parties and (b) Related Relief;

(l)     Motion for Order, pursuant to Bankruptcy Code § 107, Bankruptcy Rule 9018, and Local Bankruptcy Rule 9018-1(B) (a) Authorizing them to File a Fee Letter Relating to the Debtors' Proposed Debtor-in-Possession Financing under Seal and (b) Granting Certain Related Relief;

(m)     Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals;

(n)     Motion for Order Authorizing them to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of Business;

(o)     Motion for Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Payment, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment; and

(p)     Motion for Entry of Order Establishing Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to Bankruptcy Code § 503(b)(9).

## B. Procedural Orders.

Following hearings held on March 3, and April 6, 2010, to consider various motions, the Bankruptcy Court entered certain procedural orders, among others, directing joint administration of these Cases for procedural purposes; authorizing the Debtors to file a consolidated list of their 50 largest unsecured creditors and establishing procedures for notifying Creditors of the commencement of these Cases; establishing procedures for interim compensation and reimbursement of expenses of professionals; and authorizing the Debtors to employ and compensate certain professionals utilized in the ordinary course of business.

## C. Other Substantive First-Day Orders.

Following hearings held on March 3, April 6, and April 15, 2010, the Bankruptcy Court entered other orders relating to the following:

(a)     **Debtor-in-Possession Financing.**

By interim order dated March 3, 2010, the Bankruptcy Court authorized the Debtors to borrow up to an aggregate principal amount of $8 million with respect to advances under the DIP Facility (with such amount to be increased to $11 million in accordance with a term sheet submitted to the Bankruptcy Court) and up to $15 million to fund letters of credit. The Bankruptcy Court also authorized the Debtors to file a related fee letter under seal in accordance with Bankruptcy Code § 107(b).

On April 16, 2010, the Bankruptcy Court entered an order approving the DIP Facility on a final basis. On April 21, 2010, in accordance with such order, the Debtors entered into the DIP Facility. For a more detailed discussion of the DIP Facility, see the section above entitled "Corporate and Capital Structure of the Debtors"

(b)     **Home Sales Order and Rights of Operational Lien Claimants.**

As part of their operations, the Debtors rely upon, routinely contract with, and are obligated to a number of third parties that provide goods, materials, labor, and services to the Debtors. Many of these third parties (collectively, the "Operational Lien Claimholders") may have had a right or interest, as of the Petition Date, whether or not such right or interest has been exercised, under applicable law, to assert and/or to perfect materialmans liens, mechanics liens, or other statutory or common law liens relating to construction (collectively, the "Operational Liens").

On or about the Petition Date, the Debtors filed a motion to authorize them to contract and close on sales of homes, to honor deposits and other contractual obligations, to sell homes free and clear of all liens, claims, encumbrances, and other interests, to establish procedures for the resolution of lien and other claims, and to use proceeds of home sales in accordance with lien procedures, and on March 4, 2010, the Bankruptcy Court entered an interim order (the "Interim Home Sales Order") granting the Home Sales Motion in part. Thereafter, the Debtors worked

with the Operational Lien Claimholders to resolve certain objections to the Home Sales Motion and to develop procedures to protect the interests of the Operational Lien Claimholders. On April 15, 2010, the Bankruptcy Court entered a final order (the "Home Sales Order") approving the Home Sales Motion on a final basis and authorizing the Debtors, among other things, to contract and close on sales of homes, honor deposits and other contractual obligations, sell homes free and clear of all liens, claims, encumbrances, and other interests, establish procedures for the resolution of lien and other claims, and use proceeds of home sales (and other funds) in accordance with such lien procedures (as described herein, the "Home Sales Procedures"). As of August 30, 2010, the Debtors have closed on 231 sales of homes pursuant to the Home Sales Order.

The Home Sales Procedures require the Debtors to provide notice to certain parties after the closing of a home and cause such notice to be filed with the Bankruptcy Court. Thereafter, each of the Operational Lien Claimholders has 30 days to send a written demand (each a "Demand") to the parties specified in the Home Sales Order. A Demand must (i) set forth the location of the property, (ii) state the amount of the asserted claim, (iii) describe, with particularity, the reasons the Operational Lien Claimholder believes it has a valid and enforceable Operational Lien against the individual property sold, and (iv) attach documentation (e.g., invoices or purchase orders) or other information sufficient to demonstrate that a valid and enforceable Operational Lien exists or could otherwise be asserted and perfected. To the extent that an Operational Lien Claimholder was provided valid notice of a closing of a sale and did not send a Demand in compliance with the procedures established in the Home Sales Order, the Operational Lien Claimholder is forever barred from pursuing any secured claim in connection with such Operational Lien.

On July 22, 2010, the Debtors filed a motion seeking clarification of the Home Sales Order in light of entry of the order establishing the Claims Filing Bar Date. On August 5, 2010, the Bankruptcy Court entered an order granting the relief requested in such motion (the "Clarifying Order"). Most importantly, the Clarifying Order provides that Operational Lien Claimholders may not pursue any pre-petition unsecured claim barred by the order establishing the Claims Filing Bar Date.

As of August 30, 2010, the Debtors had received, reviewed, and responded to 489 Demands in accordance with the Home Sales Procedures. The review process required the Debtors to determine whether each purported Operational Lien was valid and senior to the liens of the Revolving Credit Facility Lenders pursuant to applicable law in each of the states in which the Debtors operate -- Pennsylvania, New Jersey, New York, North Carolina, Virginia, Illinois, Florida, and South Carolina.

The laws in all such states provide that a mechanics lien will be given priority over a mortgage or deed of trust if the date that such mechanics lien is considered valid and perfected is prior to the date such mortgage or deed of trust is recorded in the appropriate land records. However, in the vast majority of situations, the dates upon which the purported Operational Liens are considered valid and perfected is subsequent to the date of the liens of the Revolving Credit Facility Lenders, and thus the liens of the Revolving Credit Facility Lenders are senior.

In Illinois and Virginia, but not in the other states, the law with respect to priority of mechanics liens contains additional favorable provisions for Operational Lien Claimholders. In Virginia, pursuant to VA. CODE ANN. § 43-21 (2010) and applicable case law, a mechanics lien is entitled to priority over a prior recorded mortgage to the extent of the value of the improvements on the land, and a prior recorded mortgage has priority over a mechanics lien to the extent of the value of the land.

Similarly, in Illinois, where the recording of the mortgage predates the contract date, the contractor/subcontractor has priority with respect to the value of the improvements (pursuant to the doctrine of "enhancement") and the lender has priority as to the land. LaSalle National Ass'n v. Cypress Creek, 2010 WL 273042 (Ill. App. 3d 2010); 770 ILCS 60/16.

In contrast, except in rare circumstances:

(a)      in Pennsylvania and North Carolina, the lien of a mortgage or deed of trust is senior to any mechanics lien or potential mechanics lien if such mortgage was recorded in the appropriate land records prior to the date that the lien claimant commenced work or the delivery of materials. See 49 P.S. §1508 (Pennsylvania) and N.C.G.S. §44A-10 (North Carolina).

(b)      in New York, New Jersey, and South Carolina, the lien of a mortgage or deed of trust is senior to any mechanics lien or potential mechanics lien if such mortgage was recorded in the appropriate land records prior to the date that the mechanics lien was filed. See New York Lien Law § 13, N.J.S.A. 2A:44A-10 and 22 (New Jersey), and SC Code of Laws Sec. 29-5-70 (South Carolina).

(c)      in Florida, the lien of a mortgage or deed of trust is senior to any mechanics lien or potential mechanics lien if such mortgage was recorded in the appropriate land records prior to (i) the date that the mechanics lien was filed if such claim is relating to professional services (e.g. architectural, landscape architecture, interior design, engineering, or surveying and mapping) or subdivision improvements and (ii) the date that the notice of commencement with respect to the property was properly filed if such claim is asserted by a materialman or laborer (A) in privity with the owner, subcontractor, or sub-subcontractor that complied with Florida Construction Lien Law § 713.05 or (B) not in privity with the owner, subcontractor, or sub-subcontractor that complies with the provisions of Florida Construction Lien Law § 713.06. See Florida Construction Lien Law § 713.07

Accordingly, the vast majority of the purported Operational Liens arising in Pennsylvania, New Jersey, New York, North Carolina, Florida, and South Carolina are junior to the liens of the Revolving Credit Facility Lenders because the liens securing the claims of the Revolving Credit Facility Lenders were recorded prior to the date that, depending upon the state, either the Operational Lien Claimholder (i) commenced work or the delivery of materials or (ii) filed an Operational Lien.

In contrast, the majority of the purported Operational Liens arising in Virginia, and the vast majority of the Operational Liens in Illinois, are potentially at least partially senior (senior

as to the value of the improvements, and junior as to the value of the land) to the liens of the Revolving Credit Facility Lenders because, notwithstanding the fact that in the vast majority of cases, the liens securing the Revolving Credit Facility Lenders were recorded prior to the date that the Operational Lien Claimholder signed a contract to provide materials or labor (Illinois) or the date of commencement of work or the delivery of materials (Virginia), the laws of the states of Illinois and Virginia provide that a mechanics lien, even if later in time, is senior to the lien of a mortgage, with respect to that portion of the value of the property sold that is attributable to the improvements, while the lien of the mortgage is senior to a mechanics lien with respect to that portion of the value of the property which is attributable to the land.

However, in certain situations, even purported Operational Liens arising in Virginia and Illinois are junior to the liens of the Revolving Credit Facility Lenders because either the Operational Lien Claimholder is not entitled to an Operational Lien at all because of a failure to meet the applicable state statutory requirements for the creation and perfection of a mechanics lien, and in Virginia, certain of the Operational Lien Claimholders executed and delivered lien waivers, which, pursuant to VA. CODE ANN. § 43-3(C), bars such Operational Lien Claimholders from asserting a mechanics lien with respect to work performed or material supplied until such time, if at all, the waiver is withdrawn in accordance with Virginia law.

Applying the Home Sales Procedures and applicable law, as described above, the Debtors reviewed 489 Demands and determined that 75 of the purported Operational Liens were entitled to complete or partial priority over the liens of the Revolving Credit Facility Lenders, while 414 were not.[6] As of the date hereof, one Operational Lien Claimholder, Mammoth Grading, Inc. ("Mammoth"), has disputed the determination made by the Debtors by requesting a determination from the Bankruptcy Court as contemplated by the Home Sales Procedures. As discussed below, the Debtors have objected to Mammoth's request, and the dispute remains pending before the Bankruptcy Court.

In addition to their review of the Demands in accordance with the Home Sales Procedures, the Debtors have endeavored to review (and continue to review) all available documentation related to potential Secured Operational Lien Claims, including Demands submitted for homes that have not yet closed, all available notices of liens, all filed secured claims, all unsecured claims filed by vendors, and any other claims that they suspect could be asserted as Secured Operational Lien Claims. The Debtors utilized such documentation and the analysis described above to prepare both Exhibit F, which contains a schedule setting forth the Debtors' position as to the correct status and/or Allowed amount (if any) of all known Secured Operational Lien Claims in Class 2C, and Exhibit G, which contains a schedule setting forth the Operational Lien Claims that the Debtors have determined constitute General Unsecured Claims

_____

[6]     All of the purported Operational Liens entitled to priority or partial priority related to claims arising in Virginia and Illinois, and none of the purported Operational Liens entitled to priority or partial priority related to claims arising in Pennsylvania, New Jersey, New York, North Carolina, Florida, and South Carolina.

Against Any of the Debtors in Class 3A (as such schedule may be amended or revised and included in the Plan Supplement or otherwise), subject to all rights and defenses. As with the Demands, the majority of the purported Operational Lien Claims that were reviewed were junior to the liens of the Revolving Credit Facility Lenders, and therefore, were not included in Exhibit F, but are instead included in Exhibit G. Any Operational Lien Claim relating to a home sold prior to the Petition Date was not included on Exhibit F. Generally, when real property is conveyed subject to a mechanics lien, or if after the closing of a sale of real property, a mechanics lien is filed which relates back to a time prior to such sale, that mechanics lien acts as a lien on such sold real property only and not on the proceeds derived from the sale of such real property or any other assets of the seller of the real property. Accordingly, any mechanics lien which was filed on a home which was sold by the Debtors prior to the Petition Date would not attach to the proceeds of such sale or any other assets of the Debtors.

On the Schedules, the Debtors did not list any Operational Lien Claimholder as having a Secured Claim.

**ANY OPERATIONAL LIEN CLAIMHOLDER HOLDING A CLAIM THAT IS EITHER (I) LISTED ON EXHIBIT G OR (II) NOT LISTED ON EITHER EXHIBIT F OR EXHIBIT G, WILL BE TREATED FOR ALL PURPOSES UNDER THE PLAN AND IN THESE CASES AS A GENERAL UNSECURED CLAIM IN CLASS 3 OR CLASS 3A (AS APPLICABLE) AND NOT AS AN OTHER SECURED CLAIM IN CLASS 2B OR A SECURED OPERATIONAL LIEN CLAIM IN CLASS 2C, AND WOULD OTHERWISE BE SUBJECT TO ALL RIGHTS, DEFENSES, OBJECTIONS, AND CLAIMS OF THE DEBTORS OR THE REORGANIZED DEBTORS (AS APPLICABLE) WITH RESPECT THERETO, EXCEPT TO THE EXTENT THAT THE APPLICABLE OPERATIONAL LIEN CLAIMHOLDER OBTAINS A FINAL ORDER OF THE BANKRUPTCY COURT PRIOR TO THE EFFECTIVE DATE DETERMINING THAT ITS OPERATIONAL LIEN CONSTITUTES AN ALLOWED OTHER SECURED CLAIM IN CLASS 2B OR AN ALLOWED SECURED OPERATIONAL LIEN CLAIM IN CLASS 2C. ANY OPERATIONAL LIEN CLAIM HOLDER OBJECTING TO THE PROPOSED CLASSIFICATION AND/OR TREATMENT OF ITS OPERATIONAL LIEN CLAIM SHALL HAVE UNTIL THE CONFIRMATION OBJECTION DEADLINE TO DO SO, OR WILL OTHERWISE BE BARRED FROM DOING SO THEREAFTER AND WILL BE DEEMED TO HAVE CONSENTED TO THE PROPOSED CLASSIFICATION AND TREATMENT OF ITS CLAIM AS SET FORTH HEREIN; PROVIDED, HOWEVER, THAT THE FOREGOING WILL NOT IN ANY WAY MODIFY THE HOME SALES PROCEDURES, WHICH WILL REMAIN IN EFFECT THROUGH THE EFFECTIVE DATE.**

**ANY OPERATIONAL LIEN CLAIMHOLDER LISTED ON EXHIBIT G WILL BE ENTITLED TO VOTE TO ACCEPT OR TO REJECT THE PLAN AS A CLASS 3 OR CLASS 3A CREDITOR (AS APPLICABLE), SUBJECT TO ALL OF THE OTHER VOTING AND SOLICITATION PROCEDURES AND REQUIREMENTS SET FORTH HEREIN AND IN THE ORDER APPROVING THIS DISCLOSURE STATEMENT.**

Upon a formal written request at any time prior to the Confirmation Objection Deadline by an Operational Lien Claimholder made to counsel to the Debtors ((i) Cahill Gordon &

Reindel LLP, 80 Pine Street, New York, New York 10005 (Attn: Maya Peleg, Esq.) and (ii) Blank Rome LLP, One Logan Square, 130 North 18th Street, Philadelphia, Pennsylvania 19103 (Attn: Maria Renee McKinney, Esq.)) describing the requested information with particularity, the Debtors will utilize commercially reasonable efforts to provide further information regarding the methodology they employed in determining why a particular Operational Lien Claim constitutes a General Unsecured Claim on Exhibit G.

(c)     **Critical Vendors.**

In the ordinary course of business, the Debtors rely on certain third parties to supply goods and services, without which the Debtors either could not operate or would operate at significantly reduced efficiency.  The Debtors have established relationships with a number of vendors and suppliers in each of their markets and believe that these relationships ensure continued access to consistent labor and material and otherwise provide substantial savings and benefits.  In order to continue to operate their businesses and to complete and to close on the sale of homes, without disruption, the Debtors sought authority to pay certain of these "critical" vendors on account of goods and/or services provided prior to the Petition Date.

On March 3, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain of these critical vendor claims up to $7.5 million and approving certain related payment procedures.  On April 6, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay certain of these critical vendor claims in an amount not to exceed $10 million, with similar procedures as set forth in the prior interim order.

Pursuant to these orders, through August 10, 2010, the Debtors have paid approximately $2.6 million to critical vendors.  Such payments were generally a portion of the outstanding amounts owed, ranging from approximately 23.5% to 89.5%, and were generally conditioned upon the express agreement by each critical vendor to continue providing goods and services on customary or otherwise agreed-upon terms, to waive any right to assert statutory or other liens against the Debtors, and to remove liens and encumbrances against the Debtors' assets or properties, where applicable.

(d)     **Surety Bonds.**

On March 3, and April 6, 2010, respectively, the Bankruptcy Court issued an interim and then a final order authorizing, but not directing, the Debtors to maintain surety bonds (including the authority to revise, extend, supplement, renew, or modify surety bond coverage) and to pay any pre-petition and/or post-petition premiums thereunder and preventing the issuers of surety bonds from giving any notice of termination or otherwise modifying or canceling such surety bonds without the consent of the Debtors or by the terms of the underlying agreements.

(e)     **Warranties and Mortgage Plus Programs.**

On March 3, and April 6, 2010, respectively, the Bankruptcy Court entered an interim and then a final order authorizing the Debtors to maintain their "Mortgage Plus" program, which allows the Debtors to provide incentives to home buyers that use Alambry as their mortgage broker, such as extending the Debtors' typical one-year initial warranty on workmanship and

materials to two years, and their home warranty program. These orders also permitted the Debtors to modify existing programs and to introduce new programs that are similar in scope and expense.

(f)     **Homeowner and Similar Associations**

On March 3 and April 6, 2010, respectively, the Bankruptcy Court entered an interim and then a final order authorizing the Debtors to pay any pre-petition obligations to homeowners associations, condominium associations, and other community organizations.

(g)     **Bank Accounts.**

On March 3, 2010, the Bankruptcy Court entered an interim order authorizing and approving the maintenance and continued use of the Debtors' existing cash management system, including the use of existing bank accounts, continued use of business forms, and temporary waiver of the requirements of Bankruptcy Code § 345, which generally requires the maintenance of bank accounts at "approved depositories" or the purchase of bonds or other protection for any over-night deposits or investments not held at approved depositories.

On April 6, 2010, the Bankruptcy Court entered a final order authorizing and approving the maintenance and continued use of the Debtors' existing cash management system, including the use of existing bank accounts and continued use of business forms.

(h)     **Taxes.**

On March 3, 2010, the Bankruptcy Court entered an order authorizing the Debtors to pay taxes and similar fees to governmental authorities up to $641,000. As of August 1, 2010, the Debtors had paid approximately $461,000 in accordance with this order.

(i)     **Employee-Related Matters.**

On March 3, 2010, the Bankruptcy Court entered an interim order granting the Debtors authority to pay pre-petition employee obligations for payroll service fees and workers compensation premiums, wages and commissions (capped, where applicable, at $10,950 per employee), reimbursement obligations (capped at $25,000 in the aggregate), 401(k) contributions (capped at $81,000 in the aggregate), health benefit plans, amounts withheld from employees remaining in the Debtors' possession, and any administrative and third-party processing fees.

On April 6, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay certain pre-petition obligations owing to the Debtors' employees, including, but not limited to, wages, commission, accrued but unused vacation, performance bonuses, construction bonuses, employee health care benefits, 401(k), and similar benefits, and other miscellaneous employee expenses and benefits.

Certain other related relief that had been requested by the Debtors regarding unpaid contractual and discretionary bonuses and deferred compensation has not been granted at this time, but such requested relief could be considered by the Bankruptcy Court at future hearings.

(j)     **Utilities.**

On March 3, and April 6, 2010, respectively, the Bankruptcy Court entered an interim and then a final order prohibiting utilities from either discontinuing or refusing service to the Debtors on account of pre-petition claims. Each of the Debtors' utility companies was deemed adequately protected unless and until it makes an adequate assurance request in accordance with certain procedures.

According to this order and the procedures established thereunder, as of August 1, 2010, the Debtors have deposited $121,291.10 into a segregated account as "adequate assurance deposits", in addition to $68,188.50 sent directly to particular utility companies for the same purpose.

(k)     **503(b)(9) Claims.**

On April 6, 2010, the Bankruptcy Court entered an order establishing procedures for the assertion, resolution, and satisfaction of claims asserted against the Debtors pursuant to Bankruptcy Code § 503(b)(9) ("503(b)(9) Claims"). Such order memorializes Bankruptcy Code § 503(b)(9) and provides, among other things, that the value of any goods received by the Debtors within 20 days of the Petition Date will be entitled to status as an Administrative Expense Claim in these Cases.

The Bankruptcy Court established May 14, 2010, as the deadline for parties to file 503(b)(9) Claims, and June 14, 2010, as the deadline for the Debtors to object to timely-filed 503(b)(9) Claims. Purported holders of 503(b)(9) Claims that were objected to by the Debtors were given until June 24, 2010, to respond to any objection.

Approximately 40 503(b)(9) Claims were asserted against the Debtors, and on June 14, 2010, the Debtors filed an omnibus objection (the "503(b)(9) Objection") to the allowance and payment of certain of these 503(b)(9) Claims on various grounds. In all, the Debtors objected to 503(b)(9) Claims asserted by 14 parties. In advance of the June 24, 2010, response deadline to the 503(b)(9) Objection, the Debtors reached resolutions with certain claimants, while five parties timely filed responses to the 503(b)(9) Objection.

Pursuant to the procedures implemented by the Bankruptcy Court for the resolution and payment of 503(b)(9) Claims, the Debtors have engaged in discussions to settle the 503(b)(9) Claims of the five parties who timely filed responses. The Debtors have reached a resolution with three of these parties, and on September 8, 2010, the Bankruptcy Court entered an order sustaining the Debtors' objections to those 503(b)(9) claimants who did not timely file a response to the Debtors' objection, and approving the Debtors' resolution of the timely-filed response of one party. The Debtors expect that an order will be entered in early October, 2010, with respect to two other parties with whom the Debtors have reached a resolution. The Debtors anticipate that they will continue to negotiate with the remaining two parties, or such parties' 503(b)(9) Claims will be considered by the Bankruptcy Court and allowed, disallowed, or adjusted in amount in due course.

**D. Professional Retention Applications and Orders.**

The Debtors also filed several motions and/or applications, as appropriate, to retain Professionals in these Cases. Specifically, on the Petition Date and thereafter, the Debtors filed motions and/or applications to employ and to retain the following parties in the following roles:

(a)    Garden City Group, Inc., as Claims, Notice, and Balloting Agent (approved on March 3, 2010, nunc pro tunc to the Petition Date);

(b)    Cahill Gordon & Reindel LLP, as general bankruptcy and restructuring co-counsel (approved on April 6, 2010, nunc pro tunc to the Petition Date);

(c)    Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), as general bankruptcy and restructuring co-counsel (approved on March 26, 2010, nunc pro tunc to the Petition Date);[7]

(d)    Elliott Greenleaf, as general bankruptcy and restructuring co-counsel (approved on April 6, 2010, nunc pro tunc to March 8, 2010);

(e)    Blank Rome LLP, as special corporate counsel under Bankruptcy Code § 327(e) (approved on April 6, 2010, nunc pro tunc to the Petition Date);

(f)    PMCM, as restructuring advisor as well as providing services of the CRO (approved on April 6, 2010, nunc pro tunc to March 4, 2010);

(g)    FTI Consulting, Inc. ("FTI"), as financial advisor (approved on April 6, 2010, nunc pro tunc to the Petition Date and expanded to include services previously performed by the Debtors' former Chief Financial Officer on May 21, 2010);

(h)    BMO Capital Markets Corp. ("BMO"), as M&A advisor (approved on April 6, 2010 nunc pro tunc to the Petition Date),[8]

---

[7]    On March 4, 2010, Morris Nichols ceased to perform services for the Debtors, and on June 2, 2010, its final fee application was approved by the Bankruptcy Court.

[8]    On June 4, 2010, the Debtors terminated the services of BMO. BMO contends that, pursuant to a letter agreement, dated March 24, 2010 (the "BMO Letter Agreement"), the Debtors owe it for three months of fees and a transaction fee, in connection with its prior services to the Debtors relating to the Asset Purchase Agreement with NVR or otherwise (the "Alleged Transaction Fee"). The Debtors do not dispute that BMO is entitled to $500,000 as an Allowed Administrative Claim in these Cases for the two months of services it performed after the BMO Letter Agreement was approved by the Bankruptcy Court and prior to its being terminated, but they dispute that BMO is entitled either to a third month's payment or to the Alleged Transaction Fee, on the ground (with respect to

the latter), among other things, that the Plan does not constitute the type of "Transaction" that gives rise to BMO's having a right to receive the Alleged Transaction Fee under the terms of the BMO Letter Agreement or otherwise.  The Debtors further contend that BMO is not entitled to the Alleged Transaction Fee under such Agreement or otherwise because, among other things, BMO did not identify the Sponsors to the Debtors as potential parties to any Transaction prior to such termination.  The Debtors understand that BMO disputes these contentions.  The Debtors reserve all rights and defenses in connection with these and any other or further claims asserted by BMO in these Cases, including the right to object to any such claims under Bankruptcy Code § 328(a), on the ground that the terms and conditions of the BMO Letter Agreement have "prove[n] to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions," including the withdrawal of the Proposed Sale Motion, as discussed further herein.  However, in the event that this Court rules, pursuant to a Final Order, that BMO is entitled the third month's payment of $250,000 and/or the Alleged Transaction Fee as Allowed Administrative Claims, the Debtors or the Reorganized Debtors (as the case may be) would have sufficient liquidity to pay BMO any remaining amounts due pursuant to Plan Section 3.1, either from Cash on hand or from the Exit Credit Facility.

[9]     The Debtors orally terminated the services of Lieutenant Island on July 23, 2010, as acknowledged in a letter received from counsel for Lieutenant Island on August 2, 2010.  Lieutenant Island contends that, pursuant to a letter agreement, dated as of December 5, 2008, and amended on February 26, 2010 (as amended, the "Lieutenant Island Letter Agreement"), the Debtors owe it a termination fee in the amount of $600,000 (the "Alleged $600,000 Termination Fee").  The Debtors do not dispute that Lieutenant Island is entitled to a termination fee in the amount of $200,000 as an Allowed Administrative Claim in these Cases under the terms of the Lieutenant Island Letter Agreement, but they dispute that Lieutenant Island is entitled to any amount beyond that.  Because the Plan does not constitute the type of "transaction" covered by the Lieutenant Island Letter Agreement, much less one that would be "completed with a purchaser or investor with which Lieutenant Island had been engaged in active purchase or investment discussions," as is required under the express terms of the Lieutenant Island Letter Agreement for it to be entitled to any payment beyond $200,000, Lieutenant Island does not have a right to receive the Alleged $600,000 Termination Fee (under the terms of the Lieutenant Island Letter Agreement or otherwise).  The Debtors further reserve all rights and defenses in connection with these and any other or further claims asserted by Lieutenant Island in these Cases, including the right to object to any such claims under Bankruptcy Code § 328(a), on the ground that the terms and conditions of the Lieutenant Island Letter Agreement have "prove[n] to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions," including the

(j)     Ernst & Young LLP, as tax advisor (approved on June 1, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to April 12, 2010);[10]

(k)     PricewaterhouseCoopers, as auditor and tax consultant (approved on August 6, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to April 15, 2010); and

(l)     Ferguson Partners Ltd., as recruitment advisor (approved on August 6, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to July 14, 2010).

## E. Formation of Creditors Committee.

On March 11, 2010, the United States Trustee formed the Creditors Committee and appointed the following members to serve thereon:  Taberna Capital Management III, Ltd.; Wilmington Trust Company; 84 Lumber Company; Robert K. Foster, Sr.; Sunrise Concrete Co., Inc.; Burlington Commercial Floor Covering; and Wildflowers at Wallkill Condo Assoc.  The current co-chairs of the Creditors Committee are Taberna Capital Management III, Ltd. and Sunrise Concrete Co., Inc.

On April 12, 2010, the Creditors Committee filed an application to retain Duane Morris LLP, as its counsel.  This application was approved on May 4, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to March 11, 2010.  On May 25, 2010, the Creditors Committee also filed an application to retain Cole, Schotz, Meisel, Forman & Leonard, P.A., as its conflicts counsel.  This application was approved on June 15, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to April 28, 2010.

On April 12, 2010, the Creditors Committee filed an application to retain J.H. Cohn LLP, as its financial advisor and forensic accountant.  This application was approved on May 4, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to March 11, 2010.

On May 5, 2010, the Creditors Committee filed an application to retain Kurtzman Carson Consultants LLC, as communications agent.  This application was approved on June 1, 2010, <u>nunc</u> <u>pro</u> <u>tunc</u> to April 14, 2010.

---

withdrawal of the Proposed Sale Motion, as discussed further herein.  However, in the event that this Court rules, pursuant to a Final Order, that Lieutenant Island is entitled to the Alleged $600,000 Termination Fee as an Allowed Administrative Claim, the Debtors or the Reorganized Debtors (as the case may be) would have sufficient liquidity to pay Lieutenant Island any amounts due pursuant to Plan Section 3.1, either from Cash on hand or from the Exit Credit Facility.

[10]     On July 13, 2010, the Debtors notified Ernst & Young LLP that the engagement had been terminated.

### F. Schedules and Statements.

On March 10, 2010, the Debtors filed a motion for an order extending the time to file Schedules until April 12, 2010, and on April 6, 2010, such relief was granted. On April 12, 2010, the Debtors filed the Schedules, and on June 8, 2010, the Debtors filed certain amendments to the Schedules.

### G. Bar Date Motions.

On May 14, 2010, the Debtors filed a motion for an order (i) establishing the deadline for filing proofs of claim for pre-petition claims, (ii) approving proof of claim forms, (iii) approving mailing and publication procedures, and (iv) granting other related relief. On June 1, 2010, the Bankruptcy Court granted such relief and established August 9, 2010, at 5:00 P.M. (prevailing Eastern Time), as the Claims Filing Bar Date, and August 30, 2010, at 5:00 P.M. (prevailing Eastern Time), as the governmental bar date for pre-petition claims. The bar date for pre-petition claims filed by guarantors, sureties, endorsers, and other co-debtors is September 8, 2010, at 5:00 P.M. (prevailing Eastern Time)).

On August 20, 2010, the Debtors filed a motion for an order (i) establishing October 25, 2010, as the deadline (the "Initial Administrative Claims Bar Date") for asserting Administrative Claims incurred by the Debtors through October 15, 2010, other than DIP Facility Claims, Administrative Claims based upon professional fees, fees or charges asserted against the respective Estates under 28 U.S.C. § 1930, and post-petition liabilities incurred or expenses arising in the ordinary course of the Debtors' respective businesses (including, but not limited to, vendor, employee wage and benefit, and state and local property, sales, and use taxes), (ii) approving related claim forms, (iii) approving related mailing and publication procedures, and (iv) granting other related relief. After the filing of the motion, the Debtors engaged in discussions with the United States Trustee and agreed to modify the requested dates. Accordingly, on September 8, 2010, the Bankruptcy Court granted such modified relief and established November 1, 2010, at 5:00 P.M. (prevailing Eastern Time), as the Initial Administrative Claims Bar Date for all such Administrative Claims incurred by the Debtors as of October 1, 2010.

### H. RayKen Stipulation.

On April 8, 2010, RayKen Development LLC ("RayKen") filed a motion seeking relief from the automatic stay imposed by Bankruptcy Code § 362(a) for the purpose of terminating certain agreements of sale with the Debtors. On April 26, 2010, RayKen and the Debtors entered into a stipulation (the "RayKen Stipulation") in full and complete satisfaction of all of the issues raised in such motion. On May 4, 2010, the Bankruptcy Court entered an order approving the RayKen Stipulation.

### I. Mustafa Settlement.

Prior to the Petition Date, one of the Debtors was named as a defendant in the lawsuit styled Mona Mustafa v. Realen Homes, L.P. et al., 08 L 496. On May 6, 2010, the Debtors, Latimer LeVay Jurasek, Mona Mustafa, and Ground Engineering Consultants executed a settlement agreement, release, and assignment of rights (the "Mustafa Settlement") to resolve all

claims of such parties. On May 6, 2010 the Debtors filed a motion pursuant to Bankruptcy Rule 9019 and Bankruptcy Code § 105(a) for an order approving and authorizing the Debtors' entry into the Mustafa Settlement. On June 1, 2010, the Bankruptcy Court entered an order approving the Mustafa Settlement.

## J. Upper Stipulation.

On August 6, 2009, Kyle J. Upper and OHB entered into an employment agreement, effective as of August 1, 2009, pursuant to which Mr. Upper agreed to be employed by OHB on an "at-will" basis as an Executive Vice President, and a non-compete agreement. On April 16, 2010, the Debtors and Mr. Upper entered into a stipulation (the "Upper Stipulation") providing for the termination of his employment agreement and certain provisions of the non-compete agreement and the release, subject to certain exceptions, of all actual and potential claims against the Debtors. On May 4, 2010, the Bankruptcy Court entered an order approving the Upper Stipulation.

## K. G&I One Greenwood Motion.

The Debtors lease their main corporate headquarters in Bensalem, Pennsylvania, from G&I One Greenwood FE LLC ("G&I One Greenwood"), and on May 18, 2010, G&I One Greenwood filed a motion (the "G&I One Greenwood Motion"), seeking the allowance and payment of alleged administrative expense claims for post-petition amounts owed under the related lease (the "Greenwood Lease"). G&I One Greenwood's alleged administrative claim is based on asserted "holdover" double rent for a certain portion of the leased premises. On May 26, 2010, the Debtors filed an objection to the G&I One Greenwood Motion, arguing that any rent in excess of regular market-based rent the Debtors are required to pay is not an obligation required to be timely paid under Bankruptcy Code § 365(d)(3), such extra rent is not attributable to any benefit to the Estates, and any holdover rent is an unenforceable penalty. By agreement of the Debtors and G&I One Greenwood, the G&I One Greenwood Motion has been continued indefinitely.

## L. Worrall Stipulation.

Prior to the Petition Date, the Debtors entered into an agreement with Scanden LLC ("Scanden"), pursuant to which, among other things, Scanden (essentially Patrick Worrall, its owner and only employee) was employed to provide certain consulting and financial analysis services to the Debtors. In connection therewith, Scanden was paid $20,000 monthly, plus certain bonuses and expense reimbursement, and was provided a retainer of $60,000. Subsequent to the Petition Date, On April 1, 2010, rather than continue to retain Scanden, the Debtors employed Mr. Worrall, at lower cost and with other technical modifications to the terms of employment. On May 28, 2010, the Debtors terminated Mr. Worrall's employment and began discussions regarding, among other things, amounts owed and return of the $60,000 retainer.

On June 16, 2010, the Debtors, Scanden, and Mr. Worrall entered into a Stipulation (the "Worrall Stipulation") terminating and/or rejecting these agreements and resolving certain claims and issues arising under such agreements. Pursuant to the Worrall Stipulation, Scanden or Mr. Worrall, as applicable, would transfer or otherwise cause to be paid $40,000 to the Debtors, and

contemporaneously therewith, the Debtors would transfer or otherwise cause to be paid to Mr. Worrall $29,740.97 of outstanding fees and/or wages owed (less any applicable payroll taxes and other required withholdings) and $7,817.87, for reimbursement of out-of-pocket expenses. The Worrall Stipulation also provided for mutual releases.

On June 16, 2010, the Debtors filed a Motion to Approve the Worrall Stipulation, and on June 30, 2010, the United States Trustee objected to such relief. After a hearing held on July 8, 2010, the Bankruptcy Court entered a consent order authorizing payments under, and providing for termination of, the Debtors' employment agreement with Mr. Worrall.

On July 15, 2010, the Debtors filed an application (the "Scanden Application") to retain Scanden nunc pro tunc to the Petition Date. On July 28, 2010, the United States Trustee objected to the Scanden Application, and after a hearing held on August 6, 2010, to consider the Scanden Application, the Bankruptcy Court approved the Scanden Application.

### M. Agreed Orders Regarding Certain North Carolina Lien Enforcement Actions.

Throughout these cases, various parties have moved for relief from the automatic stay imposed by Bankruptcy Code § 362(a) to add one or more of the Debtors as defendants in certain actions to enforce mechanics or similar liens in North Carolina against certain homes the Debtors sold prior to the Petition Date. The Debtors filed objections to these motions because, if granted, and the Debtors were joined as a party, the Debtors would have to appear and present a defense.

The Debtors have, in certain instances, consented to limited relief from the automatic stay to permit the filing of such lien enforcement actions, provided that such actions would then be stayed in all respects and against all defendants pursuant to Bankruptcy Code §§ 105 and 362. The Debtors have agreed to the entry of approximately 15 such agreed orders.

Various parties have violated the automatic stay by filing similar enforcement actions without filing such a motion. In certain of these cases, the Debtors have agreed to a form of order retroactively lifting the automatic stay with respect to the applicable action, provided that the plaintiffs therein immediately file a notice of abatement setting forth that such action is stayed in all respects and against all defendants pursuant to Bankruptcy Code §§ 105 and 362 and then move for retroactive relief from the automatic stay. The remaining issues with regard to these actions need not be specifically addressed in the Plan. Rather, the Debtors anticipate that such actions will likely be resolved on a case-by-case basis, either in the claims-reconciliation process or otherwise, during the course of these Cases. In any event, the Debtors reserve all rights with respect to such actions.

### N. Motions to Enforce the Automatic Stay.

After the Petition Date, three of the Debtors' vendors removed material in violation of the automatic stay of Bankruptcy Code § 362(a) from one of the Debtors' building sites on account of alleged obligations incurred by the Debtors prior to the Petition Date. On May 14, 2010, the Debtors filed motions for orders enforcing the automatic stay, awarding actual damages, costs, attorney's fees, and punitive damages, and finding civil contempt against All Steel Supply, Inc. ("All Steel"), DiNaso & Son Building Supply Company, and Eric's Nursery and Landscaping LLC ("Eric's Nursery"). On September 20, 2010, the Debtors filed a motion for an order

striking certain responses of All Steel and other relief for failure to comply with a scheduling order of the Bankruptcy Court, which is scheduled to be heard on October 7, 2010.

**O. The Withdrawn Proposed Sale Motion and the NVR Complaint.**

As discussed above, the Debtors' initially proceeded to market and attempt to sell all or substantially all of their assets during these Cases pursuant to Bankruptcy Code § 363. Accordingly, the Debtors negotiated an asset purchase agreement (the "Asset Purchase Agreement") with NVR, Inc. ("NVR"), as a "stalking horse" bidder for the proposed sale of substantially all their assets for approximately $170 million, subject to Bankruptcy Court approval. On April 13, 2010, the Debtors filed a motion (the "Proposed Sale Motion") to approve the Asset Purchase Agreement and to establish bidding and other procedures related thereto.

On or about May 3, 2010, the Sponsors expressed their belief that proceeding with the Proposed Sale Motion on the proposed timeline was not likely to maximize recoveries or otherwise be in the interests of the Debtors' various constituencies, and the Sponsors indicated that they would be willing to consider supporting a potential transaction with the Debtors that would yield superior recoveries to the Debtors' creditors and ensure the continued viability of the Debtors' businesses. In order to consider strategic alternatives, including restructuring through a plan of reorganization, the Debtors adjourned the initial hearing scheduled to consider the Proposed Sale Motion. By letter dated May 19, 2010, the Sponsors acknowledged their willingness to continue negotiations to structure a plan of reorganization and requested that the Debtors' withdraw the Proposed Sale Motion. The Debtors filed a notice of withdrawal of the Proposed Sale Motion shortly thereafter on May 19, 2010.

On May 28, 2010, NVR initiated an adversary proceeding by filing a complaint in the Bankruptcy Court, alleging that it is entitled to damages against the Debtors based upon theories of breach of contract, promissory estoppel, unjust enrichment, and liquidated damages pursuant to the Asset Purchase Agreement, which was never approved by the Bankruptcy Court. On June 3, 2010, NVR amended its complaint to add additional parties. On June 11, 2010, the Bankruptcy Court entered an order extending the time in which the Debtors have to file a responsive pleading through and including July 14, 2010, and on July 14, 2010, the Debtors filed a motion to dismiss (the "Motion to Dismiss") NVR's complaint and the adversary proceeding.

In the Motion to Dismiss, the Debtors argue, among other things, that, because the Bankruptcy Court never approved the Asset Purchase Agreement, it was never legally binding and that NVR's breach of contract claim is therefore without merit, and any liquidated damages provision thereunder is unenforceable. Moreover, the Debtors argue that NVR's claims for promissory estoppel and unjust enrichment must be dismissed because, among other things, there was no promise by the Debtors on which NVR could have reasonably relied, and NVR never conferred a benefit on the Debtors that enriched the Debtors unjustly or otherwise. The Bankruptcy Court has not yet ruled on the Motion to Dismiss, and the parties have commenced discovery.

**P. Eric's Nursery Complaint.**

On July 8, 2010, Eric's Nursery commenced an adversary proceeding against the Debtors by filing a complaint for non-dischargeability (the "Eric's Nursery Complaint"). On July 15, 2010, the Debtors sent a letter to counsel for Eric's Nursery requesting them to withdraw and/or dismiss the Eric's Nursery complaint or potentially risk sanctions under Bankruptcy Rule 9011, as the basis for the claims set forth in the Eric's Nursery Complaint are not applicable against the Debtors. At a hearing held on August 6, 2010, Eric's Nursery confirmed that it would withdraw the Eric's Nursery Complaint, and on August 9, 2010, the Deputy Clerk for the Bankruptcy Court filed a notice closing the adversary proceeding.

**Q. Mammoth Grading Lift Stay and Related Motions.**

In May 2008, Parker & Orleans Homebuilders, Inc. ("Parker & Orleans"), one of the Debtors, contracted with Mammoth, to provide labor, equipment, and certain related services for properties being developed by the Debtors in North Carolina. In connection therewith, Mammoth filed mechanics liens (the "Mammoth Liens") against the Debtors totaling approximately $370,000.

On February 18, 2009, Mammoth filed for Chapter 7 bankruptcy protection before the United States Bankruptcy Court for the Eastern District of North Carolina, Wilson Division (the "North Carolina Bankruptcy Court"), and, shortly thereafter, commenced an adversary proceeding against Parker & Orleans. On February 9, 2010, the North Carolina Bankruptcy Court entered an order approving a settlement between the Debtors and Mammoth that provided for a payment by Parker & Orleans of $187,628.96. The Debtors did not make such payment prior to the Petition Date.

On June 25, 2010, the Debtors filed a motion before the North Carolina Bankruptcy Court seeking relief from the automatic stay imposed by Bankruptcy Code § 362(a) in Mammoth's bankruptcy case to enforce the Home Sales Order in connection with sales of properties that may be subject to the Mammoth Liens. The Debtors and the trustee subsequently in Mammoth's Chapter 7 case agreed upon the terms of an order lifting the automatic stay, which was entered by the North Carolina Bankruptcy Court on July 7, 2010.

On July 21, 2010, Joseph N. Callaway, the Chapter 7 trustee for Mammoth, filed a motion with the Bankruptcy Court for a determination of the validity, extent, and priority of one of the Mammoth Liens, and the Debtors filed an objection to that motion on September 1, 2010. The matter is currently scheduled to be heard by the Bankruptcy Court on October 7, 2010.

**R. Extension Motions.**

On May 14, 2010, the Debtors filed a motion requesting an extension of the exclusive periods (the "Exclusive Periods") within which to file a plan of reorganization and to solicit votes thereon provided under Bankruptcy Code § 1121(d). On June 1, 2010, the Bankruptcy Court entered an order extending the time within which to file a plan to September 27, 2010, and

the attendant solicitation period to November 26, 2010, without prejudice to the Debtors' right to seek further extensions. On September 27, 2010, the Debtors filed a second motion requesting a further extension of the Exclusive Periods, through and including November 26, 2010 and January 25, 2011, respectively. The matter is currently scheduled to be heard by the Bankruptcy Court on November 8, 2010.

On May 14, 2010, the Debtors filed a motion requesting an extension of the time by which they must assume or reject unexpired leases of nonresidential real property (up to and including September 26, 2010) under Bankruptcy Code § 365(2)(4), and on June 1, 2010, the Bankruptcy Court granted such relief.

On May 14, 2010, the Debtors filed a motion requesting an extension of the deadline (the "Removal Deadline") within which to remove actions, and on June 1, 2010, the Bankruptcy Court granted such relief and extended the Removal Deadline to August 30, 2010, without prejudice to the Debtors' rights to seek further extensions thereof. On July 22, 2010, the Debtors filed a motion requesting a further extension of the Removal Deadline until November 29, 2010.

**S. The Initial Plan and Disclosure Statement.**

On August 12, 2010, the Debtors filed an initial plan and disclosure statement in support thereof, both of which have been amended as set forth herein, and a motion seeking approval thereof and of the Voting Instructions, the Solicitation Procedures, the Tabulation Procedures, and other related relief.

**T. Certain Other Motions and Notices Filed by the Debtors.**

On March 19, 2010, the Debtors filed a motion for an order authorizing Community Management Services Group, Inc., to pay obligations of certain homeowner associations, and on April 6, 2010, the Bankruptcy Court granted such relief.

On April 16, 2010, the Debtors filed a motion for an order approving procedures for the sale of certain de minimis assets, and on May 4, 2010, the Bankruptcy Court granted such relief.

On April 22, 2010, the Debtors filed a motion seeking authority to reject various agreements with Garry P. Herdler, which was granted On June 1, 2010.

On May 4, 2010, the Debtors filed a motion for an order seeking authority to reject various agreements of sale with Meritage Homes of Florida and Kolter Group LLC, and on May 21, 2010, the Bankruptcy Court granted such relief.

On May 14, 2010, the Debtors filed a motion seeking authority to reject an unexpired equipment lease with DEX Imaging, Inc., and on June 1, 2010, the Bankruptcy Court granted such relief.

On June 28, 2010, the Debtors filed a notice of filing of form 8-k regarding certain lenders' support of the Short Term Incentive Plan.

On July 22, 2010, the Debtors filed a motion seeking clarification of the Home Sales Order in light of the Claims Filing Bar Date, and on August 5, 2010, the Bankruptcy Court granted such relief.

On August 18, 2010, the Debtors filed a motion seeking authority to surrender certain life insurance policies in exchange for their cash surrender value, and on September 8, 2010, the Bankruptcy Court granted such relief.

On August 20, 2010, the Debtors filed a motion seeking authority to assume certain (a) leases for nonresidential real property the Debtors use as office space in certain of the locations in which they operate and (b) leases for model homes, and pursuant to orders entered on September 21, 2010, the Bankruptcy Court granted such relief.

On September 20, 2010, the Debtors filed a motion to reject certain copier and other equipment and non-residential real property leases, which is scheduled to be heard by the Bankruptcy Court on October 7, 2010.

## VIII.   THE PLAN OF REORGANIZATION

The following discussion of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A.

### A.  General -- Classification of Claims.

In accordance with Bankruptcy Code § 1123, the Plan, among other things, designates classes of claims ("Claims") and classes of interests ("Interests"), specifies which classes are impaired and which are not impaired under the Plan, and specifies the treatment of each class that is impaired under the Plan.  The provisions of the Bankruptcy Code require that each class contain Claims and Interests of respective creditors and interest holders that are substantially similar to the other Claims or Interests in such class.  The Plan designates twelve classes of Claims and two classes of Interests.  This classification takes into account the differing nature and priority of the various Claims and Interests under the Bankruptcy Code and other applicable laws, as well as the business necessities of the Debtors.

While the Debtors believe that they have classified all Claims and Interests in compliance with the provisions of the Bankruptcy Code (including, but not limited to, in compliance with Bankruptcy Code § 1122), it is possible that a party-in-interest will challenge such classification and that the Bankruptcy Court will determine that a different classification is required for the Plan to be confirmed.  In such event, the Debtors reserve the right to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court for confirmation of the Plan.

The Plan provides for the treatment of "Allowed Claims".  An Allowed Claim is, except as otherwise provided in the Plan (including in Plan Section 13.6), with reference to a Claim:  (a) any Claim against a Debtor that has been listed by such Debtor in the Schedules filed by such Debtor as liquidated in an amount greater than zero dollars ($0.00) and not disputed or contingent and for which no contrary Proof of Claim has been filed and as to which no timely objection has been interposed; (b) any Claim as to which a Proof of Claim has been timely filed

and (i) no objection to the allowance thereof has been timely interposed on or before the Claims Objection Bar Date, and (ii) such Claim has not (as applicable) been withdrawn, paid in full, or otherwise deemed satisfied in full (pursuant to an order of the Bankruptcy Court or otherwise); (c) any Claim as to which an objection has been filed and a Final Order has been entered in favor of the respective Claim holder with respect to all or any portion of such Claim, or any such objection has been settled, waived through payment, or withdrawn; (d) any Claim that has otherwise been allowed by a Final Order (including, without limitation, the DIP Facility Order, with respect to DIP Facility Claims); (e) any Claim as to which, upon the lifting of the automatic stay pursuant to Bankruptcy Code § 362, the liability of a Debtor, allowance, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (f) with respect to any Administrative Claim for goods or services provided to the Debtors during these Cases in the ordinary course of the Debtors' businesses by non-Professionals, such Administrative Claim has not been withdrawn, paid, or otherwise satisfied in full (pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses), or otherwise deemed satisfied in full in the ordinary course of the Debtors' businesses; (g) with respect to any Secured Operational Lien Claim, such Claim is determined to be an Allowed Class 2C Claim in the manner set forth in Plan Section 4.4(b); or (h) any Claim that is expressly deemed an Allowed Claim under the Plan (including the Secured Revolving Credit Facility Claims and the Lenders' Deficiency Claim). Except for the DIP Facility Claims and unless otherwise ordered by the Bankruptcy Court prior to Confirmation, or as specifically provided to the contrary in the Plan with respect to any particular Claim, an "Allowed" Claim will not, for any purpose under the Plan, include (i) any interest on such Claim to the extent accruing or maturing on or after the Petition Date, (ii) punitive or exemplary damages, or (iii) any fine, penalty, or forfeiture.

**B. Summary of Distributions Under the Plan.**

All estimates of Claim amounts are preliminary in nature and are based on current limited information and certain timing and other assumptions that may prove to be incorrect, and therefore, the actual amounts of Allowed Claims may vary significantly from such estimates.

**1. Administrative Claims.**

"Administrative Claims" are defined in the Plan as

> all Claims for costs and expenses of administration of these Cases with priority under Bankruptcy Code § 507(a)(2), costs and expenses allowed under Bankruptcy Code § 503(b) (including, without limitation, under Bankruptcy Code § 503(b)(9)), the actual and necessary costs and expenses of preserving the respective Estates of the Debtors and operating the respective businesses of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors pursuant to Bankruptcy Code § 364 or otherwise (other than any DIP Facility Claims), professional fees and expenses of the Debtors and the Creditors Committee (including without limitation the expenses incurred by each member of the Creditors Committee in its capacity as such), and

post-petition Indenture Trustee Fees, in each case to the extent allowed by an order of the Bankruptcy Court under Bankruptcy Code § 330(a) or § 331 or otherwise, and any fees or charges assessed against the respective Estates under 28 U.S.C. § 1930; *provided, however, that the Holder of an Administrative Claim (except for an Administrative Claim based upon (i) Professional Fees, the allowance and timing for filing of applications for Professional Fees being governed by Plan Section 13.7), (ii) DIP Facility Claims, (iii) fees or charges asserted against the respective Estates under 28 U.S.C. § 1930, and (iv) goods or services provided to the Debtors during these Cases in the ordinary course of the Debtors' businesses by non-Professionals) must file a request for payment on or before the Applicable Administrative Claims Bar Date for such Administrative Claim to be eligible to be considered an Allowed Claim.*

The Plan defines the "Applicable Administrative Claims Bar Date" as either (i) the Initial Administrative Claims Bar date, to the extent the applicable Administrative Claim arose prior thereto, or (ii) the Final Administrative Claims Bar Date, to the extent the applicable Administrative Claim arose on or after the Initial Administrative Claims Bar Date." The "Final Administrative Claims Bar Date" is in turn defined as the

deadline for filing any Administrative Claims incurred on and after October 2, 2010, through and including the Confirmation Date, other than DIP Facility Claims, Administrative Claims based upon Professional Fees, fees or charges asserted against the respective Estates under 28 U.S.C. § 1930, and post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtors' respective businesses (including, but not limited to, vendor, employee wage and benefit, and state and local property, sales, and use taxes), *which date shall be 30 days after the Confirmation Date as set forth in the Confirmation Order*.

Pursuant to the Plan, each holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 60 days after the Allowance Date, except to the extent that such holder has agreed to a less favorable treatment of such Allowed Claim; provided, however, that Allowed Administrative Claims representing obligations incurred in the ordinary course of the Debtors' businesses will be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements related thereto.

No Professional Fees will be paid with respect to any Claim or Interest except as specified in the Plan or as allowed by an order of the Bankruptcy Court. All final applications for Professional Fees for services rendered in connection with these Cases prior to and including the Confirmation Date must be filed with the Bankruptcy Court not later than 90 days after the Effective Date. Notwithstanding anything to the contrary herein, the Debtors or the Reorganized

Debtors (as applicable) will pay any and all Allowed, Court-approved Professional Fees that were incurred by the Professionals for the Creditors Committee prior to August 1, 2010 (except for any fees incurred by those Professionals in their investigation of the Claims and/or Liens of the Revolving Credit Facility Lenders) and that were either unpaid or the subject of a holdback as of the Effective Date. In addition, notwithstanding anything to the contrary herein or in any order of the Bankruptcy Court, any Professional Fees incurred by the Professionals for the Creditors Committee in excess of $125,000 in their investigation of the Claims and/or Liens of the Revolving Credit Facility Lenders will only be paid from amounts that would otherwise be available for distribution to the Holders of Allowed Claims in Classes 3A, 3B, and 3D; provided, however, that in consideration of the Unsecured Creditor Settlement, if Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), then an additional $300,000 (the "Additional Committee Investigation Fees"), which will be deducted from the Unsecured Creditor Cash Pool, will be available to pay Allowed Professional Fees incurred by the Professionals for the Creditors Committee in their investigation of the Claims and/or Liens of the Revolving Credit Facility Lenders. For the avoidance of doubt, except as provided in the preceding sentence, no more than $125,000 of the Carve-Out (as defined in the DIP Facility Order), and no portion of any cash collateral or proceeds of the DIP Facility, will be paid to the Professionals for the Creditors Committee or any representative of the Estates to investigate the Claims and/or Liens of the Revolving Credit Facility Lenders. If Class 3 votes as a Class in the aggregate to accept the Plan, to the extent the Professionals for the Creditors Committee incur any Additional Committee Professional Fees, the Additional Committee Professional Fees will be paid from the Unsecured Creditor Cash Pool, and the Debtors and the Reorganized Debtors will have no obligation to pay any Additional Committee Professional Fees.

The Reorganized Debtors will have until the Initial Distribution Date (or such longer period of time as may be allowed by order of the Bankruptcy Court) to review and object to Administrative Claims that were required to be filed on or prior to the Initial Administrative Claims Bar Date, and until 45 days following the Final Administrative Claims Bar Date (or such longer period of time as may be allowed by order of the Bankruptcy Court) to review and object to Administrative Claims that were required to be filed on or prior to the Final Administrative Claims Bar Date. If the Reorganized Debtors fail to submit a timely objection to an Administrative Claim, or following a timely objection to such Administrative Claim, the Bankruptcy Court enters a Final Order deeming the Administrative Claim an Allowed Administrative Claim, such Administrative Claim will be treated as an Allowed Administrative Claim under the Plan.

As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed Administrative Claims will be approximately $14,629,000. The Debtors further estimate that approximately $5,153,000 of the total amount of Allowed Administrative Claims will consist of unpaid Professional Fees, as well as approximately $7,302,000 of unpaid ordinary course post-petition accounts payable.

## 2. The DIP Facility Claims.

The DIP Facility Claims consist of all Claims of the DIP Facility Lenders against the Debtors represented by, related to, arising under, or in connection with the revolving loans issued

under the DIP Facility for all outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of any payments made by any of the Debtors to the DIP Facility Lenders prior to the Effective Date on account of such Claims ("DIP Revolving Facility Claims") and all Claims of the DIP Facility Lenders against the Debtors represented by, related to, arising under, or in connection with term loans issued under or approved in connection with the DIP Facility for all outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of any payments made by any of the Debtors to the DIP Facility Lenders prior to the Effective Date on account of such Claims ("DIP Term Loan Claims").

On the Effective Date, each holder of an Allowed DIP Revolving Facility Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, Cash in an amount equal to such holder's Allowed DIP Revolving Facility Claim, which payments will collectively be in the amount equal to the aggregate outstanding amount of the Allowed DIP Revolving Facility Claims. As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed DIP Revolving Facility Claims will be approximately $19.85 million.

In addition, each Holder of an Allowed DIP Term Loan Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed DIP Term Loan Claim, (i) Cash in an amount up to such Holder's Allowed DIP Term Loan Claim, to the extent sufficient Cash proceeds are available from the Exit Credit Facility for distribution to fully satisfy such Allowed DIP Term Loan Claim, and (ii) to the extent sufficient Cash proceeds are not available from the Exit Credit Facility for distribution on account of such Allowed DIP Term Loan Claim, New Notes in an aggregate principal amount equal to any portion of such Allowed DIP Term Loan Claim that is not satisfied with Cash proceeds from the Exit Credit Facility. As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed DIP Term Loan Claims will be approximately $80 million, plus any interest, fees, charges, and expenses then owed.

The total distributions of shares of the New Notes and/or Cash on account of Allowed DIP Facility Claims will be made by the Debtors on the Effective Date to the DIP Facility Agent for subsequent distribution to the Holders of Allowed DIP Facility Claims (as applicable) as of the Distribution Record Date. The DIP Facility Agent or an affiliate thereof will serve as the transfer exchange agent for the initial distribution of the New Notes to the Holders of the Allowed DIP Facility Claims.

The DIP Facility Claims will be Allowed Claims under the Plan in the aggregate amount equal to all obligations under the DIP Facility outstanding as of the Effective Date, as agreed to by the DIP Facility Lenders and the Debtors, or in the event of a dispute regarding such amount, as such amount has been determined by a Final Order of the Bankruptcy Court.

On the Effective Date, at the election of the Debtors or the Reorganized Debtors, as applicable, (x) the DIP L/C Issuer will, to the extent permissible under the applicable agreement, receive cancellation without draw of all outstanding letters of credit issued under the DIP Facility, (y) the Debtors or the Reorganized Debtors, as applicable, will arrange for the issuance of additional letters of credit in favor of the DIP L/C Issuer, equal to the DIP L/C Issuer's

maximum exposure under such letters of credit, in a form and substance satisfactory to the DIP L/C Issuer, or (z) the outstanding letters of credit under the DIP Facility will be secured by Cash equal to 105% of the DIP L/C Issuer's maximum exposure under such outstanding letters of credit.

All distributions under the Plan on account of the Allowed DIP Facility Claims will be distributed by the Debtors to the DIP Facility Agent, for further distribution to the Holders of Allowed DIP Facility Claims as of the Distribution Record Date, pursuant to the terms and subject to the conditions of the DIP Facility and the Plan.

### 3. Tax Claims.

A "Tax Claim" is a Claim entitled to priority under Bankruptcy Code § 507(a)(8). Such Claims include claims for certain taxes measured by income or gross receipts, property taxes, withholding taxes, employment taxes, excise taxes, and customs duties and any penalty related to such tax claim that is in compensation for actual pecuniary loss.

Pursuant to the Plan, each holder of an Allowed Tax Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, at the election of the applicable Debtor, either Cash equal to the amount of such Allowed Claim on the later of the Initial Distribution Date and the date that is 60 days after the Allowance Date or in accordance with Bankruptcy Code § 1129(a)(9)(C), deferred Cash payments of a value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, over a period not exceeding five years after the Petition Date, and in a manner not less favorable than the treatment of the most favored nonpriority unsecured Claim provided for by the Plan, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim.

As noted above, on March 3, 2010, the Bankruptcy Court entered an order authorizing the Debtors to pay pre-petition taxes. The Debtors estimate that a total of $460,522.70 has been paid in accordance with this order as of the date hereof, and anticipate that they will make additional payments thereunder between approximately $75,000 and $100,000 prior to the Effective Date. The Debtors believe that the total amount of Allowed Tax Claims will be between approximately $535,522.70 and $2.5 million on the Effective Date.

### 4. Unimpaired Classes.

#### (a) Class 1 -- Priority Claims.

Class 1 consists of all Priority Claims, which are claims that are entitled to priority pursuant to Bankruptcy Code § 507(a) or (b) and that are not Administrative Claims or Tax Claims. Such claims would include, but would not be limited to, unsecured claims earned within 180 days before the Petition Date (up to $10,950 for each person) for wages, salaries, or commissions, including severance, vacation, and sick leave pay earned, and unsecured claims for contributions to an employee benefit plan arising from services rendered within 180 days before the Petition Date, for each such plan up to a specified limit determined by the magnitude of other employee-related claims paid by the Debtors.

Pursuant to the Plan, if not otherwise paid in full pursuant to an order of the Bankruptcy Court prior to the Confirmation Date, and except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim, each holder of an Allowed Class 1 Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, Cash equal to the amount of such Allowed Claim on the latest of the Initial Distribution Date, the date that is 60 days after the Allowance Date of such Claim, and the date when such Allowed Claim becomes due and payable according to its terms and conditions. Accordingly, the Allowed Claims in Class 1 are unimpaired, such that the Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).

As of the Bar Date, 181 Proofs of Claim were timely filed asserting, in the aggregate, approximately $6,747,657.79 as Priority Claims. The Debtors anticipate that they will object to at least certain of such claims (on the grounds that such claims are not entitled to priority status under applicable law, were duplicative of other claims that were filed, have already been paid in full or in part pursuant to certain orders of the Bankruptcy Court, or otherwise), such that, as of the Effective Date, the total amount of Allowed Priority Claims will be lower than such asserted sum. As a result, as of the date hereof, the Debtors believe that the total amount of the Allowed Priority Claims will be between approximately $76,000 on the Effective Date.

**(b)** **Class 2B -- Other Secured Claims Against Any of the Debtors.**

Class 2B consists of Secured Claims against any of the Debtors that are not otherwise classified in Article II of the Plan. Accordingly, Class 2B Claims include Claims arising under any secured capital leases of the Debtors, but do not include any Claims under, respectively, the Revolving Credit Facility, the Revolving Credit Facility Guarantee, or the DIP Facility, or Secured Operational Lien Claims. Class 2B Claims also do not include any Tax Claims. The Plan defines "Secured Claims" as

> [a]ll Claims that are secured by a properly perfected, valid, enforceable, and not otherwise avoidable lien on property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code § 553, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a) and, if applicable, § 1129(b); provided, however, that if the holder of a Secured Claim is entitled to and does timely elect application of Bankruptcy Code § 1111(b)(2), then such holder's Claim shall be a Secured Claim to the extent such Claim is Allowed. Only those Operational Lien Claims that are determined to constitute Secured Operational Lien Claims in the manner provided in Plan Section 4.4(b) or otherwise pursuant to a Final Order of the Bankruptcy Court shall constitute Secured Claims for any purpose under the Plan and in these Cases.

Class 2B Claims will be treated in the manner set forth in Plan Section 4.3. Under the Plan, in full satisfaction, settlement, release, and discharge of, and in exchange for, each outstanding Allowed Class 2B Claim that has not previously been satisfied pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses, at the election of the applicable Debtor or Reorganized Debtor, such Debtor or Reorganized Debtor will either: (a) pay the amount of such Allowed Class 2B Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; (b) return the underlying collateral to the Holder of such Allowed Class 2B Claim; (c) Reinstate such Allowed Class 2B Claim in accordance with the provisions of Bankruptcy Code § 1124(2); or (d) treat such Allowed Class 2B Claim in a manner otherwise agreed to by the Holder thereof. Accordingly, the Allowed Claims in Class 2B are all unimpaired, such that the Holders of Allowed Class 2B Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).

As of the date hereof, the Debtors estimate that, as of the Effective Date, there will be a total of between $0 and approximately $522,193.51 in Allowed Class 2B Claims that will not otherwise have been satisfied pursuant to a Final Order of the Bankruptcy Court or in the ordinary course of the Debtors' businesses.

### (c) Class 2C -- Secured Operational Lien Claims Against Any of the Debtors.

Class 2C consists of all Secured Operational Lien Claims against any of the Debtors, as determined in the manner set forth in Plan Section 4.4 or otherwise pursuant to a Final Order of the Bankruptcy Court. Accordingly, subject to the terms and conditions of Plan Section 4.4 (including, without limitation, those set forth in Plan Section 4.4(d) regarding the Debtors' or the Reorganized Debtors' right to commence an action in the Bankruptcy Court in the event they determine that any Operational Lien Claim set forth on such Exhibit F does not properly constitute an Allowed Secured Operational Lien Claim in Class 2C), all Operational Lien Claims set forth on Exhibit F constitute Allowed Class 2C Claims for all purposes under the Plan and in these Cases. The Plan defines "Operational Lien Claims" as "[a]ll Claims represented by, related to, arising under, or in connection with an Operational Lien." The Plan defines "Operational Liens" as "[a]ny construction, materialman's, mechanics', or other statutory or common law liens or other claim arising from, or relating to, the construction of homes or related activities, that was or could have been asserted at any time as of the Effective Date against any of the Debtors or their Assets."

**ALL HOLDERS OF OPERATIONAL LIEN CLAIMS SHOULD NOTE THAT MOST OPERATIONAL LIEN CLAIMS WILL NOT BE TREATED AS SECURED CLAIMS UNDER THE PLAN. INSTEAD, AS DESCRIBED FURTHER HEREIN, ONLY THOSE OPERATIONAL LIEN CLAIMS THAT ARE LISTED ON EXHIBIT F HERETO OR OTHERWISE DETERMINED TO CONSTITUTE SECURED OPERATIONAL LIEN CLAIMS IN THE MANNER PROVIDED IN PLAN SECTION 4.4(b) OR PURSUANT TO A FINAL ORDER OF THE BANKRUPTCY COURT WILL CONSTITUTE SECURED CLAIMS FOR ANY PURPOSE UNDER THE PLAN AND IN THESE CASES. ALL OTHER OPERATIONAL LIEN CLAIMS THAT ARE NOT EXPRESSLY DEEMED OR JUDICIALLY DETERMINED TO BE SECURED**

**OPERATIONAL LIEN CLAIMS (INCLUDING THOSE CLAIMS LISTED ON <u>EXHIBIT G</u> HERETO, OR THOSE CLAIMS NOT LISTED ON EITHER <u>EXHIBIT F</u> OR <u>EXHIBIT G</u>) WILL BE TREATED UNDER THE PLAN AS GENERAL UNSECURED CLAIMS IN CLASS 3 OR CLASS 3A, AS APPLICABLE (SUBJECT TO ALL OF THE DEBTORS' RIGHTS AND DEFENSES WITH RESPECT THERETO).**

Class 2C Claims will be treated in the manner set forth in Plan Section 4.4. Under the Plan, in full satisfaction, settlement, release, and discharge of, and in exchange for, each outstanding Allowed Class 2C Claim that has not previously been satisfied pursuant to an order of the Bankruptcy Court or otherwise in the ordinary course of the Debtors' businesses: (a) to the extent that the home or other Asset that is the subject of the applicable Secured Operational Lien Claim has been sold by the Debtors at any time prior to the Effective Date, the Reorganized Debtors will pay the amount of such Allowed Class 2C Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; and (b) to the extent that the home or other Asset that is the subject of the applicable Secured Operational Lien Claim has not been sold by the Debtors prior to the Effective Date, at the election of the applicable Reorganized Debtor, such Reorganized Debtor will (i) pay the amount of such Allowed Class 2C Claim in full, in Cash, on the later of the Initial Distribution Date or the date that is 60 days after the Allowance Date of such Claim; (ii) Reinstate such Allowed Class 2C Claim in accordance with the provisions of Bankruptcy Code § 1124(2); (iii) upon the sale of the home or other Asset that is the subject of the applicable Secured Operational Lien Claim, pay in full, in Cash, the amount of such Allowed Class 2C Claim; or (iv) treat such Allowed Class 2C Claim in a manner otherwise agreed to by the Holder thereof.

Except as otherwise set forth in the Plan, the provisions of the Plan relating to the Operational Lien Claims will on and after (but not prior to) the Effective Date, for all purposes in these Cases, supersede the corresponding provisions in the Home Sales Order and any other order entered in these Cases with respect thereto; <u>provided</u>, <u>however</u>, that the Home Sales Order and any other order entered in these Cases that is or would be modified pursuant to Plan Section 4.4(b) will, except as specifically modified, remain in full force and effect for all purposes in these Cases. Without limiting the generality of the foregoing, after consideration of the facts and of applicable law, <u>Exhibit F</u> to the Disclosure Statement contains a schedule setting forth the Debtors' position as to the correct status and/or Allowed amount (if any) of all known Secured Operational Lien Claims. In addition, <u>Exhibit G</u> to the Disclosure Statement contains a schedule setting forth the Operational Lien Claims that the Debtors have determined constitute General Unsecured Claims (as such schedule may be amended or revised and included in the Plan Supplement or otherwise, in the manner set forth below). *Without in any way modifying the Home Sales Procedures, which will remain in effect through the Effective Date, any Operational Lien Claimholder will have until the Confirmation Objection Deadline to object to (i) the inclusion of its Operational Lien Claim on <u>Exhibit G</u> to the Disclosure Statement, (ii) the omission of its Operational Lien Claim from <u>Exhibit F</u> to the Disclosure Statement, and (iii) the stated Allowed amount of any Operational Lien Claim on such <u>Exhibit F</u>; notwithstanding the foregoing, the 30-day waiting period for filing a Demand Resolution Motion (as such term is defined in the Home Sales Order) will not prohibit the filing of any such objection. Except to the extent that the applicable Operational Lien Claimholder so objects prior to the Confirmation Objection Deadline and obtains a Final Order of the Bankruptcy Court determining that its Claim constitutes an Allowed Secured Operational Lien Claim in Class 2C in an amount in*

*excess of zero dollars ($0.00), any Operational Lien Claims that are (i) not otherwise expressly set forth on such Exhibit F as being an Allowed Secured Operational Lien Claim, (ii) set forth on Exhibit G, or (iii) do not appear on either Exhibit F or Exhibit G, will be treated for all purposes under the Plan and in these Cases as General Unsecured Claims in Class 3 or 3A (as applicable) and not as Secured Operational Lien Claims in Class 2C (or Other Secured Claims in Class 2B), and will be otherwise subject to all rights, defenses, objections, and claims of the Debtors or the Reorganized Debtors (as applicable) with respect thereto. Also, any party that disputes the Allowed amount of an Operational Lien Claim set forth on Exhibit F must object to such proposed amount prior to the Confirmation Objection Deadline or will be deemed to have consented to such amount for all purposes under the Plan and in these Cases. Any non-Debtor party that fails to object on or prior to the Confirmation Objection Deadline to the Debtors' position regarding the status and/or Allowed amount of such party's Operational Lien Claim will be deemed to have consented to such position, and its Claim will be treated in accordance therewith for all purposes under the Plan (including, but not limited to, for voting, classification, and distribution purposes) and otherwise in these Cases, and may not otherwise receive any other treatment or additional distribution or consideration from, or otherwise seek recourse against, any of the Debtors, the Estates, the Reorganized Debtors, or any of their presently or previously owned Assets or assets that they may own in the future, except as otherwise set forth herein and in the Plan. In addition, any purported Operational Lien Claimholder whose Operational Lien Claim (i) does not appear on Exhibit F as an Allowed Secured Operational Lien Claim, (ii) appears on Exhibit G as a General Unsecured Claim, or (iii) does not appear on either Exhibit F or Exhibit G, and who fails to object or otherwise respond in a timely manner to such omission or inclusion (as applicable) prior to the Confirmation Objection Deadline, will be deemed to have consented thereto, and its Operational Lien Claim (if any) will be treated for all purposes under the Plan (including, but not limited to, for voting, classification, and distribution purposes) and otherwise in these Cases as a General Unsecured Claim in Class 3 or 3A (as applicable) and not as a Secured Operational Lien Claim in Class 2C (or Other Secured Claim in Class 2B), and may not otherwise receive any other treatment or additional distribution or consideration from, or otherwise seek recourse against, any of the Debtors, the Estates, the Reorganized Debtors, or any of their presently owned or previously owned Assets or assets that they may own in the future, beyond any distribution or other treatment to be afforded to such Claim under the terms and conditions of the Plan.* In the event of a dispute regarding: (x) the status of any Operational Lien Claim set forth on Exhibit F or Exhibit G to the Disclosure Statement, or not set forth on either Exhibit F or Exhibit G, or any other asserted Operational Lien Claim, (y) the Allowed amount of such Claim, or (z) any other matter pertaining thereto (each an "Operational Lien Claim Dispute"), any payment or other distribution or treatment with respect to such Claim as provided for in the Plan will be made only following the entry of a Final Order resolving the applicable Operational Lien Claim Dispute.

**ALL HOLDERS OF OPERATIONAL LIEN CLAIMS SHOULD CAREFULLY REVIEW THE SCHEDULES INCLUDED AS EXHIBIT F AND EXHIBIT G HERETO (AS SUCH SCHEDULES MAY BE AMENDED OR REVISED AND INCLUDED IN THE PLAN SUPPLEMENT OR OTHERWISE) TO DETERMINE WHETHER OR NOT THE DEBTORS PROPOSE TO TREAT SUCH HOLDER'S OPERATIONAL LIEN CLAIM AS A SECURED OPERATIONAL LIEN CLAIM OR AS A GENERAL UNSECURED CLAIM. IF ANY HOLDER OF AN OPERATIONAL LIEN CLAIM DISAGREES WITH SUCH TREATMENT, IT MUST OBJECT IN ACCORDANCE WITH THE**

**PROCEDURES SET FORTH HEREIN OR IN THE NOTICE ACCOMPANYING THIS DISCLOSURE STATEMENT PRIOR TO THE CONFIRMATION OBJECTION DEADLINE, OR IT WILL BE FOREVER BARRED FROM ASSERTING ANY SECURED CLAIM AGAINST THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, OR ANY OF THEIR PRESENTLY OWNED OR PREVIOUSLY OWNED ASSETS, OR ANY ASSETS THAT THEY MAY OWN IN THE FUTURE; PROVIDED, HOWEVER, THAT THE FOREGOING WILL NOT IN ANY WAY MODIFY THE HOME SALES PROCEDURES, WHICH WILL REMAIN IN EFFECT THROUGH THE EFFECTIVE DATE.**

The Bankruptcy Court may adjudicate any Operational Lien Claim Dispute at or prior to the Confirmation Hearing or on any other date the Bankruptcy Court may schedule (upon reasonable notice). After the Confirmation Date, the Debtors, and on and after the Effective Date, the Reorganized Debtors, will have the authority to settle, compromise, resolve, or withdraw any Operational Lien Claim Dispute.

The listing of a Claim on Exhibit F or Exhibit G to this Disclosure Statement will not constitute an admission by the Debtors that such Claim is an Allowed Claim, that the Debtors have any liability with respect thereto, or that the applicable non-Debtor party has any rights or claims with respect to any of the Assets. The Debtors will retain the right to commence an action in the Bankruptcy Court in the event they determine that any Operational Lien Claim set forth on Exhibit F does not properly constitute an Allowed Secured Operational Lien Claim in Class 2C.

As of the date hereof, the Debtors estimate that, as of the Effective Date, there will be a total of approximately $960,613.92 in Allowed Class 2C Claims that will not otherwise have been satisfied pursuant to a Final Order of the Bankruptcy Court or in the ordinary course of the Debtors' businesses.

> **(d)     Class 6 -- Old Stock of the Subsidiary Debtors.**

Except as the Debtors and the Reorganized Debtors may otherwise determine, the Debtors' existing corporate structure of affiliate and/or subsidiary ownership will be maintained, unaffected by the Plan, as set forth further in Plan Section 6.2. At the election of the Reorganized Debtors and with the consent of the Sponsors, each respective Old Stock Interest in a Subsidiary Debtor will be unaffected by the Plan, in which case the entity holding an Interest in such Subsidiary Debtor will continue to hold such Interest in the applicable Reorganized Subsidiary Debtor following the Effective Date, cancelled and new equity in the applicable Reorganized Subsidiary Debtor will be issued pursuant to the Plan or otherwise restructured.

> **(e)     Special Provision Regarding Unimpaired Claims.**

Except as may otherwise be provided in the Plan, the Confirmation Order, any other Final Order of the Bankruptcy Court, or any Plan Document, nothing will affect the Debtors' or the Reorganized Debtors' (as applicable) rights and defenses, both legal and equitable, with respect to any Claims that are not impaired under the Plan, including, but not limited to, all rights with respect to legal and equitable defenses to, and/or setoffs or recoupments against, such Claims.

**5.      Impaired Classes.**

  **(a)      Class 2A -- Secured Revolving Credit Facility Claims.**

  Class 2A consists of all Secured Revolving Credit Facility Claims, which are all Secured Claims of the Revolving Credit Facility Lenders against any of the Debtors represented by, related to, arising under, or in connection with the Revolving Credit Facility (as against the Revolving Credit Facility Borrowers, as the borrowers thereunder) and/or the Revolving Credit Facility Guaranty (as against OHB, in its capacity as the Revolving Credit Facility Guarantor), as applicable, for any and all outstanding obligations thereunder incurred through and including the Effective Date, after taking into account the sum of all payments or other distributions made by any of the Debtors to the Revolving Credit Facility Lenders prior to the Effective Date on account of such Claims (pursuant to the DIP Facility or otherwise).

  Under the Plan, the Secured Revolving Credit Facility Claims will be deemed Allowed Claims in the aggregate amount of $145 million (subject to the ultimate amounts outstanding under the DIP Facility as of the Effective Date).  Accordingly, the Allowed amount of the Class 2A Claims takes into account any and all amounts previously paid by the Debtors to the Holders of Revolving Credit Facility Claims from the proceeds of the DIP Facility or otherwise during the course of these Cases.

  Class 2A Claims will be treated in the manner set forth in Plan Section 5.2, which provides that, on the Effective Date, or as soon thereafter as is practicable, each Holder of an Allowed Class 2A Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, its Claim, such Holder's Pro Rata share of the shares of New OHB Common Stock, the New Notes, and Cash in an amount equal to the Adequate Protection Claim (it being understood that such payment will be made as soon as reasonably practicable after the Effective Date from proceeds received by the Debtors or the Reorganized Debtors, as applicable, from the sale, transfer, or other disposition of what would otherwise be Unencumbered Assets (but for the Adequate Protection Liens)); provided, however, that if Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), the Holders of Class 2A Claims will be deemed to have waived the right to receive the Cash payment on account of the Adequate Protection Claim.  For purposes of determining the amounts of such distribution of the New Notes to the Holders of Allowed Class 2A Claims, each Holder of an Allowed Class 2A Claim's Pro Rata share will be calculated using such Holder's Allowed Secured Revolving Credit Facility Claim as the numerator, and the aggregate amount of the Allowed Secured Lender Claims as the denominator.

  The Plan defines the "Adequate Protection Claim" as "the Claim of the Revolving Credit Facility Lenders in an amount equal to the Diminution in Value"; "Diminution in Value" has the meaning ascribed to such term in the DIP Facility Order, where it is defined as "the diminution in the value of the Pre-Petition Liens [as such term is defined in the DIP Facility Order] calculated in accordance with section 506(a) of the Bankruptcy Code."

  If necessary, the Adequate Protection Claim will be valued at an amount to be determined by the Bankruptcy Court at or prior to the Confirmation Hearing.  The Sponsors assert that the amount of the Adequate Protection Claim as of the Effective Date will be an amount equal to the

DIP Revolving Facility Claims, plus the aggregate amount of letters of credit issued and outstanding under the DIP Facility and not otherwise terminated or cancelled as of the Effective Date, which, based upon current projections, would result in a total claim of approximately $21 million. The Debtors reserve all rights and defenses with respect to such asserted amount.

The sum total of the value of the distributions to be made to the Holders of Allowed Secured Revolving Credit Facility Claims will not exceed the aggregate amount of the Allowed Secured Revolving Credit Facility Claims.

On the Effective Date, (i) all outstanding notes issued in connection with the Revolving Credit Facility and any outstanding notes issued in connection with the Revolving Credit Facility Guarantee will, to the extent permissible under the applicable agreement, be cancelled and will be deemed terminated and of no force and effect, and (ii) at the election of the Debtors or the Reorganized Debtors, as applicable, (x) the Revolving Credit Facility L/C Issuer will receive cancellation without draw of all outstanding letters of credit issued under the Revolving Credit Facility, (y) the Debtors or the Reorganized Debtors, as applicable, will arrange for the issuance of additional letters of credit in favor of the Revolving Credit Facility L/C Issuer, equal to the Revolving Credit Facility L/C Issuer's maximum exposure under such letters of credit, in a form and substance reasonably satisfactory to the Revolving Credit Facility L/C Issuer, or (z) the outstanding letters of credit under the Revolving Credit Facility will be secured by Cash equal to 105% of the Revolving Credit Facility L/C Issuer's maximum exposure under such outstanding letters of credit.

Class 2A is impaired and the Holders of Allowed Class 2A Claims are entitled to vote to accept or to reject the Plan.

As of the date hereof, the Debtors estimate that the total amount of Allowed Secured Revolving Credit Facility Claims on the Effective Date will be approximately $145 million, subject to the ultimate amounts outstanding under the DIP Facility as of the Effective Date.

### (b) Class 3 -- Aggregate Unsecured Claims Against Any of the Debtors.

Class 3 consists of all Aggregate Unsecured Claims against any of the Debtors. The Plan defines "Aggregate Unsecured Claims" as "[c]ollectively, all of the General Unsecured Claims, the Junior Subordinated Notes Claims, the Trust Preferred Securities Claims, and the Convenience Class Claims."

If Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), then as soon as practicable after the Effective Date, each Holder of an Allowed Aggregate Unsecured Claim as of the Distribution Record Date will receive from the Unsecured Creditor Agent, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, such Holder's Pro Rata Share of (i) the Initial Avoidance Claim Proceeds, (ii) the Excess Avoidance Claim Proceeds, and (iii) the Aggregate Unsecured Creditor Distribution. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then each Holder of an allowed Aggregate Unsecured Claim will be treated in accordance with Plan Sections 5.4, 5.5, or 5.6, as applicable.

The Plan defines "Aggregate Unsecured Creditor Distribution" as the "balance of the Unsecured Creditor Cash Pool, after giving effect to the prior payment in full of Additional Committee Investigation Fees, the Agreed Committee Professional Fees, the Claim Resolution Fees, and any Additional Committee Professional Fees." The "Unsecured Creditor Cash Pool" is in turn defined as "[c]ash in the aggregate amount of $6 million plus any Critical Vendor Payment Amounts, Additional Vendor Payment Amounts, Initial Avoidance Claim Proceeds, and Excess Avoidance Claim Proceeds received by the Unsecured Creditor Agent, if any, to be applied to the Aggregate Unsecured Creditor Distribution, the Agreed Committee Professional Fees, the Additional Committee Investigation Fees, the Claim Resolution Fees, and any Additional Committee Professional Fees." "Additional Committee Professional Fees" is defined as "Allowed Professional Fees incurred by the Professionals for the Creditors Committee in excess of the Agreed Committee Professional Fees."

The Plan defines "Initial Avoidance Claims Proceeds" as the "first $4 million of proceeds derived from the prosecution of Avoidance Claims (as and when any such proceeds are recovered)." "Excess Avoidance Claims Proceeds" are all "proceeds from the prosecution of Avoidance Claims in excess of the Initial Avoidance Claims Proceeds."

The Creditors Committee estimates that the amount of the various fees and expenses that will ultimately be deducted from the $6 million Unsecured Creditor Cash Pool for the period prior to the Effective Date is between approximately $800,000 and $900,000.

As of the date hereof, the Debtors estimate that there will be approximately $279 million in Allowed Class 3 Claims on the Effective Date.

     **(c)     Class 3A -- General Unsecured Claims Against Any of the Debtors.**

Class 3A consists of all Allowed General Unsecured Claims against any of the Debtors. The Plan defines "General Unsecured Claims" as

> [u]nless otherwise specified in the Plan or in a Final Order of the Bankruptcy Court, all Claims, other than (i) Secured Claims (as provided for, and determined in accordance with, Bankruptcy Code § 506(a) and the Plan (including, without limitation, Plan Section 4.4(b)), including the DIP Facility Claims, the Secured Revolving Credit Facility Claims, or any Secured Operational Lien Claims); (ii) Administrative Claims; (iii) Priority Claims; (iv) Tax Claims; (v) Junior Subordinated Notes Claims; (vi) Trust Preferred Securities Claims; (vii) Convenience Class Claims; (viii) the Lenders' Deficiency Claim; or (ix) Intercompany Claims; and (B) not otherwise entitled to priority under the Bankruptcy Code or a Final Order of the Bankruptcy Court. *Without limiting the generality of the foregoing, all Operational Lien Claims that are not Secured Operational Lien Claims, Other Secured Claims, or Administrative Claims shall constitute General Unsecured Claims.*

If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then on the Initial Distribution Date, or as soon thereafter as is practicable, and subject to the provisions of Plan Section 6.9, each Holder of an Allowed Class 3A Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, such Holder's Pro Rata share of the Initial Avoidance Claims Proceeds, the Excess Avoidance Claims Proceeds, and the Unencumbered Asset Net Sale Proceeds.

Creditors with Allowed Class 3A Claims may, at their option, elect (as indicated on their Class 3A Ballot) instead to have their Claim treated as a Convenience Class Claim in accordance with Class 3C. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then any Class 3A Creditor making such election will not receive such Holder's Pro Rata share of (a) the Initial Avoidance Claims Proceeds, (b) the Excess Avoidance Claims Proceeds, and (c) the Unencumbered Asset Net Sale Proceeds, but will instead receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, Cash in an amount equal to 3% of such Allowed Claim (subject to the limits set forth in Plan Section 5.6). Any Creditor whose Allowed Class 3A Claim would otherwise exceed $25,000 and elects to have its Claim instead treated as a Class 3C Claim, will be deemed to have an Allowed Claim for all purposes under the Plan and in these Cases in an amount equal to $25,000. For the avoidance of doubt, if Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), then any Holder of an Allowed Class 3A Claim as of the Distribution Record Date making such election will be treated as a Holder of an Allowed Class 3 Claim in accordance with Plan Section 5.3, notwithstanding the election.

The Plan defines "Unencumbered Assets" as "[e]xcept as otherwise set forth in Plan Section 6.9(d), collectively, the assets listed as 'Unencumbered Assets' on Exhibit I to the Disclosure Statement (as such schedule may be revised and included in the Plan Supplement or otherwise), to the extent any such assets are determined not to be subject to valid, enforceable, and non-avoidable Liens of the Revolving Credit Facility Agent or Operational Liens, either by agreement of the Debtors and the Revolving Credit Facility Agent, or as determined by a Final Order of the Bankruptcy Court, which assets shall be maintained and sold in accordance with Section 6.9 hereof." In addition, the Plan defines Unencumbered Asset Net Sale Proceeds as:

(i)     In the case of any Unencumbered Asset that is a parcel of real property, an amount equal to the proceeds actually received by the Debtors, the Reorganized Debtors, or a Joint Venture (to the extent of the Debtors' or the Reorganized Debtors' interest in such Joint Venture) as applicable, from the sale, transfer, or other disposition of such parcel of real property, in each case net of (1) any and all Disposition Costs actually incurred or payable by the Debtors, the Reorganized Debtors, or Joint Venture, as applicable, at any time from and after the Effective Date, (2) the value of any improvement made on or to any such parcel of real property from and after the Petition Date, and (3) the Capital Charge.

(ii)     In the case of any Unencumbered Asset that is not a parcel of real property, the actual proceeds received by the Debtors or the Reorganized Debtors, as applicable, upon the sale, transfer, or other disposition of such Unencumbered Asset, net of any and all Disposition Costs actually incurred or payable by the Debtors or the Reorganized Debtors, as applicable, at any time from and after the Effective Date.

(iii)    Unencumbered Asset Net Sale Proceeds will be determined only after giving effect to the Adequate Protection Liens and payment of the Adequate Protection Claims.

The Plan defines "Capital Charge" as "[a]n amount equal to 20% of the Development Costs incurred or payable by the Debtors, the Reorganized Debtors, or a Joint Venture, as applicable, at any time from or after the Petition Date."

"Disposition Costs" are "[a]ll costs, fees (including, without limitation, attorney and broker fees and expenses), taxes, commissions, other expenses, the Overhead Allocation, and other liabilities (including, without limitation, any Secured Operational Lien Claim) incurred or payable by the Debtors, the Reorganized Debtors, or any Joint Venture, as applicable, in connection with the sale, transfer, or disposition of any Unencumbered Asset, provided that in the case of an Unencumbered Asset of a Joint Venture, Disposition Costs shall be allocated to the Debtors or the Reorganized Debtors to the extent of their interest in the applicable Joint Venture."  "Development Costs" are the "actual, documented costs, fees, taxes, and other expenses incurred by the Debtors or the Reorganized Debtors in holding and/or improving any Unencumbered Asset that is a parcel of real property from and after the Petition Date."  A "Joint Venture" is "[a]ny partnership, limited liability company, or similar arrangement creating a joint venture, between (i) a Debtor, Reorganized Debtor, or an Affiliate of a Debtor or a Reorganized Debtor, and (ii) another entity that is not a Debtor, a Reorganized Debtor, or an Affiliate of a Debtor or a Reorganized Debtor."  Lastly, the Plan defines "Overhead Allocation" as "[t]he amount that is the average figure over the Debtors' or the Reorganized Debtors' (as applicable) previous four quarters that their general and administrative expenses represent as a percentage of the Debtors' or the Reorganized Debtors' (as applicable) sale."

As set forth in greater detail on Exhibit I hereto (as such schedule may be updated in the Plan Supplement or otherwise), certain assets of the Debtors have been identified as being Unencumbered Assets.  However, except as otherwise set forth in Plan Section 6.9(d), any Unencumbered Asset that is subject to a valid Operational Lien will remain subject to such Lien for all purposes in these Cases, except to the extent that such Unencumbered Asset is unencumbered solely as the result of the Lien of the Revolving Credit Facility Lenders' having been avoided in the resolution of an Avoidance Claim, in which case the Operational Lien on such Unencumbered Asset will only be recognized to the extent it would have come ahead of the Revolving Credit Facility Lenders' Lien under applicable law had such Lien not been so avoided.  To the extent that the value of an Unencumbered Asset that is the subject of a valid Operational Lien exceeds the value of the Operational Lien Claim thereon, the difference in such value will constitute an Unencumbered Asset that will be available for distribution to Creditors in Class 3A, 3B, or 3D, subject to the terms and conditions of the Plan.

As of the Bar Date, 1,293 Proofs of Claim were timely filed asserting, in the aggregate, approximately $490,275,126.78 in General Unsecured Claims. As of the date hereof, the Debtors estimate that there will be approximately $41,644,235 in Allowed Class 3A Claims on the Effective Date.

PARTIES SHOULD BE AWARE THAT ALL OPERATIONAL LIEN CLAIMS THAT ARE EITHER (i) LISTED ON EXHIBIT G HERETO OR (ii) NOT LISTED ON EITHER EXHIBIT F OR EXHIBIT G HERETO WILL BE TREATED AS CLASS 3 OR CLASS 3A CLAIMS (SUBJECT TO ALL OF THE DEBTORS' RIGHTS AND DEFENSES WITH RESPECT THERETO), AS APPLICABLE, ALTHOUGH SUCH OPERATIONAL LIEN CLAIMHOLDERS WILL HAVE UNTIL THE CONFIRMATION OBJECTION DEADLINE TO OBJECT TO SUCH CLASSIFICATION OR BE DEEMED TO HAVE CONSENTED THERETO (AN "OPERATIONAL LIEN OBJECTION"). Accordingly, all Operational Lien Claimholders whose Claims appear on Exhibit G hereto will be entitled to vote such Claims in Class 3 or Class 3A, as applicable (subject to the other voting and solicitation procedures provided for herein and in the Bankruptcy Court order approving this Disclosure Statement); provided, however, that the foregoing will not in any way modify the Home Sales Procedures, which will remain in effect through the Effective Date.

IN ADDITION, ANY PARTY-IN-INTEREST CLAIMING TO HAVE A VALID LIEN UPON ANY ASSET LISTED ON EXHIBIT I TO THIS DISCLOSURE STATEMENT MUST FILE AN OBJECTION (AN "UNENCUMBERED ASSET OBJECTION") PRIOR TO THE PLAN OBJECTION DEADLINE IN ORDER TO CHALLENGE THE INCLUSION OF ANY SUCH ASSET AS AN "UNENCUMBERED ASSET" OR BE FOREVER BARRED FROM DOING SO, SUCH THAT THE APPLICABLE ASSET WILL BE TREATED AS AN UNENCUMBERED ASSET FOR ALL PURPOSES UNDER THE PLAN AND IN THESE CASES. Any Unencumbered Asset that is subject to a valid Operational Lien will remain subject to such Lien for all purposes in these Cases, except to the extent that such Unencumbered Asset is unencumbered solely as the result of the Lien of the Revolving Credit Facility Lenders' having been avoided in the resolution of an Avoidance Claim, in which case the Operational Lien on such Unencumbered Asset will only be recognized to the extent it would have come ahead of the Revolving Credit Facility Lenders' Lien under applicable law had such Lien not been so avoided.

FOR THE AVOIDANCE OF DOUBT, CASTING A BALLOT TO ACCEPT THE PLAN WILL NOT PRECLUDE A PARTY-IN-INTEREST FROM FILING AN OPERATIONAL LIEN OBJECTION AND/OR AN UNENCUMBERED ASSET OBJECTION PRIOR TO THE PLAN OBJECTION DEADLINE.

   (d) **Class 3B -- Junior Subordinated Notes Claims and Trust Preferred Securities Claims Against Any of the Debtors.**

Class 3B consists of all Junior Subordinated Notes Claims and Trust Preferred Securities Claims against any of the Debtors. The Plan defines "Junior Subordinated Notes Claims" as "[c]ollectively, all Claims represented by, related to, arising under, or in connection with the respective Junior Subordinated Notes and any and all guarantees issued with respect thereto,

including either any direct claims or any indirect claims asserted by the Junior Subordinated Notes Indenture Trustee or by a subrogee or successor-in-interest of any party, or otherwise" and "Trust Preferred Securities Claims" as "[c]ollectively, all Claims represented by, related to, arising under, or in connection with the Trust Preferred Securities and any and all guarantees issued with respect thereto, including either any direct claims or any indirect claims asserted by the Junior Note Indenture Trustee or by a subrogee or successor-in-interest of any party, or otherwise."

Under the Plan, the Junior Subordinated Note Claims and the Trust Preferred Securities Claims will be Allowed Claims in the aggregate amount of $120,926,656.06, consisting of (a) approximately $119 million in principal amount issued pursuant to the Junior Subordinated Notes Indentures and related documents, and (b) $1,926,656.25 in accrued but unpaid interest as of the Petition Date at the applicable rates specified in the Junior Subordinated Notes Indentures and related documents, as well as other fees and costs associated therewith. On the Effective Date, the Trust Agreement will be deemed terminated and dissolved and, if necessary or desirable, the Debtors or the Reorganized Debtors (as the case may be) or the applicable Junior Subordinated Note Indenture Trustee may file a certificate of cancellation with the Secretary of State of Delaware, and upon such termination and dissolution, any guaranty of the Trust Preferred Securities Claims or the Junior Subordinated Notes Claims will be deemed terminated and of no force and effect.

On the Effective Date, all outstanding Junior Subordinated Notes and Trust Preferred Securities will be cancelled. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then on the Effective Date, or as soon thereafter as is practicable, each Holder of an Allowed Class 3B Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, such Holder's Pro Rata share of (a) the Initial Avoidance Claims Proceeds, (b) the Excess Avoidance Claims Proceeds, and (c) the Unencumbered Asset Net Sale Proceeds; provided, however, that, except for the Initial Avoidance Claims Proceeds, in accordance with the subordination provisions of the Trust Preferred Securities and the Junior Subordinated Notes, such distribution will not be made to the Holders of Junior Subordinated Notes Claims or Trust Preferred Securities Claims, but will instead be made to the Revolving Credit Facility Agent for further distributions to the Holders of the Lenders' Deficiency Claim in Class 3D.

For the avoidance of doubt, distributions by the Reorganized Debtors to Holders of the Junior Subordinated Note Claims pursuant to the Plan will not be reduced on account of Allowed Indenture Trustee Fees that are due and owing; provided, however, that nothing herein will be deemed to impair, waive, extinguish, or negatively impact the Indenture Trustee Charging Lien upon any and all distributions made by the Debtors under the Plan to the Holders of such Junior Subordinated Note Claims but, for the further avoidance of doubt, not upon the distributions to be turned over to the Revolving Credit Facility Agent pursuant to the Plan.

As discussed further below in Section XIII.2 hereof, the Debtors believe that the Junior Subordinated Notes are likely to be treated as "United States Real Property Interests" within the meaning of the "FIRPTA" provisions of the Tax Code. Accordingly, the applicable payor (either the Debtors or the Unsecured Creditor Agent, as applicable) would be required to withhold 10% of the amount of any distributions to be made under the Plan to the Holders of Junior

Subordinated Notes Claims that are "non-U.S. persons" (within the meaning of Section 7701(a)(30) of the Tax Code).

(e)     **Class 3C -- Convenience Class Claims Against Any of the Debtors.**

Class 3B consists of all Convenience Class Claims against any of the Debtors. The Plan defines "Convenience Class Claims" as "[a]ll General Unsecured Claims (a) in an amount less than or equal to $25,000 or (b) with respect to which the applicable holder has voluntarily agreed on its Ballot to reduce the amount of its General Unsecured Claim to $25,000".

If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then on the Effective Date, or as soon thereafter as is practicable, each Holder of an Allowed Convenience Class Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, Cash in an amount equal to 3% of such Allowed Claim. Any Creditor whose Allowed Claim would otherwise exceed $25,000 and elects to have its Claim treated as a Class 3C Claim, will be deemed to have an Allowed Claim for all purposes under the Plan in an amount equal to $25,000. If Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), then each Holder of an Allowed Class 3C Claim as of the Distribution Record Date will be treated as a Holder of an Allowed Class 3 Claim in accordance with Plan Section 5.3.

As of the date hereof, the Debtors estimate that, as of the Effective Date, there will be a total of approximately $5.06 million in Allowed Class 3C Claims; this amount depends in part upon the amount of Class 3A Claimholders who elect to instead have their Claims treated as Class 3C Claims.

(f)     **Class 3D -- The Lenders' Deficiency Claim Against Any of the Debtors.**

Class 3D consists of the Lenders' Deficiency Claim, which is defined in the Plan as "[t]he portion of the Allowed Revolving Credit Facility Claims that does not constitute a Secured Claim, as provided for in, and determined in accordance with, Bankruptcy Code § 506(a), which Lenders' Deficiency Claim will be an Allowed Class 3D Claim for all purposes under the Plan and in these Cases (including with respect to voting thereon) in an amount as set forth in Plan Section 5.7." Under the Plan, the Lenders' Deficiency Claim will be Allowed in an amount equal to $113 million (subject to the ultimate amounts outstanding under the DIP Facility as of the Effective Date).

If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then on the Effective Date, or as soon thereafter as is practicable, each Holder of an Allowed Class 3D Claim as of the Distribution Record Date will receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Claim, such Holder's Pro Rata share of (a) the Excess Avoidance Claims Proceeds and (b) the Unencumbered Asset Net Sale Proceeds. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then Holders of Class 3D Claims will also receive (on a Pro Rata basis) the distribution of the Excess Avoidance Claims Proceeds and the

Unencumbered Asset Net Sale Proceeds that otherwise would be distributed to the Holders of Class 3B Claims pursuant to Plan Section 5.5 but for the subordination provisions of the Junior Subordinated Notes and the Trust Preferred Securities.

If Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), then each Holder of an Allowed Class 3D Claim as of the Distribution Record Date will be deemed to have waived any right to receive any distribution on account of the Lenders' Deficiency Claims and to enforce the subordination or turnover provisions in the Trust Preferred Securities, the Junior Subordinated Notes, and the Junior Subordinated Notes Indentures.

(g)    <b>Class 4 -- Old OHB Common Stock Interests.</b>

Class 4 consists of all Old OHB Common Stock Interests. The Plan defines "Old OHB Common Stock" as "[a]ll the shares of common stock of OHB, $0.10 par value per share, and any options (including, without limitation, all options issued under any of the Existing Stock Option Plans), warrants, or rights, contractual or otherwise, to acquire any shares of such common stock."

On the Effective Date, all outstanding shares of Old OHB Common Stock and all other Old Stock of OHB will be cancelled and will be deemed terminated and of no force and effect. In addition, without limiting the generality of the foregoing, any and all options or rights to exercise warrants or options or to otherwise acquire any shares of Old OHB Common Stock or any other Interest in OHB, under any of the Existing Stock Option Plans or otherwise, will be cancelled and be deemed terminated and of no force and effect. No distribution of any kind will be made on account of the Old OHB Common Stock or any other Old Stock of OHB under the Plan.

(h)    <b>Class 5 -- Intercompany Claims.</b>

Class 5 consists of all Allowed Intercompany Claims. Class 5 Claims will be treated in the manner set forth in Plan Section 5.9. Intercompany Claims are (a) any account reflecting intercompany book entries by one Debtor (or any non-Debtor Affiliate of a Debtor) with respect to any other Debtor or (b) any Claim that is not reflected in such book entries and is held by a Debtor (or any non-Debtor Affiliate of a Debtor) against any other Debtor. For the avoidance of doubt, Intercompany Claims will not include any obligation or Claim against OHI Financing in favor of Orleans Homebuilders Trust I or Orleans Homebuilders Trust II or any guarantee Claim against OHB in favor of Orleans Homebuilders Trust I or Orleans Homebuilders Trust II, which Claims will be extinguished.

Specifically, pursuant to the Plan, all Intercompany Claims will be reviewed by the Debtors or the Reorganized Debtors, as applicable, and adjusted, continued, or discharged, as the Debtors or the Reorganized Debtors, as applicable, with the consent of the Sponsors, determine as appropriate (by, among other things, releasing such claims, contributing them to capital, issuing a dividend, or leaving them unimpaired), taking into account, among other things, the distribution of consideration under the Plan and the economic condition of the Reorganized Debtors, among other things. The Holders of Intercompany Claims will not be entitled to

84

participate in any of the distributions on account of Claims under Plan Sections 5.2, 5.3, 5.4, 5.5, 5.6, or 5.7 and will only be entitled to the treatment provided in Plan Section 5.9.

Class 5 is impaired, and the Holders of Claims in Class 5 are deemed to have rejected the Plan and are not entitled to vote on the Plan in accordance with the provisions of the Bankruptcy Code § 1126(g).

As of the date hereof, the Debtors estimate that, as of the Effective Date, there will be a total of approximately $5,391,763.97 in Allowed Class 5 Claims, including, an Intercompany Claim owing from OHI Financing, Inc. to Orleans Homebuilders Trust I in the amount of approximately $33,803,333, including accrued, unpaid interest.

### (i)    Special Provision Regarding Impaired Claims.

Except as may otherwise be provided in the Plan, the Confirmation Order, any other Final Order of the Bankruptcy Court, or any Plan Document, nothing will affect the Debtors' or the Reorganized Debtors' (as applicable) rights and defenses, both legal and equitable, with respect to any Claims that are impaired under the Plan, including, but not limited to, all rights with respect to legal and equitable defenses to, and/or setoffs or recoupments against, such Claims.

## C.  Implementation of the Plan.

### 1.    Ownership of the Reorganized Subsidiary Debtors.

Except as the Debtors and the Reorganized Debtors may otherwise determine, the ownership of the capital stock or other equity interests of the respective Reorganized Subsidiary Debtors following the Effective Date will be unaffected by the Plan, as each Debtor that owned or held the Old Stock of a Subsidiary Debtor (to the extent that any of such Subsidiary Debtors has not been sold or otherwise transferred, dissolved, consolidated, or merged under applicable law prior to the Effective Date) as of the Effective Date will, as a Reorganized Debtor on the Effective Date, own or hold such capital stock and/or equity interest (as applicable) in the corresponding Reorganized Subsidiary Debtor as of the Effective Date.  In addition (other than with respect to any stock or joint-venture interests cancelled, sold, or otherwise transferred by any of the Debtors on or prior to the Effective Date), on the Effective Date, each Reorganized Debtor will own and retain its equity or joint-venture interests in all Non-Debtor Subsidiaries, Affiliates, or joint-ventures (to the extent that any such Non-Debtor Subsidiary, Affiliate, or joint-venture interest has not been sold or otherwise transferred, dissolved, consolidated, or merged under applicable law prior to the Effective Date) to the same extent that the applicable Debtor owned such equity or joint-venture interest in such Non-Debtor Subsidiary, Affiliate, or joint venture prior to the Effective Date.  The Debtors will also be authorized under the Plan to dissolve, merge, consolidate, or undertake any similar transaction with respect to any of the Debtors or the Reorganized Debtors in accordance with applicable law prior to, on, or after the Effective Date, and to cause the transfer of assets between or among the Debtors in connection with any such dissolution, merger, or consolidation.

## 2. Issuance of New Securities; Execution of Plan Documents.

On the Effective Date, Reorganized OHB will issue the New OHB Common Stock and the New Notes; the Reorganized Subsidiary Debtors will execute, deliver, and issue the New Notes Guarantees; and the applicable Reorganized Debtors will issue any and all notes in connection with the Exit Credit Facility, the Exit Credit Facility Guarantees, and each other Plan Document. The issuance of the New OHB Common Stock pursuant to the Plan (including, pursuant to Plan Sections 5.2, 6.14, 6.16, and 6.17), the New Notes and the New Notes Guarantees, and any and all notes under or in connection with the Exit Credit Facility, the Exit Credit Facility Guarantees, or otherwise by any of the Reorganized Debtors, will all be authorized under the Plan without the need for any further corporate action or court order.

The execution and delivery by the Debtors or the Reorganized Debtors party thereto (as applicable) of all Plan Documents (including, without limitation, the Exit Credit Facility and the Exit Credit Facility Guarantees, any document memorializing the New Notes, the New Notes Guarantees, and/or any other agreement entered into, or instrument, security interest, guaranty, or note issued in connection with any of the foregoing, any other Plan Document, and any other document reasonably necessary or appropriate to effectuate the events contemplated herein and therein), is authorized by the Plan without the need for any further corporate action or court order. All such Plan Documents will become effective and binding upon the parties thereto simultaneously in accordance with their respective terms and conditions as of the Effective Date.

## 3. Corporate Governance and Related Action.

**(a) The Amended and Restated Certificates of Incorporation, the Amended and Restated By-Laws, the Amended and Restated LLC Agreements, the Amended and Restated Limited Partnership Agreements, and Other Applicable Certificates of Formation and/or Organization.**

On or before the Effective Date, the Reorganized Debtors will (a) file their respective Amended and Restated Certificates of Incorporation or other applicable certificates of formation and/or organization (as applicable) with the appropriate state officials in accordance with applicable state law and (b) adopt their respective Amended and Restated By-Laws, Amended and Restated LLC Agreements, Amended and Restated Limited Partnership Agreements, or similar constituent documents. Each of the Amended and Restated Certificates of Incorporation, Amended and Restated LLC Agreements, and Amended and Restated Limited Partnership Agreements (as applicable) of the respective Reorganized Debtors will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by Bankruptcy Code § 1123(a). After the Effective Date, the Reorganized Debtors may amend and restate their respective Amended and Restated Certificates of Incorporation, Amended and Restated By-Laws, Amended and Restated LLC Agreements, Amended and Restated Limited Partnership Agreements, applicable certificates of formation and/or organization, and/or other constituent documents (as applicable) as permitted by the governing state general corporation law, limited liability corporation law, or limited partnership law (as applicable) and the applicable agreements and constituent documents (including the Amended and Restated Certificates of Incorporation,

the Amended and Restated By-Laws, the Amended and Restated LLC Agreements, and the Amended and Restated Limited Partnership Agreements) of the Reorganized Debtors.

(b)     **Corporate Actions.**

All actions reasonably necessary and desirable to effectuate, implement, or adopt the Exit Credit Facility; the issuance of the New OHB Common Stock; the Short Term Incentive Plan; the New Notes and the New Notes Guarantees; the adoption and/or filing (as applicable) of the Amended and Restated Certificates of Incorporation, the Amended and Restated By-Laws, the Amended and Restated LLC Agreements, the Amended and Restated Limited Partnership Agreements, certificates of formation and/or organization, or similar constituent documents of the Reorganized Debtors (including ; the selection of the directors, officers, and/or managers of the respective Reorganized Debtors; any dissolution, consolidation, merger, or similar transaction involving any of the Subsidiary Debtors or Reorganized Subsidiary Debtors; and all other actions or transactions contemplated by the Plan, the Plan Documents, or such other documents, and all actions appropriate, necessary, or desirable to effectuate any of the foregoing or comparable transactions, will be authorized and approved in all respects under the Plan without the need for any further corporate or similar action or court order.  All matters provided for in the Plan or in any Plan Document involving the corporate structure, assets, and/or operations of the Debtors or the Reorganized Debtors, and any corporate or similar action required by, or helpful to, the Debtors or the Reorganized Debtors in connection with the Plan or any of the Plan Documents will be deemed to have occurred and will be in effect, without any requirement of further action by the respective security holders, members, managers, officers, and directors of the Debtors or the Reorganized Debtors.  After the Confirmation Date and on or prior to the Effective Date, the appropriate members of the Boards of Directors and/or members, managers, or officers of the Debtors and the Reorganized Debtors are authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates, and instruments contemplated by the Plan and/or any of the Plan Documents in the name of and on behalf of the applicable Debtor(s) or Reorganized Debtor(s).

4.     **Administration of the Plan.**

After the Effective Date, each of the Reorganized Debtors is authorized to perform those responsibilities, duties, and obligations set forth or contemplated in the Plan, including, without limitation, subject to Plan 6.5(b), making distributions as provided under the Plan; objecting to the allowance of any Claim or Interest, and prosecuting any litigation pertaining thereto or with respect to any Avoidance Claim; paying such Claims as may be later Allowed, as contemplated by the dispute resolution procedures contained in Plan Section 6.12; and overseeing and governing the continuing affairs and operations of the Reorganized Debtors on a go-forward basis.

If Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), the Unsecured Creditor Agent will be (i) authorized and directed to establish the Unsecured Creditor Escrow Account to hold the Unsecured Creditor Cash Pool, make distributions to Holders of Allowed Aggregate Unsecured Claims therefrom as provided under the Plan; (ii) authorized, subject to the Litigation Protocol, to object to the allowance of any Class 3 Claim and to prosecute on behalf of the Debtors and the Reorganized Debtors, as

applicable, any litigation pertaining thereto or with respect to any Avoidance Claim; and (iii) authorized and directed to pay such Claims as may later be Allowed, as contemplated by the dispute resolution procedures contained in Plan Section 6.12. The Plan defines the Unsecured Creditor Agent as the "[p]erson designated in writing by the Creditors Committee, which designation shall be filed on the docket for these Cases prior to the date of the Confirmation Hearing and be subject to approval by the Bankruptcy Court in the Confirmation Order, to serve as the Unsecured Creditor Agent in accordance with the Plan, and any successor(s) thereof."

The Reorganized Debtors and the Unsecured Creditor Agent (if applicable) may retain without further Bankruptcy Court approval or notice such management, law firms, accounting firms, experts, advisors, agents, consultants, investigators, appraisers, auctioneers, or other professionals as they may deem desirable, necessary, or appropriate, including, without limitation, a transfer or disbursing agent, to aid them in the performance of their duties and obligations under the Plan and the Confirmation Order. It will not be a requirement that any such parties retained by any of the Reorganized Debtors or the Unsecured Creditor Agent be a "disinterested person" (as such term is defined in Bankruptcy Code § 101(14)), and such retained parties may include Professionals or other Persons that had previously been active in these Cases on behalf of any Debtor, Creditor, or Interest holder, the Creditors Committee, or other constituency.

The Reorganized Debtors will be responsible for filing all federal, state, and local tax returns for the Debtors and for the Reorganized Debtors.

To the extent the manner of performance is not specified in the Plan, the Debtors and the Reorganized Debtors will have the discretion to carry out and perform all other obligations or duties imposed on them, or actions contemplated or authorized, by the Plan, any Plan Document, or by law in any manner their respective Boards of Directors, managers, or officers so choose.

5. **Provisions Relating to the Existing Notes, OHB Common Stock, Operational Liens, and the Credit Facilities**.

On the Effective Date, the Junior Subordinated Notes; the Trust Preferred Securities; any and all notes issued in connection with the Revolving Credit Facility, or the DIP Facility; the Guarantees; the Old OHB Common Stock and any other Interests in OHB; the Existing Stock Option Plans; and any other options, warrants, calls, subscriptions, or other similar rights or other agreements or commitments, contractual or otherwise, obligating any of the Debtors to issue, transfer, or sell any shares of Old OHB Common Stock or other Interest in OHB, will be automatically canceled and deemed terminated, extinguished, and of no further force and effect without further act or action under any applicable agreement, law, regulation, order, or rule, and the holders thereof or the parties thereto will have no rights, and such instruments or agreements will evidence no rights, except the right to receive the distributions (if any) to be made to the Holders of such instruments under the Plan. Notwithstanding the foregoing, the Junior Subordinated Notes, the Trust Preferred Securities, the Junior Subordinated Notes Indentures, and the Trust Agreement will continue in effect solely for the purposes of (i) allowing the Holders of the Junior Subordinated Notes and the Trust Preferred Securities to receive their distributions under the Plan, (ii) allowing the Indenture Trustees or its respective nominees to make distributions, if any, to be made on account of the Junior Subordinated Notes Claims or the

Trust Preferred Securities Claims, (iii) permitting the Indenture Trustees to assert their Indenture Trustee Charging Liens against such distributions for payment of the Indenture Trustee Fees (but, for the avoidance of doubt, not upon the distributions to be turned over to the Revolving Credit Facility Agent pursuant to the Plan), (iv) allowing the Indenture Trustees to enforce any right or other Claim they may have under the Junior Subordinated Notes Indentures and the Trust Agreement (subject to all rights and defenses of the Debtors and the Reorganized Debtors), (v) permitting the Indenture Trustees to exercise their rights and obligations relating to the interests of Holders of the Allowed Junior Subordinated Notes Claims and the Allowed Trust Preferred Securities Claims pursuant to the applicable Junior Subordinated Notes Indenture or the Trust Agreement (subject to all rights and defenses of the Debtors and the Reorganized Debtors), and (vi) allowing the Indenture Trustee to appear in these Cases. On the Effective Date, as provided in Plan Sections 3.2 and 5.2, at the election of the Debtors or the Reorganized Debtors, as applicable, (a) the respective letter of credit issuers under the Credit Facilities will, to the extent permissible under the applicable agreement, receive cancellation without draw of all outstanding letters of credit issued thereunder, (b) the Debtors or the Reorganized Debtors, as applicable, will arrange for the issuance of additional letters of credit in favor of such issuers, equal to such issuers' maximum exposure under such letters of credit, in a form and substance satisfactory to such issuers, or (c) the outstanding letters of credit thereunder will be secured by Cash equal to 105% of such issuers' maximum exposure under such outstanding letters of credit.

No Holder of any notes issued in connection with any of the Credit Facilities, the Trust Preferred Securities, the Junior Subordinated Notes, or any of the Guarantees will be entitled to any distribution under the Plan unless and until such Holder has first surrendered or caused to be surrendered any such notes or Guarantees to the applicable Administrative Agent or Indenture Trustee or its respective nominee, which in turn will surrender any and all such notes or Guarantees to the Debtors or the Reorganized Debtors, or, in the event that such original notes or Guarantees have been lost, destroyed, stolen, or mutilated, has first executed and delivered an affidavit of loss and indemnity with respect thereto in a form customarily utilized for such purposes that is satisfactory to the Debtors or the Reorganized Debtors, and, in the event the Debtors or the Reorganized Debtors so request, has first furnished a bond in form and substance (including, without limitation, amount) satisfactory to the Debtors or the Reorganized Debtors (as applicable). If a Holder has actual possession of any note or Guarantee issued in connection with any Credit Facility, Trust Preferred Security, Junior Subordinated Note, or any of the Guarantees, then such Holder must physically surrender or cause to be surrendered its note(s) or Guarantee(s) to the applicable Administrative Agent or Indenture Trustee or its respective nominee for subsequent distribution to the Debtors or the Reorganized Debtors (as applicable), in accordance with the procedures required by the Debtors. As soon as practicable after such surrender of the applicable note or Guarantee to the Debtors (or the Reorganized Debtors), or such delivery of an affidavit of loss and indemnity and such furnishing of a bond as provided in Plan Section 6.6(b), the Debtors, the Reorganized Debtors, or the Unsecured Creditor Agent (as applicable) will make the distributions provided in the Plan with respect to the applicable Allowed Claim(s) (as and to the extent as set forth in the Plan), although the Debtors, the Reorganized Debtors, or the Unsecured Creditor Agent (as applicable) may, in their sole discretion, elect to make any such distributions prior to the surrender of the applicable note or Guarantee. Promptly upon the surrender of such instruments, the Debtors or the Reorganized Debtors (as applicable) will cancel any and all notes issued in connection with any of the Credit

Facilities, the Trust Preferred Securities, the Junior Subordinated Notes, or any of the Guarantees.

Unless Reinstated, all Operational Liens will be deemed discharged, released, null and void, terminated, and of no force and effect on the Effective Date. Each Holder of a Secured Operational Lien Claim will be treated in accordance with Plan Section 4.4. Each Holder of an Operational Lien Claim that is not a Secured Operational Lien Claim or an Other Secured Claim will be treated in accordance with Plan Section 5.3 as the Holder of an Aggregate Unsecured Claim or Plan Section 5.4 as a General Unsecured Creditor (as applicable) for all purposes in connection with the Plan and these Cases. Other than with respect to any Reinstated Operational Liens, no Holder of any Operational Lien Claim will be entitled to any distribution under the Plan unless and until such Holder has first executed and delivered a Lien Waiver to the Debtors or the Reorganized Debtors, in a form customarily utilized for such purposes that is satisfactory to the Debtors or the Reorganized Debtors, or otherwise caused its Operational Lien to be released to the satisfaction of the Debtors or the Reorganized Debtors (as applicable), including through the execution, delivery, and filing or recording of another Lien release document in form and substance that is satisfactory to the Debtors or the Reorganized Debtors or as otherwise requested by the Debtors or the Reorganized Debtors (as the case may be). Such Lien Waiver (as well as the discharge, release, and related provisions of Article IX of the Plan) will be binding upon the applicable Operational Lien Claimholder in all respects. As soon as practicable after such delivery of a Lien Waiver or other such Lien release document as provided in Plan Section 6.6(c), the Debtors or the Reorganized Debtors (as applicable) will make the distributions provided in the Plan with respect to the applicable Allowed Operational Lien Claim(s) (as and to the extent as set forth in the Plan). The Debtors, the Reorganized Debtors, and all other parties may rely upon such Lien Waivers or other Lien release documents, and/or the discharge, release, and related provisions of Article IX of the Plan, for all purposes with respect to the Operational Liens and Operational Lien Claims. Each and every federal, state, and local governmental agency or department is directed by the terms of the Plan to accept any and all documents and instruments as provided by the Debtors, the Reorganized Debtors, or related parties (including the Confirmation Order and/or the applicable Lien Waivers or such other Lien release documents as described in Plan Section 6.6(c)) necessary and appropriate to revise all applicable records to reflect that the Operational Liens at issue have been released, discharged, terminated, and are thus null and void and of no force and effect. The Debtors and the Reorganized Debtors (as the case may be) will be authorized to execute and deliver such documents, in the name and stead of the Holder of any Operational Lien that is not Reinstated, or take any other actions as may be reasonable, necessary, or appropriate (including, without limitation, filing termination statements and directing third parties holding collateral or other property of the Debtors to promptly remit such collateral or property without further consent of any other party) to effectuate the releases, discharges, and terminations of Operational Liens contemplated by the Plan, and, at their discretion, will be appointed as attorney-in-fact for the purposes of executing and/or filing any Lien Waiver or any other related or appropriate documents with any entity in order to effectuate the foregoing release, discharge, and termination of the applicable Operational Liens. Notwithstanding anything in the Plan to the contrary, but subject to the terms of the Junior Subordinated Notes Indentures, the Trust Agreement, and applicable law, the Plan will not be deemed to affect or impair any applicable Indenture Trustee Charging Lien upon the property to be distributed to the Holders of the Junior Subordinated Notes Claims or the Trust Preferred Securities Claims (as applicable) under the Plan (but, for the

avoidance of doubt, not upon the distributions to be turned over to the Revolving Credit Facility Agent pursuant to the Plan) to secure the payment of Allowed fees and expenses incurred or to be incurred by the applicable Indenture Trustees or obligations in favor of the Indenture Trustees (subject to all rights and defenses thereto), which Liens upon the property to be so distributed will continue notwithstanding the occurrence of the Confirmation Date or the Effective Date and notwithstanding any discharge of the Debtors pursuant to the Plan and Bankruptcy Code § 1141. Notwithstanding anything in the Plan to the contrary, but subject to the terms of the Junior Subordinated Notes Indentures, the Trust Agreement, and applicable law, the Indenture Trustees may at any time, and from time to time, pay or reserve for such fees, expenses, and other obligations from any such money or property so distributed under the Plan that is held by the applicable Indenture Trustees (but, for the avoidance of doubt, not upon the distributions to be turned over to the Revolving Credit Facility Agent pursuant to the Plan).

On the Effective Date, the obligations with respect to and under the Trust Preferred Securities, the Junior Subordinated Notes, the Junior Subordinated Notes Indentures, and the Trust Agreement will be deemed terminated, canceled, and extinguished (all without any further action by any Person or the Bankruptcy Court), and will have no further legal effect, and such instruments will evidence no rights except the right to receive the distributions (if any) to be made to the Holders of such instruments under the Plan (which distributions will, subject to the terms and conditions of the Plan, in turn be distributed on a Pro Rata basis by the Junior Subordinated Notes Indenture Trustees either to (y) the Holders of the Trust Preferred Securities Claims or the Junior Subordinated Notes Claims or (z) the Holders of the Allowed Lenders' Deficiency Claim, in the manner as further set forth in the Plan (including, without limitation, Section 5.5 thereof)). Notwithstanding anything in the Plan to the contrary, the authority of the Junior Subordinated Notes Indenture Trustees under the Junior Subordinated Notes Indentures will be terminated as of the Effective Date, except as otherwise provided for in Plan Sections 5.5(c) and 6.6(a).

All distributions under the Plan on account of the Allowed Revolving Credit Facility Claims will initially be distributed to the Revolving Credit Facility Agent for further distribution to the Holders of Allowed Revolving Credit Facility Claims as of the Distribution Record Date, pursuant to the terms and subject to the conditions of the Revolving Credit Facility and the Plan. Upon the delivery of the foregoing distributions to the Revolving Credit Facility Agent, the Debtors and the Reorganized Debtors will be released of all liability with respect to their obligation to make such distributions. The Revolving Credit Facility Agent will thereafter take all steps necessary and appropriate to effectuate such further distribution thereof to the Holders of the Allowed Revolving Credit Facility Claims on a Pro Rata basis. Similarly, all distributions under the Plan on account of the Allowed DIP Facility Claims will initially be distributed to the DIP Facility Agent, for further distribution to the Holders of Allowed DIP Facility Claims as of the Distribution Record Date, pursuant to the terms and subject to the conditions of the DIP Facility and the Plan. Upon the delivery of the foregoing distributions to the DIP Facility Agent, the Debtors and the Reorganized Debtors will be released of all liability with respect to their obligation to make such distributions. The DIP Facility Agent will thereafter take all steps necessary and appropriate to effectuate such further distribution thereof to the Holders of the Allowed DIP Facility Claims on a Pro Rata basis. On the Effective Date, all of the obligations and Liens under the respective Credit Facilities will be deemed terminated, canceled, and extinguished (all without any further action by any Person or the Bankruptcy Court) and will

have no further legal effect other than as evidence of any right to receive distributions under the Plan as set forth in Plan Sections 3.2, 5.2, 5.5, and 5.7; provided, however, that the respective Credit Facilities will continue in effect and will not be deemed canceled on the books and records of the applicable Administrative Agents, solely for the purposes of and to the extent necessary to facilitate the respective distributions to the Revolving Credit Facility Lenders or the DIP Facility Lenders as of the Distribution Record Date, pursuant to the Plan and to enable the respective Administrative Agents to perform any and all current and future administrative functions.

Any Initial Avoidance Claims Proceeds and, in the event that Class 3 votes to accept the Plan, any portion of the Aggregate Unsecured Creditor Distribution to be distributed to the Holders of the Allowed Junior Subordinated Notes Claims in accordance with Plan Section 5.3 or 5.5 will be distributed to the Junior Subordinated Notes Indenture Trustees (either by the Debtors or the Unsecured Creditor Agent, depending on whether or not Class 3 votes to accept the Plan), which may work with or through the facilities of DTC, for further distribution to the Holders of Allowed Junior Subordinated Notes Claims as of the Distribution Record Date, after paying or reserving for any unpaid Allowed Indenture Trustee Fees to the extent provided for by the Junior Subordinated Notes Indentures and in accordance with the Plan and with applicable law. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), all distributions other than any Initial Avoidance Claims Proceeds under the Plan on account of the Allowed Junior Subordinated Notes Claims will be distributed to the Revolving Credit Facility Agent for further distribution to the Holders of the Allowed Lenders' Deficiency Claim, pursuant to the terms and subject to the conditions of the Plan (including Section 5.5 thereof). Upon the delivery of the foregoing distributions to the Junior Subordinated Notes Indenture Trustees and/or the Revolving Credit Facility Agent (as applicable), the Debtors, the Reorganized Debtors, and the Unsecured Creditor Agent (as applicable) will be released of all liability with respect to their obligation to make such distributions. The Junior Subordinated Notes Indenture Trustees and the Revolving Credit Facility Agent, as applicable, will thereafter take all steps necessary and appropriate to effectuate such further distribution thereof to the Holders of the Allowed Junior Subordinated Notes Claims and the Allowed Lenders' Deficiency Claim, respectively, on a Pro Rata basis. Similarly, any Initial Avoidance Claims Proceeds and, in the event that Class 3 votes to accept the Plan, any portion of the Aggregate Unsecured Creditor Distribution to be distributed to Holders of the Allowed Trust Preferred Securities Claims in accordance with Plan Section 5.5 will be distributed to the Indenture Trustee for the Trust Preferred Securities (either by the Debtors or the Unsecured Creditor Agent, depending on whether or not Class 3 votes to accept the Plan), which may work with or through the facilities of DTC, for further distribution to the Holders of Allowed Trust Preferred Securities Claims as of the Distribution Record Date, after paying or reserving for any unpaid Allowed Indenture Trustee Fees to the extent provided for by the Indenture for the Trust Preferred Securities and in accordance with the Plan and with applicable law. If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), all distributions other than any Initial Avoidance Clams Proceeds under the Plan on account of the Allowed Trust Preferred Securities Claims will be distributed to the Revolving Credit Facility Agent, for further distribution to the Holders of the Allowed Lenders' Deficiency Claim, pursuant to the terms and subject to the conditions of the Plan (including Section 5.5 thereof). Upon the delivery of the foregoing distributions to the trustee for the Trust Preferred Securities and the Revolving Credit Facility Agent, the Debtors, the Reorganized Debtors, and the Unsecured Creditor Agent (as

applicable) will be released of all liability with respect to their obligation to make such distributions. The trustee for the Trust Preferred Securities and the Revolving Credit Facility Agent, as applicable, will thereafter take all steps necessary and appropriate to effectuate such further distribution thereof to the Holders of the Allowed Trust Preferred Securities Claims and the Allowed Lenders' Deficiency Claim, respectively, on a Pro Rata basis.

The Indenture Trustees will only be required to act and make distributions in accordance with the terms of the Plan and the applicable Indentures and will have no (A) liability for actions taken in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold an Allowed Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

Subject to the terms and conditions of Bankruptcy Code § 503(b)(5), the Debtors will pay the reasonable, necessary, customary, and documented fees, charges, and expenses (including, without limitation, all reasonable and documented attorneys' fees and expenses) incurred by the respective Administrative Agents, the Contributing Lender, the Junior Subordinated Notes Indenture Trustees, and the trustee for the Trust Preferred Securities in the performance of any function associated with the Credit Facilities, the Junior Subordinated Notes Indentures, the Trust Preferred Securities, and the Plan (as applicable) during the period from and including the Petition Date until such time as all distributions provided for under the Plan to the Holders of Allowed Revolving Credit Facility Claims, Allowed DIP Facility Claims, Allowed Junior Subordinated Notes Claims, or Allowed Trust Preferred Securities Claims (as applicable) have been made. Any such Allowed amounts due and owing under the terms of the Plan will not be deducted from the distributions to be made thereunder to the Holders of Allowed Claims in Class 2A or Class 3B.

Given the important role these parties will play in effectuating the distributions to be made under the Plan to the individual Holders of the various Claims at issue, the Debtors believe that it is customary and appropriate in cases of this size and complexity for them to pay the Administrative Agents', the Contributing Lender's, the Junior Subordinated Notes Indenture Trustees', and the trustee for the Trust Preferred Securities' respective reasonable, necessary, customary, and documented fees, charges, and expenses for the post-Petition, pre-distribution period. The Debtors are also concerned that these parties may not agree to perform timely these crucial services absent their being assured under the Plan that they will be compensated therefor; if these parties were to refuse to do so, and the Debtors were, as a result, forced to retain other entities (likely with lesser familiarity with the Debtors and the various debts and other agreements being addressed under the Plan), to undertake these tasks, it is possible that the Debtors would incur even greater costs and expenses that may ultimately be owed to the Administrative Agents, the Contributing Lender, and/or the Junior Subordinated Notes Indenture Trustees in the manner set forth above. In addition, the Debtors believe that these parties may be contractually entitled to these payments, as for example, in Section 1.5 of the Exit Credit Facility, the Exit Credit Facility Agent is entitled to draw against any deposit account owned by the applicable Debtor on account of fees and expenses or payments due to the Exit Credit Facility Agent.