**6.      Delivery of Distributions; Unclaimed Property; Undeliverable Distributions**.

Except as may otherwise be provided in Plan Sections 3.2, 5.2, 5.5, 6.7, and 6.8, any distributions to Holders of Allowed Claims under the Plan will be made:  at the addresses set forth either on the Schedules or as otherwise set forth on the Debtors' respective books and records, or on the respective Proofs of Claim filed by such Holders in the event that the addresses indicated thereon differ from those set forth on the Schedules or as otherwise set forth on the Debtors' respective books and records, or upon the applicable securities depositories, clearing systems, or broker, bank, or custodial participants in the clearing system (as applicable); or at the addresses set forth in any written notices of address change delivered to the Debtors or the Reorganized Debtors (if after the Effective Date) after the date of any related Proof of Claim.

Pursuant to Section 2.12.5 of the Revolving Credit Facility, and as set forth further in Plan Section 6.6(e), the distributions of shares of New OHB Common Stock, New Notes, and Cash to be provided under Plan Sections 5.2, 5.5, and 5.7 on account of Allowed Revolving Credit Facility Claims (except as otherwise set forth in Plan Sections 5.5 and 5.7), will be made by the Debtors on the Effective Date to the Revolving Credit Facility Agent for subsequent distribution to the Holders of Allowed Revolving Credit Facility Claims as of the Distribution Record Date.  The Revolving Credit Facility Agent or an affiliate thereof will serve as the transfer exchange agent for the initial distribution of the shares of New OHB Common Stock and the New Notes to the Holders of the Allowed Revolving Credit Facility Claims.

In accordance with Bankruptcy Code § 1143, any holder of any note issued in connection with any of the Credit Facilities or any of the Guarantees that fails to surrender the applicable note or deliver an affidavit of loss and indemnity as provided in the Plan prior to 5:00 P.M. (prevailing Eastern Time) on the date that is one year from and after the later of the Effective Date or the applicable Allowance Date with respect to any Claims arising from or relating to any such note issued in connection with any of the Credit Facilities or the Guarantees, will be deemed to have forfeited all rights and claims in respect of such Claims and will be forever barred from receiving any distributions under the Plan on account thereof.  In such cases, any property held for distribution by the applicable Administrative Agent on account of Allowed Claims based on any such note issued in connection with the applicable Credit Facility or any of the Guarantees, will be made available for redistribution, on a Pro Rata basis, to all other Holders of Allowed Claims arising under the applicable Credit Facility that timely surrendered the applicable note or delivered an affidavit of loss and indemnity as provided in the Plan.  Similarly, other than with respect to any Reinstated Operational Lien(s), to the extent the Debtors or the Reorganized Debtors (as the case may be) are unable to effectuate the release, discharge, or termination in the manner provided in Plan Section 6.6(c) of an Operational Lien that is not being Reinstated, any Operational Lien Claimholder in Class 2C or Classes 3 or 3A, as applicable, that fails to execute a Lien Waiver as provided in Plan Section 6.6(c) prior to 5:00 P.M. (prevailing Eastern Time) on the date that is one year from and after the later of the Effective Date or the applicable Allowance Date with respect to any such Operational Lien Claims will be deemed to have forfeited all rights and claims in respect of such Claims and will be forever barred from receiving any distributions under the Plan on account thereof.  In such cases, any property held for distribution by the Debtors or the Reorganized Debtors on account of applicable Allowed Class 2C Claims will be kept by the Reorganized Debtors, and any property held for distribution by the Debtors or the Reorganized Debtors or the Unsecured

Creditor Agent (as applicable) on account of applicable Allowed Class 3 or 3A Claims based on such Operational Liens will be made available for redistribution, on a Pro Rata basis, to all other Holders of Allowed Class 3 or 3A Claims, as applicable.

If the distribution to the holder of any Allowed Priority Claim, Allowed Class 2B Claim, Allowed Class 2C Claim, Allowed Class 3 Claim, Allowed Class 3A Claim, Allowed Class 3C Claim, or Allowed Class 3D Claim is returned to the Reorganized Debtors as undeliverable, no further distribution will be made to such holder unless and until the Reorganized Debtors are notified in writing of such holder's then current address. The Reorganized Debtors will retain any such undeliverable distributions.

Any holder of an Allowed Claim who does not assert a claim for an undeliverable distribution prior to 5:00 P.M. (prevailing Eastern Time) on the date that is one year after the date by which such holder was first entitled to such distribution will no longer have any claim to, or interest in, such undeliverable distribution and will be forever barred from receiving any distribution under the Plan.

Nothing contained in the Plan will require the Debtors or the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

7.    **Funding of the Unsecured Creditor Cash Pool and Distributions to Holders of Allowed Aggregate Unsecured Creditor Claims if Class 3 Votes to Accept the Plan**.

If Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will fund the Unsecured Creditor Cash Pool by depositing Cash in the total amount of $6 million into the Unsecured Creditor Escrow Account. The Unsecured Creditor Escrow Account will be managed by the Unsecured Creditor Agent for further distribution (in a time and manner to be determined by the Unsecured Creditor Agent, in his or her discretion) to the Holders of Allowed Aggregate Unsecured Claims as of the Distribution Record Date and/or any other Professionals or other parties entitled to a distribution thereof, in each case pursuant to the terms and subject to the conditions of the Plan. Upon the delivery of the $6 million Cash deposit to the Unsecured Creditor Escrow Account, the Debtors and the Reorganized Debtors will be released of any and all liability with respect to (a) their obligations to the Holders of Allowed Aggregate Unsecured Claims and Lenders' Deficiency Claims, and (b) the Additional Committee Investigation Fees, the Agreed Committee Professional Fees, the Claim Resolution Fees, and any Additional Committee Professional Fees. The Unsecured Creditor Agent will thereafter take all steps necessary and appropriate to effectuate such further distribution thereof to the Holders of the Allowed Aggregate Unsecured Claims in accordance with the Plan.

8.    **Funding of Cash Distributions under the Plan**.

Any funds necessary to make the Cash distributions required under the Plan and/or to fund the future obligations of the Reorganized Debtors will be made from: the Cash on hand of the Debtors and of the Reorganized Debtors; the Exit Credit Facility; the proceeds recovered from the prosecution of Avoidance Claims and other Causes of Action; the Cash generated as

Unencumbered Asset Net Sale Proceeds, as and when received by the Debtors or the Reorganized Debtors, as applicable; and the future operations of the Debtors and the Reorganized Debtors (as applicable).

9. **Unencumbered Assets and Distribution of Unencumbered Asset Net Sale Proceeds**.

The Unencumbered Assets will be maintained, sold, transferred, or otherwise disposed of by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business. The Unencumbered Assets will not be, and will not be deemed to be, held in trust for the benefit of any Person, and the Debtors or the Reorganized Debtors, as applicable, will be authorized to maintain, sell, transfer, or otherwise dispose of the Unencumbered Assets in their discretion and business judgment.

If Class 3 votes as a Class in the aggregate to reject the Plan in accordance with Bankruptcy Code § 1126(c), then subject to the terms and conditions of the Plan, including Sections 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, and 6.6 thereof, the Reorganized Debtors (or any transfer or disbursing agent retained by the Reorganized Debtors pursuant to Plan Section 6.5(c)) will make the distributions to the Holders of Allowed Claims in Class 3A, 3B, or 3D (as applicable) on a quarterly basis for each quarter in which the aggregate amount of (i) the Initial Avoidance Claims Proceeds, (ii) the Excess Avoidance Claims Proceeds, and (iii) the Unencumbered Asset Net Sale Proceeds then available for distribution to such Holders exceeds $1 million.

**Any party-in-interest claiming to have a valid Lien upon any Asset listed on Exhibit I to this Disclosure Statement as an Unencumbered Asset must file an objection prior to the Plan Objection Deadline in order to challenge the inclusion of any such Asset thereon, or be forever barred from doing so, such that the applicable Asset will be treated as an Unencumbered Asset for all purposes under the Plan and in these Cases.**

Any Unencumbered Asset that is subject to a valid Operational Lien will remain subject to such Lien for all purposes in these Cases, except to the extent that such Unencumbered Asset is unencumbered solely as the result of the Lien of the Revolving Credit Facility Lenders' having been avoided in the resolution of an Avoidance Claim, in which case the Operational Lien on such Unencumbered Asset will only be recognized to the extent it would have come ahead of the Revolving Credit Facility Lenders' Lien under applicable law had such Lien not been so avoided. To the extent that the value of an Unencumbered Asset that is the subject of a valid Operational Lien exceeds the value of the Operational Lien Claim thereon, the difference in such value will constitute an Unencumbered Asset that will be available for distribution to Creditors in Class 3A, 3B, or 3D, subject to the terms and conditions of the Plan.

10. **Allocations of Distributions.**

All distributions paid to Holders of Allowed Claims in satisfaction thereof pursuant to the Plan will be allocated first to the original principal amounts of such Claims (as determined for U.S. federal income tax purposes) and, second, to the portion of such Claims representing interest (as determined for U.S. federal income tax purposes), and any excess thereafter will be allocated to the remaining portion of such Claims.

11.     **Distribution Limitations.**

Notwithstanding any other provision of the Plan to the contrary, no distribution will be made on account of any Claim, or part thereof, that is not an Allowed Claim or that has been avoided or is subject to any objection. The sum total of the value of the distributions to be made on the Initial Distribution Date to all holders of Claims in a particular Class (if any) will not exceed the aggregate amount of the Allowed Claims in such Class (if any), and the distribution to be made to each individual holder of an Allowed Claim will not exceed the amount of such holder's Allowed Claim.

12.     **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims.**

Distributions under the Plan to each Holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in Plan Section 6.28 will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities that any entity may hold against the Debtors' or the Reorganized Debtors' insurance carriers.

13.     **Manner of Payments Under the Plan.**

Any Cash distribution to be made by the Debtors or the Reorganized Debtors (as applicable) pursuant to the Plan may be made by a check on a United States bank selected by the Debtors or the Reorganized Debtors (as applicable); provided, however, that Cash distributions made to foreign Holders of Allowed Claims may be paid, at the option of the Debtors or the Reorganized Debtors (as applicable), in such funds and by such means as are necessary or customary in a particular foreign jurisdiction, and to either of the Administrative Agents on account of the DIP Revolving Facility Claims or the Revolving Credit Facility Claims, respectively, will be made by wire transfer as directed by the applicable Administrative Agent from a domestic bank selected by the Debtors or the Reorganized Debtors (as applicable).

14.     **Disputed Claims.**

No distribution or payment will be made on a Disputed Claim until such Disputed Claim becomes an Allowed Claim. On the Initial Distribution Date, any Cash distributions reserved for the Holders of any Disputed Claims in each Class under the Plan will be deposited in deposit accounts that meet the requirements of Bankruptcy Code § 345 for the benefit of the Holders of Disputed Claims whose Claims are ultimately Allowed in the respective Classes in which the Disputed Claims are classified (each deposit account, a "Disputed Claims Reserve"); provided, however, that in the event Class 3 votes to accept the Plan, the Unsecured Creditor Agent may elect not to establish a separate Disputed Claims Reserve for Disputed Class 3 Claims, but may instead elect to set aside a portion of the Unsecured Creditor Cash pool that he or she determines, in his or her discretion, is sufficient to pay the Pro Rata share thereof to any Disputed Class 3 Claims that ultimately become Allowed Class 3 Claims.

Subject to the other provisions of the Plan (including Section 6.12(a) thereof), the Reorganized Debtors and/or the Unsecured Creditor Agent, as applicable (or any transfer or disbursing agent retained thereby pursuant to Plan Section 6.5(c)) will withhold from the property to be distributed under the Plan and deposit in the applicable Disputed Claims Reserve a sufficient amount of such withheld property to be distributed on account of the amount of Claims that are Disputed Claims in such Class had such Disputed Claims been Allowed Claims as of the Initial Distribution Date for such Class under the Plan.

As to a Disputed Claim, the Bankruptcy Court will, upon a motion by the Debtors or the Reorganized Debtors or any other party in interest in these Cases (as applicable), estimate the maximum allowable amount of such Disputed Claim and the amount to be placed in the applicable Disputed Claims Reserve on account of such Disputed Claim. Any Creditor whose Claim (i) is estimated by an order of the Bankruptcy Court or (ii) is the subject of a motion or objection to (A) estimate or liquidate the Allowed amount of such Disputed Claim at zero dollars ($0.00) or (B) disallow, expunge, vacate, or otherwise strike such Disputed Claim in full on any grounds, as contemplated by Plan Section 6.12(a), will not have any recourse to the Debtors or to the Reorganized Debtors (as applicable), any Assets theretofore distributed on account of any Allowed Claim, the Unsecured Creditor Cash Pool (if applicable), or any other entity or property in the applicable Class if the finally Allowed Claim of that Creditor exceeds that estimated maximum allowable amount. Instead, such Creditor will have recourse only to any remaining amounts in the applicable Disputed Claims Reserve or from any future distributions made by the Debtors or the Reorganized Debtors with respect to Allowed Claims in the applicable Class.

All earnings on any Cash held in a Disputed Claims Reserve will be held in trust and will be distributed only in the manner described in Plan Section 6.12(e).

At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the distributions reserved for such Disputed Claim or such portion, plus any earnings thereon, net of any taxes, will be released from the appropriate Disputed Claims Reserve and delivered to the Holder of such Allowed Claim in the manner as described in the Plan. At such time as all or any portion of any Disputed Priority Claim or any Disputed Class 1, 2B, or 2C Claim is determined not to be an Allowed Claim, the distribution reserved for such Disputed Claim or such portion, plus any earnings thereon, net of any taxes, will be released from the appropriate Disputed Claims Reserve and returned to the Reorganized Debtors. At such time as all or any portion of any Disputed Class 3 Claim (or Disputed Class 3A Claim or Disputed 3B Claim, as applicable) is determined not to be an Allowed Claim, the distribution reserved for such Disputed Claim or such portion, plus any earnings thereon, will be released from the appropriate Disputed Claims Reserve account and made available for redistribution in a timely manner to the other Holders of Allowed Claims of such Classes; provided, however, that none of the Unsecured Creditor Agent, the Debtors, the Reorganized Debtors, or any transfer or disbursing agent retained by the Reorganized Debtors pursuant to Plan Section 6.5(c) will be required to make any such redistribution until the aggregate amount available with respect thereto is at least $25,000. Upon the resolution of all Disputed Claims, any remaining amounts that had been reserved on account thereof will be finally distributed in the manner set forth in the Plan.

After the Confirmation Date, the Debtors, and on and after the Effective Date, the Reorganized Debtors and the Unsecured Creditor Agent subject to the Litigation Protocol (if

applicable), will have the authority to object to and litigate any Disputed Claims and will have the authority to settle, compromise, resolve, or withdraw any objection to Disputed Claims.

### 15. The Short Term Incentive Plan and the Long Term Incentive Plan.

To the extent provided by the terms of the Short Term Incentive Plan, as set forth on a schedule in the Plan Supplement, within 30 days of the Effective Date, the Reorganized Debtors will make a total of approximately $1,855,048.50 in Cash payments to approximately 40 of the Debtors' employees, including 15 employees who may be considered officers thereof, and six months thereafter, the Reorganized Debtors will make an additional total of approximately $527,489.50 in Cash payments to approximately five of the Debtors' employees who may be considered officers.

On or following the Effective Date, the Long Term Incentive Plan will be adopted by Reorganized OHB. The terms and conditions of the Long Term Incentive Plan will be determined by the Board of Directors of Reorganized OHB.

### 16. Post-Effective Date Shareholder Agreements.

On and/or after the Effective Date, the Holders of the New OHB Common Stock will enter into such shareholder and/or equity holder agreements containing provisions customary for transactions of the type contemplated in the Plan and as otherwise necessary to implement the provisions contemplated in the Plan, including customary minority rights, approval rights, and anti-dilution protection, in each case, to be agreed upon by such Holders on and after the Effective Date in accordance with the terms thereof. To the extent then available, any such agreement(s) may be filed as part of the Plan Supplement.

### 17. No Fractional Shares.

No fractional shares of New OHB Common Stock will be issued or distributed under the Plan. Whenever any distribution to a particular Person would otherwise call for the distribution of a fraction of a share of New OHB Common Stock, the actual distribution of shares of such stock will be rounded down to the next lower whole number. The total number of shares of New OHB Common Stock to be distributed to a Class of Claims will be adjusted as necessary to account for this rounding. No consideration will be provided in lieu of fractional shares of New OHB Common Stock that are rounded down.

### 18. Litigation Protocol.

In consideration of the Unsecured Creditor Settlement, if Class 3 votes as a Class in the aggregate to accept the Plan in accordance with Bankruptcy Code § 1126(c), the Unsecured Creditor Agent will be authorized to object to the allowance of any Class 3 Claim and prosecute on behalf of the Debtors and the Reorganized Debtors, as applicable, any litigation pertaining thereto or with respect to any such objection or Avoidance Claim, subject to the following:

(a)     The Unsecured Creditor Agent will not object to the Allowance of any Class 3 Claim under Bankruptcy Code § 502(d) or commence or prosecute any Avoidance Claim against any Critical Vendor or Additional Vendor without the prior written consent of the Debtors or the

Reorganized Debtors, as applicable, in the Debtors' or the Reorganized Debtors' sole discretion; for the avoidance of doubt, the Unsecured Creditor Agent may object to the Allowance of any Class 3 Claim for any reason other than under Bankruptcy Code § 502(d) without having to follow the Litigation Protocol.

(b)     If the Debtors or the Reorganized Debtors (as applicable) withhold their consent to the Unsecured Creditor Agent's objecting under Bankruptcy Code § 502(d) to the Allowance of a Class 3 Claim of, or the pursuit of an Avoidance Claim against, a Critical Vendor or an Additional Vendor, the Debtors or the Reorganized Debtors (as applicable) will pay to the Unsecured Creditor Agent either the Critical Vendor Payment Amount or the Additional Vendor Payment Amount, as applicable, by depositing such amount into the Unsecured Creditor Escrow Account.  Any Critical Vendor Payment Amount or Additional Vendor Payment Amount received by the Unsecured Creditor Agent will be distributed to the Holders of Allowed Aggregate Unsecured Claims on a Pro Rata basis, as if such amounts were part of the initial Unsecured Creditor Cash Pool.  Any dispute between the Debtors or the Reorganized Debtors, on the one hand, and the Unsecured Creditor Agent, on the other hand, as to (i) the Critical Vendor Payment Amount or the Additional Vendor Payment Amount or (ii) any objection (or lack thereof) to a Class 3 Claim that cannot be resolved in good faith by the Debtors or the Reorganized Debtors (as applicable) and the Unsecured Creditor Agent will be determined by the Third-Party Mediator, whose determination will be binding and not subject to appeal or Court approval.  Each party will bear its own fees and expenses in any such dispute and will be responsible for an equal portion of the Third-Party Mediator's fees and expenses.  Following any such determination by the Third-Party Mediator, the Debtors or the Reorganized Debtors (as applicable) may, notwithstanding such determination, consent to the Unsecured Creditor Agent's objecting to the Allowance of the applicable Class 3 Claim or the pursuit of the applicable Avoidance Claim against the Critical Vendor or the Additional Vendor and will have no obligation to pay the Critical Vendor Payment Amount or the Additional Vendor Payment Amount.

(c)     If the Debtors or the Reorganized Debtors (as applicable) consent to the Unsecured Creditor Agent's objecting to the Allowance of a Class 3 Claim under Bankruptcy Code § 502(d) or the pursuit of an Avoidance Claim against a Critical Vendor or an Additional Vendor, any amount recovered in such litigation by the Unsecured Creditor Agent will be for the benefit of and distributed to the Holders of Allowed Aggregated Unsecured Claims on a Pro Rata basis, net of Claim Resolution Fees.

"Additional Vendors" are those "Persons who supply or provide goods, supplies, parts, materials, other tangible objects, and/or services to any of the Debtors or the Reorganized Debtors and are listed on a designated Schedule A to be kept confidential by the Debtors, the Reorganized Debtors, the Sponsors, the Creditors Committee, and the Unsecured Creditor Agent. "Additional Vendor Payment Amount" is defined as "[w]ith respect to either (a) an objection to the Allowance of any Class 3 Claim of an Additional Vendor under Bankruptcy Code § 502(d), or (b) the prosecution of any Avoidance Claim against an Additional Vendor, the amount that is 60% of the reasonably estimated recovery thereon, which, with respect to a particular Avoidance Claim, shall be as set forth in the Creditors Committee Avoidance Claim Report."  "Critical Vendors" are those "Persons who supply or provide goods, supplies, parts, materials, other

tangible objects, and/or services to any of the Debtors or the Reorganized Debtors and are listed on a designated Schedule B to be kept confidential by the Debtors, the Reorganized Debtors, the Sponsors, the Creditors Committee, and the Unsecured Creditor Agent." The "Critical Vendor Payment Amount" means "[w]ith respect to either (a) an objection to the Allowance of any Class 3 Claim of a Critical Vendor under Bankruptcy Code § 502(d), or (b) the prosecution of any Avoidance Claim against a Critical Vendor, the amount that is 40% of the reasonably estimated recovery thereon, which, with respect to a particular Avoidance Claim, shall be as set forth in the Creditors Committee Avoidance Claim Report." The "Creditors Committee Avoidance Claims Report" refers to that certain schedule, entitled "Preference Analysis," provided by the Creditors Committee to the Debtors and the Sponsors on or about September 15, 2010, containing schedules addressing potential Avoidance Claims, which will be kept confidential by the Debtors, the Reorganized Debtors, the Sponsors, the Creditors Committee, and the Unsecured Creditor Agent.

The schedule of Critical Vendors contains a list of approximately 52 parties and the schedule of Additional Vendors contains a list of approximately 76 parties. The Debtors, the Reorganized Debtors, the Sponsors, the Creditors Committee, and the Unsecured Creditor Agent will keep the respective schedules of the Additional Vendors and the Critical Vendors confidential (although the Debtors will provide copies of these schedules to the Bankruptcy Court and to the United States Trustee for their review) because they have determined that a failure to do so may prejudice the Debtors and/or the Unsecured Creditor Agent (as applicable) in a variety of ways. Initially, the schedules contain the Creditors Committee's analysis of the potential preference exposure of each of the various Critical Vendors or Additional Vendors, information that should not become public because it would reveal to potential defendants how the Creditors Committee has valued the applicable Avoidance Claim and/or the merits of any defenses thereto. Also, if a vendor were to discover that it has been deemed a Critical Vendor or an Additional Vendor, this could adversely impact the Debtors' or the Unsecured Creditor Agent's (as applicable) ability to successfully negotiate a settlement of the applicable Avoidance Claim because it might signal that the plaintiff would be willing to settle such claim at only 40% or 60% (as applicable). Finally, the Debtors are concerned that any vendor that discovers the Debtors did not seek to have it deemed a Critical Vendor or Additional Vendor would consider this as a sign that the Debtors do not sufficiently value their business relationship with the applicable vendor, which could impair the Debtors' or the Reorganized Debtors' future activities with such vendor.

Accordingly, if the Unsecured Creditor Agent wants to object to the Class 3 Claim of an Additional Vendor or a Critical Vendor pursuant to Bankruptcy Code § 502(d), or if the Unsecured Creditor Agent wants to commence an Avoidance Claim against these parties, it will need to obtain the prior consent of the Reorganized Debtors. If the Reorganized Debtors decline to grant such consent, they will have to pay into the Unsecured Creditor Cash Pool, either 40% or 60% (depending upon whether the party at issue is an Additional Vendor or a Critical Vendor) of the applicable amount as set forth in the Creditors Committee Avoidance Claim Report. The Debtors and the Creditors Committee note that under the Litigation Protocol, the Unsecured Creditor Agent would not need the Debtors' or the Reorganized Debtors' consent to object to any Claim of an Additional Vendor or a Critical Vendor on any grounds other than under Bankruptcy Code § 502(d). The Debtors and the Creditors Committee believe that an Additional

Vendor or a Critical Vendor whose Class 3 Claim is not objected to and against which an Avoidance Claim is not commenced pursuant to the Litigation Protocol may, as with all other General Unsecured Creditors (to the extent all such Creditors otherwise have an Allowed Claim), receive a greater distribution under the treatment provided for in the Plan in the event that Class 3 votes as a Class to accept the Plan than would otherwise be the case if Class 3 votes as a Class to reject the Plan. The projections regarding recoveries to the Holders of Allowed Class 3 Claims that are contained in this Disclosure Statement are premised in part upon the Litigation Protocol embodied in the Unsecured Creditor Settlement being in effect, and neither the Debtors nor the Creditors Committee believe that their compliance with the Litigation Protocol will reduce the anticipated distributions to Holders of Allowed Class 3 Claims, as contemplated by the Plan and as projected in this Disclosure Statement.

### 19. Deadlines for Determining the Record Holders of the Various Classes of Claims.

At the close of business on the Distribution Record Date, the respective transfer records for the Credit Facilities, the Trust Preferred Securities, the Junior Subordinated Notes, and the Old OHB Common Stock will be closed, and there will be no further changes in the record Holders of the respective DIP Facility Claims, Revolving Credit Facility Claims, the Trust Preferred Securities Claims, the Junior Subordinated Notes Claims, General Unsecured Claims, Convenience Class Claims, or the Old OHB Common Stock after such date. None of the Debtors, the Reorganized Debtors, any disbursing agent or transfer agent retained by the Reorganized Debtors pursuant to Plan Section 6.5(c), nor the respective Administrative Agents or Indenture Trustees will (as applicable) have any obligation to recognize any transfer of the DIP Facility Claims, the Revolving Credit Facility Claims, the Trust Preferred Securities Claims, the Junior Subordinated Notes Claims, General Unsecured Claims, Convenience Class Claims, the Old OHB Common Stock, any notes or other securities issued in connection with either of the Credit Facilities, the Junior Subordinated Notes, the Trust Preferred Securities, or any of the Guarantees occurring after the Distribution Record Date (as applicable), and such parties will be entitled, instead, to recognize and deal for all purposes hereunder and under the Plan with only those record Holders thereof as of the close of business on the Distribution Record Date.

### 20. De Minimis Distributions.

No Holder of an Allowed Claim will be entitled to receive any distribution from any Debtor, Reorganized Debtor, any disbursing agent or transfer agent retained by the Reorganized Debtors pursuant to Plan Section 6.5(c), or the Unsecured Creditor Agent (as applicable) unless and until at least $75 in Cash is then on hand and specifically allocable for a distribution on account of such Allowed Claim. To the extent that an amount less than $75 in Cash does not become available and specifically allocable for distribution on account of a particular Claim within the date that is one year after the Effective Date, the Holder of such Claim will have its Claim for, and its right to, such distribution discharged and will be forever barred from asserting any such claim against, or interest in, the Reorganized Debtors or their respective property, or, if applicable, the Unsecured Creditor Agent or the Unsecured Creditor Cash Pool. Any Cash not distributed pursuant to Plan Section 6.21 will be the property of the Reorganized Debtors, or remain part of the Unsecured Creditor Cash Pool, as applicable, free and clear of any restrictions thereon, and any such Cash held by any disbursing agent or transfer agent retained by the

Reorganized Debtors or the Unsecured Creditor Agent pursuant to Plan Section 6.5(c) will be returned to the Reorganized Debtors or the Unsecured Creditor Agent, respectively.

### 21. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereunder, the Debtors, the Reorganized Debtors, the Unsecured Creditor Agent, any disbursing agent or transfer agent retained by the Reorganized Debtors or the Unsecured Creditor Agent, pursuant to Plan Section 6.5(c), the Junior Subordinated Notes Indenture Trustees, the trustee under the Trust Preferred Securities, and the Administrative Agents, as the case may be, will comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding and reporting requirements.

### 22. Direction to Parties.

From and after the Effective Date, the Reorganized Debtors may apply to the Bankruptcy Court for an order directing any party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the Plan and to perform any other act, including the satisfaction of any Lien or the execution and delivery of a Lien Waiver, that is necessary, appropriate, or beneficial for the consummation of the Plan.

### 23. Setoffs.

The Debtors will, pursuant to Bankruptcy Code § 553, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim, all claims, rights, and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim that are not otherwise waived, released, or compromised in accordance with the Plan; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim will constitute a waiver or release by the Debtors of any such claims, rights, and Causes of Action that any of the Debtors may possess against such holder.

### 24. Preservation of Causes of Action.

Except as otherwise set forth in the Plan, in accordance with Bankruptcy Code § 1123(b), as of the Effective Date, the Reorganized Debtors will retain all Causes of Action (including, without limitation, any and all Avoidance Claims) and any actions that could be brought under Bankruptcy Code § 542 or 543, and will have the power, subject to any applicable releases and/or waivers contained in the Plan (including, without limitation, in Article IX thereof), to (i) institute and present in the name of the Debtors, or otherwise, all proceedings (other than Avoidance Claims if Class 3 votes to accept the Plan, in which case Avoidance Claims may be instituted and presented by the Unsecured Creditor Agent as set forth below herein and in Plan Section 6.25) that they may deem proper in order to collect, assert, and enforce any claim, right, or title of any kind in or to any of the Debtors' Assets and/or to avoid any purported Lien, and (ii) to defend and compromise any and all actions, suits, and proceedings in respect of such Assets. For the avoidance of doubt, if Class 3 votes to accept the Plan, the Unsecured Creditor Agent may prosecute any Avoidance Claim on behalf of the Holders of Allowed Class 3 Claims subject to the Litigation Protocol, and the Unsecured Creditor Agent will have the power, subject

to any applicable releases and/or waivers contained in the Plan (including, without limitation, in Article IX thereof), to institute and present in the name of the Debtors' Estates, or otherwise, all proceedings that he or she may deem proper in order to collect, assert, and enforce any such Avoidance Claim.

### 25. Secondary Liability Claims.

Holders of all Allowed Secondary Liability Claims will be entitled to only one distribution from the Debtors, which distribution will be as provided in the Plan in respect of such underlying Allowed Claim and which Allowed Secondary Liability Claim (as well as the underlying Allowed Claim) will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim (if any). No multiple recovery on account of any Allowed Claim and Related Allowed Secondary Liability Claim (including, but not limited to, on account of any Claim based on any of the Guarantees or any guarantee or similar right related to an Executory Contract) will be permitted.

### 26. The Plan Supplement.

The Plan Supplement will be filed with the Bankruptcy Court within the time established by the order of the Bankruptcy Court approving this Disclosure Statement or other applicable order of the Bankruptcy Court. The Plan Supplement will include (unless previously filed) the respective draft forms of a sample Amended and Restated Certificate of Incorporation, Amended and Restated LLC Agreement, Amended and Restated Limited Partnership Agreement, and Amended, Restated Bylaws, and any applicable certificates of formation and/or organization; the draft forms of the New Notes and the New Notes Guarantees; and certain additional information regarding the aggregate terms and conditions of the Short Term Incentive Plan. The Debtors will also include in the Plan Supplement a draft form of, or term sheet for, the Exit Credit Facility or any shareholder agreement, but only if and to the extent that such draft(s) is available as of the date of the filing of the Plan Supplement. The Plan Supplement may also include revised or updated lists of (a) the Executory Contracts identified as "to be assumed" under the Plan and the proposed respective cure amounts due thereunder (if any), (b) the Executory Contracts identified as "to be rejected" under the Plan, (c) any revisions to Exhibit I hereto, containing a revised schedule of the Unencumbered Assets, and/or (d) any revisions to Exhibit J hereto, containing a revised schedule of developments that will not revest in the Reorganized Debtors. The draft forms, summaries, lists, and schedules so set forth in the Plan Supplement may be amended, modified, or supplemented from time to time after the filing of the Plan Supplement. Upon its filing, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Claims Agent, through the Bankruptcy Court's website, www.nysb.uscourts.gov, or through the website maintained by the Claims Agent, www.orleanshomesreorg.com.

### 27. "Change of Control" Provisions.

Notwithstanding anything to the contrary that may be contained in the Plan or the Confirmation Order, any insurance policy, surety bond or similar bond, either of the Credit Facilities, the Junior Subordinated Notes Indentures, any documents entered into in connection

with the Trust Preferred Securities, any Executory Contract, or other contract or agreement to which any of the Debtors or their Affiliates is a party, the transactions to be consummated in accordance with the Plan will not create, or be deemed to create, any claim or right in connection therewith upon a "Change of Control" or similar term, as such term may be defined or utilized in any such documents or agreements.

### 28. United States Trustee's Fees.

The Debtors and the Reorganized Debtors will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). After confirmation of the Plan, the Debtors will file with the Bankruptcy Court and the United States Trustee a quarterly post-confirmation report, in the format specified by the United States Trustee, for each quarter that any of such Reorganized Debtors' particular Cases remain open. The United States Trustee quarterly fee will be calculated on all disbursements made by the Reorganized Debtors until the particular Cases are closed, converted to cases under Chapter 7 of the Bankruptcy Code, or dismissed (as applicable). The Bankruptcy Court will retain jurisdiction to decide any post-confirmation dispute concerning the United States Trustee quarterly fees.

### 29. Sales or Restructuring Transactions.

The Debtors and/or the Reorganized Debtors are authorized, but not directed, to engage in any sale or restructuring transaction involving their Assets, businesses, and/or operations, including, without limitation, (a) forming, or causing to be formed, new direct or indirect subsidiaries, or causing to dissolve, consolidate, or merge, any existing direct or indirect subsidiaries, (b) engaging in asset sales, assignments, or transfers to unrelated third parties or to Affiliates, or (c) transferring operations to existing or newly formed direct or indirect subsidiaries. The Debtors and the Reorganized Debtors are authorized (but not directed) to take any and all actions as may be reasonable, necessary, or appropriate to effectuate any such transactions, without the need for any further court order or notice.

### D. Other Provisions of the Plan.

### 1. Rejection or Assumption of Executory Contracts.

The Bankruptcy Code gives the Debtors the power, after the commencement of these Cases, subject to the approval of the Bankruptcy Court, to assume or to reject executory contracts and unexpired leases. Generally, an "executory contract" is a contract (including unexpired leases) under which material performance (other than the payment of money) is still due by each party. In this context, "assumption" of an executory contract means, among other things, that the Debtors re-affirm their obligations under the relevant contract or lease and cure all monetary defaults thereunder.

It is the intention of the Debtors that, as of the Confirmation Date, but subject to the occurrence of the Effective Date and the terms and conditions of the Plan (including Sections 7.2 and 7.3 thereof), all Executory Contracts (including, without limitation, those Executory Contracts identified as "to be rejected" on the list attached as <u>Exhibit E</u> to this Disclosure Statement, as such list may be revised and included in the Plan Supplement or otherwise, and those otherwise expressly rejected under and pursuant to the terms of the Plan, including under

Article VII thereof) will be deemed rejected by the applicable Debtors in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, except those Executory Contracts that (a) have previously been assumed by an order of the Bankruptcy Court, (b) are the subject of a motion to assume pending on the Confirmation Date, (c) are identified as "to be assumed" on the list attached as Exhibit D to the Disclosure Statement (as such list may be revised and included in the Plan Supplement or otherwise), or (d) are otherwise expressly assumed under and pursuant to the terms of the Plan (including under Article VII thereof). Assumption of the Executory Contracts at issue in clauses (c) or (d) in the immediately preceding sentence will be effective as of the Confirmation Date, subject to the occurrence of the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of all such rejections and assumptions (as applicable) pursuant to Bankruptcy Code §§ 365(a) and 1123, subject to the occurrence of the Effective Date and the terms and conditions of the Plan (including Sections 7.2 and 7.3 thereof). The listing of a document on either Exhibit D or Exhibit E to the Disclosure Statement (as either such list may be revised and included in the Plan Supplement or otherwise), or any other statement in the Plan (including in Plan Section 7.1) or in the Disclosure Statement will not constitute an admission by the Debtors that such document is an executory contract or unexpired lease or that the Debtors have any liability thereunder. Each Executory Contract assumed pursuant to Plan Article VII (i.e., those Executory Contracts at issue in clauses (c) and (d) of the first sentence of Plan Section 7.1) or otherwise will revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as may be modified by (w) any agreement with respect thereto between the Debtors and the applicable non-debtor party, (x) the provisions of the Plan, (y) any order of the Bankruptcy Court approving and authorizing its assumption, or (z) applicable federal law. The Debtors will retain the right at all times prior to the Effective Date (i) to assume any additional or other Executory Contract(s) not specifically identified on the list thereof attached as Exhibit D to the Disclosure Statement (or as such list may be revised and included in the Plan Supplement or otherwise) as "to be assumed" (including, without limitation, any Executory Contract currently identified on Exhibit E to the Disclosure Statement as "to be rejected" or are otherwise being rejected pursuant to the terms of the Plan) or (ii) to reject any additional or other Executory Contract(s) not specifically identified on the list thereof attached as Exhibit E to the Disclosure Statement (or as such list may be revised and included in the Plan Supplement or otherwise) as "to be rejected" (including, without limitation, any Executory Contract currently identified on Exhibit D to the Disclosure Statement as "to be assumed" or are otherwise being assumed pursuant to the terms of the Plan), in each case upon providing notice to the non-Debtor party thereto. Without limiting the effect of Plan Section 7.1, Exhibit D to this Disclosure Statement contains a schedule of all known Executory Contracts (in addition to those referenced in Plan Sections 7.7, 7.8, 7.9, and 7.11) anticipated to be assumed under the Plan (as such schedule may be revised and included in the Plan Supplement or otherwise), subject to the Debtors' right to determine at any time subsequently, on or prior to the Effective Date, including, without limitation, as may be set forth in the Plan Supplement, either to assume or to reject any Executory Contracts or to include additional Executory Contracts to be either (a) assumed under the Plan or (b) rejected under the Plan, in each case upon providing notice to the non-Debtor party thereto.

To the extent there are any monetary amounts by which each Executory Contract to be assumed pursuant to the Plan (i.e., those Executory Contracts at issue in clauses (c) and (d) of the first sentence of Plan Section 7.1) is in default must be cured and/or satisfied pursuant to

Bankruptcy Code § 365(b)(1) and the terms of the Plan, such cure or satisfaction will be by payment of the cure amount (as such amount has been agreed upon by the Reorganized Debtors in the manner set forth in Plan Sections 7.2 or 7.3 or, in the event of a dispute regarding such cure amount, as such amount has been determined by a Final Order of the Bankruptcy Court, subject to the Debtors' or the Reorganized Debtors' right to elect thereafter to reject such agreement in the manner set forth below in Plan Section 7.2) in Cash by the latest of (a) the Effective Date (or as soon thereafter as is practicable), (b) in the event of a dispute regarding the cure amount, within 60 days of the entry of an order of the Bankruptcy Court establishing such cure amount, (c) the date of a Final Order of the Bankruptcy Court (or as soon thereafter as is practicable) approving and authorizing the assumption of an Executory Contract not otherwise assumed pursuant to the terms of the Plan, or (d) on such other terms as the parties to such Executory Contracts may otherwise agree. Notwithstanding the foregoing, in the event of a dispute regarding the amount of any required cure payments, the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code § 365) under the contract or lease to be assumed, or any other matter pertaining to assumption (each an "Assumption Dispute"), the cure payments required will be made following the entry of a Final Order resolving the Assumption Dispute and approving the assumption or as otherwise agreed by the parties to such dispute; provided, however, that in the event the Bankruptcy Court determines that the actual cure payment owed to a particular non-Debtor party to an Executory Contract exceeds the proposed cure amount as set forth either in Plan Section 7.3 or the notice provided by the Debtors pursuant to Section 7.3 thereof and as set forth on Exhibit D to this Disclosure Statement (as applicable), or (ii) the Debtors and the applicable non-debtor party involved in any Assumption Dispute cannot otherwise consensually resolve such Assumption Dispute, the Debtors may reject the Executory Contract at issue pursuant to Bankruptcy Code § 365, rather than paying the disputed cure amount, by presenting a proposed order to the Bankruptcy Court for such rejection, without any prior notice (although the Debtors will inform the applicable non-Debtor party to such Executory Contract of the rejection thereof and of the Plan Rejection Bar Date). In the event any Executory Contract is so rejected, the non-debtor party thereto will be entitled to file a Proof of Claim pursuant to Plan Section 7.4, which Claim will be classified pursuant to Plan Section 7.5, but will not be entitled to any other or further Claim or relief from any of the Debtors or the Reorganized Debtors. After the Confirmation Date, the Debtors, and on and after the Effective Date, the Reorganized Debtors, will have the authority to settle, compromise, resolve, or withdraw any Assumption Dispute without the need for any Bankruptcy Court or other approval or any other or further notice.

The Debtors will provide notice to the non-debtor parties to all Executory Contracts listed on Exhibit D hereto as being assumed of the proposed default amount (if any) owed under the applicable Executory Contract and the last date by which such non-debtor party may file an objection or other response with respect to such proposed default amount. *All other Executory Contracts being assumed under the Plan that are not specifically identified on the list thereof attached as Exhibit D to this Disclosure Statement (or as such list may be revised and included in the Plan Supplement or otherwise, including any Executory Contracts being assumed pursuant to Plan Sections 7.6, 7.7, 7.8, 7.9, or 7.11 will be deemed to have a proposed default amount of $0 for all purposes in these Cases. Any non-debtor party that fails to object or otherwise respond on or prior to the Confirmation Objection Deadline to the proposed default amount owed either as listed on such notice and Exhibit D (or as such list may be revised) or as otherwise set forth in Plan Section 7.3, will be deemed to have consented to such applicable*

*proposed amount and to the proposed assumption by the Debtors of the applicable Executory Contract, and may not receive any other or additional distribution or consideration from the Debtors, the Estates, the Reorganized Debtors, or the Assets, or otherwise seek recourse against, the Debtors, the Estates, the Reorganized Debtors, or any of their Assets, beyond such proposed amount owed.*

Each non-debtor party to any Executory Contract rejected under and pursuant to Article VII of the Plan will be entitled to file, not later than 30 days after the entry of the Confirmation Order (the "Plan Rejection Bar Date"), a Proof of Claim against the applicable Debtor for an alleged Rejection Claim. *If no such Proof of Claim for a Rejection Claim is timely filed against the applicable Debtor, any such Claim will not be entitled to receive any distributions under the Plan on account thereof from the Debtors, the Reorganized Debtors, or their respective Estates or Assets.* Objections to any such Proof of Claim will be filed not later than 90 days after such Proof of Claim is filed (subject to any potential further extensions of such date as so ordered and approved by the Bankruptcy Court), and the Bankruptcy Court will decide any such objections. Distributions (if any) in respect of such Claims (consistent with the distributions to be received by Holders of other Claims in the Class into which such Claims fall, as determined by Plan Section 7.6) will be made no earlier than the later of (i) 60 days after the expiration of the 90-day period (as such period may be extended by order of the Bankruptcy Court) for filing an objection in respect of any Proof of Claim filed pursuant to Plan Section 7.5 and (ii) 60 days after the Claim has been Allowed by a Final Order of the Bankruptcy Court, provided that no such distribution will be made before the Effective Date.

Notwithstanding anything to the contrary herein or in the Plan, the Plan Rejection Bar Date will apply only to Rejection Claims with respect to those Executory Contracts that are to be rejected under and pursuant to the Plan. Any holder of a Rejection Claim for an Executory Contract that is not to be rejected pursuant to the Plan, but whose Rejection Claim instead arises under an Executory Contract that either has already been rejected by an order of the Bankruptcy Court or is the subject of a separate motion to reject pending on the Confirmation Date, must file a Proof of Claim for such Rejection Claim by the date provided in any order relating to such rejection.

Except as otherwise provided under the Plan, any Rejection Claims against any of the Debtors will be treated as Class 3 or Class 3A Claims, as applicable, in each instance to the extent it is an Allowed Claim.

## 2. Insurance Policies and Surety Bonds.

All insurance policies of the Debtors (including, without limitation, the Directors & Officers Liability Insurance Policies) providing coverage to the Debtors and/or the Debtors' current or former directors, officers, stockholders, agents, employees, representatives, predecessors, and others for conduct in connection in any way with the Debtors, their assets, liabilities, and/or operations, regardless of whether such policies are Executory Contracts, unless previously rejected and/or terminated or expired in accordance with their terms, will be deemed assumed by the applicable Debtors as of the Confirmation Date, subject to the occurrence of the Effective Date, and will remain in full force and effect thereafter in accordance with their terms. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such

assumptions pursuant to Bankruptcy Code §§ 365 and 1123 and otherwise, subject to the occurrence of the Effective Date. Each insurance policy assumed pursuant to Article VII of the Plan will be retained by, and will revest in, and be fully enforceable by, the respective Reorganized Debtor in accordance with its terms, except as may be modified by the provisions of the Plan, any order of the Bankruptcy Court approving and authorizing its assumption, or applicable federal law.

Other than those listed on Exhibit E hereto (as the same may be amended or modified), all surety bonds or similar bonds (including, without limitation, any agreements, documents, or instruments relating thereto) issued on behalf of or obtained by the Debtors or otherwise with respect to any of their present or previously-owned Assets or developments, will remain and continue in full force and effect on and after the Effective Date in accordance with their terms. Each such surety bond or similar bond will be retained by and will revest in, and be fully enforceable by, the respective Reorganized Debtor or any other party with an interest therein or beneficiary thereunder, subject to applicable provisions of, and all of the Debtors' rights under, the Bankruptcy Code, including, without limitation, Bankruptcy Code § 363(l). Nothing in Plan Section 7.7 will constitute or be deemed a waiver of any cause of action that the Debtors, the Reorganized Debtors, or any beneficiary or related entity under any surety bond or similar bond may hold against any entity, including the issuer of any surety bonds or similar bond, under any of such bonds. Without limiting the generality of the foregoing, such surety bonds will not constitute Executory Contracts for any purposes under the Plan or otherwise in these Cases, such that neither the Debtors nor the Reorganized Debtors will have any obligations to satisfy any purported defaults thereunder pursuant to Bankruptcy Code § 365(b)(1) or otherwise in order for such bonds to revest in and be fully enforceable by the respective Reorganized Debtor or any other party with an interest therein or beneficiary thereunder on and after the Effective Date.

Notwithstanding anything provided in the Plan to the contrary, no provision of the Plan, including, without limitation, the discharge and release from Claims as provided for in Article IX thereof, will be deemed in any way to diminish or impair the enforceability of any insurance policies, surety bonds, or similar bonds, or any agreements, documents, or instruments relating to the foregoing, that may cover claims against any of the Debtors, any other Person, or otherwise with respect to any of the Debtors' present or previously-owned Assets or developments. Any failure by the Debtors to list any particular insurance policy, surety bond, or similar bond on any schedule of Executory Contracts to be assumed under the Plan (either contained in this Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors', the Reorganized Debtors', or any beneficiary's (as applicable) ability to enforce such policy, surety bonds, or similar bond, and instead, any and all such policies and bonds will be transferred to and vested in the Reorganized Debtors and will remain and continue in full force and effect on and after the Effective Date in accordance with Plan Section 7.7.

Nothing contained herein or any Exhibits hereto, or in the Plan or the Confirmation Order will constitute an admission by any of the Debtors that their insurance policies, surety bonds, or similar bonds constitute Executory Contracts under, or for purposes of, Bankruptcy Code § 365.

Any Claims by any non-Debtor party to any insurance policies, surety bonds, or similar bonds, or any agreements, documents, or instruments relating to the foregoing, against any of the

Debtors that arose on or prior to the Petition Date, other than for any Claim for any unpaid premiums thereunder, will be treated as Class 3 or Class 3A Claims, as applicable, in each instance to the extent they are Allowed Claims, and will be subject to all applicable defenses and objections of the Debtors, the Estates, and the Reorganized Debtors (including, but not limited to, as provided for in Bankruptcy Code § 502(e)); provided, however, that, to the extent any non-Debtor party to any insurance policies, surety bonds, or similar bonds, or any agreements, documents, or instruments relating to the foregoing has a fixed, non-contingent, and liquidated Claim against the Debtors and holds any collateral to secure the Debtors' obligations thereunder, such party may, upon granting the Debtors a minimum of 14-days' notice in writing, apply such collateral to reduce the Allowed amount of any fixed, non-contingent, and liquidated Claim such party may have against the Debtors under such any insurance policies, surety bonds, or similar bonds, or any agreements, documents, or instruments relating to the foregoing. In the event the Debtors object within such 14-day period to such proposed application of any collateral, such party will be stayed from the application thereof until the dispute has been adjudicated by a Final Order of the Bankruptcy Court or upon an agreement with respect thereto with the Debtors or the Reorganized Debtors (as the case may be), which the parties may enter into with any further notice or court order. Alternatively, any party to any insurance policies, surety bonds, or similar bonds, or any agreements, documents, or instruments relating to the foregoing that will be retained by and revest in the Reorganized Debtors in the manner set forth in Plan Section 7.7 and who currently holds any collateral to secure the Debtors' obligations thereunder, may continue to retain such collateral on and after the Effective Date in the manner provided for in the applicable agreements with the Debtors. In addition, any Claim for any unpaid premiums under such insurance policies, surety bonds, or similar bonds that are being retained by and will revest in the Reorganized Debtors will constitute Administrative Claims (subject to all applicable defenses and objections of the Debtors, the Estates, and the Reorganized Debtors).

      **3.**      **Compensation and Benefits Programs**.

Except as otherwise expressly provided under the Plan (including, without limitation, as set forth in Plan Section 7.8 with respect to the Existing Stock Option Plans, the SERP, the Deferral Plan, and agreements with third-party administrators under the Debtors' medical plans prior to 2009) or any exhibit hereto, in the Plan Supplement, or to the Plan, unless otherwise rejected or lawfully terminated by the Debtors, all employment policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their current or former Employees, retirees, and non-Employee directors, including, without limitation, all savings plans, any profit-sharing plans, pension or retirement plans (including, but not limited to, any plans qualified under Internal Revenue Code § 401(a)), healthcare plans, disability plans, benefit plans, and life, accidental death, dismemberment insurance plans in effect as of the Confirmation Date, and a payment of $350,000 to the Vesey Estate (collectively, the "Compensation and Benefits Programs") will be treated as either Executory Contracts under the Plan and on the Confirmation Date, subject to the occurrence of the Effective Date, will be assumed pursuant to the provisions of Bankruptcy Code §§ 365 and 1123 or otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtors to list any particular Compensation and Benefits Program on any schedule of Executory Contracts to be assumed under the Plan (either contained in this Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such program and instead, any and all such programs

(except those referenced in Plan Section 7.8(b)) will be deemed assumed (to the extent any such agreements constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.8. The Debtors and the Reorganized Debtors (as applicable) will retain their rights to amend, modify, or terminate the Compensation and Benefits Programs in accordance with the terms of the applicable agreements and applicable law.

Subject to the occurrence of the Effective Date, and notwithstanding anything that may be to the contrary in Plan Section 7.8(a), the Existing Stock Option Plans, the SERP, the Deferral Plan, and all agreements with third-party administrators under the Debtors' medical plans prior to 2009 will not be assumed by Reorganized OHB on the Effective Date, but will instead be cancelled and deemed terminated and/or rejected and of no force and effect as of the Effective Date.

### 4. Obligations to Indemnify Directors, Officers, and Employees, etc.

Notwithstanding anything to the contrary in the Plan, the obligations of each of the Debtors to indemnify the Vesey Estate and any Person who has served as one of the Debtors' directors, officers, employees, agents, representatives, management, or otherwise, at any time on or after the Petition Date, by reason of such person's service to such Debtor in such a capacity, to the extent provided in the applicable certificates or articles of incorporation formation, organization, or limited partnership, limited liability company or operating agreements, limited partnership agreements, by-laws, or similar constituent documents, by statutory law, or by written agreement, policies, or procedures of or with such Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and Bankruptcy Code §§ 365 and 1123 or otherwise on the Confirmation Date, subject to the occurrence of the Effective Date. Accordingly, such indemnification obligations will not be discharged, but they will instead survive and be unaffected by entry of the Confirmation Order and the consummation of the Plan, and will otherwise be in full force and effect on and after the Effective Date. Any failure by the Debtors to list any particular indemnification agreement on any schedule of Executory Contracts to be assumed under the Plan (either contained in this Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such agreement.

### 5. Contracts and Leases Entered Into Post-Petition.

Any contracts and leases entered into after the Petition Date by any Debtor, to the extent not expired, terminated, or cancelled in accordance with their terms or pursuant to an order of the Bankruptcy Court prior to the Effective Date, will survive and remain unaffected by entry of the Confirmation Order and the consummation of the Plan.

### 6. Home Sale Contracts.

Unless otherwise specifically rejected or lawfully terminated by the Debtors, all contracts entered into prior to the Petition Date by any Debtor with any party to acquire a home from any Debtor (a "Home Sale Contract"), will be (a) treated as Executory Contracts under the Plan and

will be assumed on the Confirmation Date, subject to the occurrence of the Effective Date, pursuant to the provisions of Bankruptcy Code §§ 365 and 1123 or (b) otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtors to list any particular Home Sale Contract on any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such contract, and instead, any and all Home Sale Contracts will be deemed assumed (to the extent any such agreements constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.11. Notwithstanding the specific terms of any Home Sale Contract or any other provisions of the Plan, any provision in any particular Home Sale Contract purporting to create a breach or default by the applicable Debtor party thereto solely on account of its failure to close thereunder by any designated time within 90 days after the Effective Date, will be deemed of no force and effect and need not be specifically cured by the Debtors or the Reorganized Debtors pursuant to Bankruptcy Code §§ 365 and 1123 or otherwise as of the Effective Date. Instead, the time in which the Debtors and the Reorganized Debtors (as applicable) may close under any Home Sale Contract that has not closed as of the Effective Date will be automatically extended by the Plan until the later of the closing date provided for in the applicable Home Sale Contract (including all possible extensions contained in the applicable contract) and 90 days following the Effective Date.

The Debtors do not believe they are parties to any pre-Petition Home Sale Contracts that have not yet closed where the non-Debtor party thereto is currently in possession of the applicable premises.

### 7. Employment Agreements With Sales Staff.

Unless otherwise specifically rejected or lawfully terminated by the Debtors, all employment agreements entered into prior to the Petition Date by any Debtor with any member of their sales staff still employed by the Debtors as of the Confirmation Date will be (i) treated as Executory Contracts under the Plan and will be assumed on the Confirmation Date, subject to the occurrence of the Effective Date, pursuant to the provisions of Bankruptcy Code §§ 365 and 1123 or (ii) otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtors to list any particular such employment agreement on any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, Exhibit D thereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such agreement, and instead, any and all such agreements will be deemed assumed (to the extent any such agreements constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.12.

### 8. Broker Commission Agreements.

Unless otherwise specifically rejected or lawfully terminated by the Debtors, all broker commission agreements entered into prior to the Petition Date by any Debtor, except for those with East West Realty, will be (i) treated as Executory Contracts under the Plan and will be assumed on the Confirmation Date, subject to the occurrence of the Effective Date, pursuant to

the provisions of Bankruptcy Code §§ 365 and 1123 or (ii) otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtors to list any particular broker commission agreement on any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such agreement, and instead, any and all such agreements will be deemed assumed (to the extent any such agreements constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.13. As of the Confirmation Date, but subject to the occurrence of the Effective Date, all broker commission agreements entered into prior to the Petition Date by any Debtor with East West Realty will be deemed rejected by the applicable Debtors in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123.

9.   **Rejection of Contracts with Vendors**.

All contracts, work orders, or other similar agreements entered into prior to the Petition Date by any Debtor with any Vendor, to the extent not terminated or cancelled in accordance with their terms or pursuant to an order of the Bankruptcy Court prior to the Effective Date, will be (a) deemed rejected pursuant to the Plan, to the extent that they constitute Executory Contracts, which rejection will be deemed effective as of the Confirmation Date, subject to the occurrence of the Effective Date and (b) deemed terminated to the extent that they do not constitute Executory Contracts, which termination will be deemed effective as of the Confirmation Date, subject to the occurrence of the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of all such rejections and/or terminations pursuant to Bankruptcy Code §§ 365(a) and 1123 or otherwise, subject to the occurrence of the Effective Date, and subject to the Debtors' right to elect, in their discretion, to instead assume any particular pre-Petition Date contract, work order, or other similar agreement with any Vendor in accordance with the terms and conditions of Article VII of the Plan.

10.   **Agreements Related to the Developments**.

Unless otherwise specifically rejected or lawfully terminated by the Debtors, all (a) agreements relating to any of the Developments embodied in development orders, city and/or county ordinances, zoning approvals, permits, and/or other related documents or any other official action of a governmental unit, quasi-governmental unit, and/or utility granting certain development rights, property interests, and/or entitlements to the Debtors; and (b) those governmental and quasi-governmental approvals, agreements, waivers, permits, licenses, variances, special exceptions, and water and sewer reservations as are necessary, appropriate, beneficial, or required, to permit the continued construction and development of any of the Developments entered into prior to the Petition Date by any Debtor, will be (i) treated as Executory Contracts under the Plan and will be assumed on the Confirmation Date, subject to the occurrence of the Effective Date, pursuant to the provisions of Bankruptcy Code §§ 365 and 1123 or (ii) otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtors to list any particular agreement or other document referred to in Plan Section 7.14 on any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, Exhibit D hereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors'

ability to assume such agreement and/or other document, and instead, any and all such agreements and documents will be deemed assumed (to the extent any such agreements or documents constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.14. Without limiting the generality of the foregoing, all of the Debtors' rights in or related to any of the Developments (or any of their other developments not scheduled on Exhibit J hereto, as such schedule may be revised and included in the Plan Supplement or otherwise) will revest in the Reorganized Debtors on and subject to the occurrence of the Effective Date, but the developments listed on Exhibit J to the Disclosure Statement (as such schedule may be revised and included in the Plan Supplement or otherwise) will not revest in the Reorganized Debtors and all applicable agreements related thereto will be deemed rejected or terminated, as applicable, as of the Effective Date.

The Plan defines "Developments" as

> collectively, the following real estate developments of the Debtors: Lake Elsie Reserve - Tavares, Lake County, FL; Glenwood Springs - Deland , Volusia County, FL; East Lake Park – St. Cloud, Osceola County, FL; Preserve at Black Hammock - Oviedo, Seminole County, FL; Cheswick Meadows – IL; Cheswick Place – Lake in the Hills, IL; Herons Landing –IL; Nobel Woods – Woodbridge, IL; Prairie Trail – Lake Villa, IL; Spring Gate at Southbury – Oswego, IL; Verona Ridge – Aurora, IL; River Hills – Bolingbrook, IL; Brookshire Estates - Lower Makefield Township and Newtown Township, Bucks County, PA; Byers Station - Upper Uwchlan Township and West Vincent Township, Chester County, PA; Chanticleer - Lower Makefield Township, Bucks County, PA; Chelsea Glen – East Greenwich Township, Gloucester County, NJ; Chestnut Ridge – East Fallowfield Township and West Bradford Township, Chester County, PA; Covington Manor – Mansfield Township, Burlington County, NJ; The Preserve at Squire Cheyney Farm – Thornbury Township, Chester County, PA; Greenbrier at Thornbury – Thornbury Township, Delaware County, PA; Greenbrier at Thornbury II – Thornbury Township, Delaware County, PA; Foxhall Estates - Lower Makefield Township, Bucks County, PA; Hidden Creek – Logan Township, Gloucester County, NJ; Hillview – Valley Township, Caln Township and Coatesville, Chester County, PA; Leigh Court - Harrison Township, Gloucester County, NJ; Liberty Village – Upper Saucon Township, Lehigh County, PA; Notting Hill – Upper Saucon Township, Lehigh County, PA; Matthew's Ridge – Wrightstown Township, Bucks County, PA; Meadows at Mansfield – Mansfield Township, Burlington County, NJ; Michaelson's Woods – Tabernacle Township, Burlington County, NJ; Millstone River Preserve – Hamilton Township Middlesex County, NJ; Waterside Crossing - Millstone Township, Monmouth

County, NJ; Weathersfield – Hamilton Township, Mercer County, NJ; Wheatley Meadows - Harrison Township, Gloucester County, NJ; Wildflower Condominium – Wallkill, Orange County, NY; Woodside Crossing – Rock Tavern, Orange County, NY; Wildflowers at Medford – Medford Township, Burlington County, NJ; Winchester – Hamilton Township, Monmouth County, NJ; South Creek - Chesterfield, VA; Summer Lake - Moseley, VA; Hartley Village - Midlothian, VA; Mallory Village - Midlothian, VA; Founders Bridge - Midlothian, VA; Foxcreek - Moseley, VA; Raleigh (Sleepy Hollow) - Richmond, VA; Thomas Mill - Glen Allen, VA; Dunnottar - Chesterfield, VA; Tarrrington Sect. 4 & 5 - Midlothian, VA; Henley - Glen Allen, VA; Woodbridge Crossing - Midlothian, VA; Patriots Landing - Quinton, VA; Tilman's Farm - Powhatan, VA; Ridge At Hunton Park - Glen Allen, VA; Highlands I - Chesterfield, VA; Meadowville Landing - Chester, VA; Tarrrington Sect. 12 - Midlothian, VA; Elm Crest - Richmond, VA; Heartquake – VA; Riverfront - Suffolk, VA; Eagle Harbor - Carrollton, VA; Graystone - Carrollton, VA; Founders Point - Suffolk, VA; Ashby West - Carrollton, VA; Weldon Ridge - Cary, NC; Reynolds Mill - Wake Forest, NC; Southampton - Durham, NC; Trinity Ridge - Durham, NC; Legends Oaks - Chapel Hill, NC; Oak Ridge Lake - Oak Ridge, NC; Walnut Creek - High Point, NC; Bentley Park - Jamestown, NC; Gentry Farm - High Point, NC; Riverbend - Charlotte, NC; Old Sycamore 100 - Mint Hill, NC; Callonwood I - Matthews, NC; Providence Forest - Weddington, NC; The Cove @ Chesapeake – Mooresville, NC; Lake Forest Preserve - Weddington, NC; Olde Sycamore The Links - Mint Hill, NC; Allyson Park - Charlotte, NC; Springs Village - Charlotte, NC; Chesapeake Point - Mooresville, NC; Lawson - Waxham, NC; Lake Forest - Arbor - Weddington, NC; Bridle Path - Marvin, NC; Silver Gull - Tega Cay, SC; Hearthwood - Harrisburg, NC; Callonwood - Matthews, NC; Bridge Pointe - Harrisburg, NC; and Wellington Chase - Concord, NC.

**11.     Permits and Licenses.**

The Debtors, and, as of the Effective Date the Reorganized Debtors, will be authorized by the Plan, to continue to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets or the Debtors' businesses, and all such licenses, permits, registrations, and governmental authorizations and approvals will survive in full force and effect, remain unaffected by entry of the Confirmation Order and the consummation of the Plan and are deemed to have been, and under the Plan are, assumed by the Reorganized Debtors as of the Effective Date.  All applicable governmental entities are, under the Plan, authorized and directed to continue to honor and operate under all such licenses, permits, registrations, and governmental authorizations or approvals.  Any failure by the Debtors to list any particular license, permit, registration, or governmental authorization or approval on

any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, <u>Exhibit D</u> thereto, the Plan Supplement, or otherwise) will not in any way impair the Debtors' ability to assume such license, permit, registration, or governmental authorization or approval, and instead, any and all such license, permit, registration, and governmental authorization or approval will be deemed assumed (to the extent any such agreements constitute Executory Contracts) and/or otherwise will remain in full force and effect on and after the Effective Date in accordance with Plan Section 7.15.

### 12. Further Actions.

The Debtors and the Reorganized Debtors will be authorized to execute, deliver, file, or record such documents, contracts, instruments, certificates, releases, Lien Waivers, and other agreements and to take such other action as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, any Plan Document, the release of Operational Liens, the transactions contemplated under the Plan, and/or the Plan Documents, the Long Term Incentive Plan, the New Notes and the New Notes Guarantees, the Exit Credit Facility, and any notes or guarantees issued in connection therewith.

### 13. Modification and Reservation of Rights in the Event of Nonacceptance of the Plan.

Under the Plan, the Debtors expressly reserve the right to request that the Bankruptcy Court confirm the Plan over the non-acceptance of any impaired Class of Claims or Interest in accordance with the applicable provisions of Bankruptcy Code § 1129(b). In the event that any impaired Class or Classes does not accept the Plan, upon the written request of the Debtors filed with the Bankruptcy Court, the Plan may (if necessary) be modified, revised, and amended to provide treatment to ensure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Classes rejecting the Plan, and, in particular, to provide the treatment necessary to meet the requirements of Bankruptcy Code § 1129(a) and (b) with respect to the rejecting Classes and any other Classes adversely affected by the modifications caused by Article X of the Plan. In particular, the treatment of any rejecting Classes or adversely affected Classes may be modified and amended from that set forth in Article V of the Plan, even if less favorable, to the minimum treatment necessary to meet the requirements of Bankruptcy Code § 1129(a) and (b). These modifications may include, but will not be limited to, cancellation of all amounts otherwise payable under the Plan to the rejecting Classes and to any junior Classes affected thereby (even if such Classes previously accepted the Plan) consistent with Bankruptcy Code § 1129(b)(2)(B)(ii) and (C)(ii). Nothing in the Plan will affect or excuse the Debtors' obligations, as plan proponents, to comply with the provisions of Bankruptcy Code § 1127 with respect to any proposed modifications of the Plan.

### 14. Modification of the Plan Prior to or After the Entry of the Confirmation Order.

The Debtors reserve the right to alter, amend, or modify the Plan prior to the entry of the Confirmation Order, subject to (i) the Sponsors' consent, and (ii) solely with respect to alterations, amendments, or modifications to Plan Sections 2.4(a), 5.3, 6.10, 6.13, 13.7, and any other provision that affects the economic terms of the Unsecured Creditor Settlement, the

Creditors Committee's consent. After the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, upon order of the Bankruptcy Court, may amend or modify the Confirmation Order, and the Plan, in accordance with Bankruptcy Code § 1127, the Confirmation Order, and the Plan, subject to the Sponsors' consent and, if Class 3 votes to accept the Plan, the Unsecured Creditor Agent's consent.

### 15. Revocation or Withdrawal of the Plan.

The Debtors have the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors do so revoke or withdraw the Plan, then the Plan will be null and void and, in such event, nothing contained in the Plan or in the Confirmation Order will be deemed to (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or (b) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving any of the Debtors.

### 16. Substantive Consolidation of the Debtors.

The Plan contemplates and is predicated upon the substantive consolidation of the Estates and the Debtors only for the purposes of all actions associated with voting, confirmation, and distribution. Accordingly, on the Effective Date, all of the Debtors and their Estates will, only for purposes of Sections 5.2, 5.3, 5.4, 5.5, 5.6, and 5.7 of the Plan, be deemed merged and (i) all assets and liabilities of the Debtors will be treated only for purposes of such Plan Sections 5.2, 5.3, 5.4, 5.5, 5.6, and 5.7 as though they were merged, (ii) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtors will be eliminated and cancelled, (iii) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations will be considered a single claim against the Debtors, and (iv) any Claim filed in these Cases will be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Such substantive consolidation will not (other than for voting, treatment, and distribution purposes under the Plan) affect (x) the legal and corporate structures of the respective Debtors or the Reorganized Debtors (including the corporate ownership of the Subsidiary Debtors), and (y) any intercompany claims.

The Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Estates and these Cases for the limited purposes described above, although nothing herein or in the Plan will, or will be deemed to, prejudice or otherwise affect the Debtors' right to file a separate motion seeking substantive consolidation if they elect to do so in their discretion. If no objection to the substantive consolidation provided for in the Plan is timely filed by the deadline established therefor by the Bankruptcy Court, an order approving such substantive consolidation (which may be the Confirmation Order or any other order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the proposed substantive consolidation of the Estates and these Cases and the objections thereto may be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Bankruptcy Code § 105(a), which empowers a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the

Bankruptcy Code and ensures a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction," see Mgmt. Tech. Corp. v. Pardo, 56 B.R. 337, 339 (Bankr. D. N.J. 1985), provides a court with the authority to grant substantive consolidation. In In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit adopted a standard for substantive consolidation that requires debtors seeking such relief to show either "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."

The Debtors submit that there is more than ample evidence supporting substantive consolidation for the limited purposes set forth in the Plan. Prior to the Petition Date, the Debtors prepared and filed consolidated financial reports, and vendors relied upon the Orleans Homebuilders franchise in most instances when providing credit and offering services to a Debtor, rather than the creditworthiness of the individual Debtor they may have actually been contracting with. Substantive consolidation would thus ensure that the Debtors' creditors receive the benefit of the satisfaction of their claims from a combined pool of Assets, all of which were subject to the blanket Liens of the Revolving Credit Facility Lenders and the DIP Facility Lenders. Moreover, as the Debtors have operated as a consolidated enterprise and reported on a consolidated basis for several years, attempting to disentangle their records and operations would be unduly costly and burdensome, especially considering the recent losses of key management personnel. Indeed, attempting to create detailed books and records for more than 50 individual Debtors for numerous periods prior and subsequent to the Petition Date, including reconciling related intercompany claims and ledgers, would be similarly difficult. Thus, the Debtors believe that they satisfy the standards of Owen Corning and that this Court can order the substantive consolidation of their Estates.

Notwithstanding the substantive consolidation provided for in the Plan, nothing therein will affect the obligation of each Debtor to pay quarterly fees to the United States Trustee program pursuant to 28 U.S.C. § 1930 until the earlier of the time its particular Case is closed, dismissed, or converted to a case under Chapter 7.

### E. Retention of Jurisdiction.

#### 1. Claims and Actions.

Following the Effective Date, the Bankruptcy Court will retain such jurisdiction over these Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the intents and purposes of the Plan are carried out. The Bankruptcy Court will also expressly retain jurisdiction: (a) to hear and determine all Claims against, or Interests in, any of the Debtors; and (b) to enforce all Causes of Action that may exist on behalf of any of the Debtors that are not otherwise waived or released under the Plan.

#### 2. Retention of Additional Jurisdiction.

Following the Effective Date, the Bankruptcy Court will also retain jurisdiction for the purpose of classification of Claims and Interests, the re-examination of Claims or Interests that

have been Allowed, and the dispositions of any objections as may be filed to any Claims, including Bankruptcy Code § 502(c) proceedings for estimation of Claims. The Bankruptcy Court will further retain jurisdiction for the following additional purposes:

(a)     to decide all questions and disputes regarding title to the respective Assets of the Debtors, all Causes of Action, controversies, disputes, or conflicts, whether or not subject to any pending action as of the Effective Date, between any of the Debtors and any other party, including, without limitation, any right to recover assets pursuant to the provisions of the Bankruptcy Code;

(b)     to enforce (with respect to all parties, including all Operational Lien Claimholders and all applicable federal, state, and local governmental agencies or departments) and interpret the terms and conditions of the Plan;

(c)     to enter any orders, including, but not limited to, future injunctions as are necessary to enforce the respective title, rights, and powers of the Debtors, and to impose such limitations, restrictions, terms, and conditions on such title, rights, and powers as the Bankruptcy Court may deem necessary;

(d)     to enter an order or orders closing these Cases;

(e)     to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to implement the intents and purposes of the Plan;

(f)     to decide any and all objections to the allowance of Claims and Interests and purported Liens (including Operational Liens), and to decide any actions for a determination that any Operational Lien Claim set forth on Exhibit F to the Disclosure Statement does not constitute a Secured Operational Lien Claim;

(g)     to determine any and all applications for allowances of compensation and reimbursement of expenses and the reasonableness of any fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(h)     to determine any applications or motions pending on the Effective Date for the rejection, assumption, or assignment of any Executory Contract (including under the provisions of Article VII of the Plan) and to hear and determine, and, if need be, to liquidate any and all Claims and/or disputes arising therefrom and/or with respect to any extant or future Claims and/or disputes related to the revesting of non-executory contracts, including, but not limited to, surety bonds or similar bonds;

(i)     to determine any and all applications, adversary proceedings, and contested matters that may be pending on the Effective Date;

(j)     to consider any modification of the Plan, whether or not the Plan has been substantially consummated, and to remedy any defect or omission or to reconcile

any inconsistency in any order of the Bankruptcy Court, to the extent authorized by the Plan or the Bankruptcy Court;

(k)    to determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Plan Document;

(l)    to consider and act on the compromise and settlement of any Claim against or Cause of Action by or against any of the Debtors arising under or in connection with the Plan;

(m)    to issue such orders in aid of execution of the Plan as may be authorized by Bankruptcy Code § 1142;

(n)    to protect any Reorganized Debtor and any Released Party against any Claims, Liens (including Operational Liens), and Interests released or discharged pursuant to the Plan (including Article IX of the Plan) and/or to adjudicate any action alleging that any Non-Debtor Released Party engaged in willful misconduct or fraud;

(o)    to enforce the provisions of the Plan (including Section 6.6 thereof) relating to the release, discharge, and termination of applicable Operational Liens and to otherwise require all applicable Federal, state, and local governmental agencies to (i) recognize the Debtors' appointment as attorney-in-fact for the purposes of executing and/or filing any Lien Waiver or any other related or appropriate documents with any entity in order to effectuate the release, discharge, and termination of the applicable Operational Liens as provided for in the Plan and (ii) accept any and all documents and instruments (including the Plan, the Confirmation Order, and/or all Lien Waivers) as provided by the Debtors, the Reorganized Debtors, or any related parties to revise appropriately all applicable records and files to reflect that all such Liens have been released, discharged, and terminated in accordance with the Plan, the Confirmation Order, and/or such Lien Waivers; and

(p)    to determine such other matters or proceedings as may be provided for under Title 28 or any other title of the United States Code, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, other applicable law, the Plan, or in any order or orders of the Bankruptcy Court, including, but not limited to, the Confirmation Order or any order that may arise in connection with the Plan or the Confirmation Order.

## F. Releases.

### 1. Releases by Holders of Claims or Interests.

The Plan incorporates and implements a compromise and settlement reached among the Debtors, the Sponsors, the Revolving Credit Facility Lenders, the DIP Facility Lenders, and the Creditors Committee (the "Unsecured Creditor Settlement"). The Unsecured Creditor

Settlement includes, among other things, the creation of the Unsecured Creditor Cash Pool for distribution to Holders of Allowed Aggregate Unsecured Claims and the waiver of the Lenders' Deficiency Claims and the rights of the Holders of Lenders' Deficiency Claims to enforce subordination and turnover provisions in the Trust Preferred Securities, the Junior Subordinated Notes, and the Junior Subordinated Notes Indentures under certain circumstances.

*Except as otherwise provided in the Plan, as of the Confirmation Date, but subject to the occurrence of the Effective Date, each Non-Debtor Releasing Party, in consideration of the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, the New OHB Common Stock, the New Notes, the New Notes Guarantees, the Exit Credit Facility, the Reinstatement of the Reinstated Liens, the Unsecured Creditor Settlement, and the other contracts, instruments, releases, agreements, waivers, and documents to be executed and delivered in connection with the Plan, and in consideration of the efforts of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, obligations, rights, Causes of Action, or liabilities (including, but not limited to, any claims arising out of, or relating to, any alleged fiduciary or other duty; any alleged violation of any federal or state securities law or any other law relating to creditors' rights generally; any of the Released Parties' ownership of any securities of any of the Debtors; or any derivative claims asserted on behalf of a Debtor), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Non-Debtor Releasing Party ever had, now has, or may have that are based in whole or in part on any act, omission, transaction, event, or other occurrence from the beginning of time through and including the Effective Date and in any way relating to the Debtors, these Cases, or the Plan; the Disclosure Statement; the Plan Documents; the formulation, negotiation, preparation, dissemination, implementation, and/or administration of the Plan, the Disclosure Statement, and the Plan Documents and the transactions contemplated thereby; the solicitation of votes with respect to, and the pursuit of Plan Confirmation; the Confirmation and consummation of the Plan; the subject matter of, or the transactions or events giving rise to, any Claim or Interest of such Non-Debtor Releasing Party, any security previously issued by any of the Debtors, and any and all claims based upon or arising out of such actions or omissions will be forever and completely waived and released by the Non-Debtor Releasing Parties;* provided, *however,* Plan Section 9.6(b) will not release, and the Non-Debtor Releasing Parties do not waive the right to enforce, the Debtors' or the Reorganized Debtors' duties, obligations, covenants, and agreements under (i) the Plan, (ii) any settlement agreement approved by the Bankruptcy Court in these Cases, regardless of whether such approval is granted prior to or after the Confirmation Date, (iii) the Assumed Contracts, or (iv) the Plan Documents to be delivered under the Plan; provided further, however, *that the release set forth in Plan Section 9.6(b) is in addition to the discharge of Claims and termination of Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code;* and provided further, however, *that nothing in Plan Section 9.6(b) will be deemed to assert or imply any admission of liability on the part of any of the Released Parties.*

*All Non-Debtor Releasing Parties will be forever precluded from asserting any of the claims released pursuant to Plan Section 9.6 against any of the Released Parties or any of the Released Parties' respective assets; and to the extent that any Non-Debtor Releasing Party*

*receives monetary damages from any Released Party on account of any claim released pursuant to Plan Section 9.6, such Non-Debtor Releasing Party will assign, pursuant to the Plan, all of its right, title, and interest in and to such recovery to the Released Parties against and/or from whom such money is recovered.*

Notwithstanding any provision of the Plan to the contrary, the releases contained in Plan Section 9.6 will not be construed as, or operate as a release of, or limitation on (x) any claims by the Non-Debtor Releasing Parties against the Released Parties that do not relate to or involve the Debtors or these Cases, (y) any claims, obligations, rights, causes of action, or liabilities by the Non-Debtor Releasing Parties against the Released Parties arising out of any action or omission to the extent that such action or omission is determined in a Final Order by a court of competent jurisdiction to have constituted willful misconduct or fraud, or (z) objections to Claims.

The Plan defines "Released Parties" as

> [c]ollectively, (a) the Debtors and the Reorganized Debtors; (b) the Revolving Credit Facility Lenders and the DIP Facility Lenders, solely in their respective capacities as such; (c) the Administrative Agents, solely in their respective capacities as such; (d) the Creditors Committee and the members thereof, solely in their respective capacities as such; (e) the current and former directors, officers, professionals, agents, and employees of the Debtors and the Reorganized Debtors, solely in their capacities as such; (f) the Sponsors, solely in their capacities as such; (g) the Exit Credit Facility Agent and the Exit Credit Facility Lenders, solely in their capacities as such; (h) the Indenture Trustees, in their respective capacities as such; (i) with respect to each of the foregoing Persons, such Person's predecessors, successors, and assigns, and current and former directors, officers, employees, stockholders, members, subsidiaries, affiliates, principals, agents, advisors, financial advisors, attorneys, accountants, investment bankers, consultants, underwriters, appraisers, representatives, and other professionals, in each case in their respective capacities as such; and (j) any Person claimed to be liable derivatively through any Person referred to in clauses (a), (b), (c), (d), (e), or (f) of this Section 1.153.

The Plan defines "Non-Debtor Releasing Parties" as "[c]ollectively, each and every Person that has held, holds, or may hold a Claim or Interest and that votes to accept the Plan."

Notwithstanding anything in the Plan to the contrary, nothing in the Plan will release any claims asserted by Laura J. Rosquist a/k/a Laura Dietz against any non-Debtor entities (a) in that certain action captioned as <u>Laura Dietz v. Realen Homes, L.P., et al. pending in the Circuit Court for the Nineteenth Judicial Circuit, Lake County, Illinois, as case number 07 L 870</u>, which is pending in the Circuit Court for the Nineteenth Judicial Circuit, Lake County, Illinois, as case number 07 L 870, including, without limitation, (i) Illinois Berger Excavating Contractors, Inc.; (ii) Rieke Contracting, Inc.; (iii) FKA Rieke Excavating, Inc.; (iv) Soil and Material Consultants,

Inc.; (v) First Place Concrete, Inc.; and (vi) Realen Home Developers, LLC, or (b) in any other action.

The Debtors are not currently aware of any definitive, pending, or asserted material claims of the Non-Debtor Releasing Parties against the Released Parties that would be released pursuant to Plan Section 9.6, but no assurances can be made as to whether or not any such claims would or could be asserted in the future absent the provisions of Plan Section 9.6. The Debtors believe that the foregoing releases and the protections afforded thereby are common and widely-accepted in cases of this size and complexity, particularly in consensual restructurings like this one. The Released Parties have invested a great deal of time and effort aimed toward facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the benefit of all parties-in-interest. Given their participation and integral role in furtherance of the Debtors' restructuring, and the fact that such releases would only be binding upon those parties who vote in favor of the Plan, it would be entirely unfair for these parties to remain potentially exposed to what would likely be frivolous lawsuits by the very Non-Debtor Releasing Parties that are benefiting from such Plan and the distributions thereunder.

## 2. Release by the Debtor Releasing Parties.

*On the Effective Date, pursuant to Bankruptcy Code § 1123(b), Bankruptcy Rule 9019, or otherwise, and except as otherwise specifically provided in the Plan or in the Plan Documents, the Debtor Parties, in consideration of the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New OHB Common Stock, the New Notes and the New Notes Guarantees, the Exit Credit Facility, the Reinstatement of the Reinstated Liens, the Unsecured Creditor Settlement, and the other contracts, instruments, releases, agreements, waivers, and documents to be executed and delivered in connection with the Plan, and in consideration of the efforts of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that such Debtor Party ever had, now has, or may have that are based in whole or in part on any act, omission, transaction, or occurrence taking place on or prior to the Effective Date and in any way relating to the Debtors, these Cases, or the Plan; the Disclosure Statement; the Plan Documents; the formulation, negotiation, preparation, dissemination, implementation, and/or administration of the Plan, the Disclosure Statement, and the Plan Documents; the confirmation and consummation of the Plan; the subject matter of, or the transactions or events giving rise to, any Claim or Interest of such Debtor Party, or any security previously issued by any of the Debtors. The immediately preceding sentence will not, however, apply to (a) any indebtedness of any Person to any of the Debtors for money borrowed by such Person or any other contractual obligation of any Person to any of the Debtors, (b) any claims by the Debtor Releasing Parties against the Released Parties arising out of any action or omission to the extent that such action or omission is determined in a Final Order by a court of competent jurisdiction to have constituted willful misconduct or fraud, or (c) any setoff, counterclaim, or defense under Bankruptcy Code § 502(d)*

*that the Debtors may have or assert against any Person other than any of the Sponsors or the other DIP Facility Lenders or Revolving Credit Facility Lenders (whose respective Claims will, for the avoidance of doubt, be allowed in the respective manner and amounts provided in the Plan), provided that the aggregate amount thereof will not exceed the aggregate amount of any Claims held or asserted by such Person against the Debtors. Holders of Claims or Interests against any of the Debtors will be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover any such claim that could be brought on behalf of or in the name of the Debtors.*

The Debtors believe that the foregoing releases and the protections afforded thereby are common and widely-accepted in cases of this size and complexity. The Released Parties have invested a great deal of time and effort aimed toward facilitating the expeditious reorganization of the Debtors and the implementation of the consensual restructuring contemplated by the Plan, to the benefit of the Debtors and their Estates. The Debtors thus believe that it is appropriate and warranted in the context of these Cases that these parties be afforded the foregoing protections. In addition, the Debtors are not currently aware of any definitive, material claims against either the Released Parties or any holder of a Claim that could potentially vote to accept the Plan that would be released pursuant to Plan Section 9.7, and in any event, absent these releases, it is likely that the Released Parties would assert a right of indemnification against the Debtors or the Reorganized Debtors on account of the claims at issue, such that the Estates themselves could potentially be harmed without these releases.

### 3. Injunction Related to Releases.

*The Confirmation Order will be deemed to enjoin permanently the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the Plan (including the releases set forth in Article IX thereof).*

### 4. Exculpation.

*No Released Party will have or incur, and each Released Party will be exculpated from, any liability (whether arising under contract, tort, or federal or state securities laws, whether known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise) to any Person for any pre-Petition Date or post-Petition Date act or omission taken or not taken (as the case may be), or any other transaction, event, or occurrence in any way in connection with, arising from or relating to the Debtors, these Cases (and the commencement or administration thereof); this Disclosure Statement, the Plan (either prior to Confirmation and approval of same, or as same may be confirmed or otherwise approved by the Bankruptcy Court), or any orders of the Bankruptcy Court related thereto, the Plan Documents or the transactions contemplated thereby, or the formulation, negotiation, preparation, dissemination, implementation, or administration of any of the foregoing documents; the solicitation of votes in connection with, and the pursuit of, Confirmation of the Plan; the property to be distributed under the Plan; the Exit Credit Facility; the Confirmation and/or consummation of the Plan; the Effective Date; any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; any other act taken or omitted to be taken in connection with, or in contemplation of, any of the restructuring or other transactions*

*contemplated by the Plan; and the property to be distributed or otherwise transferred under the Plan*; <u>provided</u>, <u>however</u>, that nothing in Plan Section 9.9 will exculpate or release any Released Party from its obligations arising under confidentiality agreements and common-interest agreements; <u>provided</u> <u>further</u>, <u>however</u>, that nothing in Plan Section 9.9 will release any entity from any claims, obligations, rights, causes of action, or liabilities arising out of such entity's willful misconduct or fraud. Each Released Party will be entitled reasonably to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

### G. Risk Factors.

THE NEW OHB COMMON STOCK AND THE NEW NOTES TO BE ISSUED UNDER THE PLAN ARE SPECULATIVE SECURITIES OR INSTRUMENTS AND INVOLVE A HIGH DEGREE OF RISK. CREDITORS SHOULD CAREFULLY REVIEW THE FOLLOWING RISK FACTORS TOGETHER WITH THE OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

#### 1. Ability to Service Debt.

Based on historical data and net cash provided by operating activities during recent Fiscal Years, anticipated growth and business prospects, expected availability under the Exit Credit Facility, and management's operating strategy, the Debtors anticipate that the Reorganized Debtors should be able to generate sufficient Cash from operations to meet the Cash obligations incurred pursuant to the Plan and the Plan Documents (including, without limitation, the New Notes and the Exit Credit Facility). If, however, the Reorganized Debtors are unable to generate sufficient funds to meet such obligations, funds will have to be derived from alternative sources, such as new equity financings, asset sales, additional borrowings, and/or reductions in capital expenditures. Unfavorable conditions in the financial markets and the homebuilding and related industries, restrictive covenants contained in the new debt instruments, and/or various other factors may limit the ability of the Reorganized Debtors successfully to undertake any such actions, however, and no assurance can be given as to the availability of feasible alternative sources of funds. Any utilization of alternative sources of funds may impair the competitive position of the Reorganized Debtors, reduce their cash flows, or have other adverse consequences.

#### 2. Projected Operating and Financial Results.

The Debtors have prepared the financial projections attached as <u>Exhibit B</u> hereto. The assumptions on which these projections are based, however, are subject to significant uncertainties, and inevitably, some assumptions will not prove accurate. Also, unanticipated events and circumstances beyond the Reorganized Debtors' control may affect the actual financial results.

Neither the Debtors nor the Reorganized Debtors make any representation as to the accuracy of the projections or the Reorganized Debtors' ability to achieve projected results. The

actual results achieved could vary from the projected results, and the variations may be material. It is urged that all of the assumptions and other caveats regarding the projections set forth on Exhibit B hereto be examined carefully in evaluating the Plan.

The projections were not prepared with a view toward public disclosure or compliance with the published guidelines of the SEC or the American Institute of Certified Public Accountants regarding projections or forecasts. The Debtors' independent auditors have neither examined the projections nor compiled any analysis contained therein and assume no responsibility therefor.

### 3. No Assurance of a Public Market of the New OHB Common Stock or the New Notes.

The New OHB Common Stock and the New Notes are new securities for which there is currently no trading market. Subject to the terms of any Registration Rights Agreement the Reorganized Debtors may enter into in the future, the New OHB Common Stock and the New Notes will not be listed on an exchange or traded over the counter. There can be no assurance that a market for any of these securities will develop or, if such a market develops, whether such market would create liquidity or the price at which the New OHB Common Stock or the New Notes may trade.

### 4. No Public Reporting.

On the Effective Date, the Old OHB Common Stock will be cancelled and will no longer be outstanding. On July 29, 2010, OHB filed a Form 15 with the SEC providing notice of termination of registration under the Securities Exchange Act of 1934, as amended (the "Exchange Act") with respect to the Old OHB Common Stock and of the suspension of its obligations to file reports with the SEC.

The Reorganized Debtors will not file reports with the SEC. Unless and until Reorganized OHB becomes a "reporting company" pursuant to the Exchange Act, files on a timely basis the reports required to be filed thereunder, and otherwise complies with the provisions of Rules 144 and 144A of the Securities Act of 1933, as amended, the holders of the New OHB Common Stock or the New Notes will not be able to resell any such securities pursuant to Rule 144 or 144A. Accordingly, no assurance can be given that a holder of the New OHB Common Stock or the New Notes will be able to sell those securities in the future or as to the price at which such a sale may occur.

### 5. Certain Tax Matters.

The Plan is subject to substantial uncertainties regarding the application of U.S. federal income tax laws to various transactions and events contemplated therein. For a more detailed discussion of these issues, see the section below entitled "Certain U.S. Federal Income Tax Considerations".

**6. Consequences if the Plan is Not Confirmed or the Conditions to Effectiveness are Not Satisfied.**

There can be no assurance that the Plan as proposed will be approved by the requisite number of holders or amounts of Claims in the applicable Class(es) or by the Bankruptcy Court. Similarly, in the event that any impaired Class or Classes vote(s) to reject the Plan, there can be no assurance that the Debtors will be able to obtain confirmation of the Plan under the "cram-down" provisions of Bankruptcy Code § 1129(b). For a more detailed discussion of these issues, <u>see</u> the section below entitled "<u>Confirmation Without Acceptance By All Impaired Classes</u>".

In the event the Plan is not confirmed within the exclusive time period allotted by Bankruptcy Code §1121, as extended by orders of the Bankruptcy Court, for the Debtors to propose the Plan and solicit votes thereon, any other party-in-interest may propose a plan of reorganization, and subsequent plans may be proposed and approved by the requisite majorities and be confirmed by the Bankruptcy Court. Notwithstanding Bankruptcy Court approval, it is possible that the Plan may not be consummated because of other external factors that may adversely affect the Debtors and their businesses.

Specifically, even if the Debtors obtain the requisite acceptances to confirm the Plan, and/or the requirements of Bankruptcy Code § 1129(b) for cram down are met with respect to any Impaired Class that has rejected the Plan, there can be no assurance that the Bankruptcy Court will confirm the Plan. Pursuant to Bankruptcy Code § 1128(b), any party-in-interest, including the United States Trustee, any Creditor, or any equity holder, has the right to be heard by the Bankruptcy Court on any issue in the Cases. It is possible that such a party-in-interest could challenge, among other things, the terms of the Plan or the adequacy of the time period allotted for solicitation (the "Solicitation") on the Plan for considering whether to accept or to reject the Plan. Even if the Bankruptcy Court were to determine that the Solicitation was proper, it could still decline to confirm the Plan if it were to find that any statutory condition for confirmation has not been met. Bankruptcy Code § 1129 sets forth the requirements for confirmation. While the Debtors believe that the Plan complies with all of the confirmation requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion. A party-in-interest may also object to the classification or treatment of any Claim or Interest and might succeed in persuading the Bankruptcy Court that the classification or treatment of such Claim or Interest provided by the Plan is improper. In such event, it is the present intention of the Debtors to modify the Plan to provide for whatever reasonable classification or treatment may be required by the Bankruptcy Court for confirmation of the Plan and to use the votes received pursuant to the Solicitation for the purpose of obtaining the approvals of the affected Class. However, any reclassification mandated by the Bankruptcy Court might render such course of action impossible, and the Debtors could then be forced to conduct a new solicitation of acceptances of the Plan, as modified.

The confirmation and effectiveness of the Plan are also subject to certain conditions. For a more detailed discussion of these conditions, <u>see</u> the section below entitled "<u>Confirmation of the Plan -- Conditions to Effectiveness</u>". There can be no assurance that these conditions to confirmation and effectiveness of the Plan will be satisfied or, if not satisfied, that the Debtors or any other parties required to do so will waive such conditions. Therefore, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that it will subsequently be

consummated. Furthermore, there can be no assurance that modifications of the Plan will not be required for its confirmation or that such modifications would not require resolicitation of acceptances from one or more Classes of impaired claims and equity interests.

### 7. Securities Issuance.

The issuance of new securities involves adherence to certain securities-law regulations. Although the Debtors believe the securities issued in accordance with the Plan are exempt from these securities-law requirements, including under Bankruptcy Code § 1145, there can be no assurance that the Bankruptcy Court or any applicable regulatory agency will decide that the relevant exemptions apply to these issuances. For a more detailed discussion of the risks involved with securities issuance, see the section below entitled "Securities Law Issues".

### 8. The Effect of Bankruptcy on the Debtors' Businesses.

The Debtors have attempted to minimize the potential adverse effect of the filing of these Cases upon the Debtors' relationships with their employees, suppliers, operators, lessors, and customers, by, among other things, filing a proposed disclosure statement and Chapter 11 plan (which reflects a compromise and settlement reached with the Sponsors) as closely as possible after the Petition Date in the hopes of minimizing the time the Debtors spend in Chapter 11. Nonetheless, the filing of these Cases by the Debtors and the publicity attendant thereto might have adversely affected the Debtors' businesses and the businesses of any of the Non-Debtor Subsidiaries or other affiliates of the Debtors, especially because of the inability to pay certain Claims. The Debtors are hopeful that relationships with their customers, suppliers, operators, lessors, and employees have been maintained and will not suffer further erosion if the Plan is confirmed and consummated in a timely manner.

However, adverse effects are likely to be experienced during the pendency of any increasingly-protracted bankruptcy cases. If the Debtors remain in Chapter 11 for a prolonged period, they could continue presumably to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. In light of financing and other potential concerns, it is not certain the degree to which the Debtors could survive as a going concern in protracted Chapter 11 cases. The Debtors could have difficulty sustaining the high costs and the erosion of vendor, operators, supplier, lessor, and customer confidence that may be caused if they remain in bankruptcy for an extended period of time. Ultimately, there could be no assurance that the Debtors would not be forced to liquidate under Chapter 7 or 11.

### 9. Confirmation of a Modified Plan.

Although the Debtors believe that each of the provisions of the Plan is appropriate and legally valid in the context of these Cases, it is possible that one or more of such provisions may be subject to challenge and that the Plan, as confirmed, may differ in one or more material respects from the existing version of the Plan.

10. **Substantial Risks Inherent in the Debtors' or the Reorganized Debtors' Businesses.**

(a) **The homebuilding industry is experiencing a severe and extended downturn that may continue for an indefinite period and may continue to adversely affect the Debtors' or the Reorganized Debtors' businesses and results of operations.**

The homebuilding industry has experienced a significant and sustained downturn characterized by decreased demand for new homes, an oversupply of both new and resale home inventories, including foreclosed homes; aggressive price competition among homebuilders, including increased incentives for home sales; and a restrictive mortgage-lending environment. Economic conditions in the United States have also weakened, which puts continued pressure on consumer confidence for residential real estate. These industry and economic trends have resulted in downward pressure on the Debtors' home prices, fewer home sales, and increased cancellation rates. As a result, the Debtors have experienced a significant reduction in revenues and margins. These challenging market conditions are expected to continue for the foreseeable future, and in the near term, these conditions may further deteriorate. The Debtors expect that continued weakness in the homebuilding industry could further adversely affect their or the Reorganized Debtors' businesses and results of operations.

(b) **Deterioration in economic conditions in general could further reduce the demand for homes and, as a result, could reduce the Debtors' or the Reorganized Debtors' earnings and adversely affect their financial condition.**

Changes in national and local economic conditions could have additional negative impacts on the Debtors' or the Reorganized Debtors' businesses. Adverse changes in employment levels, job growth, consumer confidence and income, interest rates, and population growth may further reduce demand, depress prices for the Debtors' or the Reorganized Debtors' homes, and cause homebuyers to cancel their agreements to purchase homes, thereby possibly reducing revenues and adversely affecting the Debtors' or the Reorganized Debtors' businesses and results of operations. Recent changes in these economic variables have had an adverse affect on consumer demand for, and the pricing of, the Debtors' homes, causing revenues to decline, and future deterioration in economic conditions could have further adverse effects on the Debtors or the Reorganized Debtors.

(c) **Turmoil in the credit markets and the financial services industry may reduce the demand for the Debtors' or the Reorganized Debtors' homes and the availability of home mortgage financing, among other things.**

The credit markets and the financial services industry have been experiencing a period of unprecedented turmoil and upheaval characterized by the bankruptcy, failure, collapse, or sale of various financial institutions and an unprecedented level of intervention from the United States federal government. While the ultimate outcome of these events cannot be predicted, it may have a material adverse effect on the Debtors or the Reorganized Debtors and their ability to

borrow money to finance their operations, and it could also adversely impact the availability of financing to their customers.

       (d)       **Home prices and sales activities in the Debtors' Pennsylvania, New Jersey, North Carolina, and Virginia markets have a significant impact on the Debtors' sales and earnings because they conduct a significant portion of their businesses in these markets.**

The Debtors presently conduct a significant portion of their businesses in the Pennsylvania, New Jersey, North Carolina, and Virginia markets. Demand for new homes and home prices have declined in these markets and may continue to decline. There can be no assurance that the Debtors' or the Reorganized Debtors' earnings and financial position will not be further impacted if the challenging conditions in these markets continue or worsen.

       (e)       **High cancellation rates may negatively impact the Debtors' or the Reorganized Debtors' businesses.**

The Debtors' backlog reflects the number and value of sold but undelivered homes. The Debtors' sales contracts typically require purchasers to make a cash deposit. Generally, under the Debtors' contracts, the Debtors have the right to compel the customer to complete the purchase; however, the Debtors' only effective remedy may be the retention of the deposit. In some cases, a customer may receive a full or partial return of the deposit. If the current industry downturn continues, economic conditions deteriorate, or if mortgage financing becomes less accessible, more homebuyers may find it advantageous to cancel their contracts with the Debtors or the Reorganized Debtors and risk forfeiting their deposit, either in full or in part, rather than complete the purchase. Significant cancellations have had, and could have in the future, a negative impact on the Debtors' or the Reorganized Debtors' businesses and results of operations. Furthermore, the Debtors or the Reorganized Debtors may experience an increase in cancellation rates as a result of these Cases

       (f)       **Increases in interest rates, tightening of lending standards and decreases, limitations or restrictions in the availability of mortgage financing, and other economic factors outside of the Debtors' or the Reorganized Debtors' control, such as consumer confidence and declines in employment levels, could lead to fewer home sales, which could adversely affect the Debtors' or the Reorganized Debtors' revenues.**

The large majority of the Debtors' customers finance their purchases through mortgage financing obtained from unaffiliated third parties, and the Debtors' businesses and revenues, therefore, depend on the ability of their customers to obtain mortgages for their home purchases. The United States residential mortgage market has been experiencing significant disruption. Mortgage interest rates have recently experienced significant volatility and contributed to the challenging market conditions faced by the Debtors and the overall housing industry. In addition, as a result of increased default rates and other factors, the willingness of many lenders to make home mortgage loans has decreased and lenders have tightened their lending standards. Deterioration in credit quality among subprime and other nonconforming loans has caused many

lenders to stop making such loans. The volatility in interest rates, the decrease in the willingness of lenders to make home mortgage loans, the tightening of lending standards, and the availability of fewer loan products have made it more difficult for some potential buyers to finance the purchase of homes. Potential buyers may not be able to obtain acceptable financing to purchase homes, leading to further declines in the market for the Debtors' or the Reorganized Debtors' homes. In particular, because the availability of mortgage financing is an important factor in marketing many of the Debtors' homes, any limitations or restrictions on the availability of mortgage financing or increases in mortgage interest rates could reduce home sales, the lending volume at the Debtors' or the Reorganized Debtors' mortgage-brokerage subsidiary, the Debtors' or the Reorganized Debtors' total earned revenues, and future backlog. Even if the Debtors' or the Reorganized Debtors' potential customers do not need financing, changes in interest rates and mortgage availability could make it harder for them to sell their existing homes to potential buyers who need financing. Any limitations or restrictions on the availability of mortgage financing, further interest rate increases, or limits on the deductibility of home mortgages could adversely affect the Debtors' or the Reorganized Debtors' sales, which would reduce their revenues.

The Housing and Economic Recovery Act of 2008 includes a provision that eliminates, effective October 1, 2008, seller-financed down payment assistance programs for Federal Housing Administration loans. Although not material to the Debtors on a direct basis, seller-financed down payment assistance programs were important to some of the Debtors' competitors in certain markets. The elimination of such seller financed down payment assistance programs could lead to increased cancellations and lower orders for the Debtors' competitors. Such actions could result in further national discounting by the Debtors' or the Reorganized Debtors' competitors, which could result in lower demand for the Debtors' or the Reorganized Debtors' homes and put competitive pressure on them to further reduce the Debtors' or the Reorganized Debtors' home prices, thereby affecting the Debtors' or the Reorganized Debtors' revenues and margins.

The Debtors also believe that the availability of mortgage financing provided by Fannie Mae, Freddie Mac, the Federal Housing Administration, or the Veteran's Administration is an important factor in marketing many of their or the Reorganized Debtors' homes. Any limitations or restrictions on the availability of those types of financing could reduce the Debtors' or the Reorganized Debtors' sales.

### (g) A majority of the Debtors' outstanding debt is controlled by only a few holders.

A majority of the debt outstanding under the DIP Term Loan and the Revolving Credit Facility is held by the Sponsors. As a result, upon the Effective Date and the conversion of such debt into New OHB Common Stock and the New Notes, as applicable, pursuant to the Plan, the Sponsors will be secured creditors of and the primary equity holders of the Reorganized Debtors. The Sponsors' interests, in their capacity as note and equity holders, may conflict with those of other parties-in-interest.

(h)    **The Debtors and the Reorganized Debtors are subject to substantial risks with respect to the land and home inventories they maintain, and fluctuations in market conditions may affect their ability to sell their land and home inventories at expected prices, if at all, which could reduce their total revenues.**

As homebuilders, the Debtors and the Reorganized Debtors must constantly locate and acquire new tracts of land for development and developed homesites to support their homebuilding operations. There is a lag between the time the Debtors or the Reorganized Debtors acquire land for development or developed homesites and the time that the Debtors or the Reorganized Debtors can bring the communities built on the acquired land to market and deliver homes. This lag has increased as a result of these Cases and a provision of the DIP Facility that initially precluded the Debtors from commencing new construction when the Debtors contemplated engaging in a sale of substantially all their Assets under Bankruptcy Code § 363.[11] As a result, the Debtors and the Reorganized Debtors face the risk that demand for housing may decline during this period (as has occurred in the industry since 2006) and that the Debtors and the Reorganized Debtors will not be able to dispose of developed properties, undeveloped land, or homesites acquired for development at expected prices or within anticipated time frames or at all. The market value of home inventories, undeveloped land, and developed homesites can fluctuate significantly because of changing market conditions. In addition, inventory carrying costs (including interest on funds used to acquire land or build homes) can be significant and can adversely affect the Debtors' or the Reorganized Debtors' performance. Because of these factors, the Debtors or the Reorganized Debtors may be forced to sell homes, land, or lots at a loss or for prices that generate lower profit than the Debtors or the Reorganized Debtors anticipate. The Debtors or the Reorganized Debtors may also be required to make material write downs of the book value of their real estate assets in accordance with GAAP.

(i)    **Deterioration of market conditions in the homebuilding industry and customer demand could adversely affect the Debtors' or the Reorganized Debtors' land inventory and property market values.**

During the year ended June 30, 2010, the Debtors decided not to pursue development of certain parcels of land on which they had option agreements and the acquisition of certain lots on which they had options, resulting in write-offs of land deposits and pre-acquisition costs. In addition, the Debtors recorded significant impairments to residential properties completed or under construction and land held for development or sale and improvements. The impairments were primarily due to a slower than anticipated pace of new orders and increases in sales

---

[11]    The Debtors and the DIP Facility Lenders amended this provision to permit the commencement of new construction, subject to certain limitations, when the Debtors and the Sponsors decided to pursue a stand-alone plan of reorganization rather than a sale of substantially all of the Debtors' Assets.

incentives required to generate new home orders.  These write-offs and impairments adversely affected the Debtors' results of operations during the year ended June 30, 2010.  If market conditions in the homebuilding industry or customer demand continue to deteriorate or do not improve in future periods, the Debtors or the Reorganized Debtors may decide not to pursue development of additional parcels of land or the acquisition of additional lots on which they have option agreements, and the value of existing land holdings and residential properties may continue to decline.  This would lead to further write-offs of deposits and pre-acquisition costs and impairments to residential properties and land held for development or sale and improvements.

In addition, during the prior two years, the Debtors sold many of their land assets, resulting in the exit of the Debtors from Palm Bay and Palm Coast, Florida, and Arizona markets and reduced positions in the Orlando, Florida, and Chicago, Illinois, markets.  If the market conditions in the homebuilding industry continue to deteriorate or do not improve in future periods, the Debtors or the Reorganized Debtors may need to sell additional land assets in these or other markets, depleting the number of home lots available to them, which could adversely affect an ability to build new homes in the future, thus affecting their sales and reducing their future revenues from the sale of homes.

> **(j)**     **The competitive conditions in the homebuilding industry could increase the Debtors' or the Reorganized Debtors' costs, reduce their total revenues, and otherwise adversely affect their results of operations or limit their growth.**

The homebuilding industry is highly competitive and fragmented.  The Debtors compete in each of their markets with a number of national, regional, and local builders for customers, undeveloped land and homesites, raw materials, and labor.  Some of the Debtors' competitors have greater financial resources, more established market positions, and better opportunities for land and homesite acquisitions than the Debtors do and have lower costs of capital, labor, and material than the Debtors do.  The competitive conditions in the homebuilding industry could, among other things: cause the Debtors or the Reorganized Debtors to increase incentives to potential homebuyers, which could reduce their profit margins; make it difficult for the Debtors or the Reorganized Debtors to acquire suitable land or homesites at acceptable prices and terms, which could adversely affect their ability to build homes; require the Debtors or the Reorganized Debtors to increase incentives and selling commissions, which could reduce their profit margins; result in delays in construction if the Debtors or the Reorganized Debtors experience a delay in procuring materials or hiring trades people or laborers; result in lower sales volume and total earned revenues; and increase the Debtors' or the Reorganized Debtors' costs and reduce their earnings.

The Debtors also compete with resales of existing homes (including the growing number of foreclosed homes offered at substantially-reduced prices), available rental housing and, to a lesser extent, condominium resales.  An oversupply of competitively priced resale or rental homes in the markets in which the Debtors or the Reorganized Debtors operate could adversely affect their ability to sell homes profitably.  Furthermore, the filing of these Cases has put the Debtors at a competitive disadvantage with respect to their competitors that are not in bankruptcy.

**(k) The Debtors or the Reorganized Debtors may be unable to obtain suitable surety bonding for the development of their communities.**

The Debtors provide surety bonds to governmental authorities and others to ensure the completion of projects. If the Debtors or the Reorganized Debtors are unable to provide required surety bonds for their projects, their businesses operations and revenues could be adversely affected. As a result of the recent deterioration in market conditions, the availability of surety bonds has significantly decreased. In addition, surety bond providers could refuse to provide surety bonds in the future or they could require credit enhancements in order to maintain existing bonds or to issue new bonds. The filing of these Cases has further materially and adversely impacted the Debtors' ability to obtain and maintain required surety bonds. As a result, the Debtors or the Reorganized Debtors may be unable to maintain existing surety bonds or obtain new surety bonds on acceptable terms or at all. If the Debtors or the Reorganized Debtors are unable to obtain required bonds in the future, or are required to provide credit enhancements with respect to their current or future bonds the Debtors' or the Reorganized Debtors' liquidity could be negatively impacted and their businesses operations adversely impacted.

**(l) The Debtors are subject to construction defect, product liability, and warranty claims arising in the ordinary course of business that could adversely affect the Debtors' or the Reorganized Debtors' results of operations.**

As homebuilders, the Debtors are subject in the ordinary course of their businesses to construction defect, product liability, and home warranty claims. The Debtors generally provide their homebuyers with a one- to two-year limited warranty covering workmanship and materials and a 10-year limited warranty covering major structural defects. Claims arising under these warranties and construction defect and general product-liability claims are common in the homebuilding industry and can be costly. Although the Debtors maintain construction defect and product-liability insurance, the coverage offered by, and availability of, this insurance is currently limited, and where coverage is available, it may be costly. As a result of increasing insurance costs and an analysis of the Debtors' claims history, the Debtors self-insure the first $2 million of each construction defect and product-liability claim. Their product liability insurance and homebuilder protective policies contain limitations with respect to coverage, and these insurance rights may not be adequate to cover all construction defect, product liability, and warranty claims for which the Debtors or the Reorganized Debtors may be liable. In the future, coverage could be further restricted and become more costly. In addition, although the Debtors generally seek to require their subcontractors and design professionals to indemnify the Debtors for liabilities arising from their work, the Debtors or the Reorganized Debtors may be unable to enforce any such contractual indemnities. To the extent they are not General Unsecured Claims subject to the terms of the Plan, uninsured and unindemnified construction defect, product liability, and warranty claims, as well as the cost of product-liability insurance and the Debtors' homebuilder protective policy, could adversely affect the Debtors' or the Reorganized Debtors' results of operations.

**(m)** **The Debtors or the Reorganized Debtors may be subject to mold or Chinese drywall litigation and mold or Chinese drywall claims arising in the ordinary course of business for which they have no insurance that could adversely affect their results of operations.**

Lawsuits have been filed against homebuilders, including the Debtors, and insurers asserting claims of property damage and personal injury caused by the presence of mold or use of Chinese drywall in homes. Some of these lawsuits have resulted in substantial monetary judgments or settlements against homebuilders and their insurers. The Debtors' insurance carriers have excluded coverage for claims arising from the presence of mold and Chinese drywall, and the Debtors have not set aside any funds to pay for potential damages relating to mold and Chinese drywall claims. To the extent they are not General Unsecured Claims subject to the terms of the Plan, uninsured mold and Chinese drywall liability claims against the Debtors or the Reorganized Debtors could adversely affect their results of operations.

**(n)** **The Debtors or the Reorganized Debtors may be subject to environmental liabilities that could adversely affect their results of operations or the value of their properties.**

The Debtors' operations are subject to a variety of environmental laws and regulations including those relating to discharges to air and water, storage and disposal of waste, disturbance of wetlands, and clean up of contaminated soil or groundwater. In addition, the development and sale of real property creates a potential for environmental liability on the Debtors' part as owner and developer for the Debtors' own acts, as well as the acts of prior owners or operators. If the Debtors or the Reorganized Debtors fail to comply with environmental requirements or regulated materials are discovered on, under, or emanating from any of their current or former properties, the Debtors or the Reorganized Debtors may be held liable for costs and liabilities relating to those materials. In addition, environmental hazards on parcels of land adjacent to any of the Debtors' or the Reorganized Debtors' properties could also negatively impact the value of their properties or result in liabilities. Should a substantial environmental hazard be found on any of the Debtors' or the Reorganized Debtors' properties or adjacent properties, their results of operations and the value of the contaminated property could be adversely affected. New requirements or more stringent enforcement of existing laws or regulations could also result in increased costs.

**(o)** **Recent departures of certain of the Debtors' executives could harm the Debtors' or the Reorganized Debtors' businesses.**

The Debtors' ability to operate, including their ability to operate under the supervision of the Bankruptcy Court, depends in large part on their executive officers. In August, 2009, Michael T. Vesey, the Debtors' former President and Chief Operating Officer passed away. Also, on April 19, 2010, Garry P. Herdler, the Debtors' former Executive Vice President and Chief Financial Officer resigned, and his employment with the Debtors terminated on April 23, 2010. As a result of these Cases, other executive officers have resigned and additional executive officers may resign in the future. Although the Short Term Incentive Plan was designed in an effort to reduce such resignations, and the prospect of the Long Term Incentive Plan may be helpful in this regard, no assurance can be given that these departures will not have a material

adverse effect on the Debtors or the Reorganized Debtors. Furthermore, the Debtors' or the Reorganized Debtors' efforts to recruit and maintain executive officers will likely be adversely affected by these Cases, and the Debtors or the Reorganized Debtors may not be able to attract and retain qualified personnel.

> **(p)** **Shortages of materials and increases in the price of materials can harm the Debtors' or the Reorganized Debtors' businesses by delaying construction, increasing costs, or both.**

The Debtors and the overall homebuilding industry from time to time have experienced significant difficulties with respect to: shortages of materials; increases in the cost of certain materials, such as asphalt, siding, roofing, lumber, drywall, and cement, which are significant components of home construction costs; increases in the cost of petroleum, leading to increased cost of certain petroleum-based products, as well as increased delivery charges for other materials; and shortages of qualified trades people and other labor.

These difficulties have in the past and likely will in the future cause unexpected short-term increases in construction costs and cause construction delays for the Debtors or the Reorganized Debtors. The Debtors or the Reorganized Debtors will not be able to recover unexpected increases in construction costs by raising their home prices because, typically, the price of each home is established at the time a customer executes a home-sale contract. Furthermore, sustained increases in construction costs may, over time, erode the Debtors' or the Reorganized Debtors' profit margins. The Debtors have historically been able to offset sustained increases in construction costs with increases in the prices of their homes and through operating efficiencies. However, the current homebuilding industry market conditions require that the Debtors or the Reorganized Debtors reduce the prices of their homes. As a result, the effect of construction cost increases and reductions in home prices have been to significantly reduce the margins on the homes the Debtors sell. This makes it more difficult for the Debtors or the Reorganized Debtors to recover the full cost of previously-purchased land and construction costs, and has contributed to the significant reductions in the value of the Debtors' inventory. Continued increased pricing competition may further restrict the Debtors' or the Reorganized Debtors' ability to pass on any additional potential cost increases, and the Debtors or the Reorganized Debtors may not be able to achieve sufficient operating efficiencies to maintain the Debtors' current profit margins.

> **(q)** **The Debtors depend on the continued availability and satisfactory performance of their subcontractors, which, if unavailable, could have a material adverse effect on the Debtors' or the Reorganized Debtors' businesses by limiting their ability to build and deliver homes.**

The Debtors conduct their construction operations only as a general contractor. Virtually all construction work is performed by unaffiliated third-party subcontractors. As a consequence, the Debtors depend on the continued availability of, and satisfactory performance by, these subcontractors for the construction of their homes. Many of these subcontractors have been adversely impacted by these Cases, and no assurance can be given that they will continue to provide services to the Debtors or the Reorganized Debtors. If these unaffiliated third-party subcontractors do not continue to be available and perform satisfactorily, the Debtors' or the

Reorganized Debtors' ability to build and deliver homes could be limited. This could lead to a reduction in their total revenues and have a material adverse effect on their businesses.

(r)     **The Debtors' businesses are subject to governmental regulations that may delay, increase the cost of, prohibit, or severely restrict the Debtors' or the Reorganized Debtors' development and homebuilding projects and reduce their total earned revenues and growth.**

The Debtors are subject to extensive and complex laws and regulations that affect the land development and homebuilding process, including laws and regulations related to zoning, permitted land uses, levels of density, building design, elevation of properties, water and waste disposal, affordable housing, and use of open spaces. In addition, the Debtors and their subcontractors are subject to laws and regulations relating to worker health and safety. The Debtors also are subject to a variety of local, state, and federal laws and regulations concerning the protection of health and the environment. In some of the markets in which the Debtors operate, they are required to pay environmental impact fees, use energy saving construction materials, and give commitments to provide certain infrastructure, such as roads and sewage systems. The Debtors must also obtain permits and approvals from local authorities to complete residential development or home construction. The laws and regulations under which the Debtors and their subcontractors operate, and the Debtors' and their subcontractors' obligations to comply with them, may result in delays in construction and development, cause the Debtors or the Reorganized Debtors to incur substantial compliance and other increased costs, and prohibit or severely restrict development and homebuilding activity in areas in which the Debtors or the Reorganized Debtors operate. If the Debtors or the Reorganized Debtors are unable to continue to develop communities and build and deliver homes as a result of these restrictions, or if the Debtors' or the Reorganized Debtors' compliance costs increase substantially, their total revenues may be reduced.

(s)     **States, cities, and counties in which the Debtors operate have adopted, or may adopt, slow or no growth initiatives, which would reduce the Debtors' or the Reorganized Debtors' ability to build and sell homes in these areas and could adversely affect their total revenues.**

Several states, cities, and counties in which the Debtors operate have approved, and others in which they operate may approve, various "slow growth" or "no growth" initiatives and other ballot measures that could reduce the amount of land and building opportunities within those localities. This could lead the Debtors or the Reorganized Debtors to sell fewer homes and reduce their earnings. Approval of slow or no growth measures would reduce the Debtors' or the Reorganized Debtors' ability to acquire land and to build and sell homes in the affected markets and create additional costs and administration requirements, which, in turn, could have an adverse effect on their total revenues.

Expansion of regulation in the housing industry has increased the time required to obtain the necessary approvals to begin construction and has prolonged the time between the initial acquisition of land or land options and the commencement and completion of construction. These delays can increase the Debtors' or the Reorganized Debtors' costs, decrease their profitability, and increase the risks associated with the land inventories they maintain.

Municipalities may restrict or place moratoriums on the availability of utilities, such as water and sewer taps. In some areas, municipalities may enact growth initiatives that would restrict the number of building permits available in a given year. If municipalities in which the Debtors or the Reorganized Debtors operate take actions like these, it could have an adverse effect on their businesses by causing delays, increasing their costs, or limiting their ability to build in those municipalities. This, in turn, could reduce the number of homes the Debtors or the Reorganized Debtors sell and decrease their total earned revenues

> **(t)** **Increases in taxes or governmental fees could increase the Debtors' or the Reorganized Debtors' costs and adverse changes in tax laws could reduce customer demand for their homes, either of which could reduce their total earned revenues or profitability.**

Increases in real estate taxes and other local government fees, such as fees imposed on developers to fund schools, open space, road improvements, or low and moderate income housing, could increase the Debtors' or the Reorganized Debtors' costs and have an adverse effect on their operations. In addition, increases in local real estate taxes could adversely affect the Debtors' or the Reorganized Debtors' potential customers who may consider those costs in determining whether to make a new home purchase and decide, as a result, not to purchase one of their homes. In addition, any changes in the income tax laws that would reduce or eliminate tax incentives to homeowners could make housing less affordable or otherwise reduce the demand for housing, which, in turn, could reduce the Debtors' or the Reorganized Debtors' total revenues.

> **(u)** **Jeffrey P. Orleans, Chairman, President, and Chief Executive Officer and OHB's majority stockholder, may be able to cause the Debtors to take certain actions or preclude the Debtors from taking actions and may have interests that could conflict with other creditors and stockholders.**

Jeffrey P. Orleans, OHB's Chairman, President, and Chief Executive Officer, as of June 30, 2009, beneficially owned in excess of 50% of the voting power of the Old OHB Common Stock. As a result, prior to the Effective Date, and otherwise subject to the limitations imposed by these Cases and the Bankruptcy Code, Mr. Orleans may have the ability to control the outcome of significant corporate actions. His interest in exercising control over the Debtors' businesses may conflict with the interests of other creditors and stockholders.

> **(v)** **The Debtors' and the Reorganized Debtors' businesses and revenues may be adversely affected by adverse weather conditions or natural disasters.**

Adverse weather conditions, such as extended periods of rain, snow, or cold temperatures and natural disasters, such as hurricanes, tornadoes, floods, and fires, can delay completion and sale of homes, damage partially-complete or other unsold homes in the Debtors' or the Reorganized Debtors' inventory, and negatively impact the demand for homes or increase the cost of building homes. To the extent that adverse weather conditions occur for extended periods or natural disasters occur, the Debtors' or the Reorganized Debtors' businesses and quarterly

results may be adversely affected.  To the extent the Debtors' or the Reorganized Debtors' insurance is not adequate to cover business interruption losses or repair costs resulting from these events, the Debtors' or the Reorganized Debtors' total revenues may be adversely affected.

**(w)**     **Acts of war or terrorism may seriously harm the Debtors' or the Reorganized Debtors' businesses.**

Acts of war, any outbreak or escalation of hostilities between the United States and any foreign power, including the armed conflicts in Iraq and Afghanistan, or acts of terrorism, may cause disruption to the economy, the Debtors and/or the Reorganized Debtors, their employees, and their customers, which could reduce demand for the Debtors' and/or the Reorganized Debtors' homes and adversely impact the Debtors' total revenues.

**(x)**     **The Debtors or the Reorganized Debtors may not be able to utilize all of their deferred tax assets.**

As of June 30, 2010, the Debtors had net deferred tax assets and a corresponding deferred tax asset valuation allowance of $82,167,607.30 million.  The Debtors' deferred tax assets consist primarily of inventory valuation adjustments, net operating loss carryforwards, goodwill impairments, and reserves and accruals that are not currently deductible for tax purposes offset in part by capitalized interest.  Some or all of these deferred tax assets could expire unused if the Debtors or the Reorganized Debtors are unable to generate taxable income in the future sufficient to utilize them or the Debtors or the Reorganized Debtors enter into transactions that limit their right to use them.  In addition, any reorganization or liquidation in connection with these Cases may adversely impact the Debtors' or the Reorganized Debtors' ability to make use of their deferred tax assets.  If a material portion of their deferred tax assets expire unused or otherwise cannot be used, it could have a material negative impact on the Debtors' or the Reorganized Debtors' financial position or results of operations, which could have a material adverse affect on their financial position, results of operations, and cash flows.

To the extent the Plan results in cancellation of indebtedness income for U.S. federal income tax purposes to the Debtors, such income will not be taxable (although there may be some state income taxes imposed on any cancellation of indebtedness), but the Debtors will be required to reduce their net operating losses ("NOLs"), NOL carryforwards, and certain other tax attributes, such as the tax basis of inventory and other assets by the amount of such excluded income.  The future utilization of any remaining NOLs and NOL carryforwards, as well as certain built-in losses and deductions, will be severely limited because the Debtors will experience an ownership change within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended (the "Tax Code").  While a special bankruptcy exception to Section 382 of the Tax Code may lessen the impact of Section 382, its impact on the Debtors' ability to utilize their tax attributes in the future will nevertheless be substantial.  For more information on these topics, <u>see</u> the discussion below under "<u>Certain U.S. Federal Income Tax Considerations</u>".

# IX. CONFIRMATION OF THE PLAN

As discussed further below, the Bankruptcy Court will determine at the Confirmation Hearing whether the following requirements for confirmation, set forth in Bankruptcy Code § 1129, have been satisfied:

(a)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(c)     The Plan has been proposed in good faith and not by any means forbidden by law.

(d)     Any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, these Cases, or in connection with the Plan and incident to these Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(e)     The Debtors have disclosed (i) the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, manager, officer, or voting trustee (as applicable) of the Reorganized Debtors, any affiliate of the Debtors participating in a joint plan with the Debtors, or any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Creditors and Interest holders and with public policy) and (ii) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(f)     With respect to each Class of Claims or Interests, each Impaired Creditor and Impaired Interest holder either has accepted the Plan, or will receive or retain under the Plan on account of the Claims or Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.   For a more detailed discussion of this confirmation requirement, see the section below entitled "Best Interests Test".

(g)     The Plan provides that Allowed Administrative Claims and Allowed Priority Claims will be paid in full and that Allowed Tax Claims will receive on account of such Claims deferred Cash payments of a value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, over a period not exceeding five years after the Petition Date, and in a manner not less favorable than the treatment of the most favored nonpriority Claim provided for by the Plan, except to the extent that the holder of any such Claim has agreed to less favorable treatment.

(h)     If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders (as defined in Bankruptcy Code § 101(31)) holding Claims in such Class.

(i)  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  For a more detailed discussion of this confirmation requirement, see the section below entitled "Feasibility Test".

(j)  The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Bankruptcy Code § 1114(e)(1)(B) or 1114(g) at any time prior to confirmation of the Plan for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that all of the requirements of Bankruptcy Code § 1129 are met.  Among other things, the Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy, and the Debtors will be in compliance with, all the statutory requirements of Chapter 11.

**A.  Solicitation of Votes.**

Any Creditor in the Voting Classes (2A and 3 (or 3A, 3B, 3C, or 3D, as applicable)) that is the holder of an Allowed Claim therein is entitled to vote on the Plan, unless such Claim has otherwise been objected to or disallowed for voting purposes in accordance with this Disclosure Statement or any orders of the Bankruptcy Court.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that an acceptance or rejection was not solicited, procured, or made in good faith or in accordance with the provisions of the Bankruptcy Code.  For a more complete description of voting procedures and the Voting Record Date, see the section above entitled "Voting Instructions".

**B.  Confirmation Hearing.**

The Bankruptcy Code requires that the Bankruptcy Court hold a hearing on Confirmation of the Plan after all Ballots have been cast.  The Confirmation Hearing has been scheduled for November 16, 2010, at 1:30 P.M. (prevailing Eastern Time).  At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the Plan has been accepted by the requisite majorities of each Voting Class, (ii) hear and decide any objections to the Plan and to confirmation of the Plan, (iii) determine whether the Plan meets the requirements of the Bankruptcy Code, and (iv) confirm or not confirm the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjournment made at the initial Confirmation Hearing or at any subsequently-scheduled Confirmation Hearing.

Any Creditor, Interest holder, or other party-in-interest that wishes to object to Confirmation of the Plan must file, on or before 5:00 P.M (prevailing Eastern Time) on the Confirmation Objection Deadline, November 5, 2010, a written objection or response with the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware  19801, and serve copies on (a) counsel for the Debtors, (i) Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005 (Attn:

Joel H. Levitin, Esq., Stephen J. Gordon, Esq., Richard A. Stieglitz Jr., Esq., and Maya Peleg, Esq.) and (ii) Elliott Greenleaf, 1105 North Market Street, Suite 1700, Wilmington, Delaware 19801 (Attn: Rafael X. Zahralddin-Aravena, Esq., Mark A. Kearney, Esq., Neil R. Lapinski, Esq., and Shelley A. Kinsella, Esq.); (b) Counsel to the Contributing Lender, Schulte Roth & Zabel LLP, 919 3rd Avenue, New York, New York 10022 (Attn.: Adam C. Harris, Esq., and Adam L. Hirsch, Esq.); (c) counsel for the Administrative Agents, Reed Smith, LLP, 2500 One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania 19103 (Attn: Claudia Springer, Esq., and Scott Esterbrook, Esq.); (d) counsel for the Creditors Committee, (i) Duane Morris LLP, 1540 Broadway, New York, New York 10036-4086 (Attn: Gerard S. Catalanello, Esq.), (ii) Duane Morris LLP, 30 South 17th Street, Philadelphia, Pennsylvania 19103 (Attn: Lawrence J. Kotler, Esq.), and (iii) Duane Morris LLP, 1100 North Market Street, Suite 1200, Wilmington, Delaware 19801 (Attn.: Richard W. Riley, Esq., and Sommer L. Ross, Esq.); and (e) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware, 19801 (Attn: David Buchbinder, Esq.).

Any objection or response must be timely filed and served in order to enable the Creditor, Interest holder, or other party-in-interest to be heard at the Confirmation Hearing. All objections must state with particularity the grounds therefor and comply with the Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable orders of the Bankruptcy Court.

### C. Classification.

The Debtors are required under Bankruptcy Code § 1123 to classify the Claims and Interests of their Creditors and Interest holders, respectively, into Classes that contain Claims and Interests that are substantially similar to the other Claims or Interests in such Class. While the Debtors believe that the proposed classification and treatment of Claims and Interests set forth in the Plan is in compliance with the provisions of Bankruptcy Code § 1123 and is supported by prevailing case law, the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.

ANY RECLASSIFICATION OF CLAIMS OR INTERESTS REQUIRED BY THE BANKRUPTCY COURT COULD ADVERSELY AFFECT THE CLASS IN WHICH SUCH CLAIM OR INTEREST WAS INITIALLY CLASSIFIED OR ANY OTHER CLASSES UNDER THE PLAN BY CHANGING THE COMPOSITION OF SUCH CLASSES AND THE REQUIRED VOTE THEREFOR FOR APPROVAL OF THE PLAN. FURTHERMORE, A RECLASSIFICATION OF CLAIMS OR INTERESTS AFTER CONFIRMATION OF THE PLAN COULD NECESSITATE THE RESOLICITATION OF A COMPLETELY NEW OR MODIFIED PLAN OF REORGANIZATION.

### D. Impairment.

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan and is receiving a distribution under the plan votes to accept the plan (with the exception described below). A class that is not impaired under the plan in accordance with Bankruptcy Code § 1126(f) is deemed to have accepted the plan, and therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless the plan leaves unaltered the legal, equitable, and contractual rights to which each holder of claims or interests in such class are entitled or cures any default that occurred before or after the commencement of a bankruptcy case (other than defaults of a kind specified in Bankruptcy Code § 365(b)(2)), reinstates the original maturity of the claim or interest, compensates the holder for any damages incurred as a result of any reasonable reliance by such holder on any contract provision that entitled the holder to demand or receive accelerated payment of the claim, and does not otherwise alter the legal, equitable, or contractual rights to which the Claim or Interest entitles each holder thereof.

**E.  Acceptance of the Plan.**

Classes 1, 2B, 2C, and 6 are unimpaired and, therefore, the Holders of Allowed Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f).  Classes 2A and 3 (or 3A, 3B, 3C, and 3D, as applicable) are impaired and, therefore, the Holders of Allowed Claims in such Classes are entitled to vote to accept or to reject the Plan (solely on account of their Claims in such Classes).  Classes 4 and 5 (subject to the provisions of Plan Section 5.7) are impaired, but are deemed to have rejected the Plan pursuant to Bankruptcy Code § 1126(g), because the Holders of Claims and/or Interests in such Classes (as applicable) do not receive or retain any property under the Plan in respect of their Claims or Interests.

Chapter 11 does not require that each holder of a claim against, or an interest in, a debtor vote in favor of a plan of reorganization for the Bankruptcy Court to confirm such a plan.  The Bankruptcy Code defines acceptance of a plan of reorganization by a class of claims as acceptance by the creditors holding a majority in number and at least two-thirds in amount of the allowed claims of that class that have actually been voted on the plan.  Claims that are not voted will not be counted to determine whether the requisite acceptances have been obtained with respect to the Plan.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, EACH HOLDER OF A CLAIM OR INTEREST IN A CLASS WILL RECEIVE, ON ACCOUNT OF SUCH CLAIM OR INTEREST, THE SAME TREATMENT AS THE OTHER MEMBERS OF SUCH CLASS (SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN), WHETHER OR NOT SUCH HOLDER VOTED TO ACCEPT THE PLAN.  MOREOVER, UPON CONFIRMATION, THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS, REGARDLESS OF WHETHER SUCH CREDITORS OR INTEREST HOLDERS VOTED TO ACCEPT THE PLAN.

A vote to reject the Plan can only occur by proper submission of a duly-executed Ballot. A vote to accept the Plan can only occur by proper submission of a duly-executed Ballot or by submission of a Ballot either indicating a vote both to accept or to reject the Plan or indicating no choice.  Failure of a holder to return the Ballot does not constitute a vote to accept or to reject the Plan by that holder.

**F.  Confirmation Without Acceptance By All Impaired Classes.**

In the event that any impaired class or classes reject a plan of reorganization,  Bankruptcy Code § 1129(b) provides that, as long as at least one impaired class of claims has accepted the