# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ORLEANS HOMEBUILDERS, INC., et al.,[1] | Case No. 10-10684 (PJW) |
| Debtors. | Jointly Administered |

## DEBTORS' MOTION FOR ORDER AUTHORIZING THEM TO (I) ENTER INTO LETTER AGREEMENTS IN CONNECTION WITH ANTICIPATED EXIT FINANCING AND (II) INCUR AND PAY RELATED FEES AND EXPENSES AS ADMINISTRATIVE EXPENSES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion") for entry of an order, pursuant to Bankruptcy Code §§ 105(a), 363(b)(1), and 503(b)(1) and Bankruptcy Rules 2002(a)(2) and (c) and 6004(h), for entry of an order authorizing them to (i) enter into certain

---

[1] The Debtors in these cases, and the last four digits of each of their tax identification numbers, are: Orleans Homebuilders, Inc. (4323) ("OHB"), Brookshire Estates, L.P. (8725), Community Management Services Group, Inc. (6620), Greenwood Financial Inc. (7510), Masterpiece Homes, LLC (1971), OHB Homes, Inc. (0973), OHI Financing, Inc. (6591), OHI PA GP, LLC (2675), OPCNC, LLC (8853), Orleans Arizona Realty, LLC (9174), Orleans Arizona, Inc. (2640), Orleans at Bordentown, LLC (4968), Orleans at Cooks Bridge, LLC (4185), Orleans at Covington Manor, LLC (9891), Orleans at Crofton Chase, LLC (8809), Orleans at East Greenwich, LLC (9814), Orleans at Elk Township, LLC (6891), Orleans at Evesham, LLC (7244), Orleans at Falls, LP (2735), Orleans at Hamilton, LLC (9679), Orleans at Harrison, LLC (4155), Orleans at Hidden Creek, LLC (3301), Orleans at Jennings Mill, LLC (4693), Orleans at Lambertville, LLC (0615), Orleans at Limerick, LP (7791), Orleans at Lower Salford, LP (9523), Orleans at Lyons Gate, LLC (2857), Orleans at Mansfield LLC (1498), Orleans at Maple Glen LLC (7797), Orleans at Meadow Glen, LLC (4966), Orleans at Millstone River Preserve, LLC (8810), Orleans at Millstone, LLC (8063), Orleans at Moorestown, LLC (9250), Orleans at Tabernacle, LLC (9927), Orleans at Thornbury, L.P. (4291), Orleans at Upper Freehold, LLC (3225), Orleans at Upper Saucon, L.P. (3715), Orleans at Upper Uwchlan, LP (8394), Orleans at Wallkill, LLC (2875), Orleans at West Bradford, LP (4161), Orleans at West Vincent, LP (9557), Orleans at Westampton Woods, LLC (8095), Orleans at Windsor Square, LP (9481), Orleans at Woolwich, LLC (9215), Orleans at Wrightstown, LP (9701), Orleans Construction Corp. (0893), Orleans Corporation (8770), Orleans Corporation Of New Jersey (5325), Orleans DK, LLC (5308), Orleans RHIL, LP (1938), Parker & Lancaster Corporation (1707), Parker & Orleans Homebuilders, Inc. (5269), Parker Lancaster, Tidewater, L.L.C. (7432), Realen Homes, L.P. (8293), RHGP LLC (8197), Sharp Road Farms Inc. (1871), Stock Grange, LP (4027), and Wheatley Meadows Associates (5459).

letter agreements in connection with anticipated exit financing and (ii) incur and pay related fees and expenses (including any indemnification obligations) as administrative expenses. In support of the relief requested in the Motion, the Debtors represent as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a), 363(b)(1), and 503(b)(1) and Bankruptcy Rules 2002(a)(2) and (c) and 6004(h).

## INTRODUCTION

2. On March 1, 2010 (the "Petition Date"), each of the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3. On March 3, 2010, this Court entered an order approving the joint administration of these cases. The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these cases.

4. On March 11, 2010, the Office of the United States Trustee appointed the members of the Official Committee of Unsecured Creditors in these cases (the "Committee").

5. The Debtors[2] build, develop, market, and sell single-family homes, townhouses, and condominiums to various segments of the homebuyer market. The Debtors also

---

[2] For more information on the Debtors, please review the Debtors' public filings with the Securities and Exchange Commission and the Bankruptcy Court, accessible at http://www.sec.gov, http://www.orleanshomes.com, and http://www.orleanshomesreorg.com.

regularly purchase land and finished lots for development, improve land to be ready for home construction, obtain land entitlements, and invest in joint venture projects with other homebuilders.

6. The Debtors have developments or projects in the following regions: (a) the Northern Region (including southeastern Pennsylvania, central and southern New Jersey, and Orange County, New York); (b) the Southern Region (including Charlotte, Raleigh, and Greensboro, North Carolina, including adjacent counties in South Carolina, and Richmond and Tidewater, Virginia); (c) the Midwestern Region (including Chicago, Illinois); and (d) the Florida Region (including Orlando, Florida).

7. Most of the Debtors' projects are "master-planned" residential communities where the Debtors purchase plots of land, obtain the necessary approvals, build several model and "spec" (constructed but unsold) homes, and then build additional "backlog" homes upon entering into sales contracts with homebuyers. The Debtors typically act as a general contractor and employ subcontractors to construct homes and install site improvements.

8. The Debtors have negotiated a proposed plan of reorganization (as amended, modified, and supplemented, the "Plan")[3] (Docket Nos. 1821, 2153, 2217) and accompanying disclosure statement (as amended and modified, the "Disclosure Statement") (Docket Nos. 1822, 2152, 2216), which were originally filed on August 12, 2010, with amended and modified versions thereof filed on September 27, and October 1, 2010, respectively. This Court approved the Disclosure Statement by Order dated October 4, 2010 (Docket No. 2220). On October 29, 2010, the Debtors filed the supplement to the Plan and have completed the

---

[3] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or the respective Exit Facility Letters (as defined below), as applicable.

process of soliciting votes to accept or to reject the Plan. The Confirmation Hearing is currently scheduled for November 24, 2010.

## FACTUAL BACKGROUND

The Plan

9. Under the Plan, if confirmed, the Debtors will pay Allowed Administrative Claims, Priority Claims, Tax Claims, and DIP Revolving Facility Claims in full, in cash, either on the Effective Date or the later of the Initial Distribution Date[4] and the date that is 60 days after the Allowance Date of such Claim.

10. The Debtors will pay DIP Term Loan Claims either in cash, to the extent sufficient cash proceeds are available from the Exit Credit Facility (as defined below), or in New Notes in an aggregate principal amount equal to any portion of such Allowed DIP Term Loan Claim that is not satisfied with cash proceeds from the Exit Credit Facility.

11. The Plan also provides that, because Class 3 voted to accept the Plan, the Holders of the Debtors' pre-petition secured debt under the Revolving Credit Facility will receive on the Effective Date the stock of Reorganized OHB, New Notes.

12. Allowed Claims in Class 2B (Other Secured Claims Against Any of the Debtors) and Class 2C (Secured Operational Lien Claims Against Any of the Debtors) will be Reinstated.

13. In addition, because Class 3, which consists of the Aggregate Unsecured Claims (i.e., the General Unsecured Claims, the Junior Subordinated Notes Claims, the Trust

---

[4] The Plan defines the "Initial Distribution Date" as "[t]he date to be established by the Reorganized Debtors, which shall be no later than 60 days after the Effective Date or as soon as practicable thereafter, or such other date as the Bankruptcy Court may order."

Preferred Securities Claims, and the Convenience Class Claims) voted as a class to accept the Plan, the Debtors will establish a $6 million Unsecured Creditor Cash Pool to be administered by the Unsecured Creditor Agent and distributed (along with the net proceeds from Avoidance Claims) pro rata to all Holders of Allowed Class 3 Claims.

14. All funds necessary to make the cash distributions required under the Plan will be made either from cash then on hand or from the proceeds of the Exit Credit Facility.

The Exit Credit Facility

15. The Plan provides that the Reorganized Debtors will obtain exit financing pursuant to the Exit Credit Facility. The expected use of the proceeds from the Exit Credit Facility will be to: (a) satisfy the DIP Revolving Facility and certain other Allowed Claims (such as Administrative, Priority, Tax, and/or DIP Term Loan Claims); (b) fund various emergence-related disbursements (such as the $6 million Unsecured Creditor Cash Pool) to the extent required; and (c) provide for the working capital needs of the Reorganized Debtors (including with respect to procuring future surety bonds or related agreements). Thus, consummation of the Exit Credit Facility is critical to the Debtors' reorganization because the proceeds thereof are necessary to provide cash for funding their Plan and to fund the Reorganized Debtors' working capital needs.

16. It is a condition precedent to the effectiveness of the Plan that all conditions precedent to the consummation of, and the funding obligation under, the Exit Credit Facility shall have been satisfied or waived in accordance with the terms thereof. See Plan Section 8.2(c).

**The Debtors' Negotiations with Potential Lenders and their
Entry into the Exit Facility Letter Agreements**

17. The Debtors and their advisors (and the Plan Sponsors) solicited interest from numerous potential exit credit facility lenders and arrangers. Following discussions and negotiations with certain of those institutions regarding the terms of a potential exit credit facility, the Debtors (with the consent of the Plan Sponsors)[5] have elected to enter into a facility with JPMorgan Securities LLC, as sole lead arranger and sole bookrunner, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (together, the "Commitment Parties").

18. To facilitate their negotiating and ultimately entering into an exit credit facility in a timely manner, subject to approval by this Court, the Debtors and the Commitment Parties have entered into (a) a commitment letter agreement, dated November 9, 2010 (the "Commitment Letter" a copy of which is attached hereto as Exhibit A), and (b) a fee letter agreement, dated November 9, 2010 (the "Fee Letter"[6] and together with the Commitment Letter, the "Exit Facility Letters"). Under the Exit Facility Letters, the Commitment Parties have agreed to structure, arrange, and syndicate a revolving credit facility of not less than $30,000,000 and a term loan facility of $125,000,000, subject to the terms and conditions set forth in the Exit Facility Letters.

19. Under the Exit Facility Letters, subject to approval by this Court, the Debtors have agreed to the following expense reimbursement and indemnification provisions:[7]

---

[5] The Plan Sponsors are the current majority holders of the Debtors' pre-petition and post-petition secured debt and under the Plan will receive (among other things) the majority of the stock of Reorganized OHB on the Effective Date.

[6] The Fee Letter, which is confidential in nature, is not attached hereto but is being provided under separate cover to the Bankruptcy Court, the Plan Sponsors, the professionals to the Committee, and the United States Trustee.

[7] This description of the terms of the Exit Letter Agreements is a summary and provided

*Footnote continued on next page.*

- Expenses: The Debtors have agreed to reimburse each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to the Closing Date or following termination or expiration of the commitments under the Commitment Letter (including JPMorgan's reasonable and documented due diligence expenses, syndication expenses, travel expenses, reasonable and documented fees and expenses of third-party consultants, and the reasonable and documented fees, charges and disbursements of counsel (to be limited to one primary outside counsel and any reasonably necessary special and local counsel) incurred in connection with each of the Credit Facilities and any related documentation (including the Commitment Letter, the Fee Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof.

- Indemnification: The Debtors have agreed to indemnify and hold harmless the Commitment Parties, their affiliates, and their respective directors, officers, employees, advisors, agents, and other representatives (each, an "Indemnified Person") from and against any and all losses, claims, damages, and liabilities to which any such indemnified person may become subject arising out of or in connection with the Commitment Letter, the Fee Letter, the Credit Facilities, the use of the proceeds thereof, and the transactions contemplated thereby, or any claim, litigation, investigation, or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought against the Debtors, their equity holders, affiliates, creditors, or any other person, and to reimburse each indemnified person upon demand for any reasonable and documented legal (to be limited (absent an actual or potential conflict of interest) to one outside counsel for each group of indemnified persons with the same claims (and any reasonably necessary special and local counsel)) or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities, or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such indemnified person or its affiliates, directors, officers, employees, advisors, agents, or other representatives (collectively, the "Related Parties") or from such indemnified person's or Related Parties' material breach of the Commitment Letter. The Debtors have also agreed that each Commitment

---

*Footnote continued from previous page.*

for convenience. To the extent of any discrepancy between this description and the terms of the Exit Letter Agreements, the latter shall govern.

Party will only have liability to the Debtors (as opposed to any other entity or person) and that each Commitment Party will be liable solely in respect of its own commitment to the Credit Facilities on a several, and not joint, basis with any other Commitment Party. No indemnified person will be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications, or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence or willful misconduct of such indemnified person (or any of its Related Parties) or from such Indemnified Person's or Related Parties' material breach of the Commitment Letter. None of the indemnified persons or the Debtors or any of their affiliates, or the respective directors, officers, employees, advisors, and agents of the foregoing will be liable for any indirect, special, punitive, or consequential damages in connection with the Commitment Letter, the Fee Letter, the Credit Facilities, or the transactions contemplated thereby, provided that nothing contained in the last sentence of Section 7 of the Commitment Letter will limit the Debtors' indemnity obligations to the extent set forth in Section 7 of the Commitment Letter.

20. In addition, the Exit Facility Letters provide that the Debtors will pay an arrangement fee, upfront fees and/or original issue discount, and an annual administration fee to the Commitment Parties in connection with the Exit Credit Facility.[8] All such fees, expenses, and other obligations (including any indemnification obligations) of the Debtors under the Exit Facility Letters are hereinafter referred to as the "Exit Facility Letters Obligations".

## RELIEF REQUESTED

21. By this Motion, the Debtors respectfully request the entry of an order, pursuant to Bankruptcy Code §§ 105(a), 363(b)(1), and 503(b)(1) and Bankruptcy Rules 2002(a)(2) and (c), and 6004(h), for entry of an order authorizing the Debtors to (a) enter into the

---

[8] The Debtors note that, as is customary in transactions of this type, the various fees payable by the Reorganized Debtors under the Fee Letter are, among other things, subject to the occurrence of the Closing Date and the Effective Date. Accordingly, in the event the Reorganized Debtors ultimately do not enter into the Exit Credit Facility with the Potential Exit Lender, their and the Debtors' obligations would be limited to the reimbursement of expenses and the indemnification provisions described above.

Exit Facility Letters in connection with the anticipated Exit Credit Facility and (b) incur and pay the Exit Facility Letters Obligations as administrative expenses (subject to the terms and conditions of the Exit Facility Letters).

**BASIS FOR RELIEF REQUESTED**

The Applicable Standard

22. Bankruptcy Code § 363(b)(1) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Although Bankruptcy Code § 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor. See e.g., In re Martin, 91 F.3d 389, 394-395 (3d Cir. 1996) (providing that court may defer to debtor so long as there is "legitimate business justification" to approve the use, sale, or lease of property outside the ordinary course of business) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (adopting good faith test and implicitly adopting the "articulated business justification" test set forth in In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983)); In re Fed. Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003); In re Del. & Hudson Ry. Co., 124 B.R. 169, 178 (D. Del. 1991); In re Allegheny Int'l, Inc., 117 B.R. 171, 176 (W.D. Pa. 1990); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted a "sound business purpose" test in Abbotts Dairies).

23. To determine whether the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006).

24. Once a debtor articulates a valid business justification, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule shields a debtor's management from judicial second-guessing, and mandates that a court approve a debtor's business decision unless that decision is a product of bad faith or gross abuse of discretion. See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986); see also In re Bridgeport Holdings, Inc., 388 B.R. 548, 567 (Bankr. D. Del. 2008). Accordingly, upon finding that a debtor's action satisfies the business judgment rule, such action should be approved under Bankruptcy Code § 363(b)(1).

25. In addition, Bankruptcy Code § 105(a) empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." The purpose of Bankruptcy Code § 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy ¶ 105.01, at 105-5 (15th rev. ed. 1997) (footnote omitted), see also In re DeLorean Motor Co., 991 F.2d 1236, 1242 (6th Cir. 1993) ("The basic purpose of [Bankruptcy Code § 105(a)] is to enable the court to do whatever is necessary to aid its jurisdiction, i.e., anything arising in or relating to a bankruptcy case.") (citation omitted); In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 843 (E.D.N.Y. & S.D.N.Y. 1991) ("[Section

105] has been construed to afford bankruptcy courts necessary flexibility to facilitate reorganizations."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986); Mgmt. Tech. Corp. v. Pardo, 56 B.R. 337, 339 (Bankr. D.N.J. 1985).

The Debtors Have Made a Sound Business Judgment in Seeking to
<u>Execute the Exit Facility Letters and to Pay the Exit Facility Letters Obligations</u>

26. At this time, the Debtors have made significant progress toward confirmation of the Plan. As part of their exit from Chapter 11, the Debtors have received this Court's approval of the Disclosure Statement, and have completed the process of soliciting votes to accept or to reject the Plan. The Debtors believe they are now on a path to emerge from Chapter 11 as soon as the end of November 2010.

27. The Debtors will require the Exit Credit Facility, entry into which is a condition to effectiveness of the Plan, to ensure that they have sufficient available liquidity to fund their obligations under the Plan and to operate their business in the ordinary course upon their emergence from Chapter 11. See Plan Section 8.2(c). Accordingly, over the past several months, the Debtors and their advisors have spent a significant amount of time negotiating with potential lenders and arrangers to obtain the best possible terms for their exit financing to fund the Plan. Based on the Debtors' discussions with numerous financial institutions, the Debtors believe that the Exit Credit Facility will provide the Reorganized Debtors with the best financing terms and greatest operational flexibility upon their emergence from Chapter 11.

28. The Commitment Letter provides that the Commitment Parties' obligations thereunder will expire unless the Debtors have obtained this Court's approval thereof prior to November 19, 2010. Thus, the Debtors believe that a timely approval of their entry into the Exit Facility Letters, and their agreement to satisfy the Exit Facility Letters Obligations in

accordance therewith, is necessary for the Debtors to confirm the Plan and to emerge from Chapter 11 in the near-term.[9]

29. The Debtors further believe that the terms of the Exit Facility Letters and the Exit Facility Letters Obligations are customary in connection with obtaining exit financing and that incurring such obligations and entering into such agreements are warranted and appropriate in light of the value anticipated to be received by the Debtors in obtaining exit financing. The payment of certain fees and expenses at this time, and the agreement to provide indemnities, are integral terms of the Exit Credit Facility and are necessary for the Debtors and their counterparties to move forward with the financing process. Moreover, the terms of the Exit Facility Letters are the product of extended, good-faith, and arm's-length negotiations between the Debtors, the Plan Sponsors, and the Commitment Parties, and they are reasonable given the type of transactions contemplated by the Exit Facility Letters, the size of the proposed financing, and the magnitude of these cases.

30. In addition, the Debtors are concerned that if they were to delay the process of entering into the Exit Credit Facility, such delay could cause the Debtors, and potentially ultimately the Reorganized Debtors, to incur additional costs or lead to a prolonged, indefinite stay in Chapter 11. Without this financing, the Debtors may remain in Chapter 11 with no clear path toward emergence, which could damage the Debtors' relationships with their customers, suppliers, and vendors and otherwise harm their business operations, and it would also result in undue costs and delays in connection with the continuing administration of the cases, as the Plan would likely have to be withdrawn.

---

[9] To that end, concurrently herewith, filed a motion seeking to expedite the Court's consideration of this Motion.

The Obligations under the Exit Facility Letters are Administrative Expenses

31. Bankruptcy Code § 503(b)(1)(A) provides that upon notice and a hearing, the actual necessary costs and expenses of preserving the estate constitute administrative expenses. Specifically, Bankruptcy Code § 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including [ ] the actual necessary costs and expenses of preserving the estate . . . ." Id. The Exit Facility Letters Obligations constitute "necessary costs and expenses of preserving the estate" under Bankruptcy Code § 503(b)(1)(A). Without the payment of the relevant fees and expenses or the agreement to provide the indemnification obligations upon the terms and conditions provided for in the Exit Facility Letters, the Debtors would be unable to secure exit financing. As noted above, obtaining exit financing is a condition precedent to the Debtors' consummating their Plan, and thus the efforts of the Potential Exit Lender in connection therewith serves to preserve the value of the Debtors' businesses for the benefit of their estates and creditors. The Exit Facility Letters Obligations, therefore, should be awarded administrative expense status under Bankruptcy Code § 503(b)(1)(A).

32. Accordingly, the Debtors submit that entering into the Exit Facility Letters, agreeing to pay the obligations thereunder, and taking other related actions are necessary for the Debtors to both confirm and fund the Plan and emerge from Chapter 11 with sufficient liquidity to continue their business operations are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and creditors.

33. Courts routinely authorize debtors to enter into commitment letters and arrangement agreements and to pay fees and expenses and grant indemnities thereunder in connection with their efforts to locate and secure exit financing. See, e.g., In re Cooper-

Standard, No. 09-12743 (Bankr. D. Del. Apr. 19, 2010) (PJW) (Docket No. 1243) (authorizing entry into fee letter and reimbursement of expenses for proposed exit financings); In re Spansion Inc., No. 09-10690 (Bankr. D. Del. Jan. 6, 2010) (Docket No. 2254) (authorizing entry into proposal letter for exit financing and mandate letter); In re Buffets Holdings, Inc., No. 08-10141 (Bankr. D. Del. Mar. 4, 2009) (Docket No. 2181) (approving entry into exit facility engagement letter and authorizing payment of certain fees and expenses); In re Abitibibowater Inc., et al., Case No. 09-11296 (KJC) (Bankr. D. Del. Aug. 24, 2010) (Docket No. 3015); In re Smurfit-Stone Container Corp. et al., No. 09-10235 (Bankr. D. Del. Jan. 14, 2010) (Docket No. 5055) (approving entry into arrangement fee letter to pay arrangement fee based and certain nonrefundable fees and to reimburse actual, reasonable out-of-pocket expenses); In re Mirant Corp, et al., Case No. 03-46590 (DML) (Bankr. N.D. Tex. May 13, 2005) (Docket No. 9764) (permitting debtor to pay underwriting fee related to revolving credit facility); In re NRG Energy, Inc., Case No. 03-13024 (PCB) (Docket No. 676) (Bankr. S.D.N.Y. September 11, 2003); In re Integrated Health Services, Inc., Case No. 00-00389 (Bankr. D. Del. Feb. 14, 2002) (Docket No. 6662) (authorizing debtors to execute senior secured credit facilities commitment letter, pay fees in connection therewith, and pay initial purchasers).

## WAIVER OF BANKRUPTCY RULE 6004(h)

34. The Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." As set forth in the Motion, the relief proposed herein is essential and necessary for the Debtors to fund the Plan and emerge

from Chapter 11 successfully. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

35. Notice of this Motion has been served upon the United States Trustee, counsel to the agent for the Debtors' pre- and post-petition lenders, the transfer agent for the stock of Orleans Homebuilders, Inc., counsel to the Committee, counsel to the Plan Sponsors, counsel to the Commitment Parties, and all other parties that have filed notices of appearance and requested service of papers in these cases or are otherwise entitled to receive notice of this Motion pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be given in light of the circumstances of these cases.

## NO PREVIOUS REQUEST

36. No previous request for the relief sought in this Motion has been made to this or to any other court.

*(Remainder of page intentionally left blank.)*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief requested herein and such other and further relief as is just and proper under the circumstances.

Dated: November 9, 2010
Wilmington, Delaware

**ELLIOTT GREENLEAF**

_____
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com

- and -

CAHILL GORDON & REINDEL LLP

Joel H. Levitin
Stephen J. Gordon
Richard A. Stieglitz Jr.
Maya Peleg
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
Email: jlevitin@cahill.com
Email: sgordon@cahill.com
Email: rstieglitz@cahill.com
Email: mpeleg@cahill.com

*Attorneys for the Debtors and Debtors-in-Possession*