# EXHIBIT A

## The Commitment Letter

J.P. MORGAN SECURITIES LLC
383 Madison Avenue
New York, New York 10179

JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, New York 10017

November 9, 2010

Orleans Homebuilders, Inc.
3333 Street Road
Bensalem, Pennsylvania 19020

<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>") and J.P. Morgan Securities LLC ("<u>JPMorgan</u>", and together with JPMorgan Chase Bank, the "<u>Commitment Parties</u>", "<u>us</u>" or "<u>we</u>") that Orleans Homebuilders, Inc., a Delaware company ("<u>you</u>" or the "<u>Borrower</u>") and certain of your subsidiaries are operating as debtors-in-possession ("<u>Debtors</u>") pursuant to voluntary cases, jointly administered under Case No. 10-10684 (the "<u>Case</u>"), commenced under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>. (as amended, the "<u>Bankruptcy Code</u>"). You have further advised the Commitment Parties that you expect that the Debtors will be reorganized pursuant to an amended plan of reorganization proposed by the Debtors substantially similar to the Modified First Amended Joint Plan of Reorganization filed in the Case on October 1, 2010 (the "<u>Plan of Reorganization</u>"), which Plan of Reorganization, unless approved by the Commitment Parties, shall not include any modifications to the plan of reorganization filed on October 1, 2010 which are materially adverse to the Commitment Parties (and shall not include any material changes to the capital structure or cash position of the Debtors, as detailed in the sources and uses and capitalization table set forth on <u>Schedule I</u> attached hereto, that are not approved by the Commitment Parties; it being acknowledged and agreed by the Commitment Parties that the proposed plan of reorganization filed on October 1, 2010 is satisfactory). The Plan of Reorganization identifies Strategic Value Special Situations Master Fund, LP, Strategic Value Master Fund, Ltd., Anchorage Illiquid Opportunities Offshore Master Fund, L.P. and Bank of America, N.A. as the sponsors (collectively, with their affiliates, the "<u>Sponsor</u>").

In connection with the transactions contemplated hereby (the "<u>Transactions</u>"), you have requested that we agree to structure, arrange and syndicate a Revolving Credit Facility of not less than $30,000,000 and either a Term Loan Facility of $125,000,000 (collectively, the "<u>Credit Facilities</u>") or, at the option of the Borrower, a term loan of the same amount  (such term loan, a "<u>Take-Back Term Loan</u>") provided by holders of New Notes (as defined in the Plan of Reorganization), subject to the Plan of Reorganization (the "<u>Take-Back Lenders</u>").  Additionally, in the event the Borrower chooses a Take-Back Term Loan, you have requested that we agree to act as arranger on any refinancing of the Take-Back Term Loan in the debt capital markets that the Borrower in its discretion elects to commence within

12 months of the date hereof (any such debt, the "Take-Back Refinancing Facility"). Capitalized terms used but not defined herein are used with the meanings assigned to them on the Exhibits attached hereto (such Exhibits, together with this letter, collectively, the "Commitment Letter").

1. Commitments

JPMorgan Chase Bank is pleased to advise you of its commitment to provide $30,000,000 of the Revolving Credit Facility upon either (a) the terms and conditions set forth in this letter and the Summary of Terms and Conditions appearing as Exhibit A (the "Term Sheet 1"), (b) if, in consultation with us, you so designate in writing not less than 30 days prior to the proposed Closing Date, on the terms and conditions set forth in this letter and the Summary of Terms and Conditions appearing as Exhibit B (the "Term Sheet 2" and, collectively with Term Sheet 1, the "Term Sheets"), or (c) if, in consultation with us, you so designate in writing not less than 15 days prior to the proposed Closing Date, on the terms and conditions for the Revolving Credit Facility set forth in this letter and Term Sheet 2 and on terms and conditions for the Take-Back Term Loan that are substantially similar to, and not materially less favorable to the Borrower and the Lenders, taken as a whole, than, the terms and conditions for the Term Loan Facility set forth in Term Sheet 2 (or such other terms to which JPMorgan shall agree). JPMorgan is pleased to advise you that it is willing to act as Sole Lead Arranger for the Credit Facilities as indicated below, and, to the extent provided below, will use commercially reasonable efforts to assemble a syndicate of financial institutions identified by us in consultation with you to provide the balance of the necessary commitments for the Credit Facilities. It is a condition to JPMorgan Chase Bank's commitment hereunder that either the Credit Facilities not being provided by JPMorgan Chase Bank shall be provided by other Lenders or that the Take-Back Term Loan be provided by the Take-Back Lenders. JPMorgan is also pleased to act as sole book runner and sole lead arranger on any Take-Back Refinancing Facility. Any Take-Back Refinancing Facility will be on terms and conditions to be determined.

2. Titles and Roles

It is agreed that (a) JPMorgan will act as sole lead arranger and sole bookrunner for the Credit Facilities and any Take-Back Refinancing Facility (acting in such capacities, the "Sole Lead Arranger") and (b) except as may otherwise be indicated in the Term Sheets, JPMorgan Chase Bank will act as sole administrative agent for the Credit Facilities.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheets and Fee Letter referred to below) will be paid in connection with the Credit Facilities unless you and we shall so reasonably agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of the Credit Facilities than the Commitment Parties).

3. Syndication

We intend to syndicate the Credit Facilities to a group of lenders identified by us in consultation with you (together with JPMorgan Chase Bank, the "Lenders"), provided that such syndication with be subject to limitations contained in the Term Sheets. The Commitment Parties intend to commence syndication efforts promptly. You agree to actively assist the Commitment Parties in completing a syndication satisfactory to the Commitment Parties from the date of this letter until the date on which you elect to use the Take-Back Loan or JPMorgan has otherwise syndicated the Term Loan Facility in its

entirety, including all post-closing assignments and participations associated with the initial syndication (a "Successful Syndication") and during any period (the "Follow-On Syndication Period") from the date on which, at your request, JPMorgan commences arrangement of the Take-Back Refinancing Facility until the date on which JPMorgan has otherwise successfully syndicates the Take-Back Refinancing Facility. Such assistance shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your affiliates' existing banking relationships, including the existing banking relationship of the Sponsor, (B) direct contact between your senior management and advisors and the proposed Lenders, (C) your preparing and providing to the Commitment Parties all information with respect to you and your subsidiaries, including all financial information and Projections (as defined below), as the Commitment Parties may reasonably request in connection with the arrangement and syndication of the Credit Facilities and your assistance in the preparation of one or more confidential information memoranda (each, a "Confidential Information Memorandum") and other marketing materials to be used in connection with the syndication (all such information, memoranda and material, "Information Materials"), (D) your hosting, with the Commitment Parties, of one or more meetings of prospective Lenders at times and locations to be mutually agreed, and (E) your using your commercially reasonable efforts to obtain (x) corporate credit and/or corporate family ratings for the Borrower and (y) ratings for the Credit Facilities, in each case from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Financial Services LLC ("S&P") prior to the Closing Date. Upon the request of any Commitment Party, you will furnish, for no fee, to such Commitment Party an electronic version of your trademarks, service marks and corporate logo for use in marketing materials for the purpose of facilitating the syndication of the Credit Facilities (the "License"); provided, however, that the License shall be used solely for the purpose described above and may not be assigned or transferred.

The Commitment Parties will manage, in consultation with you, all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders; provided that your consent will be required for any fees to be distributed among the Lenders other than in accordance with their pro-rata share of the commitments or loans. You hereby acknowledge and agree that the Commitment Parties will have no responsibility other than to arrange the syndication as set forth herein and in no event shall the Commitment Parties be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

At the request of the Commitment Parties, you agree to assist in the preparation of a version of each Confidential Information Memorandum or other Information Material (a "Public Version") consisting exclusively of information with respect to you and your affiliates that is either publicly available or not material with respect to you and your affiliates, any of your respective securities for purposes of United States federal and state securities laws (such information, "Non-MNPI"). Such Public Versions, together with any other information prepared by you or your affiliates or representatives and conspicuously marked "Public" (collectively, the "Public Information"), which at a minimum means that the word "Public" will appear prominently on the first page of any such information, may be distributed by us to prospective Lenders who have advised us that they wish to receive only Non-MNPI ("Public Side Lenders"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing Non-MNPI. You acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise, (a) drafts and final definitive documentation with respect to the Credit Facilities, (b) administrative materials prepared by the Commitment Parties for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda) and (c) notifications of changes in the terms of the Credit Facilities may be distributed to Public Side Lenders. You acknowledge that Commitment Party public-side employees

and representatives who are publishing debt analysts may participate in any meetings held pursuant to clause (D) of the second preceding paragraph; provided that such analysts shall not publish any information obtained from such meetings (i) until the syndication of the Credit Facilities has been completed upon the making of allocations by the Sole Lead Arranger and the Sole Lead Arranger freeing the Credit Facilities to trade or (ii) in violation of any confidentiality agreement between you and the relevant Commitment Party.

In connection with our distribution to prospective Lenders of any Confidential Information Memorandum and, upon our request, any other Information Materials, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof, representing that it only contains Non-MNPI. Each Confidential Information Memorandum will be accompanied by a disclaimer exculpating you, the Sponsor and us with respect to any use thereof and of any related Information Materials by the recipients thereof.

4. Information

You hereby represent and warrant that (a) all written or formally presented information (including all Information Materials), other than the Projections and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Successful Syndication or during any Follow-On Syndication Period, you become aware that any of the representations in the preceding sentence is incorrect, in any material respect, then you will promptly supplement the Information and the Projections so that such representations are correct, in all material respects, under those circumstances. You understand that in arranging and syndicating the Credit Facilities we may use and rely on the Information and Projections without independent verification thereof.

5. Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the Fee Letter dated the date hereof and delivered herewith (the "Fee Letter") on the terms and subject to the conditions set forth therein.

6. Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 6, in Exhibits A and B under the heading "CERTAIN CONDITIONS – Initial Conditions" and Exhibit C under the heading "Conditions" (as applicable).

Each Commitment Party's commitments and agreements hereunder are subject to (a) since October 1, 2010, there not having been any change, development or event that, individually or in the

aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition, or results of operations of the Borrower and its subsidiaries, taken as a whole (a "Material Adverse Effect"); provided, however, that none of the following shall constitute a Material Adverse Effect nor shall be taken into account in determining whether a Material Adverse Effect has occurred: (i) any adverse change, effect, event, occurrence, state of facts or development to the extent attributable to the Plan of Reorganization or the announcement or pendency of the consummation of the transactions contemplated by the Plan of Reorganization; (ii) any adverse change, effect, event, occurrence, state of facts or development to the extent attributable to the Sponsors' announcement or other disclosure of their plans or intentions with respect to the operation of the Borrower's and its subsidiaries' business, so long as such are consistent with the plans and intentions disclosed to the Commitment Parties; (iii) any adverse change, effect, event, occurrence, state of facts or development resulting from any change in regulatory conditions or change in applicable laws affecting the industry in which the Borrower and its subsidiaries operate or changes in the interpretation of such regulatory conditions or applicable laws; (iv) any adverse change, effect, event, occurrence, state of facts or development resulting from the taking of any action required by, or the failure to take any action prohibited by, the Plan of Reorganization; (v) any failure by the Borrower to meet projections or forecasts, provided that the underlying causes of any such failure may be considered in determining whether there is a Material Adverse Effect or (vi) any change in accounting requirements or principles required by GAAP or required by any change in applicable laws and any restatement of the Borrower's financial statements as a result thereof or public announcement related thereto; provided, further, that in the case of each of the preceding clauses (iii) and (vi), the change, effect, event or circumstance referred to therein does not adversely affect the Borrower and its subsidiaries to a greater degree than and to the extent that such change, effect, event or circumstance affects the businesses of other comparable companies in the industries in which the Borrower operates, (b) your performance in all material respects of all your obligations hereunder and under the Fee Letter to pay fees and expenses, when due or within a reasonable time after demand, as applicable, (c) there not having occurred a dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (d) entry of an order not later than December 31, 2010 by the court having jurisdiction over the Case (the "Bankruptcy Court") in form and substance reasonably acceptable to the Commitment Parties confirming the proposed Plan of Reorganization (the "Confirmation Order"); (e) the Confirmation Order becoming a final order, in full force and effect without reversal or modification, not subject to a pending motion for reversal, modification or stay and no notice of appeal shall then be pending and the period for appealing the Confirmation Order shall have lapsed, and the Plan of Reorganization shall have gone effective; and (f) the Debtors shall have not filed or supported any other plan of reorganization or liquidation other than the Plan of Reorganization.

7.  Indemnification and Expenses

    You agree (a) to indemnify and hold harmless the Commitment Parties, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Credit Facilities, the use of the proceeds thereof and the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable and documented legal (to be limited (absent an actual or potential conflict of interest) to one outside counsel for each group of indemnified persons with the same claims (and any reasonably necessary special and local counsel)) or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing

indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "Related Parties") or from such indemnified person's or Related Parties' material breach of this Commitment Letter and (b) regardless of whether the Closing Date occurs, to reimburse each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to the Closing Date or following termination or expiration of the commitments hereunder (including JPMorgan's reasonable and documented due diligence expenses, syndication expenses, travel expenses, reasonable and documented fees and expenses of third-party consultants and the reasonable and documented fees, charges and disbursements of counsel (to be limited to one primary outside counsel and any reasonably necessary special and local counsel) incurred in connection with each of the Credit Facilities and any related documentation (including this Commitment Letter, the Fee Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other entity or person) and that each Commitment Party shall be liable solely in respect of its own commitment to the Credit Facilities on a several, and not joint, basis with any other Commitment Party. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence or willful misconduct of such indemnified person (or any of its Related Parties) or from such indemnified person's or Related Parties' material breach of this Commitment Letter. None of the indemnified persons or you or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the Credit Facilities or the transactions contemplated hereby, provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

8. Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you or your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. In addition, each Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that

the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

9.  Confidentiality

    This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) the Sponsors, you, your and their officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (c) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any prospectus or offering memoranda relating to the Credit Facilities, in any syndication or other marketing material in connection with the Credit Facilities or in connection with any public filing requirement, (d) this Commitment Letter and the Term Sheets may be disclosed to potential Lenders and Take-Back Lenders and to any rating agency in connection with the Credit Facilities, and (e) this Commitment Letter and a an agreed upon redacted version of the Term Sheets may be disclosed to the Bankruptcy Court, any official committees appointed in the Case, the U.S. Trustee and such other parties in interest as may be necessary to obtain approval by the Bankruptcy Court of the Commitment Letter, the Credit Facilities and the agreements and obligations related thereto; provided, however, that you shall only be permitted to file the Fee Letter with the Bankruptcy Court under seal and shall only be permitted to share a complete version of the Fee Letter with the parties set forth above on a confidential basis (and then only on a "professional eyes only" basis); provided further however, that the foregoing restrictions shall cease to apply in respect to the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its terms and substance) after this Commitment Letter has been accepted by you.

    The Commitment Parties shall use all nonpublic information received by them in connection with the Credit Facilities and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to any Lenders or participants or prospective Lenders or participants, (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such

Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Credit Facilities and any related transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information. The provisions of this paragraph shall automatically terminate one year following the date of this Commitment Letter.

10. Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder; provided that during the period prior to the effective date of the Plan of Reorganization each of the parties hereto submits to the jurisdiction of the Bankruptcy Court with respect to the matters relating hereto. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Borrower and each

Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction, syndication and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to (a) assistance to be provided in connection with the syndication thereof until completion of a Successful Syndication and during the Follow-On Syndication Period and (b) confidentiality of the Fee Letter and the contents thereof) shall automatically terminate and be superseded by the provisions of the Credit Facilities Documentation upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on November 10, 2010. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that (i) the initial borrowing under the Credit Facilities does not occur on or before the Expiration Date, or (ii) the Bankruptcy Court has not entered an order approving this Commitment Letter and providing for administrative expense priority status of the indemnification and expense reimbursement obligations set forth above on or before November 19, 2010, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension. "Expiration Date" means January 31, 2011.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:

J.P. MORGAN SECURITIES LLC

By: _____
Name:
Title:

Accepted and agreed to as of the date first written above:

ORLEANS HOMEBUILDERS, INC.

By: _____
       Name:
       Title:

## Sources and Uses and Capitalization Table

### Sources and uses

**($mm)**

| Sources | | Uses | |
|---|---|---|---|
| $30mm Exit revolver | - | Repayment of DIP term loan, DIP revolver, and DIP interest[2] | $93.4 |
| Exit term loan | $125.0 | Partial repayment of pre-petition revolver | 42.7 |
| Escrow cash[1] | 41.8 | Creditor claims[3] | 17.8 |
| Operating cash on hand (incl. in-transit cash from title cos.) | 4.0 | Fees and expenses[4] | 14.0 |
| | | Cash to balance sheet[5] | 3.0 |
| **Total sources** | **$170.8** | **Total uses** | **$170.8** |

[1]Currently, $41.8mm of escrowed cash will be used to repay DIP revolver and admin claims. Excess escrow cash will be used to either fund accounts payable, increase the cash to the balance sheet, or repay the pre-petition revolver
[2]Estimates DIP revolver draw of $13.0mm and DIP interest of $0.4mm on Effective Date
[3]Includes estimated Unsecured Creditor Cash Distribution, Executory contracts, Priority liens, Tax/503(b)9 Claims, and cash required for payment of post-petition accounts payable
[4]Includes financing fees, professional fees, and OID
[5]Assumes $4mm of cash on balance sheet prior to exit financing, resulting in approximately $3mm of cash on balance sheet post-transaction, exclusive of any cash set aside to cover post-petition AP

### Pro forma cap table

| ($mm) | Amount | % of Cap. |
|---|---|---|
| Cash | $10[1] | |
| | | |
| $30mm Exit revolver | - | 0.0% |
| Exit term loan | 125 | 46.6% |
| **Total secured debt** | **$125** | **46.6%** |
| | | |
| Other debt | $0 | |
| **Total debt** | **$125** | |
| Equity value | $143 | 53.4% |
| **Total capitalization** | **$268** | **100.0%** |
| *Enterprise value[1]* | *$262* | |

[1]Based on midpoint of Plan valuation of $228mm-$295mm

---

[1] Includes estimated $7mm of cash designated for post-petition a/p.

SENIOR CREDIT FACILITIES

Summary of Terms and Conditions

November 9, 2010

ORLEANS HOMEBUILDERS, INC.

Set forth below is a summary of the principal terms and conditions for the Credit Facilities. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit A is attached and in Exhibits C and D attached thereto.

**1.**     **Parties**

| | |
|---|---|
| Borrower: | Orleans Homebuilders, Inc. (the "Borrower"). |
| Guarantors: | Each of the Borrower's direct and indirect, existing and future, material wholly-owned subsidiaries (with certain exceptions for brokerage related and other subsidiaries with statutory capital limitations to be agreed to among the parties) (the "Guarantors"; together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Sole Lead Arranger"). |
| Administrative Agent and Collateral Agent: | JPMorgan Chase Bank, N.A. (in such capacity, the "Administrative Agent"). |
| Lenders: | A syndicate of banks, financial institutions and other entities arranged by the Sole Lead Arranger (collectively, the "Lenders"). |

**2.**     **Types and Amounts of Credit Facilities**

A.   Term Loan Facility.

| | |
|---|---|
| Type and Amount: | A term loan facility (the "Term Loan Facility" and, together with the Revolving Credit Facility defined below, the "Credit Facilities") in the amount of (i) $125,000,000 minus (ii) the amount, if any, by which the Revolving Commitments as of the Closing Date exceed $35,000,000 (the "Term Loans"). |

| | |
|---|---|
| Maturity and Amortization: | The Term Loans will mature on the date that is five years after the Closing Date (the "Term Loan Maturity Date").

Under the Term Loans, amortization payments in an aggregate amount equal to 1% per annum of the original principal amount of the Term Loan Facility, payable quarterly, shall be required. The balance of the Term Loans will be payable on the Term Loan Maturity Date. |
| Availability: | The Term Loans shall be made in a single drawing on the Closing Date. Repayments and prepayments of the Term Loans may not be reborrowed. |
| Purpose: | The Term Loans will be used in accordance with the Plan of Reorganization to finance the emergence of the Borrower and Guarantors from bankruptcy proceedings. |

B.    Revolving Credit Facility.

| | |
|---|---|
| Type and Amount of Facility: | Revolving credit facility (the "Revolving Credit Facility") with commitments (the "Revolving Commitments") in the amount of $30,000,000 (the loans thereunder, the "Revolving Credit Loans"). |
| Increase Option: | So long as no default or event of default then exists or would result therefrom, the Borrower shall be permitted, without consent of any Lenders other than Lenders providing additional Revolving Commitments, to increase the aggregate Revolving Commitments at any time prior to, on or after the Closing Date, by up to $20,000,000 to an aggregate amount not to exceed $50,000,000. Any such increase shall be effected pursuant to additional Revolving Commitments obtained by the Borrower from one or more Lenders or other banks, financial institutions or other entities approved by the Administrative Agent and shall be on the same terms and conditions as apply to other credit extensions under the Revolving Credit Facility, except that the Borrower will pay such fees to the Lenders furnishing such increase as the Borrower and such Lenders may then agree. |
| Availability: | The Revolving Credit Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the four and one-half year anniversary thereof (the "Revolving Credit Termination Date"). |
| Letters of Credit: | A portion of the Revolving Credit Facility not in excess of $25,000,000 shall be available for the issuance of letters of credit the "Letters of Credit") by JPMCB (in such capacity, the "Issuing Lender"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five business |

days prior to the Revolving Credit Termination Date, <u>provided</u> that any Letter of Credit may, at the Borrower's election, provide for the automatic renewal thereof for additional periods unless terminated upon any renewal date by the Issuing Lender by prior written notice to the Borrower and beneficiary (which renewals shall in no event extend beyond the date referred to in clause (b) above unless (i) the Issuing Lender elects, in its sole and absolute discretion, to permit any Letter of Credit to extend beyond such date pursuant to a separate letter of credit facility to be entered into between the Borrower and the Issuing Lender or (ii) the obligations of the Borrower in respect thereof are secured by cash collateral in an amount not less than 105% of such obligations).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Credit Loans) within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Revolving Credit Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a <u>pro rata</u> basis.

|  |  |
|---|---|
| Maturity: | The Revolving Credit Termination Date. |
| Use of Proceeds: | The proceeds of the Revolving Credit Loans shall be used, in part, in accordance with the Plan of Reorganization and, generally, to finance the working capital needs, and general corporate purposes, of the Borrower and its subsidiaries. |

## 3. <u>Certain Payment Provisions</u>

|  |  |
|---|---|
| Fees and Interest Rates: | As set forth on Annex I. |
| Optional Prepayments and Commitment Reductions: | Loans may be prepaid and Revolving Commitments may be reduced, in whole or in part in minimum amounts to be agreed upon, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Eurodollar Loans (as defined in Annex I hereto), three days') prior notice, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period. Revolving Loans are repayable without premium or penalty. The Term Loans will be prepayable at 101% during the first year after the Closing Date and at par thereafter. Optional prepayments of the Term Loans shall be applied as directed by the Borrower. |
| Mandatory Prepayments: | Mandatory prepayments will be required if and to the extent at any time the Outstanding Amount exceeds the Borrowing Base. This includes, without limitation, any prepayment required by |

reason of the Outstanding Amount exceeding the Borrowing Base calculation upon completion of appraisals within six (6) months after the Closing Date. So long as no default or event of default has occurred and is continuing, any such mandatory prepayments of principal shall be applied as directed by the Borrower. While any default is in existence, any such mandatory prepayments of principal will be applied first to reduce the Outstanding Amount under the Revolving Credit Facility (including to cash collateralize Letters of Credit) and then to repay installments of Term Loans ratably to the respective installments thereof.

If the aggregate Revolving Commitments are increased after the Closing Date by more than $5,000,000, then no later than concurrently with the effectiveness of such increase, Term Loans shall be repaid in a principal amount equal to the amount of the increase in Revolving Commitments in excess of $5,000,000. Any such repayment shall be applied to installments of the Term Loans as directed by the Borrower.

| 4. | **Collateral** | Subject to exclusions and limitations to be agreed, the obligations of each of the Borrower and the Guarantors in respect of the Credit Facilities and any swap agreements and cash management arrangements provided by any Lender (or any affiliate of a Lender, collectively, the "Obligations") shall be secured by a perfected first priority security interest in substantially all of its tangible and intangible assets (including, without limitation, intellectual property, real property and all of the capital stock of its direct subsidiaries including the Borrower), except for (a) those assets as to which the Administrative Agent shall determine in its sole discretion that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby and (b) capital stock of joint ventures if the joint venture agreement prohibits the pledge of such capital stock. The Collateral shall include all Borrowing Base Cash deposited into the Borrowing Base Account; provided that so long as no default or event of default exists, or any mandatory prepayment is due and payable, or would result therefrom, the Borrower will be permitted to withdraw funds from the Borrowing Base Account without restriction other than as set forth in the Credit Documentation for restrictions on distributions and other items to be mutually agreed. Additionally, the Borrower shall also maintain as separate accounts with the Administrative Agent, the "Collateral Proceeds Account" (into which all proceeds from the sale or other disposition of any Land or Real Property or other Collateral will be deposited) and "Operating Account" (into which only funds which are not proceeds from the sale or other disposition of any Land or Real Property or other Collateral will |

be deposited) in which the Administrative Agent will have a perfected first priority security interest; provided that (i) so long as no default or event of default exists, or would result therefrom, the Borrower will be permitted to withdraw funds from the Operating Account without restriction other than as set forth in the Credit Documentation for restrictions on distributions and other items to be mutually agreed and (ii) such withdrawals while a mandatory prepayment is outstanding shall be limited to customary and necessary operating expenses payable in the ordinary course of business as previously conducted.  The lien of the Administrative Agent on any Land or Real Property will be subject to release on customary terms and conditions and subject to customary procedures to be specified.

## 5.  **Certain Conditions**

Initial Conditions:    The first day of availability of the Credit Facilities (the "Closing Date") is subject to (a) the conditions precedent set forth in Section 6 of the Commitment Letter and in Exhibit C, (b) the accuracy in all material respects (and in all respects if qualified by materiality) of the representations and warranties in the definitive documentation for the Credit Facilities and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date.

On-Going Conditions:    After the Closing Date, the making of each Loan and the issuance of each Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (and in all respects if qualified by materiality) of all representations and warranties in the definitive documentation for the Credit Facilities; (b) after giving effect to such Loan or Letter of Credit the Borrowing Base being not less than the Outstanding Amount; and (c) there being no default or event of default in existence at the time of, or after giving effect to, such extension of credit.

## V.  **Certain Documentation Matters**

Credit
Documentation:    The definitive documentation for the Credit Facilities (the "Credit Documentation") shall contain those terms and conditions usual for facilities and transactions of this type as may be reasonably agreed by the Borrower, the Sole Lead Arranger and the Lenders.

Financial Covenants:    Financial covenants, which shall be tested quarterly, are:

Minimum Consolidated Tangible Net Worth Requirement: Minimum Consolidated Tangible Net Worth not less than (a) $100,000,000 plus (b) a dollar amount, but not less than $0, equal to 50% of the Consolidated Earnings for each completed fiscal quarter ending after September 30, 2010 in which Consolidated Earnings are greater than zero ("Positive Consolidated Earnings"); provided, however, if Consolidated Earnings in any such period are equal to or less than zero ("Negative Consolidated Earnings"), such Negative Consolidated Earnings will be carried forward, and no amount will be added to the Minimum Consolidated Tangible Net Worth in subsequent fiscal quarters until the cumulative Positive Consolidated Earnings in subsequent fiscal quarters exceed the cumulative amount of such Negative Consolidated Earnings for the periods since the last period in which there were Positive Consolidated Earnings. As of the end of the first fiscal quarter thereafter when Positive Consolidated Earnings exceed the Negative Consolidated Earnings carried forward, 50% of such excess shall be added to the Minimum Consolidated Tangible Net Requirement, and, thereafter, the Minimum Consolidated Tangible Net Worth Requirement shall be increased by 50% of Positive Consolidated Earnings in subsequent fiscal quarters until such time as there is a subsequent fiscal quarter with Negative Consolidated Earnings, at which time, the procedures above would be repeated.

Maintain Liquidity of not less than $10,000,000, provided that if the Cash Flow Coverage Ratio for any fiscal quarter is less than 2.00 to 1.00, such $10,000,000 shall increase to (i) $20,000,000 as of March 30, 2011 or June 30, 2011 and (ii) $15,000,000 as of the end of the four (4) fiscal quarter thereafter (and for purposes of clarity, the provisions of clauses (i) and (ii) shall not affect the Borrower's obligation to comply with the Cash Flow Coverage Ratio requirements set forth below).

Maintain a Cash Flow Coverage Ratio as follows:

| Fiscal quarter ending | Maximum Cash Flow Coverage Ratio |
| --- | --- |
| September 30, 2011 and December 31, 2011 | 1.50:1.00 |
| March 31, 2012 and June 30, 2012 | 1.75:1.00 |
| September 30, 2012 and thereafter | 2.00:1.00 |

As of the end of each fiscal quarter, maintain a Leverage Ratio not in excess of 0.65 to 1.00. Stepping down to 0.60 to 1.00 beginning at the fiscal quarter ending on December 31, 2012.

During any fiscal year, not make any cash expenditures for the purchase or improvement of any Land, Real Property or Lots in an aggregate amount in excess of:

| During fiscal year | Maximum cash expenditures |
|---|---|
| 2011 | $40,000,000 |
| 2012 | $45,000,000 |
| 2013 | $65,000,000 |
| 2014 | $75,000,000 |
| 2014 | $85,000,000 |

provided that (a) if the pro forma Leverage Ratio is greater than 0.55 to 1.00 as of the end of any fiscal quarter, the aggregate cash expenditures for such purchases and improvements in each subsequent fiscal quarter shall not exceed $10,000,000 unless and until the pro forma Leverage Ratio is less than or equal to 0.55 to 1.00 for two consecutive fiscal quarters and (b) any cash expenditure from the immediately previous fiscal year (but not prior years) that was less than the permitted maximum cash expenditure for such fiscal year can be included in the maximum cash expenditure for the immediately following fiscal year (but not during any period while expenditures are restricted pursuant to clause (a) above).

For purposes of determining compliance the financial covenants, any equity contribution (which equity shall be common equity) made to the Borrower on or prior to the day that is 10 business days after the day on which financial statements are required to be delivered for any fiscal quarter will, at the request of the Borrower:

(a) be included in the calculation of (i) Liquidity, (ii) Unlevered Cash Flow used in determining the Cash Flow Coverage Ratio, and (iii) Consolidated Tangible Net Worth used in determining the Leverage Ratio for the purposes of determining compliance with such financial covenants at the end of such fiscal quarter and applicable subsequent periods which include such fiscal quarter; and

(b) reduce the aggregate consideration paid for purchases of Land, Real Property, Lots and Housing Units during the fiscal year in which such fiscal quarter occurred.

Any such equity contribution included in the calculation of one or more financial covenants ("Specified Equity Contribution") is subject to the following limitations: (a) there shall be no more than two fiscal quarters in any four consecutive fiscal quarter

period in respect of which a Specified Equity Contribution is made and the maximum amount of any such Specified Equity Contribution shall be $10,000,000, (b) the amount of any Specified Equity Contribution shall be no more than the amount required to cause the Borrower to be in pro forma compliance with the financial covenants specified above; (c) the Specified Equity Contributions shall be counted solely for purposes of the financial covenants and shall not be included for the purposes of determining availability or the amount of any covenant baskets or carve-outs and (d) Specified Equity Contributions may only reduce debt for purposes of calculating the financial covenants if the proceeds are applied to repay the Term Loan, or the Revolver to the extent a corresponding reduction in the revolving commitments is made.

| | |
|---|---|
| Representations and Warranties: | Financial statements; absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; labor matters; ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; status of Credit Facilities as senior debt; Regulation H; and delivery of certain documents. |
| Affirmative Covenants: | Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information reasonably requested by the Lenders (as required below); payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; ERISA; further assurances (including, without limitation, with respect to security interests in after-acquired property); quarterly conference calls with Lenders; use of commercially reasonable efforts to obtain and maintain monitored public corporate family/corporate credit ratings; agreement to obtain interest rate protection in an amount equal to one-half of the amount of the Term Loan Facility and otherwise in a manner to be mutually agreed; reappraisal rights not more than once in any 12-month period unless the Administrative Agent reasonably believes that there has been a material and adverse change in the value of the property; and agreement to deliver to the Administrative Agent Acceptable Appraisals and environmental reports and title |

insurance on all properties included in the Borrowing Base as soon as possible but in any event within six (6) months after the Closing Date.

The Borrower shall provide the following financial statements and reports: (a) audited financial statements within 90 days after fiscal year end, (b) unaudited financial statements within 50 days after the end of each fiscal quarter, (c) concurrent with providing the financial statements required by clauses (a) and (b) above, the relevant figures broken down by region, (d) within 30 days after the end of each month end, a draft reconciliation of the previous month's Borrowing Base certificate to the current month's Borrowing Base certificate, which draft must be finalized within 60 days after the end of each month end for compliance reporting, (e) within 30 days after the end of each month end, a report showing (i) sales, (ii) Lots under Development and (iii) average sales price for Housing Units and Lots by community, and (f) no later than ninety (90) days after the end of each fiscal year, Borrower shall provide comprehensive projections for that fiscal year on a quarterly basis (a "Budget").

| | |
|---|---|
| Negative Covenants: | Limitations on: indebtedness (including guarantee obligations)[2]; liens; mergers, consolidations, liquidations and dissolutions; sales of assets; dividends and other payments in respect of capital stock; acquisitions, investments (it being agreed that the Credit Documentation will permit investments in joint ventures in an amount to be agreed), loans and advances; prepayments and modifications of subordinated and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; and changes in lines of business. |
| Events of Default: | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee, security document or subordination provisions or non-perfection of any security interest; and a change of control (the definition of which is to be agreed). All payments, proceeds and recoveries received from Collateral applied to the principal amount of Loans and Letter of Credit obligations after the commitments of the Lenders have terminated and Outstanding Amounts have been declared due and payable upon an event of |

---

[2] Credit Documentation will prohibit additional indebtedness other than baskets to be agreed upon.

default shall be applied first to amounts owed under the Revolving Credit Facility and then to the Term Loans.

| | |
|---|---|
| Voting: | Amendments and waivers with respect to the Credit Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Revolving Commitments and Term Loans (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reduction of any of the voting percentages, (ii) except as set forth below, modifications to any provisions dealing with pro rata or priority treatment of, or payments to, the Lenders, (iii) releases of all or substantially all of the Collateral (other than in connection with any immaterial adjustments, including lot line adjustments and easements, and disposition of Collateral, all as permitted by the Credit Facilities) and (iv) releases of all or substantially all of the Guarantors (other than in connection with the release or sale of the relevant Guarantor permitted by the Credit Facilities). Any amendment that would amend the definition of Borrowing Base or any of the definitions relating to the Borrowing Base or change the order of application of funds to the Revolving Credit Facility and the Term Loans shall not be effective without the consent of Lenders holding more than 50% of the Revolving Commitments and more than 50% of the Term Loans. |

The Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

The Credit Documentation shall provide that, so long as no default or event of default has occurred and is continuing and no Revolving Credit Loans are outstanding, Term Loans may be prepaid below par on a non-pro rata basis through Dutch auction or similar procedures to be agreed that are offered to all Lenders holding Term Loans on a pro rata basis in accordance with procedures and subject to restrictions to be agreed. Any Term Loan so prepaid shall automatically be canceled and retired.

Notwithstanding the foregoing, the Credit Documentation shall contain "amend and extend" provisions pursuant to which the Borrower may extend commitments and/or Term Loans with only the consent of the respective extending Lenders, it being

understood that each Lender whose commitments and/or Term Loans are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender, provided that it is understood that no existing Lender will have any obligation to commit to any such extension.

| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) an event of default has occurred and is continuing, (b) the Administrative Agent, unless the assignee is a Lender, an affiliate of a Lender or an approved fund or (c) the Issuing Bank, unless a Term Loan is being assigned. The Sponsor or any of their affiliates shall be eligible assignees (subject to the consent required above); provided that (i) its pro rata share shall not exceed 25% in the aggregate; (ii) for purposes of any amendment, waiver or modification of the Credit Documentation or any plan of reorganization that does not in each case adversely affect the Sponsor (solely in its capacity as a Lender) in any material respect as compared to other affected Lenders, the Sponsor will be deemed to have voted in the same proportion as other Lenders; provided that an affiliate of the Sponsor (approved by the Administrative Agent) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the Sponsor does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity (each, an "Affiliated Lender Fund"), will not be subject to such voting limitations and will be entitled to vote as if it was a Lender; and (iii) the Sponsor shall not be permitted to attend any "lender-only" conference calls or meetings or receive any related "lender-only" information. In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $5,000,000, in the case of a Revolving Commitment, and $1,000,000, in the case of a Term Loan, unless otherwise agreed by the Borrower and the Administrative Agent. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. |
|---|---|

The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a)

of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of Loans in accordance with applicable law shall be permitted without restriction.

**Yield Protection:**

The Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (and customary provisions for replacing Lenders that exercise their rights under the foregoing provisions) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

**Defaulting Lenders:**

The Credit Documentation shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support, Letters of Credit, to the suspension of voting rights and rights to receive certain fees, and to termination or assignment of the Revolving Commitments or Loans of such Lenders).

**Expenses and Indemnification**

The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Sole Lead Arranger associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel) and (b) all reasonable and documented out-of-pocket expenses of the Administrative Agent (including the fees, disbursements and other charges of counsel (to be limited (absent an actual or potential conflict of interest) to one outside counsel for JPMorgan and the Administrative Agent and any special and local counsel) in connection with the enforcement of the Credit Documentation.

The Administrative Agent, the Sole Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of

competent jurisdiction to arise from the bad faith, gross negligence or willful misconduct of the relevant indemnified person (or its related parties).

| | |
|---|---|
| Governing Law and Forum: | State of New York. |
| Counsel to the Administrative Agent and the Sole Lead Arranger: | Morrison & Foerster LLP. |

## Interest and Certain Fees

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate, plus the Applicable Margin. The Borrower may elect interest periods of 1, 2, 3 or 6 months for Eurodollar Rate borrowings. |

As used herein:

"ABR" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus [*]% and (iii) the Eurodollar Rate applicable for an interest period of one month plus [*]%; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the ABR be less than [*]% per annum.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate (before giving effect to any adjustment for reserve requirements) be less than [*]% per annum.

"Applicable Margin" means (a) (i) [*]%, in the case of ABR Loans (as defined below) under the Revolving Credit Facility and (ii) [*]% in the case of ABR Loans under the Term Loan Facility and (b) (i) [*]%, in the case of Eurodollar Loans (as defined below) under the Revolving Credit Facility and (ii) [*]% in the case of Eurodollar Loans under the Term Loan Facility. The foregoing margins shall be subject to increase by [*]% each upon the three month anniversary of the Closing Date at any time and so long as the then Outstanding Amount exceeds the sum of the amount of Borrowing Base Cash and the amount of the Borrowing Base that consists of Qualified Real Properties for which Appraisals have been received.

"ABR Loans" means Loans bearing interest based upon the ABR.

"Eurodollar Loans" means Loans bearing interest based upon the Eurodollar Rate.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears. |

In the case of Eurodollar Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

| Commitment Fees: | The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.75% on the average daily unused portion of the Revolving Credit Facility, payable quarterly in arrears.[3] |
| --- | --- |
| Letter of Credit Fees: | The Borrower shall pay a fee on the face amount of each Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Credit Facility. Such fee shall be shared ratably among the Lenders participating in the Revolving Credit Facility and shall be payable quarterly in arrears. |
| | A fronting fee equal to 0.25% per annum on the aggregate face amount of each outstanding Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account. |
| Default Rate: | At any time when the Borrower is in default in the payment of any amount under the Credit Facilities, after giving effect to any applicable grace period, all outstanding amounts under the Credit Facilities shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to Revolving Loans maintained as ABR Loans from time to time). |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

---

[3] To include a stepdown to 0.50%, subject to conditions to be agreed.

SENIOR CREDIT FACILITIES

Summary of Terms and Conditions

November 9, 2010

ORLEANS HOMEBUILDERS, INC.


Set forth below is a summary of the principal terms and conditions for the Credit Facilities. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit B is attached and in Exhibits A and D attached thereto.


**1.**    **Parties**

Borrower:                    Orleans Homebuilders, Inc. (the "Borrower").

Guarantors:                  Each of the Borrower's direct and indirect, existing and future, material wholly-owned subsidiaries (with certain exceptions for brokerage related and other subsidiaries with statutory capital limitations to be agreed to among the parties) (the "Guarantors"; together with the Borrower, the "Loan Parties").

Sole Lead Arranger and
Sole Bookrunner:             J.P. Morgan Securities LLC (in such capacity, the "Sole Lead Arranger").

Administrative Agent and
Collateral Agent:            JPMorgan Chase Bank, N.A. (in such capacity, the "Administrative Agent"). JPMorgan Chase Bank, N.A. JPMorgan Chase Bank, N.A. shall have the right to choose a replacement agent for the Term Loan Facility that, so long as no event of default is outstanding, is reasonably acceptable to the Borrower.

Lenders:                     A syndicate or syndicates of banks, financial institutions and other entities (collectively, the "Lenders") that is arranged by the Sole Lead Arranger.

**2.**    **Types and Amounts of First and Second Lien Credit Facilities**

A. Term Loan Facility (Second Lien Credit Facility).

Type and Amount:             A term loan facility (the "Term Loan Facility" and, together with the Revolving Credit Facility defined below, the "Credit Facilities") in the amount of (a) $125,000,000 minus (b) the

amount, if any, by which the Revolving Commitments as of the Closing Date exceed $35,000,000 (the "Term Loans").

| | |
|---|---|
| Maturity and Amortization: | The Term Loans will mature on the date that is five years after the Closing Date (the "Term Loan Maturity Date"). |
| | Under the Term Loans, amortization payments in an aggregate amount equal to 1% per annum of the original principal amount of the Term Loan Facility, payable quarterly, shall be required. The balance of the Term Loans will be payable on the Term Loan Maturity Date. |
| Availability: | The Term Loans shall be made in a single drawing on the Closing Date. Repayments and prepayments of the Term Loans may not be reborrowed. |
| Purpose: | The Term Loans will be used in accordance with the Plan of Reorganization to finance the emergence of the Borrower and Guarantors from bankruptcy proceedings. |

B.  Revolving Credit Facility (First Lien Credit Facility).

| | |
|---|---|
| Type and Amount of Facility: | Revolving credit facility (the "Revolving Credit Facility") with commitments (the "Revolving Commitments") in the amount of $30,000,000 (the loans thereunder, the "Revolving Credit Loans"). |
| Increase Option: | So long as no default or event of default then exists or would result therefrom, the Borrower shall be permitted, without consent of any Lenders other than Lenders providing additional Revolving Commitments, to increase the aggregate Revolving Commitments at any time prior to, on or after the Closing Date, by up to $20,000,000 to an aggregate amount not to exceed $50,000,000. Any such increase shall be effected pursuant to additional Revolving Commitments obtained by the Borrower from one or more Lenders or other banks, financial institutions or other entities approved by the Administrative Agent and shall be on the same terms and conditions as apply to other credit extensions under the Revolving Credit Facility, except that the Borrower will pay such fees to the Lenders furnishing such increase as the Borrower and such Lenders may then agree. |
| Availability: | The Revolving Credit Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the four and one-half year anniversary thereof (the "Revolving Credit Termination Date"). |
| Letters of Credit: | A portion of the Revolving Credit Facility not in excess of $25,000,000 shall be available for the issuance of letters of credit the "Letters of Credit") by JPMCB (in such capacity, the |

"Issuing Lender"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five business days prior to the Revolving Credit Termination Date, provided that any Letter of Credit may, at the Borrower's election, provide for the automatic renewal thereof for additional periods unless terminated upon any renewal date by the Issuing Lender by prior written notice to the Borrower and beneficiary (which renewals shall in no event extend beyond the date referred to in clause (b) above unless (i) the Issuing Lender elects, in its sole and absolute discretion, to permit any Letter of Credit to extend beyond such date pursuant to a separate letter of credit facility to be entered into between the Borrower and the Issuing Lender or (ii) the obligations of the Borrower in respect thereof are secured by cash collateral in an amount not less than 105% of such obligations).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Credit Loans) within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Revolving Credit Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis.

|  |  |
|---|---|
| Maturity: | The Revolving Credit Termination Date. |
| Use of Proceeds: | The proceeds of the Revolving Credit Loans shall be used, in part, in accordance with the Plan of Reorganization and, generally, to finance the working capital needs, and general corporate purposes, of the Borrower and its subsidiaries. |

## 3.    Certain Payment Provisions

|  |  |
|---|---|
| Fees and Interest Rates: | As set forth on Annex I. |
| Optional Prepayments and Commitment Reductions: | Loans may be prepaid and Revolving Commitments may be reduced, in whole or in part in minimum amounts to be agreed upon, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Eurodollar Loans (as defined in Annex I hereto), three days') prior notice, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period. Revolving Loans are repayable without premium or penalty. The Term Loans will be prepayable at 103% during the first year after the Closing Date, 102% during the second year after the Closing Date, 101% during the third year after the Closing Date, and at par thereafter. Optional |

prepayments of the Term Loans shall be applied as directed by the Borrower.

Mandatory Prepayments: Mandatory prepayments will be required if and to the extent at any time the Outstanding Amount exceeds the Borrowing Base.

Mandatory prepayments of principal will be applied <u>first</u> to reduce the Outstanding Amount under the Revolving Credit Facility (including to cash collateralize Letters of Credit ) and <u>then</u> to repay installments of Term Loans ratably to the respective installments thereof.

If the aggregate Revolving Commitments are increased after the Closing Date, by more than $5,000,000, then no later than concurrently with the effectiveness of such increase, the Term Loans shall be repaid in a principal amount equal to the amount of the increase in Revolving Commitments in excess of $5,000,000.  Any such repayment shall be applied to installments of the Term Loans as directed by the Borrower.

**4.**  **<u>Collateral</u>**

Subject to exclusions and limitations to be agreed, the obligations of each of the Borrower and the Guarantors in respect of the Credit Facilities and any swap agreements and cash management arrangements provided by any Lender (or any affiliate of a Lender, collectively, the "<u>Obligations</u>") shall be secured by a perfected first priority security interest (with respect to the Revolving Credit Facility) and second priority security interest (with respect to the Term Loan Facility) in substantially all of its tangible and intangible assets (including, without limitation, intellectual property, real property and all of the capital stock of its direct subsidiaries including the Borrower), except for (a) those assets as to which the Administrative Agent shall determine in its sole discretion that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby and (b) capital stock of joint ventures if the joint venture agreement prohibits the pledge of such capital stock.  The Collateral shall include all Borrowing Base Cash deposited into the Borrowing Base Account; provided that so long as no default or event of default exists, or any mandatory prepayment is due and payable, or would result therefrom, the Borrower will be permitted to withdraw funds from the Borrowing Base Account without restriction other than as set forth in the Credit Documentation for restrictions on distributions and other items to be mutually agreed.  Additionally, the Borrower shall also maintain as separate accounts with the Administrative Agent, the "Collateral Proceeds Account" (into which all proceeds from the sale or other disposition of any Land or Real Property or other Collateral will be deposited) and "Operating Account" (into

which only funds which are not proceeds from the sale or other disposition of any Land or Real Property or other Collateral will be deposited) in which the Administrative Agent will have a perfected first priority security interest; provided that (i) so long as no default or event of default exists, or would result therefrom, the Borrower will be permitted to withdraw funds from the Operating Account without restriction other than as set forth in the Credit Documentation for restrictions on distributions and other items to be mutually agreed and (ii) such withdrawals while a mandatory prepayment is outstanding shall be limited to customary and necessary operating expenses payable in the ordinary course of business as previously conducted.. The lien of the Administrative Agent on any Land or Real Property will be subject to release on customary terms and conditions and subject to customary procedures to be specified.

The lien priority, relative rights and other creditors' rights issues in respect of the Term Loan Facility and the Revolving Credit Facility will be set forth in an intercreditor agreement.

## 5. **Certain Conditions**

Initial Conditions:

The first day of availability of the Credit Facilities (the "Closing Date") is subject to (a) the conditions precedent set forth in Section 6 of the Commitment Letter and in Exhibit C, (b) the accuracy in all material respects (and in all respects if qualified by materiality) of the representations and warranties in the definitive documentation for the Credit Facilities and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date.

On-Going Conditions:

After the Closing Date, the making of each Loan and the issuance of each Letter of Credit shall be conditioned upon (a) the accuracy in all material respects (and in all respects if qualified by materiality) of all representations and warranties in the definitive documentation for the Credit Facilities; (b) after giving effect to such Loan or Letter of Credit the Borrowing Base being not less than the Outstanding Amount; and (c) there being no default or event of default in existence at the time of, or after giving effect to, such extension of credit.

## V. **Certain Documentation Matters**

Credit
Documentation:

The definitive documentation for the Credit Facilities (the "Credit Documentation") shall contain those terms and

conditions usual for facilities and transactions of this type as may be reasonably agreed by the Borrower, the Sole Lead Arranger and the Lenders. Separate Credit Documentation for the Term Loan Facility and for the Revolving Credit Facility will contain substantially the same terms subject to changes to be determined.

| Financial Covenants: | Financial covenants, which shall be tested quarterly, are: |
|---|---|

Minimum Consolidated Tangible Net Worth not less than (a) $100,000,000 plus (b) a dollar amount, but not less than $0, equal to 50% of the Consolidated Earnings for each completed fiscal quarter ending after September 30, 2010 in which Consolidated Earnings are greater than zero ("Positive Consolidated Earnings"); provided, however, if Consolidated Earnings in any such period are equal to or less than zero ("Negative Consolidated Earnings"), such Negative Consolidated Earnings will be carried forward, and no amount will be added to the Minimum Consolidated Tangible Net Worth in subsequent fiscal quarters until the cumulative Positive Consolidated Earnings in subsequent fiscal quarters exceed the cumulative amount of such Negative Consolidated Earnings for the periods since the last period in which there were Positive Consolidated Earnings. As of the end of the first fiscal quarter thereafter when Positive Consolidated Earnings exceed the Negative Consolidated Earnings carried forward, 50% of such excess shall be added to the Minimum Consolidated Tangible Net Requirement, and, thereafter, the Minimum Consolidated Tangible Net Worth Requirement shall be increased by 50% of Positive Consolidated Earnings in subsequent fiscal quarters until such time as there is a subsequent fiscal quarter with Negative Consolidated Earnings, at which time, the procedures above would be repeated.

Maintain Liquidity of not less than $10,000,000, provided that if the Cash Flow Coverage Ratio for any fiscal quarter is less than 2.00 to 1.00, such $10,000,000 shall increase to (i) $20,000,000 as of March 30, 2011 or June 30, 2011 and (ii) $15,000,000 as of the end of the four (4) fiscal quarter thereafter (and for purposes of clarity, the provisions of clauses (i) and (ii) shall not affect the Borrower's obligation to comply with the Cash Flow Coverage Ratio requirements set forth below).

Maintain a Cash Flow Coverage Ratio as follows:

| Fiscal quarter ending | Maximum Cash Flow Coverage Ratio |
|---|---|
| September 30, 2011 and | 1.50:1.00 |

| | |
|---|---|
| December 31, 2011 | |
| March 31, 2012 and June 30, 2012 | 1.75:1.00 |
| September 30, 2012 and thereafter | 2.00:1.00 |

As of the end of each fiscal quarter, maintain a Leverage Ratio not in excess of 0.65 to 1.00. Stepping down to 0.60 to 1.00 beginning at the fiscal quarter ending on December 31, 2012.

During any fiscal year, not make any cash expenditures for the purchase or improvement of any Land, Real Property or Lots in an aggregate amount in excess of:

| During fiscal year | Maximum cash expenditures |
|---|---|
| 2011 | $40,000,000 |
| 2012 | $45,000,000 |
| 2013 | $65,000,000 |
| 2014 | $75,000,000 |
| 2014 | $85,000,000 |

provided that (a) if the pro forma Leverage Ratio is greater than 0.55 to 1.00 as of the end of any fiscal quarter, the aggregate cash expenditures for such purchases and improvements in each subsequent fiscal quarter shall not exceed $10,000,000 unless and until the pro forma Leverage Ratio is less than or equal to 0.55 to 1.00 for two consecutive fiscal quarters and (b) any cash expenditure from the immediately previous fiscal year (but not prior years) that was less than the permitted maximum cash expenditure for such fiscal year can be included in the maximum cash expenditure for the immediately following fiscal year (but not during any period while expenditures are restricted pursuant to clause (a) above).

For purposes of determining compliance the financial covenants, any equity contribution (which equity shall be common equity) made to the Borrower on or prior to the day that is 10 business days after the day on which financial statements are required to be delivered for any fiscal quarter will, at the request of the Borrower:

(a) be included in the calculation of (i) Liquidity, (ii) Unlevered Cash Flow used in determining the Cash Flow Coverage Ratio, and (iii) Consolidated Tangible Net Worth used in determining the Leverage Ratio for the purposes of determining compliance with such financial covenants at the end of such fiscal quarter and applicable subsequent periods which include such fiscal quarter; and

(b) reduce the aggregate consideration paid for purchases of Land, Real Property, Lots and Housing Units during the fiscal year in which such fiscal quarter occurred.

Any such equity contribution included in the calculation of one or more financial covenants ("Specified Equity Contribution") is subject to the following limitations: (a) there shall be no more than two fiscal quarters in any four consecutive fiscal quarter period in respect of which a Specified Equity Contribution is made and the maximum amount of any such Specified Equity Contribution shall be $10,000,000, (b) the amount of any Specified Equity Contribution shall be no more than the amount required to cause the Borrower to be in pro forma compliance with the financial covenants specified above; (c) the Specified Equity Contributions shall be counted solely for purposes of the financial covenants and shall not be included for the purposes of determining availability or the amount of any covenant baskets or carve-outs and (d) Specified Equity Contributions may only reduce debt for purposes of calculating the financial covenants if the proceeds are applied to repay the Term Loan, or the Revolver to the extent a corresponding reduction in the revolving commitments is made.

| | |
|---|---|
| Representations and Warranties: | Financial statements; absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; labor matters; ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; status of Credit Facilities as senior debt; Regulation H; and delivery of certain documents. |
| Affirmative Covenants: | Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information reasonably requested by the Lenders (as required below); payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; ERISA; further assurances (including, without limitation, with respect to security interests in after-acquired property); quarterly conference calls with Lenders; use of commercially reasonable |

efforts to obtain and maintain monitored public corporate family/corporate credit ratings; agreement to obtain interest rate protection in an amount equal to one-half of the amount of the Term Loan Facility and otherwise in a manner to be mutually agreed; reappraisal rights not more than once in any 12-month period unless the Administrative Agent reasonably believes that there has been a material and adverse change in the value of the property; and agreement to deliver to the Administrative Agent Acceptable Appraisals and environmental reports and title insurance on all properties included in the Borrowing Base as soon as possible but in any event within six (6) months after the Closing Date.

The Borrower shall provide the following financial statements and reports: (a) audited financial statements within 90 days after fiscal year end, (b) unaudited financial statements within 50 days after the end of each fiscal quarter, (c) concurrent with providing the financial statements required by clauses (a) and (b) above, the relevant figures broken down by region, (d) within 30 days after the end of each month end, a draft reconciliation of the previous month's Borrowing Base certificate to the current month's Borrowing Base certificate, which draft must be finalized within 60 days after the end of each month end for compliance reporting, (e) within 30 days after the end of each month end, a report showing (i) sales, (ii) Lots under Development and (iii) average sales price for Housing Units and Lots by community and (f) no later than ninety (90) days after the end of each fiscal year, Borrower shall provide a Budget.

| Negative Covenants: | Limitations on: indebtedness (including guarantee obligations)[4]; liens; mergers, consolidations, liquidations and dissolutions; sales of assets; dividends and other payments in respect of capital stock; acquisitions, investments (it being agreed that the Credit Documentation will permit investments in joint ventures in an amount to be agreed), loans and advances; prepayments and modifications of subordinated and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; and changes in lines of business. |
| --- | --- |
| Events of Default: | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any |

---

[4] Credit Documentation will prohibit additional indebtedness other than baskets to be agreed upon.

guarantee, security document or subordination provisions or non-perfection of any security interest; and a change of control. (the definition of which is to be agreed).

Voting:

Amendments and waivers with respect to the Credit Documentation for the Term Loan Facility and the Revolving Credit Facility shall require the approval of Lenders in such facility holding more than 50% of the aggregate amount of the Term Loans or Revolving Credit Facility Commitments (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reduction of any of the voting percentages, (ii) except as set forth below, modifications to any provisions dealing with pro rata or priority treatment of, or payments to, the Lenders, (iii) releases of all or substantially all of the Collateral (other than in connection with any immaterial adjustments, including lot line adjustments and easements, and disposition of Collateral, all as permitted by the Credit Facilities); and (iv) releases of all or substantially all of the Guarantors (other than in connection with the release or sale of the relevant Guarantor permitted by the Credit Facilities).

The Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

The Credit Documentation shall provide that, so long as no default or event of default has occurred and is continuing and no Revolving Credit Loans are outstanding, Term Loans may be prepaid below par on a non-pro rata basis through Dutch auction or similar procedures to be agreed that are offered to all Lenders holding Term Loans on a pro rata basis in accordance with procedures and subject to restrictions to be agreed. Any Term Loan so prepaid shall automatically be canceled and retired.

Notwithstanding the foregoing, the Credit Documentation shall contain "amend and extend" provisions pursuant to which the Borrower may extend commitments and/or Term Loans with only the consent of the respective extending Lenders, it being understood that each Lender whose commitments and/or Term Loans are being extended shall have the opportunity to participate in such extension on the same terms and conditions

as each other Lender, provided that it is understood that no existing Lender will have any obligation to commit to any such extension.

| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) an event of default has occurred and is continuing, (b) the Administrative Agent, unless the assignee is a Lender, an affiliate of a Lender or an approved fund or (c) the Issuing Bank, unless a Term Loan is being assigned.  The Sponsor or any of their affiliates shall be eligible assignees (subject to the consent required above); provided that (i) its pro rata share shall not exceed 25% in the aggregate; (ii) for purposes of any amendment, waiver or modification of the Credit Documentation or any plan of reorganization that does not in each case adversely affect the Sponsor (solely in its capacity as a Lender) in any material respect as compared to other affected Lenders, the Sponsor will be deemed to have voted in the same proportion as other Lenders; provided that an affiliate of the Sponsor (approved by the Administrative Agent) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the Sponsor does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity (each, an "Affiliated Lender Fund"), will not be subject to such voting limitations and will be entitled to vote as if it was a Lender; and (iii) the Sponsor shall not be permitted to attend any "lender-only" conference calls or meetings or receive any related "lender-only" information.  In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $5,000,000, in the case of a Revolving Commitment, and $1,000,000, in the case of a Term Loan, unless otherwise agreed by the Borrower and the Administrative Agent.  The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment.

The Lenders shall also be permitted to sell participations in their Loans.  Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations.  Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of Loans in accordance with applicable law shall be permitted without restriction. |

| | |
|---|---|
| Yield Protection: | The Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (and customary provisions for replacing Lenders that exercise their rights under the foregoing provisions) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Defaulting Lenders: | The Credit Documentation shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support, Letters of Credit, to the suspension of voting rights and rights to receive certain fees, and to termination or assignment of the Revolving Commitments or Loans of such Lenders). |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Sole Lead Arranger associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel) and (b) all out-of-pocket expenses of the Administrative Agent (including the fees, disbursements and other charges of counsel (to be limited (absent an actual or potential conflict of interest) to one outside counsel for JPMorgan and the Administrative Agent and any special and local counsel)) in connection with the enforcement of the Credit Documentation. |
| | The Administrative Agent, the Sole Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from bad faith, gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | State of New York. |

Counsel to the
Administrative Agent
and the Sole Lead Arranger:     Morrison & Foerster LLP.

## Interest and Certain Fees

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate, plus the Applicable Margin. The Borrower may elect interest periods of 1, 2, 3, or 6 months for Eurodollar Rate Borrowings. |

As used herein:

"ABR" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus [*]% and (iii) the Eurodollar Rate applicable for an interest period of one month plus [*]%; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the ABR be less than [*]% per annum.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate (before giving effect to any adjustment for reserve requirements) be less than [*]% per annum.

"Applicable Margin" means (a) (i) [*]%, in the case of ABR Loans (as defined below) under the Revolving Credit Facility and (ii) [*]% in the case of ABR Loans under the Term Loan Facility and (b) (i) [*]%, in the case of Eurodollar Loans (as defined below) under the Revolving Credit Facility and (ii) [*]% in the case of Eurodollar Loans under the Term Loan Facility.

"ABR Loans" means Loans bearing interest based upon the ABR.

"Eurodollar Loans" means Loans bearing interest based upon the Eurodollar Rate.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears. |

In the case of Eurodollar Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

| | |
|---|---|
| Commitment Fees: | The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.75% on the average daily unused portion of the Revolving Credit Facility, payable quarterly in arrears.[5] |
| Letter of Credit Fees: | The Borrower shall pay a fee on the face amount of each Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Credit Facility. Such fee shall be shared ratably among the Lenders participating in the Revolving Credit Facility and shall be payable quarterly in arrears. |
| | A fronting fee equal to 0.25% per annum on the aggregate face amount of each outstanding Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account. |
| Default Rate: | At any time when the Borrower is in default in the payment of any amount under the Credit Facilities, after giving effect to any applicable grace period, all outstanding amounts under the Credit Facilities shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to Revolving Loans maintained as ABR Loans from time to time). |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed. |

---

[5] To include a stepdown to 0.50%, subject to conditions to be agreed.

Exhibit C

Conditions

The availability of the Credit Facilities on the Closing Date shall be subject to the satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Commitment Letter to which this Exhibit C is attached and in Exhibits A and B thereto.

1.    Each party thereto shall have executed and delivered the Credit Documentation on terms consistent with the Commitment Letter and otherwise reasonably satisfactory to both the Loan Parties and the Commitment Parties. Under Term Sheet 2, the Credit Documentation for the Term Loan Facility and for the Revolving Loan Facility will be separate and will contain other terms consistent with first/second lien structures in which liens on Collateral securing the Revolving Loan Facility are prior and superior to the liens on Collateral securing the Term Loans and will include an intercreditor agreement setting forth the lien priority, relative rights and other creditors' rights issues in respect thereof.

2.    The Commitment Parties shall have received:

a.    customary closing certificates and legal opinions;

b.    a certificate from a responsible financial officer of the Borrower, in form and substance reasonably acceptable to the Commitment Parties, certifying that the Borrower and its subsidiaries, on a consolidated basis after giving effect to the Credit Facilities and the other transactions contemplated hereby, are solvent; and

c.    a Borrowing Base certificate evidencing that the Borrowing Base is not less than the Outstanding Amount after giving effect to Loans to be made and Letters of Credit to be issued on such date.

3.    On the Closing Date, after giving effect to the Credit Facilities, neither the Borrower nor any of its subsidiaries shall have any material indebtedness for borrowed money other than the Credit Facilities, the Take-Back Loan and certain other limited indebtedness to be agreed.

4.    The Borrower shall be in compliance with the financial covenants contained in the Credit Documentation on a pro forma basis.

5.    The Commitment Parties shall have completed and be satisfied in all respects with a due diligence investigation of the Borrower and its subsidiaries (including business, accounting and legal due diligence).[6]

6.    The closing of the Credit Facilities shall have occurred on or before January 31, 2011.

7.    The Administrative Agent shall have received, at least 5 days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

8.    The Borrower shall have used commercially reasonable efforts to receive a corporate family rating, and the Borrower shall have used commercially reasonable efforts to cause the Credit

---

[6] To be removed upon completion of due diligence, which is expected to occur on or about November 22, 2010.

Facilities to receive a rating, from Moody's Investors Service, Inc. and Standard & Poor's Financial Services LLC.

9. All fees and expenses due to the Commitment Parties and the Lenders to the extent invoiced on or prior to the Closing Date shall have been paid or shall have been authorized to be deducted from the proceeds of the initial fundings under the Credit Facilities.

10. All actions necessary to establish that the Administrative Agent will have a perfected first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority security interest (subject to liens permitted under the Credit Documentation) in the Collateral under the Credit Facilities shall have been taken with limited exception to be mutually agreed upon for certain non-Qualified Real Properties.

11. All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries shall have been obtained and be in full force and effect.

12. A final, non-appealable order has been entered authorizing the Borrower and Guarantors to enter into the Credit Facilities on terms substantially similar to those set forth in the Term Sheets and confirming the Plan of Reorganization, which Plan of Reorganization, unless approved by the Commitment Parties, shall not include any modifications to the plan of reorganization filed on October 1, 2010 which are materially adverse to the Commitment Parties (and shall not include any changes to the capital structure or cash position, as detailed in the sources and uses set forth on Schedule 1 attached hereto, of the Debtors that are not approved by the Commitment Parties) (it being acknowledged and agreed by the Commitment Parties that the proposed plan of reorganization filed on October 1, 2010 is satisfactory), and such Plan of Reorganization shall have gone effective.

13. The Administrative Agent shall have received an unaudited pro forma consolidated balance sheet of the Borrower and its subsidiaries as of the last day of the most recent fiscal quarter for which financial statements are available, adjusted to give pro forma effect to the implementation of the Plan of Reorganization and the financing contemplated hereby as if such transactions had occurred as of such date.

14. As a condition to the availability of the Credit Facilities, the Sole Lead Arranger (a) shall have received one or more customary confidential information memoranda and other marketing material customarily used for the syndication of the Credit Facilities and (b) shall have been afforded a reasonable period of time to syndicate the Credit Facilities, which in no event shall be less than 15 consecutive business days from the date of delivery of the confidential information memorandum to the Lenders, which period shall exclude blackout periods of November 23, 2010 to November 28, 2010 and December 17, 2010 to January 2, 2011.

Certain Definitions

"Acceptable Appraisal" shall mean an appraisal (reasonably acceptable to the Administrative Agent as to form, assumptions, substance and appraisal date that is addressed to the Administrative Agent and was commissioned by the Administrative Agent) prepared on a fair market value basis by a qualified licensed professional appraiser reasonably acceptable to Administrative Agent and complying in all material respects with the requirements of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989.

"Appraised Value" shall mean, with respect to any Real Property or any portion thereof, the appraised value of such Real Property or portion thereof set forth in the most-recent Acceptable Appraisal obtained by the Administrative Agent pursuant to the Credit Documentation. The Appraised Value of Real Property shall be adjusted to take into account any portion that has been sold or otherwise transferred. The Appraised Value of a portion of Real Property shall be calculated based on the Acceptable Appraisal for such Real Property and allocated to such portion of such Real Property by Borrower based on a methodology to be described. The Appraised Value of all or any portion of a Real Property shall be adjusted from time to time approved by the Administrative Agent in its reasonable discretion to take into account partial dispositions, costs of improvement, damage, destruction, other casualty, condemnation, eminent domain, contamination and other adverse events. Except as otherwise reasonably determined by the Administrative Agent in its discretion, Borrower may, but shall not be required to, (i) calculate the Appraised Value of Qualified Real Property as the actual Appraised Value plus the book value of improvements since the prior measurement date and (ii) upon disposition of any such Qualified Real Property, deduct from the Appraised Value an amount equal to (A) cost of goods sold as a result of such disposition times (B) a fraction equal to the most recent adjusted Appraised Value of such Qualified Real Property divided by the corresponding book value of such Qualified Real Property (including improvements thereto). The Administrative Agent may determine that the Appraised Value of a Qualified Real Property is $0.00 as a result of material damage, destruction, other casualty, condemnation, eminent domain, contamination or other adverse event affecting such Qualified Real Property. During the first six (6) months after the Closing Date, references to Appraised Value in the definition of "Borrowing Base" shall be deemed to mean book value with respect to any Qualified Real Property for which an Appraisal has not yet been delivered.

"Borrowing Base"

For purposes of the Credit Facilities under Term Sheet 1, Borrowing Base shall mean, as of any date, an amount calculated as follows:

(a) 100% of Borrowing Base Cash; plus

(b) 90% of the lesser of Appraised Value or book value of Housing Units under Contract and Lots under Contract; plus

(c) 80% of the lesser of Appraised Value or book value of Speculative Housing Units; plus

(d) 75% of the lesser of Appraised Value or book value of Finished Lots; plus

(e) subject to the limitation set forth below, the lesser, as of any date, of (i) 50% of the lesser of Appraised Value or book value of Lots under Development or (ii) 25% of the Borrowing Base; plus

(f) subject to the limitation set forth below, 30% of the lesser of Appraised Value or book value of Lots and Housing Units (other than Lots and Housing Units described in clauses (a) through (e) above) that is Qualified Real Property.

Notwithstanding the foregoing, the Borrowing Base shall not include any amount under clauses (e) and (f) above to the extent that the sum of such amounts exceeds fifty percent (50%) of the total Borrowing Base.

For purposes of the Credit Facilities under Term Sheet 2, Borrowing Base shall mean, as of any date, an amount calculated as follows:

(a) 100% of Borrowing Base Cash; plus

(b) 90% of the book value of Housing Units under Contract and Lots under Contract; plus

(c) 80% of the book value of Speculative Housing Units; plus

(d) 75% of the book value of Finished Lots; plus

(e) subject to the limitation set forth below, the lesser, as of any date, of (i) 50% of the book value of Lots under Development or (ii) 25% of the Borrowing Base; plus

(f) subject to the limitation set forth below, 30% of the book value of Lots and Housing Units (other than Lots and Housing Units described in clauses (a) through (e) above) that is Qualified Real Property.

Notwithstanding the foregoing, the Borrowing Base shall not include any amount under clauses (e) and (f) above to the extent that the sum of such amounts exceeds fifty percent (50%) of the total Borrowing Base.

"Borrowing Base Availability" shall mean, as of any date, the lesser of (a) the Revolving Commitments and (b) (i) the Borrowing Base calculated in the most recently delivered Borrowing Base certificate minus (ii) the Outstanding Amount on such date.

"Borrowing Base Account" shall mean one or more deposit accounts or securities accounts (to which are credited only cash and Borrowing Base Permitted Investments) maintained by Borrower with Administrative Agent or its designee in which Administrative Agent has for the ratable benefit of the Lenders and Administrative Agent a first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority security interest and lien, perfected by control pursuant to a blocked account control agreement, as collateral security for the Obligations. The only cash or Borrowing Base Permitted Investments permitted into the Borrowing Base Account shall be cash or Borrowing Base Permitted Investments (a) directly from the Collateral Proceeds Account or (b) held in a pledged Collateral account for a period of at least ninety (90) days.

"Borrowing Base Cash" shall mean Cash and Borrowing Base Permitted Investments held or maintained in the Borrowing Base Account in which Administrative Agent has for the ratable benefit of the Lenders and Administrative Agent a first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority security interest and lien, perfected by control pursuant to a blocked account control agreement, as collateral security for the Obligations.

"Borrowing Base Permitted Investments" shall mean certain permitted investments to be determined in the Credit Documentation.

"Cash" shall mean money, currency or a credit balance in an unrestricted deposit account, including those funds from the Collateral Proceeds Account and funds in transit from title companies subsequent to a home closing.

"Cash Flow Coverage Ratio" shall mean, for any rolling period of four fiscal quarters, the ratio of Unlevered Free Cash Flow to Consolidated Interest Expense.

"Collateral Proceeds Account" shall mean one or more deposit accounts or securities accounts (to which are credited only cash and Borrowing Base Permitted Investments representing or arising from proceeds of the sale or other disposition of Borrowing Base Collateral) maintained by Borrower with Administrative Agent or its designee in which Administrative Agent has for the ratable benefit of the Lenders and Administrative Agent a first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority security interest and lien, perfected by control pursuant to a blocked account control agreement, as collateral security for the Obligations.

"Consolidated Earnings" shall mean, for any period, the amount which would be set forth opposite the caption "net income" (or any like caption) in a consolidated statement of income or operations of the Borrower and its subsidiaries for such period prepared in accordance with GAAP.

"Consolidated Indebtedness" shall mean, at any date, Indebtedness of the Borrower and its subsidiaries on a consolidated basis, and shall not include Indebtedness of a Loan Party to another Loan Party.

"Consolidated Interest Expense" shall mean, for any period, the aggregate amount (without duplication and determined in each case in accordance with GAAP) of interest payable in cash (excluding interest of a Loan Party to another Loan Party) incurred, whether such interest was expensed or capitalized, paid, accrued, or scheduled to be paid or accrued by any of the Loan Parties (excluding any subsidiary of the Borrower that is not a Loan Party) during such period, including (a) the interest portion of all deferred payment obligations, and (b) all commissions, discounts, and other fees and charges (excluding premiums) owed with respect to bankers' acceptances and letter of credit financings and interest swap and Hedging Obligations, in each case to the extent attributable to such period.

"Consolidated Tangible Net Worth" shall mean, at any date, the consolidated stockholders equity of the Borrower determined in accordance with GAAP, less intangible assets, all determined as of such date.

"Finished Lots" shall mean all Lots (excluding Lots under Contract) owned by the Borrower or any Guarantor with respect to which (a) development has been completed to such an extent that permits that allow use and construction, including building, sanitary sewer and water, are entitled to be obtained for a Housing Unit on such Lot and (b) start of construction has not occurred.

"First Lien Leverage Ratio" shall mean, as of any date, the ratio of (a) the Outstanding Amount under the Revolving Credit Facility to (b) the sum of Consolidated Indebtedness plus Consolidated Tangible Net Worth.

"Hedging Obligations" of a person shall mean any and all obligations of such person, whether absolute or contingent and howsoever and whensoever created, arising evidenced or acquired (including

all renewals, extensions and modifications thereof and substitutions therefor), (a) under any and all agreements, devices or arrangements designed to protect at least one of the parties thereto from the fluctuations of interest rates, commodity prices, exchange rates or forward rates applicable to such party's assets, liabilities, or exchange transaction, including, but not limited to, dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any of the foregoing.

"Housing Unit" shall mean Qualified Real Property that is a detached or attached (including townhouse condominium or condominium) single-family house (but excluding mobile homes) owned by Borrower or a Guarantor (i) which is completed or for which there has been a start of construction and (ii) which has been or is being constructed on Land which immediately prior to the start of construction constituted a Lot hereunder. The book value of Housing Units shall be calculated in accordance with GAAP and shall include all associated costs (including the applicable Lot costs) required to be capitalized under GAAP, provided that the cost of obtaining commitments for financing terms to be provided to the buyers of Housing Units shall be excluded.

"Housing Unit under Contract" shall mean, at any date, a Housing Unit that is owned by the Borrower or a Guarantor as to which the Borrower or such Guarantor has entered into a bona fide contract of sale (a) in a form customarily employed by the Borrower or such Guarantor, (b) not more than fifteen (15) months prior to such date, (c) with a Person who is not a subsidiary or affiliate, (d) which provides for closing on or before the later of thirty (30) days after completion of such Housing Unit or ninety (90) days' after the date of such contract, and (e) under which no defaults then exist; provided, however, that in the case of any Housing Unit the purchase of which is to be financed in whole or in part by a loan insured by the Federal Housing Administration or guaranteed by the Veterans Administration, the required minimum down payment shall be the amount (if any) required under the rules of the relevant agency. A Housing Unit shall not constitute a Housing Unit under Contract, at any date of determination, if (i) such Housing Unit is not completed and (ii) the start of construction thereof occurred more than twelve (12) months prior to such date.

"Indebtedness" of any person shall mean, without duplication, (a) all liabilities and obligations, contingent or otherwise, of such person (i) in respect of borrowed money (whether or not recourse of the lender is to the whole of the assets of such person or only to a portion thereof), (ii) evidenced by bonds, notes, debentures or similar instruments, (iii) representing the balance deferred and unpaid of the purchase price of any property or services, except those incurred in the ordinary course of its business that would constitute ordinarily a trade payable to trade creditors (but specifically excluding from such exception the deferred purchase price of Real Property), (iv) evidenced by bankers' acceptances, (v) consisting of obligations, whether or not assumed, secured by liens or payable out of the proceeds or production from property now or hereafter owned or acquired by such person, (vi) consisting of capitalized lease obligations (including any capitalized leases entered into as part of a sale/leaseback transaction), (vii) consisting of liabilities and obligations under any receivable sales transactions, (viii) consisting of a letter of credit, other than a performance letter of credit, or a reimbursement obligation of such person with respect to any letter of credit, (ix) consisting of Hedging Obligations, or (x) consisting of contingent obligations. With respect to the Borrower, Indebtedness includes, without limitation of the foregoing, (x) the Loans and Letters of Credit and (y) the Borrower's and any subsidiary's pro rata share of the Indebtedness of any Joint Venture.

"Joint Venture" shall mean a joint venture (whether in the form of a corporation, a partnership, limited liability company or otherwise) (a) to which the Borrower or a Joint Venture Subsidiary is or becomes a party (other than tenancies in common), (b) whether or not the Borrower is required to consolidate the joint venture in its financial statements in accordance with generally accepted accounting

principles, and (c) in which the Borrower or any Joint Venture Subsidiary has or will have a total investment exceeding $25,000 or which has total assets plus contingent liabilities exceeding $100,000. For the purposes of this definition, the Borrower's or Joint Venture Subsidiary's investment in a joint venture shall be deemed to include any securities of the joint venture owned by the Borrower or any Joint Venture Subsidiary, any loans, advances or accounts payable to the Borrower or any Joint Venture Subsidiary from the joint venture, any commitment, arrangement or other agreement by the Borrower or any Joint Venture Subsidiary to provide funds or credit to the joint venture and the Borrower's or Joint Venture Subsidiary's share of the undistributed profits of the joint venture.

"Joint Venture Subsidiary" shall mean a subsidiary of the Borrower which is a partner, shareholder or other equity owner in a joint venture which is not a Loan Party.

"Land" shall mean land owned by the Borrower or a Guarantor, which land is being developed or is held for future development or sale.

"Land Under Contract" means Land (other than Lots) that is Qualified Real Property owned by the Borrower or a Guarantor as to which the Borrower or such Guarantor has entered into a bona fide contract of sale with a Person who is not a subsidiary or affiliate.

"Leverage Ratio" shall mean the ratio of (a) Consolidated Indebtedness to (b) the sum of Consolidated Indebtedness plus Consolidated Tangible Net Worth.

"Liquidity" shall mean, at any time, the sum of all (a) Cash, cash from the sale of Housing Units and Cash Equivalents of the Borrower and all Guarantors, on a consolidated basis plus (b) the amount by which (i) the lesser of (x) the sum of the aggregate Revolving Commitments plus aggregate Term Loans outstanding and (y) the then current Borrowing Base Availability exceeds (ii) the Outstanding Amount.

"Lots" shall mean all Land that is Qualified Real Property owned by Borrower or a Guarantor which satisfies the following criteria:

(a) such Land is either: (i) described in a duly recorded plat, subdivision map or plan, final subdivision report or other delineated representation of the subdivision of lands (as applicable in the jurisdiction in which the Land is located) being a complete and exact representation of the subdivision, or a site plan (in the case of condominiums) executed and approved by the appropriate governmental authorities; or (ii) described in an approved unexpired resolution by the governmental authority having jurisdiction granting unexpired preliminary subdivision or site plan approval (as the case may be) (unless such preliminary approval is about to expire, as to be agreed) as depicted on the unrecorded preliminary site or subdivision plat, map or plan, being a complete representation of the approved but unrecorded plat of the site or subdivision of such land, containing certain other data required by local ordinances governing the subdivision of land, which has been approved by any and all governmental authorities having jurisdiction over the preliminary approval and demonstrates compliance with each and all of the standards and conditions imposed by any and all governmental authorities (unless waivers, variances, special exceptions or otherwise have been otherwise granted), and requires no further discretionary approvals, but is not a recorded final plat, map or plan. With respect to approval, issuance and recordation of a final subdivision plat, map or plan regarding such Land covered by an approved but unrecorded plat, map or plan, a valid and binding subdivision improvement agreement (if required by the applicable governmental authorities) has been executed between the owner of the Land and such governmental authorities covering installation of all offsite and other improvements required by any and all relevant governmental authorities as a condition to the issuance of a final subdivision of a final subdivision plat, map or plan;

(b) all of the said Land is zoned under applicable requirements of any and all relevant governmental authorities to permit the construction of each and all said improvements and residential dwelling units or commercial or industrial buildings (as applicable) to be located thereon, consistent with any local governmental comprehensive plan;

(c) the type and intensity of development planned to be constructed on the Land can be constructed, and permits and certificates of occupancy can be obtained, in conformance with the applicable local governmental levels of service standards (i.e., concurrency requirements) for public facilities needed to accommodate the impacts of the development to be constructed on all such Land, including but not limited to roads, water, sewer, drainage, recreation, mass transportation, solid waste and schools; and

(d) there exist no pending building or other moratoria, down zoning petitions, land use amendments, proceedings or restrictive allocations or similar matters that could adversely affect the owner's use of any and all such Land, other than those that are expected to be, and actually are, lifted or stayed within ninety (90) days after institution.

Notwithstanding the foregoing, the term "Lots" shall not include any Land upon which the start of construction has occurred.

"Lots under Contract" shall mean all Lots owned by Borrower or a Guarantor as to which Borrower or such Guarantor has entered into a bona fide contract of sale with a Person who is not a subsidiary or affiliate.

"Lots under Development" shall mean all Lots owned by Borrower or a Guarantor with respect to which construction of streets or other subdivision improvements has commenced but which are not Finished Lots or Lots under Contract.

"Model Houses" shall mean (a) all Housing Units owned by the Borrower or any Guarantor which are being used as sales models and (b) all Housing Units owned by the Borrower or any Guarantor for which there has been a start of construction which upon completion will be used as sales models.

"Outstanding Amount" shall mean, as of any date, the aggregate principal amount of Loans outstanding after giving effect to any borrowings, repayments and prepayments on such date plus the amount of Letter of Credit obligations outstanding on such date after giving effect to any issuance or reimbursements made on such date.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Qualified Real Property" shall mean, with respect to the Borrower or Guarantor as of any date, Real Property that is owned solely or jointly and severally by such Person(s) where:

(a)     Except during the six (6) month period after the Closing Date under Term Sheet 1 or in connection with the Credit Facilities under Term Sheet 2, Administrative Agent shall have received an Acceptable Appraisal (the fees and expenses associated with such Acceptable Appraisal to be paid by Borrower in accordance with the terms of this Agreement);

(b)     Except during the six (6) month period after the Closing Date, Administrative Agent shall have received phase 1 environmental assessment reports, in form and substance reasonably satisfactory to Administrative Agent from an environmental consulting firm reasonably satisfactory to

Administrative Agent, and within 10 days after such reports are made available to the Lenders by Administrative Agent, Administrative Agent shall not have received notice from the Required Lenders that such reports or firm are(is) not satisfactory to the Required Lenders;

(c)     Administrative Agent shall have received, upon its request, a copy of all recorded documents referred to, or listed as exceptions to title in, the policy or policies referred to in clause (e) below and a copy of all other material documents affecting such Real Property;

(d)     Administrative Agent shall have received a mortgage covering such Real Property duly executed and delivered by a duly authorized officer of each party thereto and in proper form to be recorded and filed in the appropriate offices in order to create valid and perfected first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority liens on such Real Property in favor of Administrative Agent and Administrative Agent shall have received such other evidence that all other actions necessary in order to create valid and perfected first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority liens on such Real Property have been taken or will be taken contemporaneously with the recording and filing of such mortgage, together with applicable assignments of leases and rents and financing statements;

(e)     Administrative Agent shall have received from a title insurance company reasonably acceptable to it in respect of such Real Property a mortgagee's title insurance policy (or policies) and endorsements thereto or marked up unconditional commitment for such insurance, including "gap" insurance coverage if the applicable mortgage has not yet been recorded, in each case in form and substance reasonably satisfactory to Administrative Agent and containing such endorsements as Administrative Agent may reasonably require;

(f)     Administrative Agent shall have received evidence satisfactory to it that such Real Property is covered by property and liability insurance that is customary for the business of the Borrower and, in the case of property insurance, names Administrative Agent an additional insured and as mortgagee;

(g)     Administrative Agent shall have received evidence satisfactory to it that all premiums in respect of the policies referred to in clause (e) above, all charges for mortgage recording tax, recording charges and all related expenses, if any, have been paid;

(h)     Administrative Agent shall have received (i) a flood hazard certificate, (ii) a policy of flood insurance to the extent improvements on such Real Property are located in a federally designated "Flood Zone", which policy provides coverage in an amount not less than the book value of such Real Property located in a "Flood Zone" or the maximum limit of coverage made available with respect to the particular type of Real Property located in the "Flood Zone" under the National Flood Insurance Act of 1968, whichever is less, to the extent available and (iii) evidence satisfactory to Administrative Agent that all actions relating such Real Property as are required by regulations implementing the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973 with respect to loans in areas having special flood hazards have been accomplished;

(i)     Administrative Agent shall have received an opinion letter from local counsel reasonably requested by Administrative Agent addressed to Administrative Agent and the Lenders in the jurisdiction in which such Real Property is located with respect to the enforceability, validity and form of the mortgage and any related fixture filings, all in form and substance reasonably satisfactory to Administrative Agent;

(j)     Such Real Property is subject to a valid enforceable first (in the case of the Credit Facilities under Term Sheet 1) or first and second (in the case of the Credit Facilities under Term Sheet 2) priority lien and perfected security interest in favor of Administrative Agent for the ratable benefit of the Lenders and Administrative Agent (subject only to limited permitted liens) as collateral security for the Obligations; and

(k)     Except for (i) Real Property Collateral in existence as of the Closing Date, (ii) Real Property purchased with Borrowing Base Cash or proceeds from the Collateral Proceeds Account and (iii) Real Property received as a dividend from a joint venture (of the Borrower or a Guarantor), the equity of which has been pledged as Collateral for a period of at least ninety (90) days, ninety (90) days shall have passed from the date on which the applicable mortgage is properly recorded in the applicable real property records.

"Real Property" shall mean Land owned, leased or hereafter acquired or leased by the Borrower or any Guarantor, together with the right, title and interest of the Borrower or such Guarantor in and to the streets, the land lying in the bed of any streets, roads or avenues, opened or proposed, in or of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights  appertaining to the use and enjoyment of the Land necessary for the residential development of such Land, together with all of the buildings and other improvements now or hereafter erected on the Land, and any fixtures appurtenant thereto and all related personal property.

"Speculative Housing Unit" shall mean any Housing Unit owned by the Borrower or a Guarantor that is not a Housing Unit under Contract and shall include, without limitation, all Model Houses.

"Take-Back Refinancing Facility" shall mean any term loan, note or bond issue refinancing the Take-Back Loan within twelve (12) months after the Closing Date.

"Unlevered Free Cash Flow" shall mean, for any period, the cash receipts of the Borrower and its subsidiaries from homebuilding activities less cash disbursements of the Borrower and its subsidiaries from homebuilding activities (excluding interest and taxes), all calculated as set forth in the most recently delivered Budget.