**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

In Re:                           )   Chapter 11
                                    )
ORLEANS HOMEBUILDERS, INC.,    )
et al.,                       )   Case No. 10-10684(PJW)
                                    )   Jointly Administered
                      Debtors.    )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rafael Zahralddin-Aravena      John D. McLaughlin, Jr.
Shelley A. Kinsella             CIARDI CIARDI & ASTIN
Andrew G. Mirisis                919 N. Market Street
ELLIOTT GREENLEAF            Suite 700
1105 North Market Street       Wilmington, DE 19801
Suite 1700
Wilmington, DE 19801          Counsel to Allsteel Supply,
                                         Inc.

Joel H. Levitin
Michael R. Carney
Maya Peleg
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005

Attorneys for Debtors and
Debtors-in-Possession

Dated: March 8, 2011

**WALSH, J.**

This is the Court's findings of fact and conclusions of law with respect to Debtors' Motion for Order (A) Enforcing the Automatic Stay, (B) Awarding Actual Damages, Costs, Attorney's Fees, and Punitive Damages and (C) Holding Allsteel Supply, Inc. in Civil Contempt. (Doc. # 902.)  For the reasons set forth below, I will grant the motion, subject to a further hearing to give the Respondent an opportunity to challenge the amount of attorneys' fees related to the Motion and to the conduct of the Respondent. I will also defer until that hearing whether there will be an assessment of punitive damages.

## BACKGROUND

Orleans Homebuilders, Inc. ("Orleans") builds, develops, markets, and sells single-family homes, townhouses, and condominiums to various segments of the homebuyer market.  Orleans also regularly purchases land and finished lots for development, improves land to be ready for home construction, obtains land entitlements, and invests in joint venture projects with other homebuilders.  Most of Orleans' projects are "master-planned" residential communities where Orleans purchases plots of land, obtains the necessary approvals, builds several model homes and "spec" (constructed but unsold) homes, and then builds additional "backlog" homes upon entering into sales contracts with homebuyers.

Orleans typically acts as a general contractor and employs subcontractors to construct homes and install site improvements.

On March 1, 2010 (the "Petition Date"), each of Orleans and affiliates filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

Allsteel Supply, Inc. ("Allsteel") supplied steel to Orleans prior to the Petition Date.  Orleans would send design plans for its houses to Allsteel, and Allsteel would fabricate and deliver "lots of steel" to each building lot.  A "lot of steel," as described by Allsteel representative Joseph Batcho, "is basically a complete set of steel for the fabrication of a house.  It usually includes a number of beams and a number of columns."  (Tr. 54:19-21.)  Allsteel filed proofs of claim for unpaid pre-petition deliveries.

Within days of the Petition Date, Allsteel was aware of Orleans' Chapter 11 proceedings and consequent automatic stay.  On March 5 and 10, 2010, Orleans' claims and noticing agent served Allsteel with a copy of the case commencement notice and various other first day motions, orders, and related notices.  (Doc. # 40.) Among other statements, the case commencement notice contains the following warning:

> **CREDITORS MAY NOT TAKE CERTAIN ACTIONS:** A creditor is anyone to whom a debtor owes money or property.  Under the Bankruptcy Code, a debtor is granted certain protection against

> creditors.  <u>Common examples of prohibited actions by creditors</u> are contacting a debtor to demand repayment, taking action against a debtor to collect money owed to creditors or <u>to take property of a debtor</u>, and starting or continuing foreclosure actions or repossessions.  <u>If unauthorized actions are taken by a creditor against a debtor, the Court may penalize that creditor</u>.  A creditor who is considering taking action against a debtor or the property of a debtor should review Bankruptcy Code § 362 and may wish to seek legal advice.

(Doc. # 40) (emphasis added.)

The record reflects that this notice was mailed to:

> Allsteel Supply, Inc.
> Attn: Joe Batch[o]
> 412 Caredean Dr
> Horsham, PA 19044-1315

(Doc. # 106, Ex. A.)

According to Orleans:

(a) Between March 18 and April 22, 2010, Allsteel removed steel (beams, columns, plates, bolts) that had been delivered to Orleans prior to the Petition Date from various of Orleans' building sites.  Upon learning of the removals, Orleans' employees contacted Allsteel several times in order to amicably resolve their dispute to avoid the costs incident to litigation.  Allsteel was unresponsive.  (Doc. # 902, ¶ 11.)

(b) On or about Friday April 23, 2010, Allsteel was caught attempting to remove additional steel from one of Orleans' building sites.  Allsteel was confronted by Orleans' employees and returned the steel.  However, within a week Allsteel returned to

the building site and successfully removed additional steel without being caught.  (<u>Id.</u>, ¶ 12.)

(c) Orleans estimates that the total loss from Allsteel's removal of building materials was approximately $24,249.89. Orleans has replaced the removed materials with steel from a new vendor as needed.  (<u>Id.</u>, ¶ 13.)

In its response to the Motion, Allsteel repeatedly asserts: "Allsteel submits that to the extent <u>[Orleans] requested</u> Allsteel to remove old steel that remained at [Orleans'] jobsites, including material incorrectly ordered and steel left behind by mistake, Allsteel removed same <u>upon the direction, authorization and instruction of [Orleans}</u>."  (Doc. # 1042, ¶¶ 11-13) (emphasis in original.)

An evidentiary hearing on this matter was held on December 21, 2010.  Four witnesses gave testimony at the hearing, three for Orleans (Anthony Paz, Samuel Williams and David Stith) and one for Allsteel (Joseph Batcho).  In addition, Orleans offered a portion of the deposition of Edmund J. McGowan, the owner of Allsteel.  I find the following excerpts from the hearing transcript to be particularly relevant to this dispute.

**Anthony Paz** - Field supervisor for Orleans

Direct examination:

"Q.  Did there come a time when you witnessed steel being removed from the jobsite at - - of Orleans?

A.    Yes.

                    *  *  *

Q.    The end of March 2010?

A.    Yes.

Q.    What did you witness?

A.    I had three lots of steel sitting and I
witnessed the driver loading three houses.  He
actually was on the last house when I
approached him.

Q.    Did you see any identifying markers with
that person?

A.    Yeah.  It said Allsteel on the truck.

Q.    What happened then?

A.    I proceeded to tell him that I can't
advise him or let him drive off with the
steel, so he contacted the office and it was
Joe who I spoke to on the phone, let him know
that, you know, at this time they can't drive
off the site.  So, in a nutshell, he asked me
if his driver was to leave would I call the
police and I said, "Yes."  He said, "Fine."
So, we agreed - - he agreed to put it back.  I
stayed around till he dropped the last load at
the last house and I left and I was on my way.

Q.    And did Joe have a last name?

A.    Botko? Botcho?

Q.    What happened at that site after that?

A.    I can't remember what day, so, I'm kind
of thinking Thursday or Friday when I came in
the following week, let's say, Monday.  That's
when I noticed the steel was gone.  So, the
three sites that they put back mysteriously
disappeared over the weekend.

Q.  And  did  you  report  that  to  your superiors?

A.  Yeah. Yeah."

(Tr. at 5:10-6:19.)

Cross-examination:

"Q.  Okay.  Now, you testified that there was a  brief  exchange  and  then  a  driver  left without the steel.  Is that correct?

A.  Correct."

(Tr. at 7:24-8:1.)


Redirect examination:

"Q.  The items you described that were taken, were these large items?

A.  Yes.

Q.  And would it take special equipment to take them away?

A.  Absolutely.

Q.  About how much weight is in an I-beam for a house?

A.  I don't know.  But I would gather, you know, 800 pounds or around that.

Q.  Could two guys pick it up and walk off with it?

A.  No, Not likely. . . . So, you have to be equipped  to  remove  steel  I-beams  off  of  a jobsite."

(Tr. at 10:11-23.)

Further redirect examination:

"Q.  At the time you spoke with an emp --
someone, did the driver put you in touch with
that person?

A.   Yes.

Q.   Did that person identify themselves as
Joe Batcho?

A.   Yes."

(Tr. at 11:16-20.)

**Samuel Williams** - Project manager for Orleans

Direct examination:

"Q.  Did there come a time when you learned
that steel was removed from jobsites owened by
Orleans?

A.   Yes.

Q.   What did you learn?

A.   I heard from the one of the
superintendents --"

(Tr. at 12:15-19.)

"Q.  And were you the project manager for
certain communities?

A.   Yes.

Q.   And did you get such a report?

A.   Yes."

(Tr. at 13:10-13.)

"Q.  Is it part of your job to then replace
items that are not there when they need to
construct the home?

A.   Provide direction for replacement.

* * *

Q.    What were you told about items missing
from your jobsites?

A.    I got a call from the superintendent that
handled a couple of communities for me and he
said that Allsteel was removing the steel from
the projects.

* * *

Q.    – - what specifically did you understand
was removed?

A.    Multiple houses of steel I-beams and
columns.

* * *

Q.    Was this steel that was set to be used
for particular homes?

A.    Yes.

Q.    This was not mistakes?

A.    No.

Q.    Was there ever a time when you personally
authorized Allsteel to remove any steel from a
jobsite?

A.    Absolutely not."

(Tr. at 14:8-15:9.)

"Q.    Did you authorize Allsteel to remove the
steel that your superintendent reported to you
as missing?

A.    Absolutely not.

Q.    And when approximately did this occur?

* * *

A.    it was probably April.

> Q.  Was it after the bankruptcy filing had occurred?
>
> A.  Yes.
>
> Q.  What did you do after you got that report?
>
> A.  I contacted my supervisor.
>
> Q.  And who was that?
>
> A.  Jonathan Fineberg (ph.)."

(Tr. at 15:17-16:5.)

Cross-examination:

> "Q.  You testified that your supervisor said that Allsteel had removed them.  How did he -- do you know how he reached that conclusion?
>
> A.  I don't know for sure.
>
> Q.  Okay.  Do you personally have any knowledge if Allsteel removed anything?  Did you ever see them remove anything?
>
> A.  I did not."

(Tr. at 17:7-13.)

> "Q.  Okay.  What, if anything, did you do once the property was reported missing?
>
> A.  I reported it to my supervisor."

(Tr. at 18:6-8.)

> **David Stith** - Vice president of Orleans

Direct examination:

> "Q.  Did there come a time when you had conversations with Mr. Ed McGowan of Allsteel?
>
> A.  Yes. . . .

Q.   Did you speak with him in March or April of 2010?

A.   Yes.

Q.   What was the substance of your conversation with Mr. McGowan?

A.   It was regarding the steel disappearing at the jobs.

Q.   What did you say to him and what did he say to you?

A.   Ed wasn't entirely happy with me.  He took the whole incident, understandably I guess, very personally and he took it personally against me in particular.

Q.   By incident you mean the bankruptcy?

A.   Yes.  And he was removing the steel, he felt like he was justified in that.  Removing the steel, I had told him that there were other courses that he should and could take.

* * *

Q.   And was it your understanding that he had already taken such steel?

A.   He had already taken some and he had taken some subsequent to that conversation.

* * *

Q.   Did he tell you he was going to take more material?

A.   He told me that he was and was justified in doing so.

* * *

Q.   Did he use the words like, "all the steel?"

A.   Yes.   He told me that he was going --
anything he could take he would take."

(Tr. at 19:15-21:3.)

"Q.   Mr. Batcho -- do you know who Mr. Batcho
is?

* * *

A.   He is as always presented to me as a
represent -- the representative of Allsteel."

(Tr. at 21:17-21.)

"Q.   . . .  What did Mr. Batcho say to you and
what did you say to Mr. Batcho?

A.   The conversation was much the same.   It
is that we needed the material to start
construction that they weren't really -- they
had no grounds to take the material whether he
thought it was right or wrong or fair or not
fair.   That legally they couldn't remove the
material from the site.

Q.   What did Mr. Batcho say to you?

A.   I believe that he deferred to Ed.   That,
you know, I don't recall his exact words but
more or less we got to do what we got to do.
But he was going to refer to Ed."

(Tr. at 22:2-12.)

"Q.   Did you have to replace the steel from
those lots?

A.   Yes, we did.

Q.   And did the company replace the steel
from those lots?

A.   Yes, we did.

Q.   Did the company get billed for the
replacement steel?

A.   Yes.

Q.   Did the company pay for the replacement steel?

A.   Yes, we did."

(Tr. at 22:24-23:6.)

"Q.   Mr. Stith, can you identify what Debtor's Exhibit 1 is?

A.   This is a list of the materials that we have -- I'm sorry; this is the checks that we paid for the material to replace the material that disappeared.

Q.   And who is the vendor that replaced the materials that disappeared?

A.   Orkin, Inc.  It's Harry Orkin, Inc.

Q.   What was the total cost of the materials that were - -

A.   $23,747.91

                    *  *  *

Q.   Do you believe this to be an accurate description of the amounts paid to replace the steel?

A.   Yes, I do."

(Tr. at 23:12-24:2.)

Cross-examination:

"Q.   .  .  .  Sir, did you ever personally see anyone from Allsteel remove any property from any worksites of Orleans?

A.   No."

(Tr. at 25:14-17.)

"Q. Okay. Now did you -- is it your testimony that originally you had ordered steel from Allsteel for each and every one of these projects or these sites listed on D-1?

A. Yes.

Q. And it's your testimony that all this steel -- did Allsteel actually deliver the steel for all these?

A. Yes. That's my testimony.

Q. Okay. And you're saying that the steel disappeared?

A. Yes."

(Tr. at 26:6-14.)

"Q. . . . do you have specific knowledge with regard to any of these particular items of who at Allsteel and when it was removed if, in fact, it was removed.

A. Well, the only knowledge that I have was as a result of the conversation with Mr. McGowan.

Q. Okay. And what exactly did Mr. McGowan say? Did he tell you why he removed the steel?

A. Because he felt justified in removing the steel --

                    * * *

A. . . . He said that he felt that he was justified because he hadn't been paid for the steel and –

                    * * *

Q. Did he ever discuss with you incorrect steel?

A. No.

* * *

A.   Within regards to this list, no, he did not.

Q.   Okay.  As far as you know, was there any nonconforming steel delivered --

A.   Within this list, no.

Q.   -- delivered by Allsteel?

A.   True.

Q.   Okay.  So everything they delivered was completely conforming to your specifications?

A.   As I know it, yes."

(Tr. at 26:25-28:12.)

"A.  . . . it'd be checked for that it is the right length and that the right count of columns are included.

Q.   Okay.  And when is that done?

A.   It's typically done either the day it's delivered or the next day.

* * *

Q.   . . . if a piece of steel is not correct, what happens?

* * *

A.   . . .  And then typically, they would bring a new piece of steel and then pick up the old piece of steel at the same time.  They would replace it.

Q.   Okay.  Simultaneously?

A.   Right.  Rather than make two different trips for the same -- "

(Tr. at 28:21-29:25.)

> "A.   They would -- whatever gyrations they would make, we would come to an agreement and then typically they would cut the new piece of steel, they would take that new piece of steel out, drop it off and pick up the incorrect piece of steel.
>
>                    * * *
>
> Q.   . . . Do you know of any circumstances in which Allsteel specifically would bring a replacement piece of steel but they come back at some later point in time and pick up the rejected incorrect steel?
>
> A.   I don't --
>
>                    * * *
>
> A.   -- I don't know of any, no."

(Tr. at 30:22-31:12.)

> "Q.   . . . Did Mr. McGowan, other than feeling that he hadn't been paid did he give you any indication of any other reason why he felt the steel should be removed?
>
> A.   I'll leave out the expletives but he thought that he was entitled."

(Tr. at 31:20-24.)

Redirect examination:

> "Q. Mr. Stith, at any time in your conversation with Mr. McGowan or Mr. Batcho, did they say to you we're only going to pick up mistaken steel?
>
> A.   There was no conversation whatsoever about mistaken steel."

(Tr. at 35:7-10.)

**Edmund J. McGowan** - Allsteel owner.

Deposition excerpts offered by Orleans:

> "Q.  Okay.  I see.  All right.  So, what --
> how are you aware of that?  I'm just trying to
> get at -- you know, you said that in this
> document that you removed steel at the
> authorization and instructions -- direction of
> [Orleans] and you said that they never called
> you or gave you that kind of authorization,
> direction, or instruction.  Is that right?
>
> A.   I'm not saying they didn't, I'm just
> saying it was always a fact to pick up old
> steel.
>
> Q.   Okay.
>
> A.   It only became an issue when they became
> a debtor.  That material was out -- that
> material that's out there is not billable, not
> invoiced, not part of the stay.  It's not to a
> house; it's to nothing.  But I'm trying to say
> it only became an issue when I guess they were
> afraid that we were taking something that was
> part of the house they were building.
>
> * * *
>
> Q.   To your knowledge, did Allsteel remove
> any kind of steel from [Orleans'] properties
> between March 18th, 2010 and April 22nd of
> 2010 to your knowledge?
>
> A.   Definition of steel or --
>
> Q.   Anything.  Steel as any kind of steel
> regardless of -- steel as in just steel as in
> material.  Between those two dates, March 18
> and April 22nd, to your knowledge did Allsteel
> remove steel from any of [Orleans']
> properties?
>
> A.   Only steel that was not secured by the
> stay."

(Tr. at 41:11-42:13.)

Counter designation offered by Allsteel:

> "Q.  Okay.  What is your understanding the words 'not secured by the stay?' What is your understanding of that?
>
> A.  Well, the steel that was out there was wrong.  That was not going to be paid for, billed on, invoiced, or anything like that.  It didn't have anything to do with the building of the house or has any worth to them."

(Tr. at 44:16-21.)

> "Q.  What does the word 'material' mean to you?
>
> A.  Well, what I'm saying is they're saying that I took these houses back.  I'm saying that I took material that was mistakes."

(Tr. at 45:5-8.)

> **Joseph M. Batcho** - Allsteel sales administrator

Direct examination:

> "Q.  .  .  .  Now, was there ever a time when the product delivered was not acceptable to Orleans?
>
> A.  Yes.  They had a number of problems with the delivery of steel to Orleans."

(Tr. at 51:15-18.)

> "Q.  Okay.  With regard to incorrect steel, I believe that's a term of ours, is that correct?
>
> A.  Right.
>
> Q.  Okay.  Was that --
>
> A.  Problem steel, incorrect steel.  We had a name for it that we don't want to use in this court."

(Tr. at 53:3-8.)

> "A.  . . .There were, as I stated, changes in the foundation would make a steel incorrect and unusable for that particular site."

(Tr. at 53:15-17.)

> "Q.  Okay.  And you would address that and have a replacement piece of steel supplied. Is that correct?
>
> A.   Fabricated and supplied, correct.
>
> Q.   . . . What is a lot of steel?
>
> * * *
>
> A.   A lot of steel is basically a complete set of steel for the fabrication of a house. It usually includes a number of beams and a number of columns.
>
> Q.  Okay.  If there was incorrect steel, would that be a whole lot that was incorrect or just a portion?
>
> A.   No.  It would be one piece here . . .
>
> * * *
>
> Q.  Okay. And would that render the entire – - if one  piece was improperly sized, would that render the entire lot –
>
> A.   No.
>
> Q.   -- nonfunctional for that house?
>
> A.   No.
>
> * * *
>
> "Q.  Okay.  And how would you handle -- what happened to the piece that was wrong?  The incorrect piece of steel?

 A. It was usually put off to the side for pick up at a later date.

* * *

 A. . . . The return runs were basically scheduled for downtime when we didn't have any steel to deliver or we had openings in our trucks and we would send the trucks out on loops to pick up the extra steel that was sitting at various lots."

(Tr. at 54:13-56:1.)

 "Q. Okay. And did you hear Mr. Stith testify that generally speaking a replacement piece would be delivered and the incorrect piece removed at the same time?

 A. That is incorrect. I did hear that but that is not the case. That never, very rarely, ever happened."

(Tr. at 56:12-16.)

 "Q. . . . When did you become aware that Orleans had sought protection of the bankruptcy court?

 A. When I received the notice which was, I guess, March of 2010."

(Tr. at 61:6-9.)

 "Q. . . . When did you provide those replacement pieces? Before or after the bankruptcy started?

* * *

 Q. The replacement pieces that you provided, when did you provide them?

 A. Pre-petition.

 Q. Okay. Did you do business with Allsteel during the post-petition -- I'm sorry.

> Did you do business with Orleans during the post-petition period?
>
> A.   No."

(Tr. at 62:4-14.)

> "Q.  . . . Were you present in court today, sir, when Anthony Paz testified?
>
> A.   Yes.
>
> Q.   Do you recall him testifying that he said somebody called Joe Batcho?
>
> A.   I never talked to Mr. Paz."

(Tr. at 62:25-63:5.)

> "Q.  Okay.  Again, you testified you were present in court when Mr. Stith testified earlier today.
>
> A.   Yes.
>
> Q.   Have you ever had any discussions with Mr. Stith about this removal -- this alleged removal of steel from Orleans worksites?
>
> A.   No."

(Tr. at 63:21-64:2.)

> "Q.  Mr. Batcho, are you aware of any time during the post-petition bankruptcy period that Allsteel picked up any steel from an Orleans jobsite?
>
> A.   I know that --
>
> Q.   But -- okay -- that was not incorrect steel?
>
> A.   No."

(Tr. at 75:5-10.)

Cross-examination:

"Q. . . . Looking first at Exhibit R-1 that you've just been testifying about, in any of the typewritten portions of any of these documents that came from [Orleans] is there any reference to incorrect steel in anyone of them?

A.   Well, in the first one there's reference to incorrect steel. "The measurement of the right side should be eighteen and three-quarter inches, you show eighteen one and a quarter."

Q.   Let me rephrase my question.  Is there any reference to picking up incorrect steel in the typewritten portions of any of these documents?

* * *

A.   No.

Q.   And the only reference to picking up steel is in your handwriting?

A.   Correct.

Q.   And you don't recall when you put those notes on there?

A.   Well, they were dated so they had to be somewhere around those dates.  I would assume those dates to be accurate. . . .

Q.   But you don't know?

A.   I can't be sure."

(Tr. at 75:21-76:18.)

"A. . . . I don't know whether any of the steel was picked up because we didn't issue any call tags or anything like that.

Q.   And you had no responsibility for checking the trucks when they came back in to see what was on them?

A.   That is correct.

Q.   So, you have no idea that your drivers were picking up when they went out to Orleans jobsites, do you?

A.   I was not there so I do not know what was picked up, correct.

Q.   Looking at Exhibit R-1 again, all of these dates beginning in November of '09 and running through the beginning of February of '10.  Is that correct?

A.   It appears to be correct, yes.

Q.   Are there any similar documents for -- that postdate early February 2010?

A.   I'm sure there are.

Q.   But you didn't produce them?

A.   We had limited time to produce the documents and we're a very small business.  We couldn't shut our doors to produce documents in this particular case."

(Tr. at 77:13-78:7.)

"Q.   Did you participate in any discussions between Mr. McGowan and anyone at Orleans sub sequent to the bankruptcy?

A.   No.

Q.   And you would agree that you learned of Orleans' bankruptcy very quickly after it occurred?

A.   Yes.

Q.   Would you agree that steel was picked up at Orleans' job sites whether it was incorrect, as you say, or otherwise post-petition?

A.   Yes.

Q.   Did you have any discussions with anyone
at Orleans following the petition date about
picking up correct or incorrect steel?

A.   No."

(Tr. at 78:20-79:8.)

In order to support its story that the removals were
removal of "incorrect steel," Allsteel (through Batcho) introduced
into evidence Allsteel's Ex. 1, which is a batch of nine documents,
some of them e-mails between Orleans and Allsteel and some of them
being Allsteel internal documents.  Most of the documents contain
a handwritten date and notations to the effect, for example, "pick
up incorrect steel," "need to pick up . . . columns delivered in
error."  There are no references to picking up "incorrect steel" in
the typewritten portion of any of the e-mail exchanges with
Orleans.  The only reference to picking up "incorrect steel" is in
the handwriting of Batcho.   And Batcho testified that he dated
those notations.  He assumed those dates to be accurate but he did
not know for sure.

**FINDINGS OF FACT**

From the above, I distill the following findings.

When Paz confronted the Allsteel driver attempting to
take away three lots of steel, he had a telephone discussion with
Batcho who agreed to put the steel back.  Why would Batcho give it
back if it was "incorrect steel" that Orleans had requested

Allsteel to retrieve?  Furthermore, if "incorrect steel" describes individual pieces of steel, and not a "lot of steel," as defined by Batcho, then why was Allsteel attempting to remove three lots of steel when it got caught and put it back under threat of police intervention?  Obviously, that was not "incorrect steel" that Orleans requested to be removed.  Later, when Stith had a discussion with Batcho, there was no mention whatsoever of taking back "incorrect steel."  Likewise, when Stith had a later conversation with McGowan, there was no mention of removing "incorrect steel."  Allsteel never mentioned "incorrect steel" until its response to Orleans' motion to enforce the automatic stay, filed on May 26, 2010.  (Doc. # 1042.)

In Stith's conversation with McGowan, there was never any conversation whatsoever about "incorrect steel."  At that same session, Stith talked to Batcho.  Again, there was no mention by Batcho of picking up "incorrect steel."  Indeed, Batcho even denied having a discussion with Paz and Stith.  His denial of any such discussions is not believable.

When Stith encountered McGowan regarding the removed steel, McGowan effectively stated that because he had not been paid for the steel, he felt justified in being able to take it back. McGowan  told Stith that he was justified in removing the steel because he had not been paid for it.  Not only did McGowan acknowledge to Stith that he was justified in removing the steel

that he had already removed but he would be removing more of the steel after their discussion.

With respect to the removed steel that the superintendent advised Williams about, Williams never authorized Allsteel to remove any such steel.

With respect to the nine documents constituting Allsteel's Ex. 1 (introduced through witness Batcho), I am very suspect of their authenticity and/or relevance.  I detail my concerns as follows:

(1)  Document B1.  This is a series of December 10, 2009 e-mails between Batcho and Williams.  The subject of the document is "Lot 22.21 at Winchester."  According to Batcho, this series of e-mails reflects a change in a particular order.  The statement "talked to Sam.  Pick up incorrect steel." is a handwritten notation made by Batcho and dated by him as of December 10, 2009. I do not believe this e-mail exchange supports a need to pick up "incorrect steel."  It starts with an e-mail from Williams to Batcho with the subject "FW:takeoffs."  The final e-mail from Williams to Batcho states: "I have reviewed your take-off for lot 22.21 at Winchester and approve as drawn w/exception of W8 X 31. It looks to me like the measurement on the right side should be 18'3/4" (you show 18' 1-1/4").  Please verify measurement and move forward with production."  I interpret that statement to mean that a measurement was corrected before Allsteel began production of

this particular batch of steel.  Furthermore, I had occasion to examine the proof of claim filed by Allsteel in the Orleans case. This proof of claim was filed on August 5, 2010.  Attached to the proof of claim is a series of invoices.  One of those invoices is with respect to "Winchester Estates # 2221 172019."  The invoice is dated December 15, 2009 and shows a shipment date of December 16, 2009.  Thus, it would appear that, according to Batcho, Allsteel was intending to pick up "incorrect steel" at an Orleans' site where no steel had yet been delivered.

(2)  Document B2.  This is a December 8 and 10, 2009 e-mail exchange between Batcho and Williams re: "takeoffs - hidden creek 8, winchester estates 12, weatherfield 2.  do you have takeoff for winchester 22.21????"  In his reply, Williams advises Batcho as follows: "I have reviewed your take-off for lot 12 at Winchester and approve as drawn."  I do not view this as being a change requested by Orleans.  It seems to me it is just confirming that Batcho's take-off with respect to Winchester Estates 12 was approved by Williams.  Document B2 has the handwritten notation "12/10 pick up incorrect steel per Sam."  Attached to the Allsteel proof of claim is an invoice with the subject "Winchester Estates # 12."  The date of the invoice is December 15, 2009, and it shows a shipping date of December 16, 2009.  Since the invoice and the shipping date are post December 10, 2009, it seems pretty obvious that the notation "12/10 pick up incorrect steel" makes no sense.

(3)   Document B3.  This is a January 7, 2010 e-mail exchange. Batcho requested from Bennis (Orleans) "Subject: Hidden creek 37"– "George, attached is the takeoff, please provide requested delivery date."  In his reply, Bennis advised  "Joe, this is approved as drawn.  The basement height is confirmed at 8' and the delivery date should be 1/20/10."  Thus, this appears to be a confirmation of the specifications before the steel is fabricated since a requested delivery date of January 20, 2010 would be well after the January 7, 2010 exchange of e-mails.  Batcho's handwritten note says "1/8/10 need to pick up 9' columns delivered in error."  The proof of claim contains a copy of an invoice dated January 18, 2010 showing a shipment to "Hidden Creek #37."  The invoice date is January 18, 2010 and shipping date is shown as January 20, 2010. I believe this information on the invoice confirms my belief that B3 does not show a change order with respect to steel previously shipped to Orleans.

(4)   Document B4.  This is an internal Allsteel communication, not an exchange between Orleans and Allsteel.  At the top right hand corner of this document is a reference to "Meadows at Mansfield lot #14 24.04."  There is no date on the document other than the date of January 10, 2010, which presumably Batcho made with a part of his handwritten statement "pick up 9' columns, swap for 8' basement."  There is no evidence that this document was intended to correct an order that had already been delivered by

Allsteel and thus requiring a return of "incorrect steel." Attached to the proof of claim is an invoice with respect to "Meadows at Mansfield #14 240 04." The invoice is dated January 18, 2010. Therefore, the invoice date does not support Batcho's contention that his handwritten notes were intended to correct an order already delivered by Allsteel.

(5) Document B5. By a January 19, 2010 e-mail Batcho inquired of Bennis: "George, Attached is the takeoff for this lot." The subject is "Re: 44/2303 Solebury Grand." Bennis replied to Batcho "Joe, this is approved as drawn. The basement height will be 9' and we will take delivery on 1/27. thanks, George." Batcho's handwritten notation states: "1/22/10 pick up incorrect steel" With the delivery date of 8 days from the e-mail, one could easily conclude that Allsteel had not yet fabricated and delivered the steel that had been ordered.

(6) Document B6. Again, this is an internal Allsteel document, not a communication between Allsteel and Orleans. This document is not dated by Batcho. The subject is "Leigh Court #14." At the top of the document in Batcho's handwriting is the statement "Swap + 1 column 8'3 - 8'7"." Then there is a note in the corner in Batcho's handwriting "drop 2, pick 1." According to Batcho: "to me, it just means that we had dropped two and we had to pick up 1 one incorrect column and deliver them two." (Tr. 71: 15-16.) The document shows a ship date of February 5, 2010. There is

no proof from this document that any correction of steel delivered occurred before or after February 5, 2010.  Again, the proof of claim includes an invoice with respect to a shipment to "Leigh Court #14."   The invoice is dated February 4, 2010, and the shipping date is stated to be February 5, 2010.   The invoice identifies a purchase order number of 173149.  This is the same purchase order number as appears on B6.  Furthermore, since the ship date on the document is February 5, 2010, this is consistent with the February 5, 2010 shipping date on the invoice.  Since B6 is not dated by Batcho, it does not support his story.

(7)   Document B7.  This is another Allsteel internal document. This document contains Batcho's handwritten statement: "Pick up Extra Steel." The document is not dated but it does say: "Requested Delivery ? 2/4/10."  I did not find any invoice attached to the proof of claim that it could easily be linked to B7.  However, I did find an invoice which describes the steel that was purchased precisely as described on B7, with one minor exception.  The only difference between the information on B7 and the information on the invoice is that B7 references the quantity of 7 of the pipe columns whereas the invoice identifies a quantity of 8.  Of course, consistent with B7 which identified a proposed delivery date of February 4, 2010, this particular invoice is dated February 4, 2010 and the shipment date is stated to be February 4, 2010, and the destination was "Chestnut Ridge Estates #224."  Thus, B7 does not

support Batcho's story about picking up incorrect steel that had previously been delivered.

(8)   Document B9[1].  This is another internal Allsteel document with Batcho's handwritten statement to the fact that "Per Sam P/U Incorrect Steel on Site. . . . 22.15 & 22.21 JB."  That statement has a written date of January 27, 2010.  The internal document shows the shipment going to "Winchester Estates #2215."  I found an invoice attached to the proof of claim which identifies a shipment to "Winchester Estates #2215."  The invoice is dated January 29, 2010 and the shipment is dated January 29, 2010.  The invoice identifies three beams and eight columns, matching the descriptions in the Allsteel internal document.  The shipment date for this delivery is after the Batcho's alleged internal "correction" identified on B9.  Thus, B9 does not support Batcho's story of correcting for previously delivered steel.

(9)   Document B10.  This is another Allsteel internal document with respect to columns designated for a site "Weatherfield Estates #2."   Handwritten on the document is the statement "Customer Confirmed Incorrect Basement Height."  This document is not dated, although it shows a ship date of January 28, 2010.  This internal document identifies a delivery of nine columns measuring 7'3"-7'7".  One of the invoices attached to the proof of claim identifies an

---

[1]  Allsteel's document B8 is not a part of the exhibit and the witness was not questioned about it.

identical shipment of columns to "Weathersfield Estates #2." That invoice has the same invoice number as B10, and it likewise states a delivery date of January 28, 2010. The invoice appears to be for a correction to a previous shipment to Weathersfield Estates #2. There is a January 12, 2010 invoice for a delivery to this same site, listing a delivery of nine columns measuring 8'3" – 8'7" to be shipped on January 8, 2010. Since this original shipment invoice is dated January 12, 2010 and the ship date on B10 is January 28, 2010 it would appear that B10 supports Allsteel's theory of "incorrect steel."

I conclude that eight of the nine documents constituting Allsteel's Ex. 1 do not support Batcho's story of retrieving "incorrect steel" that Orleans requested to be removed. Thus, I find that Batcho's testimony regarding picking up "incorrect steel" is not supported by the evidence and I therefore conclude that Batcho's testimony on this issue is not believable.

In sum, I conclude that Allsteel's removal of lots of steel at 17 Orleans sites was the result of a decision by Allsteel to engage in self help because it had not been paid for pre-petition purchases. The late-offered excuse of taking back "incorrect steel" is not believable.

Orleans' Exhibit 1 was introduced through Stith and was admitted into evidence. It identifies each of the 17 sites where Allsteel had delivered steel, which steel later was removed by

Allsteel.  Replacement steel for those sites was purchased from a different vendor and paid for by Orleans.  The total cost for the replaced steel was $23,747.91.  I find this information credible and find that the damage to the estate resulting from Allsteel's violation of the automatic stay is $23,747.91.

At the December 21, 2010 hearing, counsel for Allsteel stated that he did not have the appropriate opportunity to examine the attorneys' fees and expenses related to this matter as reflected in Orleans Ex. 1.  I therefore agreed that if I found in Orleans' favor regarding the stay violation, I would give counsel for Allsteel an opportunity to examine the fees and expenses calculations shown on Orleans Exhibit 1.  At that time, I believe it also would be appropriate to address the question of whether punitive damages should be awarded.

## CONCLUSIONS OF LAW

### Allsteel Willfully Violated the Automatic Stay

Section 362(a) enjoins creditors from taking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a).

Section 362(k) provides for damages from a willful violation of the automatic stay:

> (k)(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including

> costs and attorneys fees, and, in appropriate
> circumstances, may recover punitive damages.
>
> (2) If such violation is based on an action taken by an
> entity in the good faith belief that subsection (h)
> applies to the debtor, the recovery under paragraph (1)
> of this subsection against such entity shall be limited
> to actual damages.

11 U.S.C. § 362(k). The term "individual" in this section includes corporate debtors. Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Dev. Corp.), 901 F.2d 325, 329 (3d Cir. 1990).

Violation of the stay is "willful" under § 362(k) "upon a finding that the defendant knew of the automatic stay and that the defendants' actions which violated the stay were intentional." In re Atlantic Bus. & Cmty. Dev. Corp., 901 F.2d at 327 (finding that actions of landlord in padlocking debtor's premises after notice of bankruptcy filing and in face of court order restraining such actions were taken in bad faith and were willful violations of the automatic stay). If a violation is determined to be willful, the Court "has discretion to impose punitive damages in appropriate circumstances." Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 203 (3d Cir. 2000) (internal quotation marks omitted). Punitive damages may be appropriate to punish outrageous conduct or to deter similar conduct in the future. Frankel v. Strayer, et al. (In re Frankel), 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008).

I conclude that Allsteel willfully violated the automatic stay when it seized steel from Orleans' building sites. This violation was willful because Allsteel had notice of the automatic stay, continued taking the steel after receiving notice, and even told Orleans that it intended to continue seizing steel. Accordingly, Orleans may recover actual damages, including attorneys' fees and costs, and it may be eligible for punitive damages. I will defer, however, any conclusion concerning the amount of attorneys' fees or the appropriateness of punitive damages until Allsteel has had an opportunity to examine Orleans' attorneys' time records.

## CONCLUSION

Based on the record, I find that Allsteel willfully violated the automatic stay by removing steel from Orleans building sites. No order will issue until resolution of the legal fees and punitive damages issues. Unless the parties agree to an alternative arrangement, I will hold a hearing to determine those issues so that Allsteel can examine Orleans' attorneys and their time records.