**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ORLEANS HOMEBUILDERS, INC.,<br>*et al.*,[1]<br><br>Debtors | CHAPTER 11<br>(Jointly Administered)<br><br>Case No. 10-10684 (KJC)<br>(D.I. 4509) |

## OPINION[2]

### BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors in these chapter 11 cases are: Orleans Homebuilders, Inc., Brookshire Estates, L.P., Community Management Services Group, Inc., Greenwood Financial Inc., Masterpiece Homes, LLC, OHB Homes, Inc., OHI Financing, Inc., Orleans at Bordentown, LLC, Orleans at Cooks Bridge, LLC, Orleans at Covington Manor, LLC, Orleans at Crofton Chase, LLC, Orleans at East Greenwich, LLC, Orleans at Elk Township, LLC, Orleans at Evesham, LLC, Orleans at Fall, LP, Orleans at Hamilton, LLC, Orleans at Harrison, LLC, Orleans at Hidden Creek, LLC, Orleans at Jennings mill, LLC, Orleans at Lambertville, LLC, Orleans at Limerick, LP, Orleans at Maple Glen, LLC, Orleans at Meadow Glen, LLC, Orleans at Millstone River Preserve, LLC, Orleans at Millstone, LLC, Orleans at Moorestown, LLC, Orleans at Tabernacle, LLC, Orleans at Thornbury, L.P., Orleans at Upper Freehold, LLC, Orleans at Upper Saucon, L.P., Orleans at Upper Uwchlan, LP, Orleans at Wallkill, LLC, Orleans at West Bradford, LP, Orleans at West Vincent, LP, Orleans at Westampton Woods, LLC, Orleans at Windsor Square, LP, Orleans at Woolwich, LLC, Orleans at Wrightstown, LP, Orleans Construction Corp., Orleans Corporation, Orleans corporation of New Jersey, Orleans DK, LLC, Orleans RHIL, LP, Parker & Lancaster Corporation, Parker & Orleans Homebuilders, Inc., Parker Lancaster, Tidewater, L.L.C., Realen Homes, L.P., RHGP LLC, Sharp Road Farms, Inc., Stock Grange, LP, and Wheatley Meadows Associates (the "Debtors" or "Orleans").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). Bankruptcy Courts have subject matter jurisdiction to interpret and enforce their own orders. *In re Insilco Tech., Inc.*, 351 B.R. 313, 319 (Bankr. D. Del. 2006) citing *In re Allegheny Health, Education and Research Foundation*, 383 F.3d 169, 175-76 (3d Cir. 2004). Moreover, this is a core matter pursuant to 28 U.S.C. §157(b)(1) and *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999), which provides that a matter is core if it is one that, by its nature, could arise only in the context of a bankruptcy case. This matter also falls squarely within the confines of post-confirmation "related-to" jurisdiction set forth in *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004) which determined that the essential inquiry for post-confirmation jurisdiction is "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction . . . . Matters that affect the interpretation, implementation, consummation, execution or administration of the confirmed plan will typically have the requisite close nexus."

## BACKGROUND

Orleans Homebuilders, Inc. and related entities (the "Debtors" or "Orleans") build, develop, market, and sell single-family homes, townhouses and condominiums to homebuyers. The Mews at Byers Station (the "Condominium" or "Byers Station") is a condominium project located in Chester County, Pennsylvania, started by certain Debtors on March 29, 2006, upon filing the Declaration of Condominium (the "Declaration"), which (among other things) established the Mews at Byers Station Condominium Association, Inc. (the "Association"). The Debtors controlled the Association's board from March 29, 2006 until turnover of the Association to the unit owners during the last week of August 2009.[3]

The Debtors filed chapter 11 petitions on March 1, 2010. This Court entered an order confirming the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan") on December 1, 2010, which became effective on February 14, 2011.[4]

The Association filed a complaint against certain Reorganized Debtors on November 21, 2012, in the Court of Common Pleas of Chester County, Pennsylvania (the "Pennsylvania Action"), alleging that (i) the Reorganized Debtors failed to honor statutory and contractual warranties to repair alleged structural defects to common elements and limited common elements of the Condominium; and (ii) the Reorganized Debtors failed to pay assessments for units at the Condominium that it once owned and subsequently sold.[5]

Before the Court is the Motion of Reorganized Debtors for Order Enforcing Plan Injunction, Holding the Mews At Byers Station Condominium Association, Inc. in Civil

---

[3] *See* Joint Pre-Trial Memorandum (D.I. 4605), ¶ w.
[4] *See* D.I. 2656 (Order Confirming Plan), and D.I. 2987 (Notice of Effective Date). These bankruptcy cases were originally assigned to and presided over by the Honorable Peter J. Walsh. Upon his retirement, the cases were reassigned to me by Order dated December 12, 2014 (D.I. 4559).
[5] *See* Joint Pre-Trial Memorandum (D.I. 4605), ¶ n.

Contempt for Violating the Plan Injunction and Awarding Actual Damages, Costs, Attorney Fees and Punitive Damages (D.I. 4509) (the "Injunction Motion"). The Association filed an objection to the Injunction Motion (D.I. 4514) (the "Association Objection"). The parties filed a Joint Pre-Trial Memorandum (D.I. 4605), and the Debtors and the Association each filed a Trial Brief (D.I. 4598 and D.I. 4618, respectively) in support of their positions. After a hearing, I took this matter under advisement.

For the reasons set forth below, the Injunction Motion will be granted, in part, to enjoin claims arising prior to the Plan's Effective Date; denied, in part, as to claims arising after the Plan's Effective Date; and deferred as to the request for sanctions.

## **FACTS**

The parties' Joint Pre-Trial Memorandum contains a Statement of Uncontested Facts for the limited purpose of deciding the Injunction Motion, which includes the following:

On March 26, 2006, upon the filing of the Declaration of Condominium, the Debtors commenced development of the Condominium Project and the Association was formed.[6] The Condominium Project consists of 188 private residential units located in 25 townhouses, together with the Common Elements.[7] The Debtors turned over control of the Association to the unit owners during the last week of August 2009.[8] After the Debtor turned over control of the Association to the unit owners, the Association hired the engineering firm of FWH Associates, P.A. (the "Engineer") to inspect the Condominium Project.[9]

---

[6] Joint Pre-Trial Memorandum, ¶ a.
[7] Joint Pre-Trial Memorandum, ¶ ff.
[8] Joint Pre-Trial Memorandum, ¶ w.
[9] Joint Pre-Trial Memorandum, ¶ x.

On March 1, 2010 (the "Petition Date"), the Debtors filed chapter 11 petitions. On April 30, 2010, the Association filed a proof of claim, asserting both secured and unsecured claims.[10] On or about July 2, 2010, the Association sent the Debtors an initial engineering report.[11] By letter dated July 20, 2010, the Debtors responded to certain issues raised in the initial engineering report.[12]

On December 1, 2010, the Court entered an order confirming the Debtors' Second Amended Joint Plan of Reorganization (the "Plan").[13] The Plan became effective on February 14, 2011 (the "Effective Date").[14] Section 9.2 of the Plan and paragraph 46 of the Confirmation Order contain discharge and injunction provisions, which are described in more detail below.

In June of 2011, the Association's Engineer completed a transition report, which was sent to the Reorganized Debtors.[15] The Debtors responded by letter dated October 28, 2011, arguing that many of the items identified in the report were not under warranty, but agreeing to address specific issues on building interiors, site work, landscaping and other miscellaneous matters.[16] The Engineer also prepared two subsequent reports dated December 22, 2011 and November 12, 2012, which were shared with the Reorganized Debtors.[17] By letter dated January 5, 2012, the Debtors wrote to the Association to assert their position that the Plan and Confirmation Order discharged claims under pre-petition home warranties and enjoined holders of pre-petition home

---

[10] Joint Pre-Trial Memorandum, ¶ c.
[11] Joint Pre-Trial Memorandum, ¶ y.
[12] Joint Pre-Trial Memorandum, ¶ pp.
[13] Joint Pre-Trial Memorandum, ¶ d.
[14] Joint Pre-Trial Memorandum, ¶ e.
[15] Joint Pre-Trial Memorandum, ¶ z, ¶ aa.
[16] Joint Pre-Trial Memorandum, ¶ qq. *See also* Association Trial Brief, Ex. F (D.I. 4618).
[17] Joint Pre-Trial Memorandum, ¶ bb.

warranties from asserting claims against the Reorganized Debtors.[18] Another letter from the Debtors to the Association dated February 8, 2012, regarding "Alleged Water Infiltration" asserted that the two-year warranty period for certain units had already run.[19] On February 16, 2012, the Debtors responded to an Association letter dated February 10, 2012, to explain that certain specific items either had been or would be addressed.[20]

On September 28, 2012, the Reorganized Debtors filed the Eighth Omnibus Objection to Claims Pursuant to Bankruptcy Code § 502, Bankruptcy Rule 3007, and Local Rule 3007-1 [Substantive] (the "Claim Objection"), which asserted that the Association's claim was "not valid and that no amount was owed on account of [its] claim" and asked that the Proof of Claim be "expunged and disallowed in [its] entirety." (D.I. 4225).[21] The hearing on the Claim Objection was scheduled for October 30, 2012.[22] On October 4, 2012, the Association requested a twenty-day extension to respond to the Claim Objection because the Association "need[ed] additional time to evaluate whether any such objection should be filed."[23] The Reorganized Debtors agreed, and the hearing was adjourned until November 26, 2012.[24]

On November 9, 2012, the Association requested an additional extension to respond to the Claims Objection and an additional adjournment of the hearing. The Reorganized Debtors agreed to extend the response deadline to November 14, 2012, but declined to further delay the hearing.[25]

---

[18] Joint Pre-Trial Memorandum, ¶ ss. *See also* Association Trial Brief, Ex. H (D.I. 4618).
[19] Joint Pre-Trial Memorandum, ¶ tt. *See also* Association Trial Brief, Ex. I (D.I. 4618).
[20] Joint Pre-Trial Memorandum, ¶ uu. *See also* Association Trial Brief, Ex. J (D.I. 4618).
[21] Joint Pre-Trial Memorandum, ¶ f. *See also* Reorganized Debtors' Trial Brief, Ex. 7 (D.I. 4598).
[22] Joint Pre-Trial Memorandum, ¶ g. *See also* Reorganized Debtors' Trial Brief, Ex. 7 (D.I. 4598).
[23] Joint Pre-Trial Memorandum, ¶ h.
[24] *Id. See also* Reorganized Debtors' Trial Brief, Ex. 8 (D.I. 4598).
[25] Joint Pre-Trial Memorandum, ¶ i. *See also* Reorganized Debtors' Trial Brief, Ex. 9 (D.I. 4598).

On November 16 and 19, 2012, after the extended response deadline had passed, the Reorganized Debtors confirmed with the Association that the Association had not filed and did not intend to file a response to the Claim Objection.[26] On November 20, 2012, the Reorganized Debtors filed a Certification of Counsel, attaching a proposed order, which included the provision that "no amounts are owed on account of the [Association's] Claim, and the [Association's] Claim shall be and hereby is disallowed and expunged in its entirety."[27] The Association was served with the Certification of Counsel, including the proposed order.[28] On November 26, 2012, the Court entered the Order (the "Disallowance Order"), identical in form to the proposed order submitted by the Reorganized Debtors.[29]

On November 21, 2012, the Association filed the Pennsylvania Action against certain Reorganized Debtors.[30]

**DISCUSSION**

(1)  Pre-petition Claims

The Debtors argue that the Plan's Discharge and Injunction bars creditors, such as the Association, from "commencing or continuing in any manner" any litigation against the Reorganized Debtors arising from pre-petition claims. Section 9.2 of the Plan states, in part:

> [A]ll Holders of Claims . . . arising prior to the Effective Date shall be permanently barred and enjoined from asserting against the Debtors, the Estates, the Reorganized Debtors, . . ., their successors, or the Assets, any of the following actions on account of such Claim . . . : (a) commencing or continuing in any manner any action or other proceeding on account of such . . . Claim . . . against . . . the property of any of the Reorganized Debtors . . . other than to enforce any right to distribution with respect to such property under the Plan . . . ."[31]

---

[26] Joint Pre-Trial Memorandum, ¶ j. *See also* Reorganized Debtors' Trial Brief, Ex. 10 (D.I. 4598).
[27] Joint Pre-Trial Memorandum, ¶ k. *See also* Reorganized Debtors' Trial Brief, Ex. 11 (D.I. 4598).
[28] Joint Pre-Trial Memorandum, ¶ l. *See also* Reorganized Debtors' Trial Brief, Ex. 12 (D.I. 4598).
[29] Joint Pre-Trial Memorandum, ¶ m. *See also* Reorganized Debtors' Trial Brief, Ex. 13 (D.I. 4598).
[30] Joint Pre-Trial Memorandum, ¶ n. *See also* Reorganized Debtors' Trial Brief, Ex. 3 (D.I. 4598).
[31] Plan, § 9.2. *See also* Confirmation Order, ¶ 46. Together, these sections are known as the "Plan's Discharge and Injunction".

The Third Circuit's decision in *In re Grossman's, Inc.* instructs that a claim arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment" under the Bankruptcy Code.[32]

Here, the Debtors turned over control of the Association to the unit owners in August 2009, more than six months prior to the chapter 11 filing. On April 30, 2010, the Association filed a proof of claim, which describes the basis for the claim as "[o]bligations as Declarant & Unit Owner per 68 Pa CSA § 3101, et seq and Associations' Declaration of Covenants and Restrictions."[33] The attachment to the proof of claim explains:

> It is currently early in the turn-over phase of this Creditor Association. As such the engineering and funding studies which are routinely performed as part of the turn-over process have not yet been completed. This is currently limiting the Creditor Association's ability to provide more specific details regarding those items which must still be completed by the Debtor and those items which are defective or deficient and which it is the Debtor's obligation to address. The Creditor Association intends to file an amended Proof of Claim once additional detailed information is obtained.[34]

The proof of claim also further describes the Debtor's obligations to the Association as including, without limitation, (i) completion of construction of the condominium improvements (including items such as roads/streets, street lights, street curbing, storm sewers, water delivery system, paving, grading and landscaping); (ii) warranty against structural defects in the Units and portions of the condominium which are owned jointly as the common facilities owned by all Unit owners; (iii) payment of assessments levied by the Creditor Association upon Units owned by the Debtor (including past-due assessments), and (iv) all other obligations owed by the Debtor

---

[32] *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's, Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010).
[33] Reorganized Debtors' Trial Brief, Ex. 4 (D.I. 4598).
[34] *Id.*

7

to the Creditor Association pursuant to the Declaration, the Condominium Act and the well-settled law of the Commonwealth of Pennsylvania.

After filing the proof of claim, the Association obtained engineering reports, which were shared with the Reorganized Debtors. Thereafter, in 2011 and 2012 the Reorganized Debtors and the Association engaged in a series of correspondence in which the Reorganized Debtors agreed to address certain issues related to the units and common elements. In those letters, the Reorganized Debtors, however, stated their position that the 2-year warranties under the Pennsylvania statute had expired and that claims under warranties issued prior to the Petition Date were discharged under the Plan.

Then, on September 28, 2012, the Reorganized Debtors objected to the Association's proof of claim, arguing that no amount was owed and requesting that the claim be expunged and disallowed in its entirety. After the Association did not respond to the Claim Objection (despite receiving a continuance), the Court entered the Disallowance Order, expunging the claim.

The plain language of the Plan and Confirmation Order prevent the Association from pursuing pre-petition claims against the Reorganized Debtors, except to enforce any right to distribution under the terms of the Plan. Applying the *Grossman's* test to these facts, I conclude that the Association's pre-petition claims include any claims for damages arising out of the units and buildings constructed and sold pre-petition, as well as any right to payment for assessments that arose pre-petition. The Association clearly knew about its potential claims based on the engineering reports and the various correspondence with the Reorganized Debtors. In November 2012, the Association did not object to entry of an order expunging those claims. Any obligations on pre-petition claims under the Plan are expunged by the Disallowance Order.

The Association argues, however, that the "Revesting Provision" of the Plan provides that its pre-petition claims were not discharged, but passed through the Plan and may be enforced against the Reorganized Debtors. Section 1.163 of the Plan included the Byers Station Condominium project in the list of "Revesting Developments." Article VII of the Plan, entitled Executory Contracts, includes Section 7.14 (the "Revesting Provision"), which provides:

> 7.14  **Agreements Related to the Developments.** Unless otherwise specifically rejected or lawfully terminated by the Debtors, all (a) agreements relating to any of the Revesting Developments embodied in development orders, city and/or county ordinances, zoning approvals, permits, and/or other related documents or any other official action of a governmental unit, quasi-governmental unit, and/or utility granting certain development rights, property interests, and/or entitlements to the Debtors; and (b) those governmental and quasi-governmental approvals, agreements, waivers, permits, licenses, variances, special exceptions, and water and sewer reservations as are necessary, appropriate, beneficial, or required, to permit the continued construction and development of any of the Revesting Developments entered into prior to the Petition Date by any Debtor, shall be (i) treated as Executory Contracts under the Plan and shall be assumed on the Confirmation Date, subject to the occurrence of the Effective Date, pursuant to the provisions of the Bankruptcy Code §§ 365 and 1123 or (ii) otherwise deemed assumed on the Confirmation Date, subject to the occurrence of the Effective Date. Any failure by the Debtor to list any particular agreement or other document referred to in this Plan Section 7.14 on any schedule of Executory Contracts to be assumed under the Plan (either contained in the Disclosure Statement, including, without limitation, Exhibit D thereto, the Plan Supplement, or otherwise) shall not in any way impair the Debtors' ability to assume such agreement and/or other document, and instead, any and all such agreements and documents shall be deemed assumed (to the extent any such agreements or documents constitute Executory Contracts) and/or otherwise shall remain in full force and effect on and after the Effective Date in accordance with this Plan Section 7.14. Without limiting the generality of the foregoing, all of the Debtors' rights in or related to any of the Revesting Developments shall revest in the Reorganized Debtors on and subject to the occurrence of the Effective Date, but the Non-Revesting Developments shall not revest in the Reorganized Debtors and all applicable agreements, related thereto shall be deemed rejected or terminated, as applicable, as of, and subject to the occurrence of, the Effective Date <u>provided, however,</u> that the Debtors shall be entitled to revise the respective lists of the Revesting Developments and the Non-Revesting Developments at any time up to the occurrence of the Effective Date.[35]

---

[35] Plan, § 7.14.

The Association argues that this section provides that all pre-petition agreements related to the Revesting Developments were treated as executory contracts and assumed by the Reorganized Debtors on the Effective Date. In particular, the Association argues that the Declaration of Condominium for the Mews at Byers Station (the "Declaration"), filed with the Recorder of Deeds for Chester County, Pennsylvania on March 29, 2006, and the Public Offering Statement (the "POS") were assumed by the Reorganized Debtors so that the Debtors could complete construction and sales of the Condominium post-petition.

In response, the Reorganized Debtors argue that the Association is reading the Revesting Provision too broadly. The Reorganized Debtors insist that the provision covers only a specific and narrowly-circumscribed set of governmental and quasi-governmental rights afforded to the Reorganized Debtors - - not the assumption of any continuing liability by the Reorganized Debtors to third parties, such as the Association, who are not parties to those agreements. For an agreement to be assumed under the Revesting Development Provision, the Reorganized Debtors argue that the agreement must: (1) relate to a Revesting Development; (2) be embodied in one of the listed types of documents (i.e., development orders, city/county ordinances, zoning approvals, permits, and/or other related documents); (3) constitute an "official action of a governmental unit or quasi-governmental unit, and/or utility;" and (4) grant the Debtors "development rights, property interests, and /or entitlements."

I agree that the Association's reading of the Revesting Provision is too broad and disregards most of the language in that section. The Association argues that the provision applies to any documents that "are necessary, appropriate, beneficial, or required to permit the continued construction and development of the any of the Revesting Developments." This reading cites only to one element of the particular type of agreements the Debtors described in

that Plan provision and ignores the remaining language. Moreover, the Revesting Provision's plain language specifically applies to agreements between the Debtors and governmental or quasi-governmental agencies. It does not include agreements between the Debtors and private third-parties, even if those obligations are referenced in an assumed agreement. The Revesting Provision cannot be read so broadly to incorporate agreements within agreements that grant rights to non-governmental third parties.[36]

Further, the Reorganized Debtors argue that even if other executory contracts relating to the Byers Station Condominium were assumed pursuant to Bankruptcy Code § 365, the Plan provided that the default cure amount for any executory contract assumed under the Plan, but not specifically listed, was $0.[37] I agree that, alternatively, this provision would prevent the Association from asserting any claims arising from a pre-petition default under an assumed contract. The Association did not object to this provision and, further, allowed any claim based on a cure amount to be expunged by the Disallowance Order.

For all the reasons set forth above, the Association's causes of action against the Reorganized Debtors based on claims that arose pre-petition are barred by the Plan Discharge and Injunction, and any request for payment under the Plan was extinguished by the Disallowance Order. This includes claims based on (i) pre-petition construction and sales, (ii) pre-petition warranties, and (iii) non-payment of assessments or other amounts that became due pre-petition.

---

[36] *See In re Orleans Homebuilders, Inc.*, 561 B.R. 46, 54 (Bankr. D. Del. 2016) ("[T]he Association's attempt to drill down and apply the Revesting Provision to any agreements contained or mentioned within the agreements or approvals or permits issued by a governmental or quasi-governmental unit invents a byzantine complexity to the Plan provisions.").
[37] Plan, § 7.3.

(2)    Post-petition, Pre-Effective Date Claims.

After commencement of their chapter 11 proceedings, the Debtors continued to build and sell units at the Byers Station Condominium. In the Joint Pre-Trial Memorandum, the parties agreed that the following units were sold post-petition:

| Address | Sale Date[38] |
|---|---|
| 14 Granite Lane (Building 16) | September 30, 2010 |
| 12 Granite Lane (Building 16) | September 30, 2010 |
| 237 Flagstone Road (Building 3) | November 1, 2010 |
| 20 Granite Lane (Building 16) | November 18, 2010 |
| 235 Flagstone Road (Building 3) | November 23, 2010 |
| 23 Granite Lane (Building 17) | December 8, 2010 |
| 10 Granite Lane (Building 16) | December 9, 2010 |
| 24 Granite Lane (Building 16) | January 21, 2011 |
| 18 Granite Lane (Building 16) | February 28, 2011* |
| 13 Granite Lane (Building 17) | March 4, 2011* |
| 16 Granite Lane (Building 16) | April 27, 2011* |

[*These sales closed after the Plan's Effective Date.]

In addition to selling the eight units listed above during the post-petition, pre-Effective Date period, the parties stipulated to the following facts in the Joint Pre-Trial Memorandum:

- As of the Petition Date, Building 16 was not completed.[39]

- The closing of the sale of at least one unit in Building 3 occurred before the Petition Date.[40]

- The closing of the sale of at least one unit in Building 17 occurred before the Petition Date.[41]

- No closing for the sale of any unit at the Condominium Project occurred until construction of at least certain of the Common Elements for the building associated with that unit were completed, including the roof, the foundation and exterior walls.[42]

---

[38] Joint Pre-Trial Memorandum, ¶kk. A certificate of occupancy was issued for each unit prior to closing of the sale of any such unit. (Joint Pre-Trial Memorandum, ¶oo).
[39] Joint Pre-Trial Memorandum, ¶ gg.
[40] Joint Pre-Trial Memorandum, ¶ hh.
[41] Joint Pre-Trial Memorandum, ¶ ii.
[42] Joint Pre-Trial Memorandum, ¶ jj.

12

Deciding whether any claims arising from the post-petition activities are subject to the Plan's Discharge and Injunction requires a brief discussion of the history behind Third Circuit case law determining when a claim arises in a bankruptcy case.

Prior to *Grossman's* (discussed above), the Third Circuit's standard for determining when a claim arose was found in the *Frenville* decision,[43] which held that a claim does not ripen until a right to payment arises, as determined by reference to nonbankruptcy law.[44] In other words, the *Frenville* test decided that "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose" as determined by reference to relevant state law, "unless federal law 'creates substantive obligations' wholly apart from bankruptcy."[45]

The Third Circuit, however, abandoned the *Frenville* test in *Grossman's* when the Court, sitting *en banc*, held that a "claim" arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment."[46] The *Grossman's* Court explained that *Frenville's* focus on the "right to payment" failed to give sufficient weight to other words in the Bankruptcy Code's definition of "claim," *i.e.*, "contingent," "unmatured," and "unliquidated."[47] "The accrual test in *Frenville* does not account for the fact that a "claim" can exist under the Code before a right to payment exists under state law."[48]

---

[43] *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332, 336 (3d Cir.1984) *overruled by Jeld–Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010).
[44] *Frenville*, 744 F.2d at 337.
[45] *Kilbarr Corp. v. Gen. Servs. Admin., Office of Supply & Servs. (In re Remington Rand Corp.)*, 836 F.2d 825, 830 (3d Cir.1988). *See also In re WCI Communities, Inc.*, No. 08-11643 KJC, 2013 WL 2153108, at *5 (Bankr. D. Del. May 17, 2013).
[46] *Grossman's*, 607 F.3d at 125.
[47] *Grossman's*, 607 F.3d at 121 citing 11 U.S.C. §101(5).
[48] *Grossman's*, 607 F.3d at 121. *See also In re Rodriguez*, 629 F.3d 136, 139, 142 (3d Cir. 2010) (deciding that, under the *Grossman's* test, a lender's claim against a debtor-mortgagor for an escrow account deficit

13

A Court of Appeals panel revisited the *Grossman's* test in *Wright v. Owens Corning*.[49] The *Wright* Court expanded the test announced in *Grossman's* by holding that "a claim arises when an individual is exposed *pre-confirmation* to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code."[50] To assuage due process concerns, the *Wright* Court also decided that the *Frenville* test should continue to apply to two groups of claimants:

(1) persons who hold claims based upon exposure to a debtor's conduct or product *pre-petition*, if the reorganization plan was proposed and confirmed prior to the date *Grossman's* was decided (June 2, 2010), and

(2) persons who hold claims based upon exposure to a debtor's conduct or product *post-petition*, but *pre-confirmation*, if the reorganization plan was proposed and confirmed prior to the date *Wright* was decided (May 18, 2012).[51]

Here, the Debtors' Plan was confirmed on December 1, 2010 and became effective on February 14, 2011 (i.e., after *Grossman's*, but before *Wright*). The Plan's Discharge and Injunction in this case applies to all claims arising prior to the Effective Date. *Wright* instructs that the *Frenville* test governs the post-petition, pre-Effective Date claims in this matter.

Most of the claims asserted in the Pennsylvania Action (the "Pennsylvania Claims") are very broad and do not specify a time frame for the alleged breach or wrongful act.[52] Because the

---

arose at the time the debtor failed to make the escrow payment, even if the lender's right to payment was contingent upon the lender's disbursement of its own funds to satisfy an escrow expense).

[49] *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir.2012).
[50] *Wright*, 679 F.3d at 107 (emphasis in original).
[51] *Wright*, 679 F.3d at 109.
[52] The claims in the Pennsylvania Action include the following:
  Count I - Violations of the Pennsylvania Uniform Condominium Act (including violation of § 3314 (assessments for common expenses) and § 3412 (Declarant's obligation to complete and restore);
  Count II - Breach of Contract (including the Public Offering Statement, Declaration and Bylaws);
  Count III - Breach of Statutory Warranties (including a request for attorney fees and costs under § 3311);
  Count IV - Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
  Count V - Fraud and Intentional Misrepresentation

14

*Frenville* test is applied to claims arising post-petition, I must consider (1) whether the Association possessed a right to payment; and (2) when that right arose, as determined by reference to Pennsylvania law. If the right to pursue a claim in the Pennsylvania Action arose in the post-petition, pre-Effective Date period (i.e., between March 1, 2010 through February 14, 2011), then the language of the Plan's Discharge and Injunction bars the Association from pursuing those claims against the Reorganized Debtors.[53]

"The true test for determining when a cause of action accrues is to establish the time when a plaintiff could have first maintained a cause of action to a successful conclusion."[54] "[T]he occurrence of an act or omission - - whether it is a breach of contract or of duty - - that causes a direct injury, however slight, may start the statute of limitations running against the right to maintain an action, even if the plaintiff is not aware of the injury, and even if all resulting damages have not yet occurred."[55] However, "[a]n important exception to the general rule of accrual of a cause of action is the 'discovery rule,' which postpones the accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."[56]

---

      Count VI - Negligent Misrepresentation
      Count VII - Negligent Construction and Design
      Count VIII - Negligent Supervision
      Count IX - Concerted Tortious Conduct
      Count X - Claim for Punitive Damages

[53] The Pennsylvania Uniform Condominium Act ("PUCA") permits the Association to institute litigation in its own name on behalf of itself *or two or more unit owners* on matters affecting the condominium. 68 Pa. C.S.A. § 3302(a)(4) (emphasis added).

[54] *McCauley v. Owens-Corning Fiberglas Corp.*, 715 A.2d 1125, 1127 (Pa. Super. 1998). "The test to determine when a cause of action arises or accrues is when the plaintiff has suffered a legal injury, that is, when he or she has the right to maintain an action or first may maintain an action to a successful conclusion . . . ." 51 Am. Jur. 2d *Limitation of Actions* §127 (2017) (footnotes omitted).

[55] 51 Am. Jur. 2d *Limitation of Actions* §130 (2017) (footnotes omitted).

[56] 51 Am. Jur. 2d *Limitation of Actions* §158 (2017) (footnotes omitted). "The discovery rule tolls the running of the statute of limitations during the time that the plaintiff did not know or could not have known that he had been injured and the defendant caused the injury." *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 448 (E.D. Pa. 2015) citing *Morgan v. Petroleum Prods. Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. 2014).

Pennsylvania courts have applied the discovery rule in cases alleging latent real estate construction defects.[57] The application of the discovery rule is a question of fact.[58] "The plaintiff has an obligation to exercise reasonable diligence to inform himself of the facts and circumstances giving rise to his cause of action . . . ."[59]

The parties stipulated that the Association obtained the engineer's initial report in June 2010, i.e., in the post-petition, pre-Effective Date period. Moreover, the uncontested facts are rife with communications between the Association and the Reorganized Debtors about construction issues and defects that continued after the Plan's Effective Date. The Association had the opportunity to pursue these pre-Effective Date claims as part of their proof of claim. The parties negotiated and the Reorganized Debtors addressed at least some of the issues. Eventually, the Reorganized Debtors filed an objection to the Association's claim, alleging that there was no liability to the Association on its claims. The Court entered the Disallowance Order that expunged all pre-Effective Date claims with the knowledge and consent of the Association.

Based on the facts and circumstances of this case, the Plan's Discharge and Injunction applies and bars the Association from pursuing any post-petition, pre-Effective Date claims against the Reorganized Debtors in the Pennsylvania Action.

(3)   Post-Effective Date Claims

The plain language of the Plan's Discharge and Injunction provides that it applies to claims that arise pre-Effective Date. Therefore, any claims in the Pennsylvania Action that are based upon post-Effective Date sales or construction are not subject to the Plan's Discharge and Injunction.

---

[57] *Gustine Uniontown Assoc., Ltd. v. Anthony Crane Rental, Inc.*, 577 Pa. 14, 29, 842 A.2d 334, 344 n. 8 (2004).
[58] *Raucci*, 145 F. Supp. 3d at 448.
[59] *Id.*

The Association, however, further argues that the Reorganized Debtors' post-Effective Date actions demonstrate that the Reorganized Debtors assumed all responsibilities under the Declaration, the Public Offering Statement and the PUCA. The Association, therefore, argues that the Reorganized Debtors should be equitably estopped from bringing this Injunction Motion. A party asserting equitable estoppel must show "(1) a representation of material fact was made to the party; (2) such party had a right to, and did, rely on the representation; and (3) that denial of the representation by the party making it would injure the relying party."[60]

Here, I cannot agree that the Reorganized Debtors represented that they were assuming obligations related to the Byers Station Condominium. Although the Reorganized Debtors worked with the Association to address problems and concerns regarding completion and repair of the Condominium, the Reorganized Debtors often prefaced their cooperation - - often in writing - - with a statement that it was not waiving rights under the Plan and, further, argued that warranties had expired. In light of the Reorganized Debtors continuous statements about reserving all rights, I cannot conclude that the Association justifiably relied on any representation that the Association interpreted as a commitment to assume agreements and warranties.

---

[60] *In re McCabe*, 543 B.R. 182, 190–91 (Bankr. E.D. Pa. 2015), reconsideration denied, 559 B.R. 415 (Bankr. E.D. Pa. 2016) (citing *In re Okan's Foods, Inc.*, 217 B.R. 739, 752 (Bankr.E.D.Pa.1998)).

(4)  Sanctions

The Reorganized Debtors argue that sanctions are warranted for the Association's willful violation of the Plan's Discharge and Injunction. I will schedule a further hearing to consider the Reorganized Debtors' request for sanctions.

## CONCLUSION

For the reasons set forth above, I conclude that the Plan's Discharge and Injunction enjoins the Association from pursuing any claims against the Reorganized Debtors arising prior to the Plan's Effective Date. The Revesting Provision in the Plan does not apply to the Association's claims. However, the Plan's Discharge and Injunction does not affect any claims arising post-Effective Date. The Reorganized Debtors' request for sanctions will be deferred.

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: February 17, 2017